**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **In re:**<br><br>**ARC MANAGEMENT GROUP, LLC,**<br><br>**Debtor.** | **CHAPTER 11**<br><br>**CASE NO. 23-61742-WLH** |
| **ARC MANAGEMENT GROUP, LLC,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**FLOCK FINANCIAL, LLC,**<br>**LIBERTAS FUNDING, LLC,**<br>**WEBBANK.,**<br>**SUPERB CAPITAL, LLC,**<br>**SAMSON MCA, LLC,**<br>**ONE FUNDER,**<br>**FUNDING CLUB,**<br>**CHEETAH CAPITAL,**<br>**LENDSPARK CORPORATION,**<br>**GREEN NOTE CAPITAL PARTNERS SPV, LLC,**<br>**KYF GLOBAL PARTNERS, LLC,**<br>**TRUE BUSINESS FUNDING, LLC,**<br><br>**Defendants.** | **ADVERSARY PROCEEDING NO. 24-05018** |

**AMENDED COMPLAINT TO DETERMINE VALIDITY, PRIORITY, AND EXTENT OF LIENS AND SECURITY INTERESTS AND AVOIDANCE OF LIENS**

COMES NOW Debtor ARC Management Group, LLC (“**Debtor**” or “**Plaintiff**”) in the above captioned bankruptcy case filed under Chapter 11 of Title 11 of the United States Bankruptcy Code (the “**Bankruptcy Code**”) and files this complaint under 11 U.S.C. §§ 506 (a)

and (d) seeking a determination as to the extent, priority, and validity of certain security interests asserted by creditors of Debtor in and to certain property of Debtor. In support of this Complaint, Debtor respectfully shows the Court as follows:

## INTRODUCTION

Debtor seeks a determination from the Court regarding the validity, extent, and priority of liens and interests in Debtor's assets asserted by twelve (12) creditors. These twelve creditors (collectively, "**Defendants**"), claim security interests in various forms of Debtor's property and some Defendants assert they purchased certain of Debtor's accounts receivable. Given the number of purported secured claims and Debtor's limited assets, Debtor also seeks a determination from the Court that Defendants whose secured claims exceed the value of any subject collateral are void and are unsecured claims under § 506 of the Bankruptcy Code.

## PARTIES, JURISDICTION, AND VENUE

1. This adversary proceeding is brought pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure and 11 U.S.C. § 105. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding under 28 U.S.C. § 157(b)(K).

2. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409(a), as this is an adversary proceeding arising in and related to Debtor's Chapter 11 Case No. 23-61742-W:H (the "**Bankruptcy Case**"), which is pending in the United States Bankruptcy Court for the Northern District of Georgia, Atlanta Division (this "**Court**").

3. Defendant Flock Financial, LLC ("**Flock**") is a limited liability company organized

under the laws of Delaware having its principal place of business in Georgia located at 400 Galleria Parkway SE, Suite 1720, Atlanta, Georgia 30339.

4. Flock may be served by statutory overnight delivery or by mailing, via first class postage, pre-paid regular mail, a copy of the Summons and Complaint to Flock's attorney of record in the Bankruptcy Case as follows: Greg M. Taube, Nelson Mullins Riley & Scarborough LLP, 201 17th Street NW, Suite 1700, Atlanta, GA 30363.

5. Defendant Libertas Funding, LLC ("**Libertas**") is a limited liability company organized under the laws of Delaware having its principal place of business located at 411 W. Putnam Ave., Suite 220, Greenwich, CT 06830.

6. Libertas may be served by statutory overnight delivery or by mailing, via first class postage, pre-paid regular mail, a copy of the Summons and Complaint to its attorneys of record in the Bankruptcy Case as follows: Michael D. Robl, Robl Law Group, LLC, 3754 Lavista Road, Suite 250, Tucker, GA 30084 and Jeffrey S. Cianciulli, Weir Greenblatt Pierce LLP, The Widener Building, Suite 500, 1339 Chestnut Street, Philadelphia, PA 19107.

7. Defendant Libertas Funding, LLC d/b/a SuperB Capital ("**SuperB**") is a limited liability company organized under the laws of Delaware having its principal place of business located at 411 W. Putnam Ave., Suite 220, Greenwich, CT 06830.

8. Super B may be served by statutory overnight delivery or by mailing, via first class postage, pre-paid regular mail, a copy of the Summons and Complaint to its attorney of record in the Bankruptcy Case as follow: Michael D. Robl, Robl Law Group, LLC, 3754 Lavista Road, Suite 250, Tucker, GA 30084 and Jeffrey S. Cianciulli, Weir Greenblatt Pierce LLP, The Widener Building, Suite 500, 1339 Chestnut Street, Philadelphia, PA 19107.

9. Defendant Libertas Funding, LLC d/b/a Lendspark Corporation ("**Lendspark**") is a limited liability company organized under the laws of Delaware having its principal place of business located at 411 W. Putnam Ave., Suite 220, Greenwich, CT 06830.

10. Lendspark may be served by statutory overnight delivery or by mailing, via first class postage, pre-paid regular mail, a copy of the Summons and Complaint to its attorney of record in the Bankruptcy Case as follows: Michael D. Robl, Robl Law Group, LLC, 3754 Lavista Road, Suite 250, Tucker, GA 30084 and Jeffrey S. Cianciulli, Weir Greenblatt Pierce LLP, The Widener Building, Suite 500, 1339 Chestnut Street, Philadelphia, PA 19107.

11. Defendant One Funder ("**OF**") is a limited liability company organized under the laws of Delaware having its principal place of business located at 8019 N. Himes Avenue, Suite 300, Tampa, Florida 33614.

12. OF may be served by statutory overnight delivery or by mailing, via first class postage, pre-paid regular mail, a copy of the Summons and Complaint to its registered agent, LegalInc Corporate Services, Inc., 651 N. Broad Street, Suite 201, Middletown, Delaware 19709.

13. Libertas, SuperB, and Lendspark, are referred to collectively as "**Libertas**."

14. Defendant Webbank Holding Corp. ("**WebBank**") is a limited liability company organized under the laws of Delaware having its principal place of business located at 1 Deforest Avenue, Suite 100, Summit, NJ 07901.

15. WebBank may be served by statutory overnight delivery or by mailing, via first class postage, pre-paid regular mail, a copy of the Summons and Complaint to its attorney of record in the Bankruptcy Case as follows: Michael D. Robl, Robl Law Group, LLC, 3754 Lavista Road,

Suite 250, Tucker, GA 30084 and Jeffrey S. Cianciulli, Weir Greenblatt Pierce LLP, The Widener Building, Suite 500, 1339 Chestnut Street, Philadelphia, PA 19107.

16. Defendant Samson MCA, LLC ("**Samson**") is a limited liability company organized under the laws of New York having its principal place of business located at 17 State Street, Suite 630, New York, NY 10004.

17. Samson may be served by statutory overnight delivery or by mailing, via first class postage, pre-paid regular mail, a copy of the Summons and Complaint to its attorney of record in the Bankruptcy Case as follows: Ariel Bouskila, Berkovitvh and Bouskila PLLC, 1545 Route 202, Pomona, New York 10970.

18. Defendant Funding Club, LLC ("**Funding Club**") is a limited liability company organized under the laws of Florida having its principal place of business located at 915 Middle River Drive, Fort Lauderdale, Florida 33304.

19. Funding Club may be served by statutory overnight delivery or by mailing, via first class postage, pre-paid regular mail, a copy of the Summons and Complaint to its registered agent as follows: Registered Agents, Inc., 7901 4th Street N., Suite 300, St. Petersburg, Florida 33702

20. Defendant Cheetah Capital, LLC ("**Cheetah**") is a limited liability company organized under the laws of Delaware having its principal place of business located at 460 Faraday Ave., Jackson, NJ 08527-5072.

21. Cheetah may be served by statutory overnight delivery or by mailing, via first class

postage, pre-paid regular mail, a copy of the Summons and Complaint to its registered agent as follows: Sertus Incorporation (Delaware) Limited, 3500 S. Dupont Highway, Dover, Delaware 19901.

22. Defendant Green Note Capital Partners SPV, LLC ("**Green Note**") is a limited liability company organized under the laws of Delaware having its principal place of business located at 1019 Avenue P, Suite 401, Brooklyn, NY 11223-2366.

23. Green Note may be served by statutory overnight delivery or by mailing, via first class postage, pre-paid regular mail, a copy of the Summons and Complaint to its registered agent as follows: Delaware Corporations, LLC, 1000 N. West Street, Suite 1501, Wilmington, Delaware 19801.

24. Defendant KYF Global Partners, LLC ("**KYF**") is a limited liability company organized under the laws of New Jersey having its principal place of business located at 1019 Avenue P, Suite 401, Brooklyn, NY 11223-2366.

25. KYF may be served by statutory overnight delivery or by mailing, via first class postage, pre-paid regular mail, a copy of the Summons and Complaint to its registered agent as follows: United States Corporation Agents, Inc., 330 Changebridge Road, Suite 101, Pine Brook, New Jersey 07058..

26. Defendant True Business Funding, LLC ("**TBF**") is a limited liability company organized under the laws of New York.

27. TBF may be served by statutory overnight delivery or by mailing, via first class postage, pre-paid regular mail, a copy of the Summons and Complaint to its registered agent as follows: Inerstate Agent Services, LLC, 301 Mill Road, Suite U-5, Hewlett, NY 11557.

## FACTUAL BACKGROUND

28. On November 28, 2023 (the "**Petition Date**"), Debtor filed a voluntary petition for relief under chapter 11 title 11 of the Bankruptcy Code, initiating the Bankruptcy Case.

29. Debtor has two equal members, William Wilson and Thresa Wilson, who formed Debtor as a Georgia limited liability company in 2005. Debtor is a full-service revenue cycle accounts receivable collection company. Its clients include entities in the legal, healthcare, and retail fields. Debtor also owns ten portfolios of consumer medical accounts receivable that are serviced and managed by Allgate Financial, LLC.

30. Prior to July 2022, Debtor's source of income was commissions earned from the collection of accounts receivables placed with Debtor by its clients (the "**Commission Clients**").

31. Also prior to July 2022, Debtor's primary source of borrowing was through Libertas.

32. Beginning in July 2022, Debtor had the opportunity to purchase nine consumer medical accounts receivable portfolios from Debtor's long time client F. Schumacher & Co. and one from Keystone (the "**Purchased Portfolios**").

33. Debtor funded the purchase of the Purchased Portfolios with its funds and funds Flock provided to Debtor to fund the purchases. Flock invested $16,746,739.60 and Debtor invested $3,151,342.40.

34. Debtor and Flock entered into ten individual Joint Venture Agreements (the "**JIAs**") memorializing the terms of Flock's loan for each of the Portfolios. A true and correct copy of an example of the JIAs is attached hereto as **Exhibit A** and is incorporated herein by reference.

35. The Purchased Portfolios details are as follows:

| Month | File ID | For Sale | Purchased | % Purchased | ARC | FLOCK | Cost |
|---|---|---|---|---|---|---|---|
| Jul-22 | TSG01 | $ 85,796,899.26 | $ 78,170,959.30 | 91.11% | $476,151.30 | $1,904,605.22 | $ 2,380,756.52 |
| Aug-22 | TSG02 | $ 69,005,452.12 | $ 62,818,302.15 | 91.03% | $373,641.56 | $1,494,566.25 | $1,868,208 |
| Sep-22 | TSG03 | $ 93,076,898.00 | $ 86,369,215.02 | 92.79% | $513,968.91 | $2,055,875.66 | $ 2,569,844.57 |
| Oct-22 | TSG04 | $ 83,458,374.48 | $ 64,961,393.85 | 77.84% | $351,882.63 | $1,407,530.52 | $ 1,759,413.15 |
| 10/31/22 | TSG04A | | $ 9,889,309.02 | 11.85% | $72,693.89 | $290,775.57 | $ 363,469.46 |
| Nov-22 | TSG05 | $ 84,513,631.49 | $ 78,312,910.73 | 92.66% | $453,656.79 | $1,814,627.17 | $ 2,268,283.96 |
| Dec-22 | TSG06 | $ 80,150,775.27 | $ 76,674,589.94 | 95.66% | $236,175.10 | $2,125,575.89 | $ 2,361,750.98 |
| Jan-23 | TSG07 | $ 68,434,188.24 | $ 65,731,904.93 | 96.05% | $193,410.57 | $1,740,695.13 | $ 1,934,105.70 |
| Feb-23 | TSG08 | $ 63,094,844.11 | $ 59,918,222.95 | 94.97% | $181,186.22 | $1,630,675.95 | $ 1,811,862.16 |
| Mar-23 | TSG09 | $ 83,737,865.82 | $ 79,078,785.41 | 94.44% | $217,496.78 | $1,957,471.03 | $ 2,174,967.81 |
| | Totals | $ 711,268,929 | $ 661,925,593 | 93.06% | $ 3,070,264 | $ 16,422,398 | $ 19,492,662 |

36. Flock recorded a UCC Financing Statement for each JIA as follows (the "Flock UCCs"):

| Date/Time Recorded | UCC Number |
|---|---|
| 7/17/23 10:42:08 AM | 038-2023-015660. |
| 7/17/23 10:55:03 AM | 038-2023-015670. |
| 7/17/23 10:56:15 AM | 038-2023-015673. |
| 7/25/23 11:08:00 AM | 033-2023-002648 |
| 7/25/23 11:08:00 AM | 033-2023-002649 |
| 7/25/23 11:08:00 AM | 033-2023-002651 |
| 7/25/23 11:08:00 AM | 033-2023-002652 |
| 7/25/23 11:08:00 AM | 033-2023-002653 |
| 7/25/23 11:08:00 AM | 033-2023-002654 |
| 9/1/23 9:53:00 AM | 033-2023-003096. |

37. True and correct copies of each of the Flock UCCs are attached hereto as **Exhibit B** and are incorporated herein by reference.

38. The Purchased Portfolios provided another source of income for Debtor – the commissions earned from the collection of these Portfolios (the "**Portfolio Commission Revenue**"). Debtor's commission percentages paid from the Portfolio Commission Revenue are detailed in each of the JIAs.

39. The JIAs provide that Flock would be repaid its loans for Debtor's purchase of the

Purchased Portfolios, among other payments, before Debtor would receive addition revenue from the Purchased Portfolios

40. The JIAs also provide for Debtor to receive additional revenue after certain metrics are achieved.

41. Flock is owed $12,631,032.60 on the repayment of its investment with Debtor.

42. After Debtor's purchase of the Purchased Portfolios, Debtor incurred significant costs associated with the needed infrastructure for the collection and servicing of the accounts.

43. The Portfolios were not performing as the projections indicated to cover the expenses associated with their collection.

44. Debtor's financial situation caused Debtor to look for non-traditional short term funding to help cover the unexpected expenses.

45. All Defendants, except Flock, provided this funding.

***WEBBANK***

46. Debtor entered into three separate term loan agreements with WebBank dated August 8, 2022, December 14, 2022, and February 13, 2023 (the "**WebBank Loans**"). True and correct copies of these agreements are attached hereto as **Exhibit C** and are incorporated herein by reference.

47. WebBank recorded three UCC Financial Statements (the "**WebBank UCCs**"):

| | | |
|---|---|---|
| August 8, 2022 | 12:04:52 PM | 007-2022-047686 |
| December 14, 2022 | 8:47:02 AM | 007-2022-072654 |
| February 13, 2023 | 11:18:08 AM | 007-2023-006398 |

48. True and correct copies of WebBank's UCCs are attached hereto as **Exhibit D** and are incorporated herein by reference.

49. The remaining balance on the WebBank Loans is $551,170.53.

***SAMSON***

50. Debtor obtained funds from Samson in March and April 2023.

51. Samson recorded a UCC Financial Statement (the "**Samson UCC**"):

December 5, 2022 8:04:00 PM 007-2022-070860

52. A true and correct copy of the Samson UCC is attached hereto as **Exhibit E** and is incorporated herein by reference.

53. The remaining balance owed to Samson is $380,292.51.

***LIBERTAS***

54. Debtor obtained funds from Libertas under twelve (12) Agreements from August 2022 through November 2023 (the "**Libertas Agreements**"). True and correct copies of some of the Libertas Agreements are attached hereto as **Exhibit F** and are incorporated herein by reference.

55. Libertas recorded six UCC Financing Statements (the "**Libertas UCCs**"):

| Date/Time Recorded | UCC Number |
|---|---|
| 12/14/22 8:28:55 AM | 007-2022-072630 |
| 2/20/23 10:35:49 AM | 007-2023-007715 |
| 3/1/23 9:33:59 AM | 007-2023-009437 |
| 4/5/23 12:03:40 PM | 007-2023-016566 |
| 4/13/23 10:16:35 AM | 007-2023-018209 |
| 5/11/23 2:51:10 PM | 007-2023-024134 |

56. True and correct copies of each of the Libertas UCCs are attached hereto as **Exhibit G** and are incorporated herein by reference.

57. The remaining balance owed to Libertas is $5,285,500.

***GREEN NOTE***

58. Debtor obtained funds from Green Note on July 18, 2023 and August 4, 2023.

59. Green Note recorded two UCC Financial Statements (the "**Green Note UCCs**"):

| | | |
|---|---|---|
| August 28, 2023 | 8:38:00 AM | 038-2023-018319 |
| August 28, 2023 | 8:40:00 AM | 038-2023-018323 |

60. True and correct copies of the Green Note UCCs are attached hereto as **Exhibit H** and are incorporated herein by reference.

61. The remaining balance owed to Green Note is $169,000.

***CHEETAH***

62. Debtor obtained funds from Cheetah on June 5, 2023 and July 13, 2023..

63. Upon information and belief after a search of the public records, Cheetah did not file a prepetition UCC Financial Statement. Therefore, Cheetah is an unsecured creditor.

64. The remaining balance owed to Cheeta is $603,723.00.

***TBF***

65. Debtor obtained funds from TBF on July 19, 2023.

66. TBF filed a UCC Financing Statement (the "**TBF UCC**"):

| | | |
|---|---|---|
| July 19, 2023 | 10:51:13 AM | 038-2023-015932 |

67. A true and correct copy of the TBF UCC is attached hereto as **Exhibit I** and is incorporated herein by reference.

68. The remaining balance owed to TBF is $163,928.

***KYF***

69. Debtor obtained funds from KYF in July 2023.

70. The remaining balance owed to KYF is $218,000.

71. Upon information and belief after a search of the public records, KYF did not file a prepetition UCC Financial Statement. Therefore, KYF is an unsecured creditor.

***PROJECTED COLLECTIONS FOR THE PURCHASED PORTFOLIOS***

72. Debtor believes that the projected gross collections for the Purchased Portfolios are $13,125,842.

73. The total amount owed to Defendants is approximately $20,002,646.60.

74. An actual controversy has arisen and now exists between Debtor and Defendants as to the priority of each Defendant's lien on and security interest in and to Debtor's property. Debtor seeks a declaration from the Court of the rights and priority of each Defendant's claim in this Bankruptcy Case.

## COUNT I
## DETERMINATION OF THE VALIDITY, PRIORITY, AND EXTENT OF EACH DEFENDANT'S LIEN ON AND SECURITY INTEREST IN THE PURCHASED PORTFOLIO PURSUANT TO 11 U.S.C. § 506

75. Plaintiff adopts and incorporates the allegations contained in all preceding paragraphs of this Complaint as if fully stated herein.

76. Section 506(a)(1) of the Bankruptcy Code provides that an "allowed claim of a creditor secured by a lien on property in which the estate has an interest,…,is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property,…,and is an unsecured claim to the extent that the value of the such creditor's interest,…,is less than the amount of such allowed claim." 11 U.S.C. § 506(a)(1).

77. Based upon the JIAs and the Flock UCCs, Flock asserts a first in priority security interest in the Purchased Portfolios and the corresponding revenue.

78. Based upon the WebBank Agreements and the WebBank UCCs, WebBank asserts a first in priority security interest in the Purchased Portfolios and the corresponding revenue.

79. Based upon the Libertas Agreements and Libertas UCCs, Libertas asserts that it purchased certain of Debtor's accounts receivable. It also asserts a first in priority security interest in the Purchased Portfolios and the corresponding revenue.

80. Based upon the Samson UCC, the Green Note UCCs, and the TBF UCC, Samson, Green Note, and TBF assert that they purchased certain accounts receivable and that they have a security interest in revenues generated by Debtor from the collection of the accounts receivale.

81. A search of the Georgia UCC filing database did not reveal any UCC filings by Cheetah, Funding Club, or KYF. These three Defendants appear to be unsecured creditors.

82. Spreadsheets of Defendants' UCC filings by Defendant name and by date are attached hereto as **Exhibit J** and are incorporated herein by reference.

83. Accordingly, Plaintiff respectfully requests that the Court determine the validity and extent of each Defendant's asserted lien on and security interest an property of Debtor's estate and determine the amount of each secured claim, if one.

84. A determination by the Court of the validity, priority, and extent of the pre-petition security interest s and liens claimed by Defendants in the Purchased Portfolios, Debtor's Commission Clients Revenue, and the Purchased Portfolio Revenue is necessary to the proper administration of the bankruptcy estate.

**COUNT II**
**AVOIDANCE OF LIENS PURSUANT TO 11 U.S.C. § 506(d)**

85. Debtor repeats and realleges each of the foregoing allegations as if fully set forth herein.

86. Section 506(d) of the Bankruptcy Code provides: "To the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void,…S" 11 U.S.C. § 506(d).

87. Debtor asserts that the value of its property that secures Defendants' claims is less than the amount of these claims.

88. The Purchased Portfolios' value is based upon the collectability of the accounts receivable in each of the Purchased Portfolios. Debtor's analysis of the return on collections reveals the expected collections to be approximately $13,125,842.

89. Further, certain Defendants assert that they purchased Debtor's accounts receivable. The only accounts receivable owned by Debtor are those in the Purchased Portfolios. If the Court finds that one or more Defendants purchased any receivables that make up the Purchased Portfolios, the expected collections could be significantly less..

90. Thus, one or more Defendants' security interests and liens will not be secured by the Purchased Portfolios or the Purchased Commission Revenue or the Commission Clients' collection revenue.

91. Debtor requests the Court determine the amount of each Defendant's claim and, to the extent the claim is unsecured, to void the lien pursuant to § 506(d) and to find that Defendant holds an unsecured claim in this Bankruptcy Case.

**WHEREFORE**, Plaintiff respectfully requests that the Court:

(1) Determine the validity and extent of each Defendant's asserted lien on and security interest in and against property of Debtor's bankruptcy estate;

(2) Determine the value of each Defendant's secured claim;

(3) Void each Defendant's lien to the extent any Defendant's lien is unsecured or unenforceable; and

(4) grant Debtor such other and further relief as this Court may deem just and proper.

Dated: March 29, 2024

Respectfully submitted,

**ROUNTREE LEITMAN KLEIN & GEER, LLC**

*/s/ Ceci Christy*
Will Rountree
Georgia Bar Number
Ceci Christy
Georgia Bar Number 370092
Century Plaza I
2987 Clairmont Road, Suite 350
Atlanta, Georgia 30329
wrountree@rlkglaw.com
cchristy@rlkglaw.com
404-584-1238
*Attorneys for Debtor/Plaintiff*

**EXHIBIT "A" FOLLOWS**

# JOINT INVESTMENT AGREEMENT

THIS **JOINT INVESTMENT AGREEMENT** (this "***Agreement***") is made as of **SEPTEMBER 26, 2022**, between **FLOCK FINANCIAL, LLC**, a Delaware limited liability company (collectively the "***Company***"), and **ARC MANAGEMENT GROUP, LLC** a Georgia limited liability company ("***Debt Buyer***"). The Company and Debt Buyer are each referred to as a "***Party***" and collectively constitute the "***Parties***" to this Agreement.

## RECITALS

WHEREAS, the Company and Debt Buyer desire to jointly invest in the portfolio of charged-off consumer debt receivables set forth on Exhibit A to this Agreement on the terms and conditions set forth herein (the "***Investment***");

WHEREAS, **ARC MANAGEMENT GROUP, LLC** a Georgia limited liability company ("***Debt Buyer Parent***"), is an experienced purchaser of charged-off consumer debt receivables similar to those represented by the Investment and has infrastructure and operational expertise in the collection of charged-off consumer debt receivables, and has formed Debt Buyer as a single purpose entity to purchase portfolios such as the Investment;

WHEREAS, Debt Buyer has provided the Company with a detailed synopsis of the qualitative and topographical features of the Investment, a detailed summary of the terms and conditions of the acquisition documentation associated with the Investment (including the Purchase Price (as defined below)) and the intended strategy with respect to Debt Buyer's recovery program regarding the Investment;

WHEREAS, the Company desires to invest a portion of the Purchase Price associated with the Investment with Debt Buyer pursuant to the terms and conditions outlined in this Agreement; and

WHEREAS, in consideration of such investment of Company Funds, the Parties will enter into the Security Agreement (as defined below), granting the Company a security interest in the Investment to secure the payment of all Company Investment Proceeds, returns and payments to the Company set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## SECTION 1
## DEFINITIONS

1.1 Defined Terms. The following capitalized words and phrases used in this Agreement have the indicated meanings:

"***Affiliate***" means, with respect to any Person, (i) any Person directly or indirectly controlling, controlled by or under common control with such Person, (ii) any officer, director, or employee of such Person, or (iii) any Person who is an officer, director, or employee of any Person described in clause (i) of this definition.

"***Agreement***" means this Joint Investment Agreement, as amended from time to time. Words such as "herein," "hereinafter," "hereof," "hereto" and "hereunder," refer to this Joint Investment Agreement as a whole, unless the context otherwise requires.

"***BEAM Software***" means Oliphant Financial, LLC's proprietary integrated business processing application for the debt industry.

"***Business Day***" means any day other than a Saturday, Sunday, or a day on which banking institutions in Atlanta, Georgia or New York, New York are authorized or obligated by law or executive order to be closed.

"***Collateral Measurement***" shall mean a monthly measurement made beginning in the fourth (4) full month after the date of this agreement which measures the current portfolio principal balance remaining for all accounts that are ninety (90) days or less delinquent at that time multiplied by **82.5%** multiplied by the percentage ratio of Company Funds divided by the Purchase Price.

"***Company***" has the meaning specified in the introductory paragraph of this Agreement.

"***Company Funds***" has the meaning given it in Section 2.1 hereof.

"***Control Account***" means the bank account at a nationally recognized bank established solely for the purpose of (i) receiving semi-monthly periodic deposits from Debt Buyer related to payments on the Investment, and (ii) distributing amounts per the Company's instructions pursuant to Section 4.1.

"***Debt Buyer***" has the meaning specified in the introductory paragraph of this Agreement.

"***Debt Buyer Funds***" has the meaning given it in Section 2.1 hereof.

"***Debt Buyer Operating Agreement***" has the meaning giving it in Section 5.1 hereof.

"***Debt Buyer Parent***" has the meaning specified in the Recitals to this Agreement, and for purposes of Sections 5.2(e) and 5.2(f) hereof, means the ultimate corporate parent of Debt Buyer Parent.

"***Entity***" means any corporation, partnership, limited liability company, trust or other legal entity.

"***Excluded Expenses***" means out-of-pocket fees and expenses (i) of hiring an attorney customary market rates to litigate collection matters, (ii) of hiring a collection agent at market rates to provide non-customary collection services, (iii) associated with indemnification expenses paid to the "Special Manager" pursuant to Section 2.10 of the Debt Buyer Operating Agreement (as such term is defined therein), (iv) associated with professional fees related to the filing of tax returns with applicable tax authorities, and (v) otherwise mutually agreed to in writing by Debt Buyer and the Company.

"***Flock Financial***" means Flock Financial, LLC, a Delaware limited liability company.

"***Flock Investment Agreements***" refers collectively to this Agreement and all other joint investment agreements entered into with Debt Buyer by the Company and any other company managed or co-managed by Flock Financial for the purpose of investing in portfolios of charged-off consumer debt receivables.

"***Investment***" has the meaning given it in the Recitals to this Agreement.

"***Investment Expenses***" means out-of-pocket fees and expenses incurred by Debt Buyer in

fulfillment of its obligations set forth in Section 3 with respect to the Investment, including the payment of Service Providers and the fees and expenses incurred in connection with the compliance of Debt Buyer with regulatory licensure requirements under applicable law relating to the acquisition and servicing of the Investment. The aggregate Investment Expenses incurred by Debt Buyer and taken into account for purposes of calculating the Management Fee and Investment Proceeds shall be subject to the limitations set forth in Section 3.4. Investment Expenses shall specifically exclude the payment of Company Funds and the Return to the Company as well as any Excluded Expenses.

"***Investment Funds***" means the Company Funds and the Debt Buyer Funds, collectively.

"***Investment Proceeds***" means Investment Revenue, in excess of (i) Investment Expenses, Excluded Expenses, (iii) the Management Fee and (iv) reasonable reserves established by Debt Buyer in consultation with the Company for anticipated Investment Expenses and Excluded Expenses.

"***Investment Proceeds Shortfall***" has the meaning given it in Section 4.3 hereof.

"***Investment Revenue***" means all proceeds received by Debt Buyer in respect of the Investment.

"***Insufficient Collateral Default***" means an event which occurs when Company's Unreturned Investment Account is exceeded by the Collateral Measurement.

"***Joint Investment Agreements***" has the meaning given it in Section 4.3 hereof.

"***Joint Investment Agreement Default***" has the meaning given it in Section 4.2 hereof.

"***Joint Investments***" has the meaning given it in Section 4.3 hereof.

"***JV Documents***" means this Agreement and the Security Agreement together, with a UCC-1 financing statement showing Debt Buyer as debtor and the Company as a secured party, and any other document or agreement evidencing the investment of Company Funds or the collateral securing the investment of Company Funds.

"***Management Fee***" has the meaning given it in Section 3.6 hereof.

"***Management Fee Overage Account***" means with respect to the Company as of a relevant measurement date, the excess, if any, of (i) the aggregate Management Fees paid to the Company for completed monthly periods prior to the relevant measurement date less (ii) an amount equal to (a) 2% multiplied by (b) the aggregate Investment Revenue, measured from the date of this Agreement through the relevant measurement date.

"***Obligor***" means each signer, co-signer, guarantor or other person responsible for payment on an Investment receivable account.

"***Person***" means any individual or Entity,

"***Purchase Agreement***" means the Purchase Agreement pursuant to which Debt Buyer is obligated to acquire the Investment.

"***Purchase Price***" has the meaning given it in Section 2.1 hereof.

"***Remittance Report***" means a report submitted monthly by Debt Buyer to the Company (i) listing deposits into and disbursements out of the Trust Account, and (ii) calculating all Investment Expenses and Excluded Expenses due to Debt Buyer for the period covered by such

report. All such amounts shall be identified by Investment.

"***Return***" means an amount computed like interest at a rate of **12.00% PER ANNUM**, compounded annually, calculated on the varying amount of such Party's Unreturned Investment Account during the period to which the computation relates.

"***Return Account***" means with respect to any Party at any time, the excess, if any, of such Party's Return through such time over the total amount of cash distributed to such Party prior to such time pursuant to Sections 4.1(a)(i) and 4.1(b)(i), in the case of the Company, or Sections 4.1(a)(i) and 4.1(b)(iii), in the case of Debt Buyer.

"***Security Agreement***" has the meaning given thereto in Section 7.3.

"***Seller***" means the seller of the Investment under the terms and conditions of the Purchase Agreement.

"***Service Provider***" has the meaning given thereto in Section 3.1.

"***Single Purpose Entity***" means a Person (other than an individual, a government, or any agency or political subdivision thereof) that exists solely for the purpose of owning the investments of Company Funds, conducts business only in its own name, does not engage in any business or have any assets unrelated to the investments of Company Funds, does not have any indebtedness other than as permitted by the Flock Investment Agreements, has its own separate books, records, and accounts (with no commingling of assets), holds itself out as being a Person separate and apart from any other Person, and observes corporate and partnership formalities independent of any other entity, and which otherwise constitutes a single purpose, bankruptcy remote entity.

"***Trust Account***" shall mean the account at a nationally recognized bank established by Debt Buyer solely for the purpose of (i) receiving payments from Obligors of charged-off consumer debt receivables relating to the Investment, and (ii) distributing amounts per the Company's instructions pursuant to Section 4.1.

"***Unreturned Investment Account***" means, with respect to each Party at any time, the excess, if any, of such Party's respective portion of the Investment Funds over the total amount of cash distributed to such Party prior to such time pursuant to Sections 4.1(a)(ii) and 4.1(b)(ii), in the case of the Company, or Sections 4.1(a)(ii) and 4.1(b)(iv), in the case of Debt Buyer.

## SECTION 2
## THE INVESTMENT

2.1 The Investment Purchase Price. The aggregate purchase price with respect to the Investment is **2,569,844.57** (the "***Purchase Price***"). Each Party's respective portion of the Purchase Price is as follows:

| Party | Portion of Purchase Price |
|---|---|
| The Company | 80% |
| Debt Buyer | 20% |

Upon execution of this Agreement, Debt Buyer shall fund **20%** of the Purchase Price to the Seller via wire transfer of immediately available funds in accordance with the wire transfer instructions contemplated by the Purchase Agreement (the "***Debt Buyer Funds***"). Upon execution of this Agreement and the delivery of the Debt Buyer Funds to the Seller as contemplated by the preceding sentence, the Company shall cause an amount equal to **80%** of the Purchase Price to be delivered to the Seller via wire transfer of immediately available funds in accordance with the wire

transfer instructions contemplated by the Purchase Agreement (the "***Company Funds***"). The Company Funds shall be deemed to have been delivered to the Seller on behalf, and at the direction, of Debt Buyer. The investment of Company Funds shall constitute an investment with Debt Buyer from the Company, which such investment of Company Funds shall be returned in accordance with Section 4.1 of this Agreement and secured pursuant to the Security Agreement to be delivered in accordance with Section 7.3 of this Agreement.

2.2 Acquisition of the Investment. Upon execution of this Agreement, Debt Buyer shall consummate the acquisition of the Investment for an amount equal to the Purchase Price in accordance with the terms and conditions of the Purchase Agreement. Upon acquisition thereof by Debt Buyer, Debt Buyer shall hold good and valid title to the Investment free and clear of all liens or other encumbrances, subject to the security interest contemplated by the Security Agreement. Immediately following such acquisition of the Investment, Debt Buyer shall deliver written notice to the Company thereof. Debt Buyer shall deliver an electronic file to the Company containing the relevant Investment information for importing into the BEAM Software.

## SECTION 3
## SERVICING OF THE INVESTMENT

3.1. Servicing of the Investment. Debt Buyer shall collect, administer and service the Investment and shall have full power and authority, to the extent not limited hereunder, to do or cause to be done any and all things permissible under applicable law in connection with such servicing, administration and collection as may be necessary or desirable to optimize the recoverable value of the Investment. In the performance of its duties under this Agreement, Debt Buyer may engage attorneys, collection agents and other service providers to commence collection actions, foreclosure proceedings, collection services and/or other similar actions ("***Service Providers***").

3.2. Servicing, Administration and Collection Duties. Without limiting the generality of Section 3.1, Debt Buyer's servicing, administration and collection duties under this Agreement shall be subject to the duties set forth below.

(a) Debt Buyer shall undertake all commercially reasonable efforts to collect or otherwise realize upon the Investment being serviced hereunder. In that connection, Debt Buyer shall be solely responsible for the collection and posting of all payments, responding to inquiries of obligors associated with the Investment, investigating delinquencies, sending statements to obligors associated with the Investment, reporting any required tax information to such obligors, reporting any required credit information on obligors to the credit bureaus, accounting for proceeds collected on account of any portion of the Investment, monitoring the status of any guaranties or insurance policies relating to the Investment, commencing and pursuing collection actions, entering into agreements for the settlement, compromise or satisfaction of any claims relating to the Investment with one or more obligors associated therewith and such other practices and procedures as are generally employed in servicing, administering and collecting similar accounts, loan portfolios and other receivables. To the extent that Debt Buyer, in the performance of its duties and responsibilities under this Agreement, engages Service Providers, Debt Buyer shall also have sole responsibility for compensating, monitoring and managing the activities and actions of such attorneys and ensuring that such activities and actions are in compliance with provisions of this Agreement.

(b) Debt Buyer will instruct its Service Providers to submit electronic transfer payments directly to the Trust Account. Service Providers will also be instructed that payments

DocuSign Envelope ID: E92557E7-948B-4914-B310-40F59CAC6CFC



received by mail should be deposited into the Trust Account no later than the first Business Day after such amounts are received.

(c) Debt Buyer shall maintain detailed records with respect to each account forming a portion of the Investment, the amount and application of any funds received with respect thereto, or other realization upon such account and documentation of all servicing, administration and collection efforts and activities with respect to such account.

(d) On a monthly basis, Debt Buyer shall provide the Company with an electronic file of the collection results for the period then ended for purposes of updating the Investment information on the BEAM Software.

(e) Debt Buyer shall provide a monthly accounting of the calculation of Investment Proceeds to the Company, together with supporting documentation evidencing the sources and uses of all proceeds from the Investment for such monthly period.

3.3. Duties of Debt Buyer. Debt Buyer agrees that it shall manage, service, administer, collect and pursue enforcement proceedings with respect to the Investment in accordance with the degree of skill, prudence and attention that is customary and usual for institutions that regularly service and collect comparable accounts and, to the extent more exacting, with the degree of skill, prudence and attention that Debt Buyer exercises from time to time with respect to comparable assets that it services for itself or for others. No appointment of any Service Provider or engagement of any Service Provider for collection litigation or other purposes by Debt Buyer shall relieve Debt Buyer of any of its duties or responsibilities under this Agreement, including without limitation, its servicing responsibilities hereunder.

3.4. Cap on Investment Expenses; Affiliated Service Providers. Notwithstanding anything herein to the contrary, the aggregate Investment Expenses incurred by Debt Buyer under this Agreement shall not exceed the limitations set forth on Exhibit B. Any Investment Expenses incurred in excess of such limitations shall be borne by Debt Buyer and shall not be taken into account for purposes of calculating the Management Fee or Investment Proceeds, unless otherwise mutually agreed by the Parties in writing. To the extent such engagement is in compliance with Debt Buyer's duties set forth in Section 3.3 above, Debt Buyer may engage one or more of its Affiliates as a Service Provider and such Affiliate may receive compensation from Investment Proceeds, provided that (i) any such compensation shall constitute Investment Expenses for purposes of this Agreement and shall be subject to the limitations set forth in this Section 3.4, (ii) the fees payable to Debt Buyer's Affiliate are at market rates and (iii) the other terms and conditions of such arrangement are no less favorable than those generally available from unaffiliated third parties for a comparable level of service and quality.

3.5. Investment Expenses. Debt Buyer shall cause all Investment Expenses and Excluded Expenses to be paid from the Investment or proceeds received by Debt Buyer in respect of the Investment.

3.6. Company Management Fee. Debt Buyer shall pay to Flock Financial as compensation for certain management and other advisory services in connection with the Investment a monthly management fee (the "***Management Fee***") beginning as of the date of this Agreement and continuing until the earlier of (i) the date as of which the Investment has been fully collected and (ii) the date as of which the Parties agree in writing that the remaining portion of the Investment should be abandoned. The Management Fee shall be payable monthly in arrears within ten calendar days following the final day of each calendar month. Each monthly Management Fee shall be an amount equal to (1) 2% of the Investment Revenue received by Debt Buyer in

DocuSign Envelope ID: E92557E7-948B-4914-B310-40F59CAC8CFC



connection with the Investment during the applicable calendar month, less (2) the positive balance, if any, of the Management Fee Overage Account.

## SECTION 4
## PAYMENT OF INVESTMENT PROCEEDS

4.1. Payments of Investment Proceeds. Each month, Debt Buyer will transfer the estimated Investment Proceeds for the month's initial 15 day collection period from the Trust Account to the Control Account by no later than the 20th calendar day of the month. On the 5th day following month end, Debt Buyer will transfer the remaining estimated Investment Proceeds for the month from the Trust Account to the Control Account and provide the Company with a Remittance Report, together with applicable bank reconciliations and other supporting materials, sufficient to allow the Company to confirm that such Remittance Report is correct. In the event Debt Buyer fails to remit the semi-monthly on the aforementioned due dates, Debt Buyer will be charged a daily penalty of $2,500.

Upon receipt of the Remittance Report and confirmation by the Company that the amounts are correct, the Company will instruct Debt Buyer to disburse funds in accordance with the (approved) Remittance Report using amounts then residing in the Control Account. Investment Proceeds from the Investment will be paid by Debt Buyer in accordance with the following provisions of this Section 4.1 within ten days of the final day of each calendar month or, if such tenth day is not a Business Day, the next following Business Day.

(a) Investment Proceeds will be paid to the Parties in the following priority:

(i) first, 100% to the Company in proportion to and to the extent of their respective Return Accounts;

(ii) second, 100% to the Company in proportion to and to the extent of their respective Unreturned Investment Accounts; and

(iii) thereafter, 15% to the Company and 85% to Debt Buyer

(b) Notwithstanding anything in Section 4.1(a) to the contrary, upon the occurrence of a Joint Investment Agreement Default in accordance with Section 4.2 below, the payment of Investment Proceeds to the Parties shall be made in the order of priority set forth in this Section 4.1(b), which shall be effective with respect to the next regularly scheduled payment of Investment Proceeds and each payment of Investment Proceeds thereafter. The order of priority shall be as follows:

(i) first, 100% to the Company to the extent of the Company's Return Account;

(ii) second, 100% to the Company to the extent of the Company's Unreturned Investment Account;

(iii) thereafter, 15% to the Company and 85% to Debt Buyer.

4.2. Joint Investment Agreement Default. For purposes of this Section 4, a "***Joint Investment Agreement Default***" shall be deemed to occur: (i) if an Insufficient Collateral Default has occurred; (ii) if the Company has not received Investment Proceeds pursuant to Section 4.1 as of the completion of the 28 months from the execution of this Agreement sufficient to reduce the Company's Unreturned Investment Account and Return Account to zero; (iii) upon any breach of any term, condition or covenant set forth in Section 5.2(d), (e) or (i) of this Agreement, including, without limitation, the failure of Debt Buyer to maintain its status as a Single Purpose Entity; (iv) upon any breach shall remain uncured for fourteen (14) days or more following delivery of written notice thereof by the Company to the Debt Buyer; (iv) upon any failure by Debt Buyer to satisfy the standard of conduct applicable thereto as set forth in Section 3.3, and such failure shall remain uncured for fourteen (14) days or more following delivery of written notice thereof by the Company to Debt Buyer; (v) the filing of any petition in bankruptcy by Debt Buyer; (vi) the filing of a petition in bankruptcy against Debt Buyer that is not dismissed within ninety (90) days; (vii) the application for appointment of a receiver for, making a general assignment for the benefit of creditors by, or insolvency of Debt Buyer; or (viii) upon any "Event of Default" under the Security Agreement (as such term is used therein).

Debt Buyer shall provide prompt written notice to the Company of the occurrence of a Joint Investment Agreement Default within five Business Days of the Managers of Debt Buyer's sole member acquiring actual knowledge of the Joint Investment Agreement Default. Upon occurrence of any Joint Investment Agreement Default or at any time thereafter, the Company may exercise any or all of the rights and powers and pursue any and all of the remedies available to it hereunder and under the Security Agreement, and shall have and may exercise any and all rights and remedies available under any other provision of law or in equity including without limitation the remedies of a secured party under the Uniform Commercial Code of New York, as applicable to the Collateral (as defined in the Security Agreement)

Notwithstanding the foregoing: (A) upon a Joint Investment Agreement Default described in subsections 4.2(v), (vi) or (vii) above, the Company Funds and any and all other amounts due and payable under this Agreement and the other JV Documents shall become immediately due and payable without notice or demand; (B) in the event any Joint Investment Agreement Default described in subsection 4.2(i) occurs due to an Insufficient Collateral Default, Investment Proceeds will be paid according to the provisions of Section 4.1(b) and if the minimum Collateral Measurement threshold is then achieved at a future period and such threshold is maintained for two periods (i.e., 2 consecutive months), the provisions of Section 4.1(a) will be restored for determining allocation of the Investment Proceeds; and (C) in the event of any Joint Investment Agreement Default described in subsections 4.2(iii) and (iv), the Company shall have a period of 60 calendar days from the occurrence of a Joint Investment Agreement Default to deliver a written notice to Debt Buyer electing for the payment of Investment Proceeds to be made in accordance with the waterfall set forth in Section 4.1(b) above. Debt Buyer shall be obligated to deliver a notice to the Company in accordance with this Section 4.2 in connection with each Joint Investment Agreement Default.

4.3. Cross Collateralization. The Parties may enter into other Joint Investment Agreements (this Agreement and such other joint investment agreements being referred to collectively as the "***Joint Investment Agreements***" and individually as a "***Joint Investment Agreement***") with respect to other joint investments (the Investment and such other joint investments being referred to collectively as the "***Joint Investments***" and individually as a "***Joint Investment***"). If at the completion of the 28th month following the execution of a Joint Investment

Agreement, the Investment Proceeds from the Joint Investment are insufficient to repay the Company's Unreturned Investment Account in respect of that Joint Investment and accrued interest thereon (the "***Investment Proceeds Shortfall***"), then the Investment Proceeds collected, with respect to all other Joint Investments in which the Company's Unreturned Investment Account in respect of that Joint Investment and accrued interest thereon have been paid in full, shall be paid and applied to the Investment to which the Investment Proceeds Shortfall has occurred until the Unreturned Contribution Account on that Investment has been paid in full (such amounts shall be deemed distributed to Debt Buyer for such performing Joint Investments). The determination of which performing Joint Investments will be used to make up any Investment Proceeds Shortfall shall be made by the Company in its sole and absolute discretion.

4.4. Tax Classification. The Company and Debt Buyer acknowledge their intention to treat for federal income tax purposes the arrangement between themselves as a joint venture (or joint ventures, as applicable) taxable as a partnership (partnerships), and for Debt Buyer to file all necessary federal income tax returns for such partnership(s) on an annual basis. The Company and Debt Buyer further acknowledge their intention to allocate all items of income, gain, loss, deduction and credits of such partnership(s) between themselves in a manner consistent with their economic arrangements (as reflected in Section 4.1), as mutually agreed upon by the Company and Debt Buyer. Debt Buyer is hereby designated as the "tax matters partner" for the partnership referenced by this Section 4.4.

4.5. Right of Inspection. Upon request and after reasonable prior written notice from the Company, Debt Buyer and Debt Buyer Parent will permit any Person designated by the Company, at the Company's expense, to visit and inspect any of the properties, books and financial reports of Debt Buyer and Debt Buyer Parent and to discuss its affairs, finances and accounts all at such reasonable times during ordinary business hours of Debt Buyer and Debt Buyer Parent and as often as the Company may reasonably request for the purpose of determining compliance with this Agreement, or the status of the Investment; provided, however that the Company will use reasonable efforts to conduct (or have conducted) any such examination or inspection so as to minimize disruptions to the operations of Debt Buyer and Debt Buyer Parent.

## SECTION 5
## REPRESENTATIONS AND WARRANTIES; COVENANTS

5.1. Representations and Warranties of Debt Buyer. Debt Buyer hereby represents and warrants to the Company as follows:

(a) Debt Buyer is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, and is duly qualified, fully licensed and authorized as a passive debt buyer, and as otherwise required to hold title to the Investment and to carry out all of its other obligations hereunder, in the states and jurisdictions that require it. Debt Buyer will ensure that its Service Providers are duly qualified and licensed to conduct collection activities with respect to the Investment and are in good standing in each jurisdiction in which such qualification or licensing is necessary as a condition to conducting collection activities with respect to the Investment and where failure to obtain such licensing or qualification would have a material adverse effect on Debt Buyer. Debt Buyer has all requisite power and authority to own and operate its properties, carry out its business as presently conducted and as proposed to be conducted and to enter into and discharge its obligations under this Agreement, the Purchase Agreement, and the JV Documents to which it is a party;

(b) the execution and delivery by Debt Buyer of this Agreement, the Purchase Agreement, and the JV Documents to which it is a party and performance and compliance by Debt Buyer with such agreements have been duly authorized by all necessary action on the part of Debt Buyer and will not violate Debt Buyer's organizational documents or constitute a default under any indenture or loan or credit agreement or any other material agreement, lease or instrument to which Debt Buyer is a party or by which it or its properties may be bound or affected;

(c) this Agreement, the Purchase Agreement, and the JV Documents to which it is a party constitute the valid, legal and binding obligations of Debt Buyer, enforceable against it in accordance with their respective terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and by general principles of equity (whether considered in a proceeding or action in equity or at law);

(d) as of the date hereof, no litigation is pending or, to Debt Buyer's knowledge, threatened against Debt Buyer, the consequences of which would prohibit its entering into this Agreement, the JV Documents or the Purchase Agreement or that would materially and adversely affect the condition (financial or otherwise) or operations of Debt Buyer or its properties or the consequences of which would materially and adversely affect its performance hereunder or under the Purchase Agreement or the JV Documents to which it is a party;

(e) all actions, approvals, consents, waivers, exemptions, variances, franchises, orders, permits, authorizations, rights and licenses required to be taken, given or obtained, as the case may be, by or from any federal, state or other governmental authority or agency, that are necessary or advisable in connection with the execution and delivery by Debt Buyer of this Agreement, the Purchase Agreement, and the JV Documents to which it is a party have been duly taken, given or obtained, as the case may be, are in full force and effect on the date hereof, are not subject to any pending proceedings or appeals (administrative, judicial or otherwise) and either the time within which any appeal therefrom may be taken or review thereof may be obtained has expired or no review thereof may be obtained or appeal therefrom taken, and are adequate to authorize this Agreement, the Purchase Agreement, and the JV Documents and the performance by Debt Buyer in all material respects of its obligations under this Agreement, the Purchase Agreement, and the JV Documents to which it is a party;

(f) Debt Buyer has paid or caused to be paid to the proper authorities when due all federal, state and local taxes required to be withheld by it, other than any taxes the payment of which is being contested in good faith and by proper proceedings and for which adequate reserves have been set aside on Debt Buyer's books. Debt Buyer has filed all federal, and all state and local tax returns that would require payment of any material tax that, to the knowledge of the officers of Debt Buyer, are required to be filed, and Debt Buyer has paid or caused to be paid to the respective taxing authorities all taxes as shown on said returns or on any assessment received by it to the extent such taxes have become due except to the extent the Debt Buyer is contesting the same in good faith and through appropriate and timely proceedings and has set aside adequate reserves for the payment thereof;

(g) other than as contemplated by this Agreement, the Purchase Agreement or the JV Documents, Debt Buyer has no ownership interest in the Investment and Debt Buyer has not granted, or attempted to grant, to any other Person any security interest in the Investment, and no financing statement naming Debt Buyer or Debt Buyer Parent as debtor and covering the Investment is on file in any office;

(h) Debt Buyer has delivered to the Company a copy of the executed Purchase Agreement together with all applicable amendments or modifications thereto;

(i) Debt Buyer has delivered to the Company a certificate of its secretary certifying (a) Debt Buyer's valid corporate existence, (b) the status of Debt Buyer as a Single Purpose Entity, including specific affirmations that it will remain as such, (c) the current Debt Buyer Operating Agreement, (d) its current Certificate of Formation or Articles of Organization, as the case may be, (e) the resolutions of the board of managers or other governing authority and of the members or other equity holders of Debt Buyer approving the transactions contemplated hereby, (f) the solvency of Debt Buyer, (g) the absence of pending litigation against the company, and (h) the incumbency of officers executing documents on behalf of Debt Buyer;

(j) Debt Buyer and Debt Buyer Parent have entered into that certain Limited Liability Company Operating Agreement of Debt Buyer dated as of **TBD** attached hereto as Exhibit E (the "***Debt Buyer Operating Agreement***") and such Debt Buyer Operating Agreement has not been amended or modified since its enactment; and

(k) Debt Buyer is and has at all times since its formation been a Single Purpose Entity.

5.2. Covenants of Debt Buyer. Debt Buyer will comply with the following covenants and will cause the following covenants to be complied with, unless the Company shall otherwise consent in writing:

(a) Debt Buyer will preserve and maintain its legal existence and all of its rights, privileges and franchises necessary or desirable in the normal conduct of its business and shall conduct its business in an orderly, efficient and regular manner;

(b) Debt Buyer shall obtain prior to the date required, and preserve and maintain, all licenses and authorizations necessary to purchase, manage and administer consumer debt and other obligations from time to time constituting the Investment and all of its other obligations hereunder in each state in which such licensing is required;

(c) Debt Buyer will conduct all collection activities and all sales, transfers and dispositions relating to the Investment on an arms-length basis;

(d) Debt Buyer will not create, or attempt to create, any pledge, lien, security interest, assignment or transfer upon or in any portion of the Investment, or assign or otherwise convey, or attempt to assign or otherwise convey, any right to receive collections or other income with respect thereto;

(e) neither Debt Buyer nor Debt Buyer Parent will (i) sell, lease, assign, transfer or otherwise dispose of all or a substantial part of its assets (whether in one transaction or in a series of transactions) to any other Person, or (ii) liquidate, dissolve or suspend its business operations;

(f) neither Debt Buyer nor Debt Buyer Parent will consolidate with or merge into any Person, or permit any other Person to merge into it, or acquire (in a transaction analogous in purpose or effect to a consolidation or merger) all or substantially all the assets of any other Person, unless, with respect to Debt Buyer, such transaction is permitted or otherwise approved by the Special Manager of Debt Buyer under the Debt Buyer Operating Agreement and, with respect to

Debt Buyer Parent, (i) Debt Buyer Parent is the resulting and surviving entity and (ii) following such transaction, the equity holders of Debt Buyer Parent immediately prior to such transaction own more than fifty percent (50%) of the voting power of the equity holders of the surviving entity;

(g) Debt Buyer will not accept or receive or agree to accept or receive any rebate, refund, commission, fee (other than as a Service Provider), kickback or rake-off, including any payments under a so-called "Balance Transfer" program, whether cash or otherwise and whether paid by or originating with an obligor associated with the Investment or any other party (including but not limited to brokers and agents), as a result of or in any way in connection with collection activities related to the Investment or in connection with the sale, disposition, transfer or servicing of the Investment;

(h) Debt Buyer shall, and shall cause its Service Providers to, undertake all reasonable efforts to collect or otherwise realize upon the Investment in accordance with the collections plan attached hereto as Exhibit C, which has been previously provided to the Company;

(i) Debt Buyer shall preserve and keep in full force and effect its existence as, and at all times operate as, a Single Purpose Entity, and shall not amend, alter or modify its Debt Buyer Operating Agreement or change, transfer or assign any of its ownership or management interests during the term of this Agreement. A violation of this provision shall be deemed a material default; provided, however, that if the Special Manager of Debt Buyer fails to approve a change to the Debt Buyer Operating Agreement that is proposed by Debt Buyer in response to a notice delivered by the Company pursuant to Section 4.2, and such change to the Debt Buyer Operating Agreement would otherwise cure the Joint Investment Agreement Default set forth in such notice, then, provided that the Company's consent to such amendment is required in its capacity as Special Manager, the facts, circumstances and events set forth in such notice shall not constitute a Joint Investment Agreement Default;

(j) Debt Buyer will not terminate, amend or modify the Purchase Agreement without the prior written consent of the Company; and

(k) Debt Buyer will not, and will ensure that the Service Providers will not, refer to or use the name "Flock Financial," "Flock Middle Market Fund," or any derivative thereof or other name confusingly similar thereto in connection with any collection or enforcement activities with respect to the Investment, in any advertising, printed material, electronic medium or other medium or in any other manner whatsoever.

5.3. Representations and Warranties of the Company. The Company hereby represents and warrants to Debt Buyer as follows:

(a) the Company is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization. The Company has all requisite power and authority to enter into and discharge its obligations under this Agreement; the execution and delivery by the Company of this Agreement and performance and compliance by the Company with the terms of this Agreement have been duly authorized by all necessary action on the part of the Company and will not violate the Company's organizational documents or constitute a default under any indenture or loan or credit agreement or any other material agreement, lease or instrument to which the Company is a party or by which it or its properties may be bound or affected;

DocuSign Envelope ID: E92557E7-948B-4914-B310-40F59CAC6CFC



(b) this Agreement constitutes the valid, legal and binding obligations of the Company, enforceable against the Company in accordance with the Agreement's terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and by general principles of equity (whether) considered in a proceeding or action in equity or at law); and

(c) as of the date hereof, no litigation is pending or, to the Company's knowledge, threatened against the Company, the consequences of which would prohibit its entering into this Agreement or that would materially and adversely affect the condition (financial or otherwise) or operations of the Company or the consequences of which would materially and adversely affect its performance hereunder.

(d) Accredited Investors; Investment for Own Account. The Company represents and warrants that it is an "accredited investor" as defined in Rule 501 of Regulation D promulgated under the Securities Act of 1933. The Company represents that it is making the Investment with Company Funds solely for its own account and beneficial interest for investment and not with a view to or for sale in connection with any distribution of securities, has no present intention of selling, granting any participation in the same, and does not presently have reason to anticipate a change in such intention.

(e) Information and Sophistication. The Company acknowledges that it has received all the information it has requested from Debt Buyer that it considers necessary or appropriate for deciding whether to invest the Company Funds. The Company represents that it has had an opportunity to ask questions and receive answers from Debt Buyer and its officers regarding the terms and conditions of the Investment and to obtain any additional information necessary to verify the accuracy of the information given the Company. The Company further represents that it has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risk of the Investment.

(f) Ability to Bear Economic Risk and Knowledge of Certain Risk Factors. The Company acknowledges that investment in the Investment involves a high degree of risk, and represents that it is able, without materially impairing its financial condition, await payment of Investment Proceeds for an indefinite period of time and to suffer a complete loss of its investment. The Company has evaluated the risks involved in investing in the Investment, and has determined that the Investment is a suitable investment for the Company.

## SECTION 6
## GOVERNING LAW; JURISDICTION

6.1. Governing Law. The laws of the State of New York shall govern the validity of this Agreement, the construction of its terms, and the interpretation of the rights and duties of the Parties without regard to conflicts of law principals.

6.2. Jurisdiction; Waiver of Jury Trial.

(a) Each party hereby irrevocably (i) submits to the exclusive jurisdiction of any state or federal court in the State of Georgia, in any action or proceeding arising out of or relating to this Agreement, the relations between the parties and any matter, action or transaction described in this Agreement, whether in contract, tort or otherwise, (ii) agrees that such courts shall have exclusive jurisdiction over such actions or proceedings, (iii) waives the defense that Georgia is an inconvenient forum to the maintenance and continuation of such action or proceeding, (iv) consents to the service of any and all process in any such action or proceeding by

DocuSign Envelope ID: E92557E7-948B-4914-B310-40F59CAC6CFC



the mailing of copies (certified mail, return receipt requested and postage prepaid) of such process to them at their addresses specified in Section 7.1 and (v) agrees that a final and non-appealable judgment rendered by a court of competent jurisdiction in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. In the event that an action or proceeding is initiated in one of the courts referenced above and is pending, the parties agree, for the convenience of the parties and subject to any limitations on subject matter jurisdiction of the court, to initiate any counterclaims or related actions in the same proceeding (as opposed to a separate proceeding in any of the other courts specified above).

(b) EACH PARTY HERETO, FOR ITSELF AND ON BEHALF OF ITS AFFILIATES, HEREBY WAIVES ITS RIGHT TO TRIAL BY JURY IN ANY ACTION, LAWSUIT OR PROCEEDING RELATING TO ANY DISPUTE ARISING UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION DESCRIBED IN THIS AGREEMENT, WHETHER IN CONTRACT OR IN TORT, OR DISPUTE BETWEEN THE PARTIES (INCLUDING DISPUTES WHICH ALSO INVOLVE OTHER PERSONS).

## SECTION 7
## MISCELLANEOUS

7.1. Notices. Any notice, payment, demand, or communication required or permitted to be given pursuant to any provision of this Agreement shall be in writing and shall be (i) delivered personally, (ii) sent by postage prepaid, registered mail (airmail internationally) or (iii) delivered by nationally recognized overnight courier, addressed as follows, or to such other address as such Person may from time to time specify by notice to the other

Party: (a) If to the Company, to the Company

at:

400 Galleria Parkway, Suite 1720
Atlanta, Georgia 30339
Attn: Michael Flock

(b) If to Debt Buyer, to Debt Buyer at:

1825 Barrett Lakes Blvd,
Kennesaw, GA 30144
Attn: Bill Wilson

(c) Any such notice, payment, demand, or communication shall be deemed to be delivered, given, and received for all purposes hereof (i) on the date of receipt if delivered personally or by courier or (ii) five (5) days after posting if transmitted by mail.

7.2. Indemnity by Debt Buyer and by the Company. Debt Buyer agrees to indemnify, defend and hold harmless the Company and its Affiliates from and against any and all claims, losses, liabilities, damages, penalties, fines, forfeitures, and judgments, and all reasonable legal and accounting fees and other fees, expenses and costs of any kind resulting from or arising out of

(i) any failure of Debt Buyer to comply with and perform all of its duties and agreements hereunder, (ii) any breach by Debt Buyer of any term, condition, representation or covenant of Debt Buyer set forth in this Agreement, (iii) and any and all claims, actions or proceedings brought

against the Company or any Affiliate thereof by any third party as a result of or based upon actions or inactions by Debt Buyer in the performance of its obligations under this Agreement, including any failure by Debt Buyer, any Service Provider or any of their agents, representatives or employees to comply with all applicable debt collection laws, rules and regulations and any other action taken in collection of the Investment, and (iv) fraud and willful misconduct. By its execution below, Debt Buyer Parent hereby agrees to guaranty to the Company the payment and performance of Debt Buyer's obligations under Section 7.2(iv); provided, however, that in no event shall the indemnification obligations of Debt Buyer Parent hereunder extend to a default upon Debt Buyer's obligation to repay any investment of Company Funds to the extent such default arises from insufficient Investment Proceeds.

The Company agrees to indemnify, defend and hold harmless Debt Buyer and its Affiliates, its officers, directors, employees, agents, attorneys, representatives and successors and assigns from and against any and all claims made or threatened by any third party and any related losses, expenses, damages, costs or liabilities, including any reasonable attorneys' fees and expenses incurred in investigation and defense resulting from or arising out of (i) any failure of the Company to comply with and perform all of its duties and agreements hereunder, (ii) any breach by Company of any term, condition, representation or covenant of Company set forth in this Agreement, (iii) and any and all claims, actions or proceedings brought against Debt Buyer or any Affiliate thereof by any third party as a result of or based upon actions or inactions by the Company in the performance of its obligations under this Agreement or any other Agreement with any other party they may have in relation to the Investment, including any failure by the Company, or any of its agents, representatives or employees to comply with all applicable laws, rules and regulations and any other action taken with regard to the Investment, and (iv) fraud and willful misconduct.

7.3. Deliveries of the Parties. Upon the execution and delivery of this Agreement, Debt Buyer shall deliver to the Company a duly executed copy of the Security Agreement in substantially the formed attached hereto as Exhibit D (the "***Security Agreement***") granting the Company a security interest in the Investment to secure the payment of Investment Proceeds under this Agreement as well as the other payments to be made to the Company pursuant to this Agreement. This Agreement, together with the Security Agreement, and all other documents required to be delivered hereunder, shall be delivered to the offices of the Company at the address set forth in Section 7.1(a).

7.4. Binding Effect. Except as otherwise provided in this Agreement, every covenant, term, and provision of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns.

7.5. Construction. Every covenant, term, and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any Party. The word "including" shall mean "including, without limitation."

7.6. Confidentiality. The Parties and their Affiliates will keep confidential all financial terms regarding the transactions contemplated hereby, as well as all financial or business information, or other confidential or proprietary information of or relating to the one another, which has been or is disclosed to the other Party in connection with the negotiation and execution of this Agreement or the transactions contemplated hereby (the "***Confidential Financial Information***"). Neither Party will not disclose any Confidential Financial Information to any Person without the prior written consent of the other Party, other than to the directors, employees, auditors, counsel, or Affiliates of such Party, each of whom shall be informed of the confidential nature of the Confidential Financial Information; provided, however, that each Party may disclose

any such Confidential Financial Information (a) as may be required by any municipal, state, federal or other regulatory body having or claiming to have jurisdiction over such Party, (b) in order to comply with any law, order, regulation, regulatory request or ruling applicable to such Party, or (c) in the event either Party is legally compelled (by interrogatories, requests for information or copies, subpoena, civil investigative demand or similar process) to disclose any such Confidential Financial Information. This Section 7.6 shall be inoperative as to those portions of the Confidential Financial Information which are or become generally available to the public or to Debt Buyer on a non-confidential basis from a source other than the Company or any Person that has a confidentiality obligation with respect thereto to the Company. The obligations of the both Parties under this Section 7.6 shall survive the execution of this Agreement and the acquisition of the Investment.

7.7. Time. Time is of the essence with respect to this Agreement.

7.8. Heading. Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision hereof.

7.9. Severability. Every provision of this Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Agreement.

7.10. Further Action. Each Party agrees to perform all further acts and execute, acknowledge, and deliver any documents which may be reasonably necessary, appropriate, or desirable to carry out the provisions of this Agreement.

7.11. Counterpart Execution. This Agreement may be executed in any number of counterparts with the same effect as if all of the Parties had signed the same document. All counterparts shall be construed together and shall constitute one agreement. Counterparts may be delivered via facsimile, electronic mail (including pdf) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

7.12. Amendments. This Agreement may be amended, modified or supplemented only in a written amendment executed by each of the Parties hereto.

7.13. Survival. The respective obligations of the Parties and set forth in this Agreement shall survive the execution and delivery of this Agreement and the consummation of the acquisition of the Investment pursuant to the Purchase Agreement.

***[SIGNATURES BEGIN ON FOLLOWING PAGE]***

DocuSign Envelope ID: E92557E7-948B-4914-B310-40F59CAC6CFC



IN WITNESS WHEREOF, the Parties have caused this Agreement to be signed as of the date first written above.

**THE COMPANY:**

**FLOCK FINANCIAL, LLC**

By: ______________________________
Name: Michael R. Flock
Title: CEO / Managing Member

**DEBT BUYER:**

**TBD**

By: DocuSigned by: Bill Wilson 39C72222C4AF4DF...
Name: Bill Wilson
Title: CEO

**DEBT BUYER PARENT:**

ACKNOWLEDGED AND AGREED SOLELY TO EVIDENCE ITS RIGHTS AND OBLIGATIONS SET FORTH IN SECTIONS 4.5, 5.2 AND 7.3:

**ARC MANAGEMENT GROUP, LLC**

By: DocuSigned by: Bill Wilson 39C72222C4AF4DF...
Name: Bill Wilson
Title: CEO

DocuSign Envelope ID: E92557E7-948B-4914-B310-40F59CAC6CFC


# EXHIBIT A

**Description of the Investment**

ARC Management Group is purchasing "Balance After Insurance" and "Self-pay Patient Accounts". The accounts are 120 days past due and are being purchased from Schumacher Clinical Partners (SCP). These are unpaid Emergency Room bills for hospitals and physicians that SCP provides billing services.

# EXHIBIT B

**Limitations on Investment Expenses**

Investment Expenses in the aggregate shall be limited on a periodic basis (measured in months from the date of this Agreement) to a specified percentage of the Investment Revenue attributable to the Investment collected during the applicable period. The percentages attributable to each such period are as follows:

| MONTHLY PERIOD | PERCENTAGE OF INVESTMENT REVENUE |
|---|---|
| Months 0 - 6 | 27.5% |
| Months 7 - 12 | 30.0% |
| Months 13 – 18 | 35.0% |
| Months 19 – 24 | 35.0% |
| Months 25 – 36 | 40.0% |
| Months 37 – 48 | 40.0% |
| Months 49+ | 45.0% |

**EXHIBIT C**

**Collection Plan**

ARC will collect 75% of the accounts internally using commercial collection techniques-letters, text, emails and calls. Higher balance accounts will be forwarded to ARC's legal network for suit. 25% of the accounts will be outsourced to other agencies for benchmarking and capacity purposes.

DocuSign Envelope ID: E92557E7-948B-4914-B310-40F59CAC6CFC



# EXHIBIT D

## Form of Security Agreement

## SECURITY AGREEMENT

**THIS SECURITY AGREEMENT** is executed as of this **DAY** of **MONTH**, **2021** by and between **ARC MANAGEMENT GROUP, LLC**, a Georgia limited liability company (hereinafter "***Debtor***") on the one hand, and **FLOCK FINANCIAL, LLC**, a Delaware limited liability company, on the other hand (together hereinafter "***Secured Party***").

**WHEREAS**, Debtor and Secured Party have entered into a Joint Investment Agreement, dated as of the date hereof (the "***Joint Investment Agreement***"; capitalized terms used herein and not defined shall have the meanings assigned to them in the Joint Investment Agreement);

**WHEREAS**, pursuant to the terms of the Joint Investment Agreement, Secured Party has agreed to invest Company Funds with Debtor for the purpose of jointly investing in the Investment;

**WHEREAS**, Debtor is a single purpose entity whose sole member is Debt Buyer Parent, and has agreed to certain obligations under the Joint Investment Agreement; and

**WHEREAS**, Secured Party has required, as a condition precedent to the obligations of Secured Party under the Joint Investment Agreement, that Debtor (among other things) execute this Agreement to secure the payment and performance of all obligations of Debtor under the Joint Investment Agreement.

**NOW THEREFORE**, in consideration of the foregoing recitals, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Debtor and Secured Party hereby agree as follows:

1. Secured Obligations. This Agreement is entered into as security for (a) all obligations of Debtor under the Joint Investment Agreement (whether monetary or otherwise and whether for Investment Proceeds, expenses, indemnity or reimbursement payments or otherwise), (b) any and all other liabilities and obligations owed by Debtor to Secured Party from time to time, howsoever created, arising or evidenced, whether direct or indirect, joint or several, absolute or contingent, now or hereafter existing, or due or to become due, (c) all renewals, extensions, refinancing and modifications of any of the foregoing, and (d) all reasonable costs and expenses incurred by Secured Party in connection with the exercise of its rights and remedies hereunder and under the Joint Investment Agreement (including reasonable attorneys' fees) (collectively, "***Secured Obligations***").

2. Granting Clause. In order to secure the full and punctual payment and performance of the Secured Obligations in accordance with the terms thereof, Debtor does hereby grant, pledge, transfer, sell, assign, convey and deliver to Secured Party a security interest in and to all of Debtor's right, title and interest in and to all of Debtor's personal property and assets, including: (a) all of its receivable portfolios and underlying consumer accounts and receivables attributable to and associated with the Investment that have been or will be acquired by Debtor pursuant to the Joint Investment Agreement and the Purchase Agreement (as the case may be), as well as any

DocuSign Envelope ID: E92557E7-948B-4914-B310-40F59CAC6CFC



Investment Proceeds from the Investment, including, without limitation, all existing, future, and after-acquired accounts, general intangibles, instruments, investment property, chattel paper, letters of credit, letter of credit rights, contract rights, the Control Account, the Trust Account, and the rights to service, manage and cause the collection upon such Investment, together with all ancillary rights, remedies, powers and privileges in connection therewith, and all documents evidencing the foregoing and all cash and non-cash proceeds of the foregoing, including any insurance proceeds, and (b) to the extent not included in the foregoing subsection (a), all accounts (including health-care-insurance receivables), goods (including inventory and equipment), documents (including, if applicable, electronic documents), instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property, general intangibles (including all payment intangibles), money, deposit accounts, and any other contract rights or rights to the payment of money, and all proceeds and products of each of the foregoing, all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all proceeds of any insurance, indemnity, warranty or guaranty payable to Debtor from time to time with respect to any of the foregoing ((a) and (b), collectively, the "***Collateral***"). The security interests are granted as security only and shall not subject Secured Party to, or transfer to Secured Party, or in any way affect or modify, any obligation or liability of Debtor with respect to any Collateral or any transaction in connection therewith.

3. Perfection of Security Interests. Debtor hereby irrevocably authorizes Secured Party at any time and from time to time to file in any relevant jurisdiction relating to the Collateral any financing statements and amendments thereto that contain the information required by Article 9 of the UCC, including any financing or continuation statements or other documents for the purpose of perfecting, confirming, continuing, enforcing or protecting the security interest granted by Debtor hereunder, without the signature of Debtor where permitted by law, including the filing of a financing statement describing the Collateral as all assets now owned or hereafter acquired by Debtor, or words of similar effect. Debtor agrees to provide all information required by Secured Party pursuant to this Section promptly to Secured Party upon request. Further, promptly upon the request of Secured Party, Debtor agrees to cause the depositary bank or banks holding the Control Account and/or Trust Account to execute and deliver a Deposit Account Control Agreement, in form and substance satisfactory to Secured Party, to perfect Secured Party's security interest in such deposit accounts under the UCC.

4. Warranties of Title, etc. Debtor hereby: (a) covenants with Secured Party, its successors and assigns that Debtor is the lawful owner of the Collateral and has the right to sell, assign, convey and grant a security interest in same and that the Collateral is free and clear of all encumbrances and security interests; (b) warrants and covenants to forever defend the title of the Collateral unto Secured Party, its successors and assigns against the claims of all persons whosoever, whether lawful or unlawful; (c) warrants that no financing statement covering any of the Collateral or any of the proceeds therefrom is on file at any public office and that when the UCC financing statements in appropriate form are filed in the appropriate filing office, the security interests of Secured Party shall constitute valid and perfected security interests in the Collateral, prior to all other liens and rights of others therein, to the extent that a security interest therein may be perfected by filing pursuant to the UCC, assuming the proper filing and indexing thereof; and (d) agrees, promptly upon request from Secured Party, at the expense of Debtor, to execute and

deliver all further instruments and documents, obtain such agreements from third parties, and take all further action, that may be necessary or desirable in order to perfect and protect any security interest granted hereby or to Secured Party to exercise and enforce its rights and remedies hereunder or under any other agreement with respect to any Collateral.

5. Taxes and Charges. Debtor agrees to pay all taxes, and charges levied against the Collateral and all other claims that are or may become liens against the Collateral, or any part thereof, and should default be made in the payment of the same.

6. Non-Waiver. It is agreed that no delay in exercising any right or option given or granted hereby to Secured Party shall be construed as a waiver thereof; nor shall a single or partial exercise of any other right, power or privilege. Secured Party may permit Debtor to remedy any default, and Secured Party may waive any default without waiving any other subsequent or prior default to Debtor.

7. Events of Default. As used in this Agreement, the terms "***default***" or "***Security Agreement Default***" shall mean (a) the occurrence of a Joint Investment Agreement Default under the Joint Investment Agreement, (b) any representation or warranty made by or on behalf of Debtor under or pursuant to this Agreement shall have been false or misleading in any material respect when made, or (c) Debtor shall fail to observe or perform any covenant or agreement set forth in this Agreement and such default shall remain uncured for fourteen (14) days or more following notice thereof.

8. Acceleration of Liabilities. Secured Party shall have the rights set forth in the Joint Investment Agreement with respect to the acceleration of amounts payable to Secured Party thereunder.

9. Secured Party's Right After Default. Upon the occurrence of a Security Agreement Default, Secured Party shall have, in addition to any other rights available to it under this Agreement, the Joint Investment Agreement and applicable law, the right without further notice to Debtor to take any or all of the following actions at the same or at different times: (a) to collect all Collateral in Debtor's name and take control of any cash or non-cash proceeds of the Collateral; (b) to enforce payment of any Collateral to prosecute any action or proceeding with respect to the Collateral, to extend the time of payment of any and all Collateral, to make allowance and adjustments with respect thereto and to issue credits in the name of Debtor; and (c) to exercise other rights and remedies under this Agreement and the Joint Investment Agreement or that are available to a secured creditor under the New York Uniform Commercial Code or that are otherwise available at law or in equity, at any time, in any order and in any combination. The net cash proceeds resulting from the exercise of any of the foregoing rights, after deducting all charges, expenses, cost and attorneys' fees relating thereto, including any and all costs and expenses incurred in securing the possession of the Collateral and preparing the same for sale, shall be applied by Secured Party to the payment of the Investment, whether due or to become due, and Debtor shall remain liable to Secured Party for any deficiency.

10. General Authority. Debtor hereby irrevocably appoints Secured Party its true and lawful attorney, with full power of substitution, in the name of Debtor, Secured Party or otherwise,

DocuSign Envelope ID: E92557E7-948B-4914-B310-40F59CAC6CFC



for the sole use and benefit of Secured Party, but at Debtor's expense, to exercise, at any time (subject to the provision below) all or any of the following powers:

a. to file financing statements, financing statement amendments and continuation statements in connection with this Agreement,

b. to demand, sue for, collect, receive and give acquittance for any and all monies due or to become due with respect to any Collateral or by virtue thereof,

c. to settle, compromise, compound, prosecute or defend any action or proceeding with respect to any Collateral,

d. to sell, transfer, assign or otherwise deal in or with the Collateral or the proceeds or avails thereof, as fully and effectually as if Secured Party were the absolute owner thereof, and

e. to extend the time of payment of any or all thereof and to make any allowance and other adjustments with reference to the Collateral;

provided, however, that the powers described in clauses (b) through (e) above may be exercised by Secured Party only if a Security Agreement Default then exists.

11. Successor and Assigns. All covenants and agreements herein made by Debtor shall bind it and its permitted successors and assigns, and every option, right and privilege herein reserved or granted to Secured Party shall inure to the benefit of and may be exercised by Secured Party's successors or assigns.

12. Modification, etc. No modification, amendment or waiver of any provision of this Agreement, any note secured hereby, nor consent to any departure by Debtor there from shall in any event be effective unless the same shall be in writing and signed by Secured Party and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice to or demand on Debtor shall entitle it to any other or further notice or demand in the name, similar or other circumstances.

13. Notices. Any notice, payment, demand, or communication required or permitted to be given pursuant to any provision of this Agreement shall be in writing and shall be (a) delivered personally, (b) sent by postage prepaid, registered mail (airmail internationally) or (c) delivered by nationally recognized overnight courier, addressed as follows, or to such other address as such person may from time to time specify by notice to the other party:

i. If to Secured Party, to Secured Party at:

100 Galleria Parkway, Suite 990
Atlanta, Georgia 30339
Attn: Michael Flock

ii. If to Debtor, to Debtor at:

1825 Barrett Lakes Blvd
Kennesaw, GA 30144
Attn: Bill Wilson

DocuSign Envelope ID: E92557E7-948B-4914-B310-40F59CAC6CFC



iii. Any such notice, payment, demand, or communication shall be deemed to be delivered, given, and received for all purposes hereof (A) on the date of receipt if delivered personally or by courier or (B) five (5) days after posting if transmitted by mail.

14. Governing Law. This Agreement shall be construed in accordance with and governed by the laws of the State of New York.

15. Counterpart Execution. This Agreement may be executed in any number of counterparts with the same effect as if all of the parties had signed the same document. All counterparts shall be construed together and shall constitute one agreement. Counterparts may be delivered via facsimile, electronic mail (including pdf) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and shall be valid and effective for all purposes.

***[SIGNATURES BEGIN ON FOLLOWING PAGE]***

SAMPLE

DocuSign Envelope ID: E92557E7-948B-4914-B310-40F59CAC6CFC



IN WITNESS WHEREOF, each of the undersigned has executed this Security Agreement on the day and year first above written.

**SECURED PARTY:**

**FLOCK FINANCIAL, LLC**

By:

Name: Michael R. Flock

Title: Managing Member

**DEBTOR:**

**ARC MANAGEMENT GROUP, LLC**

By:

Name:

Title:

SAMPLE

**EXHIBIT E**

**Debt Buyer Operating Agreement**

# ORIGINATION FEE AGREEMENT

This Origination Fee Agreement ("Agreement") between Flock Financial, LLC, a limited liability company organized and existing under the laws of the State of Delaware ("Flock"); and the person or entity ("Debt Buyer Parent") signing the Counterpart Signature Page attached to this Agreement (the "Counterpart Signature Page") takes effect on the effective date set forth on the Counterpart Signature Page (the "Effective Date").

**BACKGROUND:**

A. Debt Buyer Parent is engaged in the business of purchasing portfolios of charged-off consumer debt.

B. Flock has raised capital for investment in portfolios of charged-off consumer debt receivables through joint investment arrangements with single purpose subsidiaries of reputable buyers of charged-off consumer debt.

C. Debt Buyer Parent has established a limited liability company ("SPV") that will purchase portfolios of charged-off consumer debt receivables through partial funding by Flock.

D. Simultaneously with the execution of this Agreement, SPV and Flock have entered into a Joint Investment Agreement (the "Joint Investment Agreement") whereby Flock has agreed to invest an amount specified in the Joint Investment Agreement (the "Investment") in SPV to enable it to purchase the portfolios of charged-off consumer debt receivables identified in the Joint Investment Agreement (the "Portfolios"), which Investment return, terms and conditions are in accordance with the terms of the Joint Investment Agreement and is secured pursuant to a Security Agreement between SPV and Flock whereby SPV grants Flock a security interest in the Portfolios.

E. Flock and Debt Buyer Parent (the "Parties") wish to set forth the terms and conditions upon which Debt Buyer Parent will pay Flock an origination fee for the procurement of the Investment (the "Origination Fee").

**AGREEMENT:**

The Parties therefore agree as follows:

***1.*** ***Origination Fee.***

***1.1*** ***Amount.*** The Origination Fee is **$20,558.76** representing **1%** of the Investment.

***1.2*** ***Due Date.*** The Origination Fee is payable by Debt Buyer Parent two months after the Effective Date.

***1.3*** ***Mandatory Prepayments.*** Whenever SPV receives "Investment Proceeds" (as such term is defined in the Joint Investment Agreement), Debt Buyer Parent must prepay an amount equal to the Investment Proceeds SPV receives towards the balance of any unpaid Origination Fee. Any such mandatory prepayment is due within 10 days after SPV received the Investment Proceeds.

***1.4*** ***Late Payment.*** Any payment due under this Agreement that is not paid when due must bear interest from the due date at a monthly rate equal to the lower of 1.5% or the maximum rate allowed under the law.

***2.*** ***Governing Law.*** Regardless of the place of contract, place of performance, or otherwise, this Agreement and all amendments, modifications and supplements to it, and the rights of the Parties under it, must be construed under, and be governed by, the laws of the State of Georgia without giving effect to the principles of law (such as conflicts of law or choice of law rules) that might make the law of some other jurisdiction applicable.

***3.*** ***Miscellaneous.***

***3.1*** ***Notice Procedure.*** No notice or other communication under this Agreement is sufficient to affect any rights, remedies or obligations of a Party unless the notice or communication is in writing and (as elected by the Party giving the notice) is (i) personally delivered, (ii) transmitted by facsimile or e-mail (with receipt acknowledgment), (iii) transmitted by a recognized courier service agreed to by the Parties from time to time or (iv) transmitted by postage prepaid certified or registered mail (with a return receipt requested - airmail if

international), to the Party to which notice or communication is being given at the appropriate address as follows:

(a) If to Flock:
As set forth below its signature at the last page of this Agreement

(b) If to Debt Buyer Parent:
As set forth on the Counterpart Signature Page

Except as otherwise specified in this Agreement, all notices or communications are deemed to have been duly given (i) on the date of receipt if delivered personally, (ii) on the date of transmission if transmitted by facsimile or e-mail, (iii) the day after pick-up by courier if delivered by courier or (iv) 3 days after mailing if delivered by the postal service. A Party may change its address by notice to the other Party.

***3.2*** ***Exhibit.*** The following exhibit is incorporated into this Agreement by this reference:

Exhibit 1: Counterpart Signature Page

***3.3*** ***Nonwaiver of Default.*** If a Party fails to strictly enforce the performance of a provision of this Agreement, the failure does not constitute a waiver of that provision at any future time and it does not prevent that Party from insisting on the strict keeping and performance of that provision at a later time.

***3.4*** ***Amendment or Rescission.*** The Parties may not modify or rescind this Agreement except by a written instrument signed by both Parties.

***3.5*** ***Entirety of Agreement.*** This Agreement constitutes the final agreement between the Parties. It is the complete and exclusive expression of the Parties' agreement on the matters contained in this Agreement. All prior and contemporaneous negotiations and agreements between the Parties on the matters contained in this Agreement are expressly merged into and superseded by this Agreement. The provisions of this Agreement may not be explained, supplemented, or qualified through evidence of trade usage or a prior course of dealings. In entering into this Agreement, neither Party has relied upon any statement, representation, warranty, or agreement of the other Party except for those expressly contained in this Agreement. There are no conditions precedent to the effectiveness of this Agreement other than those expressly stated in this Agreement.

***3.6*** ***Execution.*** The Parties may execute this Agreement in multiple counterparts, each of which constitutes an original, and all of which, collectively, constitute only one agreement. The signatures of both Parties need not appear on the same counterpart, and delivery of an executed counterpart signature page by facsimile or electronic means (including .pdf) is as effective as executing and delivering this Agreement in the presence of the other Party. This Agreement is effective upon delivery of one executed counterpart from each Party to the other Party. In proving this Agreement, a Party must produce or account only for the executed counterpart of the other Party.

Signed:

**FLOCK:**

**FLOCK FINANCIAL, LLC**

By: ________________________________________
Name: Michael R. Flock
Title: CEO

Flock Financial, LLC
400 Galleria Parkway, Suite 1720
Atlanta, Georgia 30339

Attn: Michael Flock

Tel: (770) 644-0850
Fax: (770) 644-0854
Email: mflock@flockfinance.com

**THE SIGNATURE OF DEBT BUYER PARENT:**

Is on the Counterpart Signature Page

***Exhibit 1***

**FLOCK FINANCIAL, LLC**
**ORIGINATION FEE AGREEMENT**

**COUNTERPART SIGNATURE PAGE**

By signing this Counterpart Signature Page, the undersigned identified below as Debt Buyer Parent agrees to be bound by the terms of the Origination Fee Agreement (the "Agreement") between Flock Financial, LLC and Debt Buyer Parent and authorizes the attachment of this signature page to a duplicate original of the Agreement.

Debt Buyer Parent acknowledges receipt of a copy of the Agreement. Debt Buyer Parent acknowledges that Debt Buyer Parent has read the Agreement and understands that by signing this document, Debt Buyer Parent assumes all of the duties and obligations imposed upon Debt Buyer Parent under the Agreement.

Debt Buyer Parent has executed the Agreement as of the date written below.

**DEBT BUYER PARENT:**

**ARC MANAGEMENT GROUP, LLC**
*Please print or type legal name of Debt Buyer Parent*

DocuSigned by:
X Bill Wilson
39C72222C4AF4DF...
*Sign here*

Its: CEO
*If the signatory is executing on behalf of an entity, please Indicate the signatory's title or office with such entity*

Effective Date: September 26, 2022

*Print or type address and e-mail address preferred for communications under the Agreement:*

1825 Barrett Lakes Blvd
Kennesaw, GA 30144

Attn: Bill Wilson
Phone:
Fax:
Email:

DocuSign Envelope ID: E92557E7-948B-4914-B310-40F59CAC6CFC



# SECURITY AGREEMENT

**THIS SECURITY AGREEMENT** is executed as of this **26th** of **SEPTEMBER 2022** by and between **ARC MANAGEMENT GROUP, LLC**, a Georgia limited liability company (hereinafter "***Debtor***") on the one hand, and **FLOCK FINANCIAL, LLC**, a Delaware limited liability company, on the other hand (together hereinafter "***Secured Party***").

**WHEREAS**, Debtor and Secured Party have entered into a Joint Investment Agreement, dated as of the date hereof (the "***Joint Investment Agreement***"; capitalized terms used herein and not defined shall have the meanings assigned to them in the Joint Investment Agreement);

**WHEREAS**, pursuant to the terms of the Joint Investment Agreement, Secured Party has agreed to invest Company Funds with Debtor for the purpose of jointly investing in the Investment;

**WHEREAS**, Debtor is a single purpose entity whose sole member is Debt Buyer Parent, and has agreed to certain obligations under the Joint Investment Agreement; and

**WHEREAS**, Secured Party has required, as a condition precedent to the obligations of Secured Party under the Joint Investment Agreement, that Debtor (among other things) execute this Agreement to secure the payment and performance of all obligations of Debtor under the Joint Investment Agreement.

**NOW THEREFORE**, in consideration of the foregoing recitals, and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Debtor and Secured Party hereby agree as follows:

1. Secured Obligations. This Agreement is entered into as security for (a) all obligations of Debtor under the Joint Investment Agreement (whether monetary or otherwise and whether for Investment Proceeds, expenses, indemnity or reimbursement payments or otherwise), (b) any and all other liabilities and obligations owed by Debtor to Secured Party from time to time, howsoever created, arising or evidenced, whether direct or indirect, joint or several, absolute or contingent, now or hereafter existing, or due or to become due, (c) all renewals, extensions, refinancing and modifications of any of the foregoing, and (d) all reasonable costs and expenses incurred by Secured Party in connection with the exercise of its rights and remedies hereunder and under the Joint Investment Agreement (including reasonable attorneys' fees) (collectively, "***Secured Obligations***").

2. Granting Clause. In order to secure the full and punctual payment and performance of the Secured Obligations in accordance with the terms thereof, Debtor does hereby grant, pledge, transfer, sell, assign, convey and deliver to Secured Party a security interest in and to all of Debtor's right, title and interest in and to all of Debtor's personal property and assets, including: (a) all of its receivable portfolios and underlying consumer accounts and receivables attributable to and associated with the Investment that have been or will be acquired by Debtor pursuant to the Joint Investment Agreement and the Purchase Agreement (as the case may be), as well as any Investment Proceeds from the Investment, including, without limitation, all existing, future, and after-acquired accounts, general intangibles, instruments, investment property, chattel paper, letters of credit, letter of credit rights, contract rights, the Control Account, the Trust Account, and the rights to service, manage and cause the collection upon such Investment, together with all ancillary rights, remedies, powers and privileges in connection therewith, and all documents

DocuSign Envelope ID: E92557E7-948B-4914-B310-40F59CAC6CFC



evidencing the foregoing and all cash and non-cash proceeds of the foregoing, including any insurance proceeds, and (b) to the extent not included in the foregoing subsection (a), all accounts (including health-care-insurance receivables), goods (including inventory and equipment), documents (including, if applicable, electronic documents), instruments, promissory notes, chattel paper (whether tangible or electronic), letters of credit, letter-of-credit rights (whether or not the letter of credit is evidenced by a writing), securities and all other investment property, general intangibles (including all payment intangibles), money, deposit accounts, and any other contract rights or rights to the payment of money, and all proceeds and products of each of the foregoing, all books and records relating to the foregoing, all supporting obligations related thereto, and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, and any and all proceeds of any insurance, indemnity, warranty or guaranty payable to Debtor from time to time with respect to any of the foregoing ((a) and (b), collectively, the "***Collateral***")). The security interests are granted as security only and shall not subject Secured Party to, or transfer to Secured Party, or in any way affect or modify, any obligation or liability of Debtor with respect to any Collateral or any transaction in connection therewith.

3. Perfection of Security Interests. Debtor hereby irrevocably authorizes Secured Party at any time and from time to time to file in any relevant jurisdiction relating to the Collateral any financing statements and amendments thereto that contain the information required by Article 9 of the UCC, including any financing or continuation statements or other documents for the purpose of perfecting, confirming, continuing, enforcing or protecting the security interest granted by Debtor hereunder, without the signature of Debtor where permitted by law, including the filing of a financing statement describing the Collateral as all assets now owned or hereafter acquired by Debtor, or words of similar effect. Debtor agrees to provide all information required by Secured Party pursuant to this Section promptly to Secured Party upon request. Further, promptly upon the request of Secured Party, Debtor agrees to cause the depositary bank or banks holding the Control Account and/or Trust Account to execute and deliver a Deposit Account Control Agreement, in form and substance satisfactory to Secured Party, to perfect Secured Party's security interest in such deposit accounts under the UCC.

4. Warranties of Title, etc. Debtor hereby: (a) covenants with Secured Party, its successors and assigns that Debtor is the lawful owner of the Collateral and has the right to sell, assign, convey and grant a security interest in same and that the Collateral is free and clear of all encumbrances and security interests; (b) warrants and covenants to forever defend the title of the Collateral unto Secured Party, its successors and assigns against the claims of all persons whosoever, whether lawful or unlawful; (c) warrants that no financing statement covering any of the Collateral or any of the proceeds therefrom is on file at any public office and that when the UCC financing statements in appropriate form are filed in the appropriate filing office, the security interests of Secured Party shall constitute valid and perfected security interests in the Collateral, prior to all other liens and rights of others therein, to the extent that a security interest therein may be perfected by filing pursuant to the UCC, assuming the proper filing and indexing thereof; and (d) agrees, promptly upon request from Secured Party, at the expense of Debtor, to execute and deliver all further instruments and documents, obtain such agreements from third parties, and take all further action, that may be necessary or desirable in order to perfect and protect any security interest granted hereby or to Secured Party to exercise and enforce its rights and remedies hereunder or under any other agreement with respect to any Collateral.

5. Taxes and Charges. Debtor agrees to pay all taxes, and charges levied against the Collateral and all other claims that are or may become liens against the Collateral, or any part thereof, and should default be made in the payment of the same.

6. Non-Waiver. It is agreed that no delay in exercising any right or option given or granted hereby to Secured Party shall be construed as a waiver thereof; nor shall a single or partial exercise of any other right, power or privilege. Secured Party may permit Debtor to remedy any default, and Secured Party may waive any default without waiving any other subsequent or prior default to Debtor.

7. Events of Default. As used in this Agreement, the terms "***default***" or "***Security Agreement Default***" shall mean (a) the occurrence of a Joint Investment Agreement Default under the Joint Investment Agreement, (b) any representation or warranty made by or on behalf of Debtor under or pursuant to this Agreement shall have been false or misleading in any material respect when made, or (c) Debtor shall fail to observe or perform any covenant or agreement set forth in this Agreement and such default shall remain uncured for fourteen (14) days or more following notice thereof.

8. Acceleration of Liabilities. Secured Party shall have the rights set forth in the Joint Investment Agreement with respect to the acceleration of amounts payable to Secured Party thereunder.

9. Secured Party's Right After Default. Upon the occurrence of a Security Agreement Default, Secured Party shall have, in addition to any other rights available to it under this Agreement, the Joint Investment Agreement and applicable law, the right without further notice to Debtor to take any or all of the following actions at the same or at different times: (a) to collect all Collateral in Debtor's name and take control of any cash or non-cash proceeds of the Collateral; (b) to enforce payment of any Collateral to prosecute any action or proceeding with respect to the Collateral, to extend the time of payment of any and all Collateral, to make allowance and adjustments with respect thereto and to issue credits in the name of Debtor; and (c) to exercise other rights and remedies under this Agreement and the Joint Investment Agreement or that are available to a secured creditor under the New York Uniform Commercial Code or that are otherwise available at law or in equity, at any time, in any order and in any combination. The net cash proceeds resulting from the exercise of any of the foregoing rights, after deducting all charges, expenses, cost and attorneys' fees relating thereto, including any and all costs and expenses incurred in securing the possession of the Collateral and preparing the same for sale, shall be applied by Secured Party to the payment of the Investment, whether due or to become due, and Debtor shall remain liable to Secured Party for any deficiency.

10. General Authority. Debtor hereby irrevocably appoints Secured Party its true and lawful attorney, with full power of substitution, in the name of Debtor, Secured Party or otherwise, for the sole use and benefit of Secured Party, but at Debtor's expense, to exercise, at any time (subject to the provision below) all or any of the following powers:

(a) to file financing statements, financing statement amendments and continuation statements in connection with this Agreement,

DocuSign Envelope ID: E92557E7-948B-4914-B310-40F59CAC6CFC



(b) to demand, sue for, collect, receive and give acquittance for any and all monies due or to become due with respect to any Collateral or by virtue thereof,

(c) to settle, compromise, compound, prosecute or defend any action or proceeding with respect to any Collateral,

(d) to sell, transfer, assign or otherwise deal in or with the Collateral or the proceeds or avails thereof, as fully and effectually as if Secured Party were the absolute owner thereof, and

(e) to extend the time of payment of any or all thereof and to make any allowance and other adjustments with reference to the Collateral;

provided, however, that the powers described in clauses (b) through (e) above may be exercised by Secured Party only if a Security Agreement Default then exists.

11. Successor and Assigns. All covenants and agreements herein made by Debtor shall bind it and its permitted successors and assigns, and every option, right and privilege herein reserved or granted to Secured Party shall inure to the benefit of and may be exercised by Secured Party's successors or assigns.

12. Modification, etc. No modification, amendment or waiver of any provision of this Agreement, any note secured hereby, nor consent to any departure by Debtor there from shall in any event be effective unless the same shall be in writing and signed by Secured Party and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice to or demand on Debtor shall entitle it to any other or further notice or demand in the name, similar or other circumstances.

13. Notices. Any notice, payment, demand, or communication required or permitted to be given pursuant to any provision of this Agreement shall be in writing and shall be (a) delivered personally, (b) sent by postage prepaid, registered mail (airmail internationally) or (c) delivered by nationally recognized overnight courier, addressed as follows, or to such other address as such person may from time to time specify by notice to the other party:

(i) If to Secured Party, to Secured Party at:

400 Galleria Parkway, Suite 1720
Atlanta, Georgia 30339
Attn: Michael Flock

(ii) If to Debtor, to Debtor at:

1825 Barrett Lakes Blvd
Kennesaw, GA30144
Attn: Bill Wilson

(iii) Any such notice, payment, demand, or communication shall be deemed to be delivered, given, and received for all purposes hereof (A) on the date of receipt if delivered personally or by courier or (B) five (5) days after posting if transmitted by mail.

14. Governing Law. This Agreement shall be construed in accordance with and governed by the laws of the State of New York.

15. Counterpart Execution. This Agreement may be executed in any number of counterparts with the same effect as if all of the parties had signed the same document. All counterparts shall be construed together and shall constitute one agreement. Counterparts may be delivered via facsimile, electronic mail (including pdf) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and shall be valid and effective for all purposes.

***[SIGNATURES BEGIN ON FOLLOWING PAGE]***

IN WITNESS WHEREOF, each of the undersigned has executed this Security Agreement on the day and year first above written.

**SECURED PARTY:**

**FLOCK FINANCIAL, LLC**

By: ______________________

Name: Michael R. Flock
Title: Managing Member

**DEBTOR:**

**ARC MANAGEMENT GROUP, LLC**

By: DocuSigned by: Bill Wilson
89C72222C4AF4DF...

Name: Bill Wilson

Title: CEO

**EXHIBIT "B" FOLLOWS**

GSCCCA eFile1: EF_009987856_001729413_038 Received:Friday, July 14, 2023 5:13:09 PM Page 1 of 1

[redacted]

FILED & RECORDED
Monday, July 17, 2023 10:55:03 AM
File Number: 038-2023-015670
Niki Sewell
Coweta County Clerk of Superior Court

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
CSC 1-800-858-5294

B. E-MAIL CONTACT AT FILER (optional)
SPRFiling@cscglobal.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

2602 97742
CSC
801 Adlai Stevenson Drive
Springfield, IL 62703

Filed In: Georgia
(Central Index - Coweta County)

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | |
|---|---|---|---|---|
| 1a. ORGANIZATION'S NAME ARC Management Group, LLC | | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS 1825 Barrett Lakes Blvd | CITY Kennesaw | STATE GA | POSTAL CODE 30144 | COUNTRY USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | |
|---|---|---|---|---|
| 2a. ORGANIZATION'S NAME | | | | |
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| | | | | |
|---|---|---|---|---|
| 3a. ORGANIZATION'S NAME Flock Financial, LLC | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS 400 Galleria Parkway SE STE 1720 | CITY Atlanta | STATE GA | POSTAL CODE 30339 | COUNTRY USA |

4. COLLATERAL: This financing statement covers the following collateral:
All of Debtor's existing, future, and after-acquired future accounts, general intangibles, instruments, investment property, chattel paper, letters of credit, letters of credit rights, contract rights, and all documents evidencing the foregoing and all cash and non-cash proceeds of the foregoing, including any insurance proceeds, constituting or being a part of the portfolio of charged off consumer debt with a financing value (FACE VALUE) of $ 78,170,959.30 Dollars, which portfolio is identified as ARC-TSG01, pursuant to a Security Agreement dated 07/28/2022, as may be amended.
A description of the portfolio and collateral can be examined by interested parties, at no cost to them, during normal business hours at secured party's office.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA: ARC-TSG01

2602 97742

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)



F

GSCCCA eFile1: EF_009987937_001729428_038 Received:Friday, July 14, 2023 5:42:54 PM Page 1 of 1

[redacted]

FILED & RECORDED
Monday, July 17, 2023 10:56:15 AM
File Number: 038-2023-015673
Niki Sewell
Coweta County Clerk of Superior Court

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
CSC 1-800-858-5294

B. E-MAIL CONTACT AT FILER (optional)
SPRFiling@cscglobal.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

2603 00135
CSC
801 Adlai Stevenson Drive
Springfield, IL 62703

Filed In: Georgia
(Central Index - Coweta County)

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | | |
|---|---|---|---|---|---|
| 1a. ORGANIZATION'S NAME ARC Management Group, LLC | | | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX | |
| 1c. MAILING ADDRESS 1825 Barrett Lakes Blvd | CITY Kennesaw | STATE GA | POSTAL CODE 30144 | COUNTRY USA | |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | |
|---|---|---|---|---|
| 2a. ORGANIZATION'S NAME | | | | |
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| | | | | |
|---|---|---|---|---|
| 3a. ORGANIZATION'S NAME Flock Financial, LLC | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS 400 Galleria Parkway SE STE 1720 | CITY Atlanta | STATE GA | POSTAL CODE 30339 | COUNTRY USA |

4. COLLATERAL: This financing statement covers the following collateral:
All of Debtor's existing, future, and after-acquired future accounts, general intangibles, instruments, investment property, chattel paper, letters of credit, letters of credit rights, contract rights, and all documents evidencing the foregoing and all cash and non-cash proceeds of the foregoing, including any insurance proceeds, constituting or being a part of the portfolio of charged off consumer debt with a financing value (FACE VALUE) of $ 62,818,302.15 Dollars, which portfolio is identified as ARC-TSG02, pursuant to a Security Agreement dated 08/25/2022, as may be amended.
A description of the portfolio and collateral can be examined by interested parties, at no cost to them, during normal business hours at secured party's office.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA: 2603 00135

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)



F

GSCCCA eFile1: EF_009987723_001729381_038 Received:Friday, July 14, 2023 4:43:48 PM Page 1 of 1

[redacted]

FILED & RECORDED
Monday, July 17, 2023 10:42:08 AM
File Number: 038-2023-015660
Niki Sewell
Coweta County Clerk of Superior Court

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
CSC 1-800-858-5294

B. E-MAIL CONTACT AT FILER (optional)
SPRFiling@cscglobal.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

2602 96447
CSC
801 Adlai Stevenson Drive
Springfield, IL 62703

Filed In: Georgia
(Central Index - Coweta County)

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | | |
|---|---|---|---|---|---|
| 1a. ORGANIZATION'S NAME ARC Management Group, LLC | | | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX | |
| 1c. MAILING ADDRESS 1825 Barrett Lakes Blvd | CITY Kennesaw | STATE GA | POSTAL CODE 30144 | COUNTRY USA | |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | |
|---|---|---|---|---|
| 2a. ORGANIZATION'S NAME | | | | |
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| | | | | |
|---|---|---|---|---|
| 3a. ORGANIZATION'S NAME Flock Financial, LLC | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS 400 Galleria Parkway SE STE 1720 | CITY Atlanta | STATE GA | POSTAL CODE 30339 | COUNTRY USA |

4. COLLATERAL: This financing statement covers the following collateral:
All of Debtor's existing, future, and after-acquired future accounts, general intangibles, instruments, investment property, chattel paper, letters of credit, letters of credit rights, contract rights, and all documents evidencing the foregoing and all cash and non-cash proceeds of the foregoing, including any insurance proceeds, constituting or being a part of the portfolio of charged off consumer debt with a financing value (FACE VALUE) of $ 90,094,978.59 Dollars, which portfolio is identified as ARC-KEY01, pursuant to a Security Agreement dated 07/28/22, as may be amended.
A description of the portfolio and collateral can be examined by interested parties, at no cost to them, during normal business hours at secured party's office.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA: ARC-KEY01

2602 96447

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)



F

[redacted]

CTY# YEAR UCC #
0332023-02649
Filed and Recorded Jul-25-2023 11:08am

Connie Taylor
Clerk of Superior Court Cobb Cty. Ga.

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
CSC 1-800-858-5294

B. E-MAIL CONTACT AT FILER (optional)
SPRFiling@cscglobal.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

2603 03008
CSC
801 Adlai Stevenson Drive
Springfield, IL 62703

Filed In: Georgia (Cobb)

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | | |
|---|---|---|---|---|---|
| 1a. ORGANIZATION'S NAME ARC Management Group, LLC | | | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX | |
| 1c. MAILING ADDRESS 1825 Barrett Lakes Blvd | CITY Kennesaw | STATE GA | POSTAL CODE 30144 | COUNTRY USA | |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | |
|---|---|---|---|---|
| 2a. ORGANIZATION'S NAME | | | | |
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| | | | | |
|---|---|---|---|---|
| 3a. ORGANIZATION'S NAME Flock Financial, LLC | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS 400 Galleria Parkway SE STE 1720 | CITY Atlanta | STATE GA | POSTAL CODE 30339 | COUNTRY USA |

4. COLLATERAL: This financing statement covers the following collateral:
All of Debtor's existing, future, and after-acquired future accounts, general intangibles, instruments, investment property, chattel paper, letters of credit, letters of credit rights, contract rights, and all documents evidencing the foregoing and all cash and non-cash proceeds of the foregoing, including any insurance proceeds, constituting or being a part of the portfolio of charged off consumer debt with a financing value (FACE VALUE) of $ 76,674,589.94 Dollars, which portfolio is identified as ARC-TSG06, pursuant to a Security Agreement dated 12/27/2022, as may be amended.
A description of the portfolio and collateral can be examined by interested parties, at no cost to them, during normal business hours at secured party's office.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA: ARC-TSG06 2603 03008

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)



F

[redacted]

CTY# YEAR UCC #
0332023-02651
Filed and Recorded Jul-25-2023 11:08am

Connie Taylor
Clerk of Superior Court Cobb Cty. Ga.

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
CSC 1-800-858-5294

B. E-MAIL CONTACT AT FILER (optional)
SPRFiling@cscglobal.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

2603 06867
CSC
801 Adlai Stevenson Drive
Springfield, IL 62703

Filed In: Georgia (Cobb)

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | | |
|---|---|---|---|---|---|
| 1a. ORGANIZATION'S NAME ARC Management Group, LLC | | | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS 1825 Barrett Lakes Blvd | CITY Kennesaw | | STATE GA | POSTAL CODE 30144 | COUNTRY USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | |
|---|---|---|---|---|
| 2a. ORGANIZATION'S NAME | | | | |
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| | | | | |
|---|---|---|---|---|
| 3a. ORGANIZATION'S NAME Flock Financial, LLC | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS 400 Galleria Parkway SE STE 1720 | CITY Atlanta | STATE GA | POSTAL CODE 30339 | COUNTRY USA |

4. COLLATERAL: This financing statement covers the following collateral:
All of Debtor's existing, future, and after-acquired future accounts, general intangibles, instruments, investment property, chattel paper, letters of credit, contract rights, and all documents evidencing the foregoing and all cash and non-cash proceeds of the foregoing, including any insurance proceeds, constituting or being a part of the portfolio of charged off consumer debt with a financing value (FACE VALUE) of $ 64,961,394.00 Dollars, which portfolio is identified as ARC-TSG04, pursuant to a Security Agreement dated 10/28/22, as may be amended.
A description of the portfolio and collateral can be examined by interested parties, at no cost to them, during normal business hours at secured party's office.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA: ARC-TSG04 2603 06867

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)



F

[redacted]

CTY# YEAR UCC #
0332023-02652
Filed and Recorded Jul-25-2023 11:08am

Connie Taylor
Clerk of Superior Court Cobb Cty. Ga.

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
CSC 1-800-858-5294

B. E-MAIL CONTACT AT FILER (optional)
SPRFiling@cscglobal.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

2603 03910
CSC
801 Adlai Stevenson Drive
Springfield, IL 62703

Filed In: Georgia (Cobb)

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

1a. ORGANIZATION'S NAME: ARC Management Group, LLC

OR

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1825 Barrett Lakes Blvd | Kennesaw | GA | 30144 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

2a. ORGANIZATION'S NAME

OR

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

3a. ORGANIZATION'S NAME: Flock Financial, LLC

OR

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 400 Galleria Parkway SE STE 1720 | Atlanta | GA | 30339 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

All of Debtor's existing, future, and after-acquired future accounts, general intangibles, instruments, investment property, chattel paper, letters of credit, letters of credit rights, contract rights, and all documents evidencing the foregoing and all cash and non-cash proceeds of the foregoing, including any insurance proceeds, constituting or being a part of the portfolio of charged off consumer debt with a financing value (FACE VALUE) of $ 79,076,785.41 Dollars, which portfolio is identified as ARC-TSG09, pursuant to a Security Agreement dated 3/30/23, as may be amended.

A description of the portfolio and collateral can be examined by interested parties, at no cost to them, during normal business hours at secured party's office.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA: ARC-TSG09

2603 03910

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)



F

GSCCCA.org - Image Index 2/4/24, 10:13 AM

[redacted]

CTY# YEAR UCC #
033-2023-02653
Filed and Recorded Jul-25-2023 11:08am

Connie Taylor
Clerk of Superior Court Cobb Cty. Ga.

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
CSC 1-800-858-5294

B. E-MAIL CONTACT AT FILER (optional)
SPRFiling@cscglobal.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

2603 03600
CSC
801 Adlai Stevenson Drive
Springfield, IL 62703

Filed In: Georgia (Cobb)

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | |
|---|---|---|---|
| 1a. ORGANIZATION'S NAME ARC Management Group, LLC | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS 1825 Barrett Lakes Blvd | CITY Kennesaw | STATE GA / POSTAL CODE 30144 | COUNTRY USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | |
|---|---|---|---|
| 2a. ORGANIZATION'S NAME | | | |
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| | | | |
|---|---|---|---|
| 3a. ORGANIZATION'S NAME Flock Financial, LLC | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS 400 Galleria Parkway SE STE 1720 | CITY Atlanta | STATE GA / POSTAL CODE 30339 | COUNTRY USA |

4. COLLATERAL: This financing statement covers the following collateral:
All of Debtor's existing, future, and after-acquired future accounts, general intangibles, instruments, investment property, chattel paper, letters of credit, letters of credit rights, contract rights, and all documents evidencing the foregoing and all cash and non-cash proceeds of the foregoing, including any insurance proceeds, constituting or being a part of the portfolio of charged off consumer debt with a financing value (FACE VALUE) of $ 59,918,223.95 Dollars, which portfolio is identified as ARC-TSG08, pursuant to a Security Agreement dated 2/28/23, as may be amended.
A description of the portfolio and collateral can be examined by interested parties, at no cost to them, during normal business hours at secured party's office.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA: ARC-TSG08 2603 03600

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)



F

[redacted]

CTY# YEAR UCC #
0332023-02654
Filed and Recorded Jul-25-2023 11:08am

Connie Taylor
Clerk of Superior Court Cobb Cty. Ga.

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
CSC 1-800-858-5294

B. E-MAIL CONTACT AT FILER (optional)
SPRFiling@cscglobal.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

2603 03297
CSC
801 Adlai Stevenson Drive
Springfield, IL 62703

Filed In: Georgia (Cobb)

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | |
|---|---|---|---|
| 1a. ORGANIZATION'S NAME ARC Management Group, LLC | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 1c. MAILING ADDRESS 1825 Barrett Lakes Blvd | CITY Kennesaw | STATE GA / POSTAL CODE 30144 | COUNTRY USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | |
|---|---|---|---|
| 2a. ORGANIZATION'S NAME | | | |
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE / POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| | | | |
|---|---|---|---|
| 3a. ORGANIZATION'S NAME Flock Financial, LLC | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| 3c. MAILING ADDRESS 400 Galleria Parkway SE STE 1720 | CITY Atlanta | STATE GA / POSTAL CODE 30339 | COUNTRY USA |

4. COLLATERAL: This financing statement covers the following collateral:
All of Debtor's existing, future, and after-acquired future accounts, general intangibles, instruments, investment property, chattel paper, letters of credit, letters of credit rights, contract rights, and all documents evidencing the foregoing and all cash and non-cash proceeds of the foregoing, including any insurance proceeds, constituting or being a part of the portfolio of charged off consumer debt with a financing value (FACE VALUE) of $ 65,731,904.93 Dollars, which portfolio is identified as ARC-TSG07, pursuant to a Security Agreement dated 1/31/23, as may be amended.
A description of the portfolio and collateral can be examined by interested parties, at no cost to them, during normal business hours at secured party's office.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA: ARC-TSG07 2603 03297

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)



F

GSCCCA.org - Image Index 

CTY# YEAR UCC #
0332023-03096
Filed and Recorded Sep-01-2023 09:53am

Connie Taylor
Clerk of Superior Court Cobb Cty. Ga.

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT SUBMITTER (optional)
CSC 1-800-858-5294

B. E-MAIL CONTACT AT SUBMITTER (optional)
SPRFiling@cscglobal.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

2629 32021
CSC
801 Adlai Stevenson Drive
Springfield, IL 62703

Filed In: Georgia (Cobb)

SEE BELOW FOR SECURED PARTY CONTACT INFORMATION

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | |
|---|---|---|---|---|
| 1a. ORGANIZATION'S NAME: ARC Management Group, LLC | | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS: 1825 Barrett Lakes Blvd | CITY: Kennesaw | STATE: GA | POSTAL CODE: 30144 | COUNTRY: USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | |
|---|---|---|---|---|
| 2a. ORGANIZATION'S NAME | | | | |
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| | | | | |
|---|---|---|---|---|
| 3a. ORGANIZATION'S NAME: Flock Financial, LLC | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS: 400 Galleria Parkway SE STE 1720 | CITY: Atlanta | STATE: GA | POSTAL CODE: 30339 | COUNTRY: USA |

4. COLLATERAL: This financing statement covers the following collateral:

All of Debtor's existing, future, and after-acquired future accounts, general intangibles, instruments, investment property, chattel paper, letters of credit, letters of credit rights, contract rights, and all documents evidencing the foregoing and all cash and non-cash proceeds of the foregoing, including any insurance proceeds, constituting or being a part of the portfolio of charged off consumer debt with a financing value (FACE VALUE) of $ $9,889,309.00 Dollars, which portfolio is identified as ARC-TSG04-2, pursuant to a Security Agreement dated 11/10/2022, as may be amended.
A description of the portfolio and collateral can be examined by interested parties, at no cost to them, during normal business hours at secured party's office.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA: ARC-TSG04-2 2629 32021

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 07/01/23)



F

**EXHIBIT "C" FOLLOWS**

# BUSINESS LOAN AND SECURITY AGREEMENT SUPPLEMENT

*This Business Loan and Security Agreement Supplement is part of (and incorporated by reference into) the Business Loan and Security Agreement. Borrower should keep this important legal document for Borrower's records.*

| YOUR LOAN DETAILS | | |
|---|---|---|
| **Borrower/Business Legal Name:** | ARC MANAGEMENT GROUP, LLC | |
| **D/B/A:** | ARC MANAGEMENT GROUP, LLC | |
| **Federal Tax ID #:** | 03-0607765 | |
| **Physical Address (Business Location):** | 1825 Barrett Lakes Blvd. Suite 505, Kennesaw, Georgia 30144 | |
| **Mailing Address (If different from Physical Address):** | 1825 Barrett Lakes Blvd. Suite 505, Kennesaw, Georgia 30144 | |
| **Lender:** | WebBank | |
| **Loan Amount:** | $ 400,000.00 | |
| **Factor Rate:** | 1.360 | |
| **Term:** | 18 Months | |
| **WEEKLY Payment Amount *:** | $ 6,974.36 | |
| **Origination Fee:** (Deducted at time of disbursement) | $ 0.00 | |
| **Prepayment:** | **The above stated Factor Rate will be reduced, as set forth below, if the Loan is paid off prior to the end of the scheduled term. The discounted Factor Rate will be as follows:** | |
| | **Loan paid off within one (1) month of disbursement/funding:** | **1.075** |
| | **Loan paid off within two (2) months of disbursement/funding:** | **1.095** |
| | **Loan paid off within three (3) months of disbursement/funding:** | **1.115** |
| | **Loan paid off within four (4) months of disbursement/funding:** | **1.135** |
| | **Loan paid off within five (5) months of disbursement/funding:** | **1.155** |
| | **Loan paid off within six (6) months of disbursement/funding:** | **1.175** |
| **Application ID:** | APP-0000002210 | |

* For loans with MONTHLY payments, the first payment will occur fourteen (14) calendar days after the day the loan is funded.

# BUSINESS LOAN AND SECURITY AGREEMENT SUPPLEMENT

*This Business Loan and Security Agreement Supplement is part of (and incorporated by reference into) the Business Loan and Security Agreement. Borrower should keep this important legal document for Borrower's records.*

*This tool is provided to help you understand and assess the cost of your business financing. The calculations below involve certain key assumptions about this Loan, including that the Loan is paid off in its entirety according to the agreed payment schedule and that no repayments are missed or late.*

| Loan Amount | Disbursement Amount[1] | Repayment Amount[2] | Term |
|---|---|---|---|
| $ 400,000.00 | $ 400,000.00 | $ 544,000.00 | 18 Months<br>(repaid WEEKLY) |

| METRIC | METRIC CALCULATION | METRIC EXPLANATION |
|---|---|---|
| **Total Cost-of-Funds**<br><br>**$ 144,000.00** | Origination Fee: **$ 0.00**<br>Cost-of-Funds **$ 144,000.00**<br><br>**Total Cost-of-Funds: $ 144,000.00** | The Origination Fee is deducted from the Loan Amount at the time of disbursement.<br>Cost-of-Funds is the Loan Amount multiplied by the Factor Rate minus the Loan Amount.<br>This is the total amount that you will pay for the Loan.<br><br>The Total Cost-of-Funds amount does not include fees and other charges you can avoid, such as Returned Payment Fees, Bank Block Fees and Default Waiver Fees.[2] |
| **Factor Rate**<br><br>**1.360** | **1.360** | This is the rate that determines the Cost-of-Funds. |
| **Average Monthly Payment**<br><br>**$ 30,222.22** | Repayment Amount: **$ 544,000.00**<br><br>Term (in months): 18 Months<br><br>Average Monthly Payment: **$ 30,222.22** | This is the average monthly repayment amount of the Loan, which does not include fees and other charges you can avoid, such as Returned Payment Fees, Bank Block Fees and Default Waiver Fees.[2]<br><br>The actual repayment frequency for the Loan will be WEEKLY. This is an estimate for comparison purposes only. |
| **Cents on the Dollar (*excluding fees*)**<br><br>**0.36 ¢** | Cost-of Funds: $ 144,000.00<br><br>Loan Amount: $ 400,000.00<br><br>Cents on the Dollar (excluding fees): **0.36 ¢** | This is the Cost-of-Funds paid per dollar borrowed. This amount is exclusive of fees. |
| **Prepayment** | Does prepayment of this Loan result in any new fees or charges?<br>Does the prepayment of this Loan decrease the Repayment Amount? | **No**<br><br>**Yes**<br>(See Prepayment Section above and Section 20 of the accompanying Business Loan and Security Agreement for specific details regarding prepayment). |

[1] The Disbursement Amount is the Loan Amount less the Origination Fee and any applicable tax withheld. Note that the Disbursement Amount may not be the amount deposited to your Designated Checking Bank Account. The amount that will be deposited to your Designated Checking Account may be reduced by any amounts owed to Lender from a prior loan or used to pay off an amount owed to a third-party and/or tax liability.

[2] Your business may incur other fees that are not a condition of borrowing, such as Returned Payment Fees, Bank Block Fees or Default Waiver Fees. Those fees are not reflected above. See Section 20 of the accompanying Business Loan and Security Agreement for details on these fees.

# BUSINESS LOAN AND SECURITY AGREEMENT SUPPLEMENT

*This Business Loan and Security Agreement Supplement is part of (and incorporated by reference into) the Business Loan and Security Agreement. Borrower should keep this important legal document for Borrower's records.*

| FEES | |
|---|---|
| **Mandatory Fees:** | |
| **Origination Fee:** | **$ 0.00** |
| **Florida Documentary Stamp Tax++:** ***(For Florida Loan Transactions Only)*** | **$ 0.00** |
| **Other Potential Fees:** | |
| **Returned Payment Fee:** | $ 35.00 per instance. |
| **Bank Block Fee:** | $ 100.00 per instance. |
| **Default Waiver Fee:** | $ 2,500.00 per instance. |
| | See Section 20 of the accompanying Business Loan and Security Agreement for more details regarding these Fees. |

++ The Florida documentary stamp tax is an excise tax imposed on certain documents executed, delivered, or recorded in Florida. Tax is paid to the Clerk of Court when the document is recorded. When a taxable document is not recorded, the tax must be paid directly to the Florida Department of Revenue. Libertas on behalf of WebBank withholds applicable Florida documentary stamp taxes owed by Borrowers at the time the loan is made and forwards the tax payment to the Florida Department of Revenue on behalf of the Borrower.

| CERTAIN DISCLOSURES | |
|---|---|
| **USA Patriot Act Notice.**<br><br>**Important Information About Procedures For Opening A New Account** | To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account.<br><br>What this means for you: When you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents. |
| **Loan Pricing Disclosure** | Lender uses a system of risk-based pricing to determine the Cost-of-funds. Risk-based pricing is a system that evaluates the risk factors of your application and adjusts the Cost-of-Funds rate up or down based on this risk evaluation. Although Lender believes that its loan process provides expedited turnaround time and efficient access to capital, this loan may be a higher cost loan than loans that may be available through other lenders. |
| **Loan for Specific Purposes Only** | The proceeds of the requested Loan may solely be used for business purposes as set forth in the accompanying Business Loan and Security Agreement. **IN ADDITION, THE LOAN WILL NOT BE USED FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES OR FOR ILLEGAL PURPOSES.** Borrower understands that Borrower's agreement not to use the Loan proceeds for personal, family or household purposes means that certain important duties imposed upon entities making loans for consumer/personal purposes, and certain important rights conferred upon consumers, pursuant to federal or state law **will not apply** to this transaction. |

# BUSINESS LOAN AND SECURITY AGREEMENT

1. **INTRODUCTION.** This Business Loan and Security Agreement together with the accompanying Business Loan and Security Agreement Supplement and the accompanying Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits), (collectively this "Agreement") governs your business loan ("Loan") made by WebBank. Please read it and keep it for your reference. In this Agreement, the words "you," "your" and "Borrower" mean the Borrower identified on the signature page of this Business Loan and Security Agreement. Each Guarantor identified on the signature page of this Business Loan and Security Agreement shall be referred to as "Guarantor" or "Guarantors" in this Agreement. The words "Lender", "we", "us", and "our" mean WebBank or its successor(s) and assign(s).

2. **EFFECTIVE DATE.** This Agreement begins on the date we accept this Agreement in Utah. We may accept this Agreement without signing it by sending you the Disbursement Amount. Borrower understands and agrees that Lender may postpone, without penalty, the disbursement of the Disbursement Amount to Borrower until in Lender's sole discretion all required security interests have been perfected and Lender has received all required personal guarantees or other documentation. If there is a delay in your receipt of the Disbursement Amount, you agree that there will be no adverse consequence to you or us.

3. **AUTHORIZATION.** Borrower agrees that the Loan made by Lender to Borrower shall be conclusively deemed to have been authorized by Borrower and to have been made pursuant to a duly authorized request on its behalf.

4. **LOAN FOR BUSINESS PURPOSES ONLY.** The proceeds of the requested Loan may solely be used for business purposes and not for any other purposes. In addition, the Loan will not be used for personal, family or household purposes or illegal purposes, and Borrower and Guarantors are forever estopped from taking the position that such Loan (including Advances, if any) are or were used for such personal, family or household purposes. Borrower understands that Borrower's agreement not to use the Loan proceeds for personal, family or household purposes means that certain important duties imposed upon entities making loans for personal, family or household purposes, and certain important rights conferred upon such persons, pursuant to federal or state law will not apply **to the Loan or the Agreement. Borrower also understands that Lender will be unable to confirm whether the use of the Loan conforms to this section. Borrower and Guarantors agree that a breach by Borrower of the provisions of this section will not affect Lender's right to (i) enforce Borrower's and Guarantor's promise to pay for all amounts owed under this Agreement, regardless of the purpose for which the Loan is in fact obtained or (ii) use any remedy legally available to Lender, even if that remedy would not have been available had the Loan been made for personal, family or household purposes.**

5. **DISBURSEMENT OF LOAN PROCEEDS, MAINTENANCE OF BORROWER'S BANK ACCOUNT, AND RIGHT TO CANCEL.** If Borrower applied and was approved for a Loan, Borrower's Loan will be disbursed upon approval as provided in the accompanying Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits). Borrower agrees to maintain sufficient funds to meet its Obligations (defined below) under the Agreement (including keeping such account open until the Total Repayment Amount has been completely repaid) in the account identified in the Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits), which is the account that was reviewed in conjunction with underwriting and approval of this Loan.

**Right to Cancel.** Notwithstanding anything to the contrary set forth in this Agreement, the Borrower shall have the right to cancel this Agreement any time until the midnight of the second Business Day following the date Disbursement Amount is initiated by Lender by notifying the Lender or the Servicer of such cancellation by notice sent in accordance with section 38 of this Agreement. Upon timely delivering such cancellation notice to Lender or Servicer, and further provided that Borrower has otherwise complied with the provisions of this Agreement, Borrower shall refund the entire amount of the Disbursement Amount back to the Lender within three (3) Business Days following the date disbursement of the Disbursement Amount is initiated by Lender. Upon such refund of the Disbursement Amount back to Lender, this Agreement shall become null and void and the parties shall have no remaining obligations to or rights against each other except that the Lender shall have the right to keep, as fair and adequate compensation for its costs of entering into this Agreement with Borrower, the entire amount of Weekly Payment Amount or Daily Payment Amount as well as the Origination Fee (as set forth above) received by the Lender prior to the date when Lender receives the Disbursement Amount back from Borrower.

6. **PROMISE TO PAY.** Borrower agrees to pay Lender the Total Repayment Amount in accordance with this Agreement Borrower agrees to enroll in Lender's Automatic Payment Plan and authorizes Lender to debit required payments as provided in the accompanying Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits). Borrower also authorizes Lender to otherwise collect amounts owed to it as provided in this Agreement.

7. **ALTERNATIVE PAYMENT METHODS.** If Borrower knows that for any reason Lender will be unable to process a payment under Lender's Automatic Payment Plan, then Borrower must either restore sufficient funds such that the missed payment can be collected as provided in the accompanying Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) or promptly send the Lender the amount of the missed payment via wire transfer or by delivering a check. If Borrower

# BUSINESS LOAN AND SECURITY AGREEMENT

elects to send payments by postal mail, then Borrower agrees to send such payments to WebBank c/o Libertas Funding, LLC, 411 West Putnam Avenue, Suite 220, Greenwich, CT 06830, Attn: Customer Service. All alternative payments must be made in good funds by check, money order, wire transfer, automatic transfer from an account at an institution offering such service, or other instrument in U.S. Dollars. Borrower understands and agrees that payments made at any other address than as specified by Lender may result in a delay in processing and/or crediting. If Borrower while enrolled in the Automatic Payment Plan makes a payment by mail, or by any pay-by-phone, on-line service, or any other service that Lender makes available, Lender may either treat such payment as an additional payment and continue to process Borrower's scheduled Automatic Payment Plan payments as required by this Agreement may reduce any scheduled Automatic Payment Plan payment by the amount of any such additional payment received.

**8. APPLICATION OF PAYMENTS.** Subject to applicable law, Lender reserves the right to allocate and apply payments received on Borrower's Loan between principal, Cost-of-Funds and fees in any manner Lender chooses in Lender's sole discretion.

**9. POSTDATED CHECKS, RESTRICTED ENDORSEMENT CHECKS AND OTHER DISPUTED OR QUALIFIED PAYMENTS.** Lender can accept late, postdated or partial payments without losing any of Lender's rights under this Agreement (a postdated check is a check dated later than the day it was actually presented for payment). Lender is under no obligation to hold a postdated check and Lender reserves the right to process every item presented as if dated the same date received by Lender or Lender's check processor unless Borrower gives Lender adequate notice and a reasonable opportunity to act on it. Except where such notice and opportunity is given, Borrower may not hold Lender liable for depositing any postdated check. **Borrower agrees not to send Lender partial payments marked "paid in full," "without recourse," or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Agreement. All notices and written communications concerning postdated checks, restricted endorsement checks (including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount) or any other disputed, nonconforming or qualified payments, must be mailed or delivered to WebBank c/o Libertas Funding, LLC, 411 West Putnam Avenue, Suite 220, Greenwich, CT 06830, Attn: Customer Service.**

**10. PREPAYMENT.** Borrower may prepay Borrower's Loan in whole on any Business Day by paying Lender the sum total of the outstanding Total Repayment Amount and any fees as determined by Lender's records in accordance with Section 8. Borrower may prepay Borrower's Loan in part on any Business Day and such payment shall be applied against the Total Repayment Amount and any fees. The Total Repayment Amount shall be reduced by the prepayment factor as set forth on Page 1 of the accompanying Business Loan and Security Agreement Supplement. For example, if the Loan's Factor Rate is 1.30 but the loan is paid off within one (1) month of disbursement/funding, the Factor Rate shall be reduced by the "one-month prepayment factor" as set forth on Page 1 of the accompanying Business Loan and Security Agreement Supplement.

**11. SECURITY INTEREST.** Borrower hereby grants to Lender, the secured party hereunder, a continuing security interest in and to any and all "Collateral" as described below to secure payment and performance of all debts, liabilities and obligations of Borrower to Lender hereunder and also any and all other debts, liabilities and obligations of Borrower to Lender of every kind and description, direct or indirect, absolute or contingent, primary or secondary, due or to become due, now existing or hereafter arising, related to the Loan described in this Agreement, whether or not contemplated by the parties at the time of the granting of this security interest, regardless of how they arise or by what agreement or instrument they may be evidenced or whether evidenced by any agreement or instrument and includes obligations to perform acts and refrain from taking action as well as obligations to pay money including, without limitation, amounts paid to Borrower or on their behalf, all Cost-of-funds, fees and expenses (all hereinafter called "Obligations"). The Collateral includes the following property that Borrower (and Guarantor, if applicable, pursuant to Section 12) now owns or shall acquire or create immediately upon the acquisition or creation thereof: (i) any and all amounts owing to Borrower now or in the future from any merchant processor(s) processing charges made by customers of Borrower via credit card or debit card transactions; (ii) all other tangible and intangible personal property, including, but not limited to (a) cash and cash equivalents, (b) inventory, (c) equipment, (d) investment property including certified and uncertified securities, securities accounts, security entitlements, commodity contracts and commodity accounts, (e) instruments, including promissory notes (f) chattel paper, including tangible chattel paper and electronic chattel paper, (g) documents, (h) letter of credit rights, (i) accounts, including health-care insurance receivables, (j) deposit accounts, (k) commercial tort claims, (l) general intangibles, including payment intangibles and software and (m) as-extracted collateral as such terms may from time to time be defined in the Uniform Commercial Code; and (iii) any and all proceeds of any of the foregoing, including insurance proceeds or other proceeds from the sale, destruction, loss, or other disposition of any of the foregoing, and sums due from a third party who has damaged or destroyed any of the foregoing or from that party's insurer. The security interest Borrower (or Guarantor, if applicable, pursuant to Section 12) grants includes all accessions, attachments, accessories, parts, supplies and replacements for the Collateral, all products, proceeds and collections thereof and all records and data relating thereto. Lender disclaims any security interest in household goods in which Lender is forbidden by law from taking a security interest. In addition to the Collateral described above, Borrower or Guarantor hereby grant to the Lender a security interest in collateral specified on Schedule 11 (attached hereto and made a part hereof).

# BUSINESS LOAN AND SECURITY AGREEMENT

**12. PROTECTING THE SECURITY INTEREST.** Borrower agrees that Lender and/or Lender's Representative may file any financing statement, lien entry form or other document required in order to perfect, amend or continue Lender's security interest in the Collateral and Borrower agrees to cooperate with Lender and Lender's Representative as may be necessary to accomplish said filing and to do whatever Lender and Lender's Representative deems necessary to protect Lender's security interest in the Collateral. Borrower and Guarantor each agree that, if any Guarantor is a corporate entity, then Lender or Lender's Representative may file any financing statement, lien entry form or other document against such Guarantor or its property that Lender and/or Lender's Representative requires in order to perfect, amend or continue Lender's security interest in the Collateral. Any such Guarantor agrees to cooperate with Lender and Lender's Representative as may be necessary to accomplish said filing and to do whatever Lender or Lender's Representative deems necessary to protect Lender's security interest in the Collateral. In this Agreement, "Lender's Representative" means any entity or individual that is designated by Lender to serve in such capacity.

**13. LOCATION OF COLLATERAL; TRANSACTIONS INVOLVING COLLATERAL.** Unless Lender has agreed otherwise in writing, Borrower agrees and warrants that (i) all Collateral (or records of the Collateral in the case of accounts, chattel paper and general intangibles) shall be located at Borrower's address as shown in the application,(ii) except for inventory sold or accounts collected in the ordinary course of Borrower's business, Borrower shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral, (iii) no one else has any interest in or claim against the Collateral that Borrower has not already told Lender about in writing prior to Lender disbursing the Disbursement Amount, (iv) Borrower shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance or charge, other than the security interest provided for in this Agreement and(v) Borrower shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral for less than the fair market value thereof. Borrower shall defend Lender's rights in the Collateral against the claims and demands of all other persons. All proceeds from any unauthorized disposition of the Collateral shall be held in trust for Lender, shall not be co-mingled with any other funds and shall immediately be delivered to Lender. This requirement, however, does not constitute consent by Lender to any such disposition.

**14. TAXES, ASSESSMENTS AND LIENS.** Borrower (and Guarantor, if applicable, pursuant to Section 12) will complete and file all necessary federal, state and local tax returns and will pay when due all taxes, assessments, levies and liens upon the Collateral and provide evidence of such payments to Lender upon request.

FOR FLORIDA LOANS: Florida documentary stamp tax required by law in the amount of $ 0.00 will be paid directly to the Florida Department of Revenue. Borrower agrees to pay such tax and further agrees that the Loan proceeds shall be reduced by said tax amount. The Lender shall forward the tax payment to the Florida Department of Revenue.

**15. INSURANCE.** Borrower (and Guarantor, if applicable, pursuant to Section 12) shall procure and maintain such insurance as Lender may require with respect to the Collateral, in form, amounts and coverage reasonably acceptable to Lender and issued by a company reasonably acceptable to Lender naming Lender as loss payee. If Borrower at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may obtain such insurance as Lender deems appropriate at Borrower's sole cost and expense as further provided in Section 18. Borrower (and Guarantor, if applicable, pursuant to Section 12) shall promptly notify Lender of any loss of or damage to the Collateral.

**16. REPAIRS AND MAINTENANCE.** Borrower (and Guarantor, if applicable, pursuant to Section 12) agrees to only use the Collateral for its originally intended purposes and keep and maintain the Collateral in good order, repair and condition at all times, and to cause others to so use, keep, and maintain, while this Agreement remains in effect. Borrower (and Guarantor, if applicable, pursuant to Section 12) further agrees to pay when due all claims for work done on, or services rendered, or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**17. INSPECTION OF COLLATERAL AND PLACE OF BUSINESS; USE OF PHOTOGRAPHS AND TESTIMONIALS.** Lender and Lender's designated representatives and agents shall have the right during Borrower's normal business hours and at any other reasonable time to examine the Collateral wherever located and the interior and exterior of any Borrower place of business. During an examination of any Borrower place of business, Lender may examine, among other things, whether Borrower (i) has a place of business that is separate from any personal residence, (ii) is open for business, (iii) has sufficient inventory to conduct Borrower's business and (iv) has one or more credit card terminals if Borrower processes credit card transactions. When performing an examination, Lender may photograph the interior and exterior of any Borrower place of business, including any signage, and may photograph any individual who has signed the Agreement ("Signatory") unless the Signatory previously has notified Lender that he or she does not authorize Lender to photograph the Signatory. Lender may obtain testimonials from any Signatory, including testimonials on why Borrower needed the Loan and how the Loan has helped Borrower. Any photograph and testimonial will become and remain the sole property of Lender. Borrower and each Signatory release Lender from any claims that may arise regarding the use of any photograph or testimonial, including any claims of defamation, invasion of privacy or infringement of moral rights, rights of publicity or copyright.

# BUSINESS LOAN AND SECURITY AGREEMENT

**18. LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any related documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any related documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate to protect the Collateral, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. To the extent permitted by applicable law, all such expenses will become a part of the Obligations and, at Lender's option, will: (i) be payable on demand; (ii) be added to the balance of the Loan and be apportioned among and be payable with any installment payments to become due during the remaining term of the Loan; or (iii) be treated as a balloon payment that will be due and payable at the Loan's maturity. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon an Event of Default.

**19. BORROWER'S REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants that: (i) Borrower will comply with all laws, statutes, regulations and ordinances pertaining to the conduct of Borrower's business and promises to hold Lender harmless from any damages, liabilities, costs, expenses (including attorneys' fees) or other harm arising out of any violation thereof; (ii) Borrower's principal executive office and the office where Borrower keeps its records concerning its accounts, contract rights and other property, is that shown in the application; (iii) Borrower is duly organized, licensed, validly existing and in good standing under the laws of its state of formation and shall hereafter remain in good standing in that state, and is duly qualified, licensed and in good standing in every other state in which it is doing business, and shall hereafter remain duly qualified, licensed and in good standing in every other state in which it is doing business, and shall hereafter remain duly qualified, licensed and in good standing in every other state in which the failure to qualify or become licensed could have a material adverse effect on the financial condition, business or operations of Borrower; (iv) the true and correct legal name of the Borrower is set forth in the application; (v) the aggregate ownership percentage of the Signatories is greater than or equal to fifty percent (50%) of the Borrower's business (if the aggregate ownership percentage is less than fifty percent (50%), the Borrower has furnished evidence that the sworn signatories have the authority to bind the Borrower in entering into this Agreement and all actions contemplated hereby); (vi) the execution, delivery and performance of this Agreement, and any other document executed in connection herewith, are within Borrower's powers, have been duly authorized, are not in contravention of law or the terms of Borrower's charter, by-laws or other constating documents, or of any indenture, agreement or undertaking to which Borrower is a party; (vii) all constating documents and all amendments thereto of Borrower have been duly filed and are in proper order and any capital stock issued by Borrower and outstanding was and is properly issued and all books and records of Borrower are accurate and up to date and will be so maintained; (viii) Borrower (a) is subject to no charter, corporate or other legal restriction, or any judgment, award, decree, order, governmental rule or regulation or contractual restriction that could have a material adverse effect on its financial condition, business or prospects, and (b) is in compliance with its charter, by-laws and other constating documents, all contractual requirements by which it may be bound and all applicable laws, rules and regulations other than laws, rules or regulations the validity or applicability of which it is contesting in good faith or provisions of any of the foregoing the failure to comply with which cannot reasonably be expected to materially adversely affect its financial condition, business or prospects or the value of the Collateral; (ix) there is no action, suit, proceeding or investigation pending or, to Borrower's knowledge, threatened against or affecting it or any of its assets before or by any court or other governmental authority which, if determined adversely to it, would have a material adverse effect on its financial condition, business or prospects or the value of the Collateral;(x) all information provided by Borrower(s) and/or Guarantor(s) as part of the application process for the Loan was true and complete; (xi) Borrower does not intend to file for reorganization or liquidation under the bankruptcy or reorganization laws of any jurisdiction; and (xii) Borrower is not presently insolvent within the meaning of the Uniform Commercial Code as well as the United States Bankruptcy Code.

**20. COST-OF-FUNDS AND FEES.** Borrower agrees to pay in full the Cost-of-Funds set forth in the accompanying Business Loan and Security Agreement Supplement. In addition to any other fees described in this Agreement, Borrower agrees to pay the following fees:

A. Origination Fee: A one-time Origination Fee in the amount set forth in the accompanying Business Loan and Security Agreement Supplement. Borrower agrees that this fee will be immediately deducted from the proceeds of Borrower's Loan.

B. Returned Payment Fee: A Returned Payment Fee in the amount set forth in the accompanying Business Loan and Security Agreement Supplement each and every instance a payment processed on Borrower's Loan is returned unpaid or dishonored for any reason.

C. Bank Block Fee: A Bank Block Fee in the amount set forth in the accompanying Business Loan and Security Agreement Supplement each and every instance wherein Lender is blocked or otherwise prevented from accessing Borrower's Designated Bank Account for purposes of a scheduled payment as required by this Agreement.

D. Default Waiver Fee: A Default Waiver Fee in the amount set forth in the accompanying Business Loan and Security Agreement Supplement each and every instance when Lender, in its sole discretion and without any requirement to do so, agrees to waive an Event of Default.

# BUSINESS LOAN AND SECURITY AGREEMENT

Payments made by Borrower hereunder will be applied and allocated between Loan principal, Cost-of- funds, and fees in the manner set forth in Section 8.

21. **INTEREST AND FEES EXCEEDING PERMITTED LIMIT**. If the Loan is subject to a law that sets maximum charges, and that law is finally interpreted so that the Cost-of-funds, interest, Origination Fee, or other fees collected or to be collected in connection with this Agreement exceed the permitted limits, then (i) any such charge will be reduced by the amount necessary to reduce the charge to the permitted limit and (ii) if required by applicable law, any sums already collected from Borrower that exceed the permitted limits will be refunded or credited to Borrower.

22. **ONLINE CUSTOMER PORTAL**. When Borrower signs in with Borrower's valid username and password at https://portal.libertasfunding.com/ Borrower can obtain information about the Borrower's Loan, such as the outstanding balance, transactions and fees. No additional paper statement will be mailed to Borrower. Borrower agrees not to share Borrower's usemame and password to https://portal.libertasfunding.com/ with any third-party.

23. **FINANCIAL INFORMATION AND REEVALUATION OF CREDIT.** Each Borrower and each Guarantor (if any) authorize Lender to obtain business, and personal credit bureau reports and investigative reports in Borrower's and any Guarantor's name, respectively, in connection with Borrower's application and at any time and from time to time during the term of the Loan, including: for purposes of deciding whether to approve the requested Loan; for any update, renewal, or extension of credit; for any review or other account servicing purposes; for engaging in account or Guaranty collections; and/or any other lawful purpose. Upon Borrower's (or Guarantor's) request, Lender will advise if Lender obtained a credit report and/or investigative report and Lender will give Borrower or Guarantor (if any) the credit bureau's name and address. Each Borrower and each Guarantor (if any) agree to submit current financial information, and any other information requested by Lender in any format requested by Lender in Borrower's name and in the name of each Guarantor, respectively, at any time promptly upon Lender's request. Borrower authorizes Lender to act as Borrower's agent for purposes of accessing and retrieving transaction history information regarding Borrower from Borrower's designated merchant processor(s). Lender may, but is not required to, report Lender's credit experiences with Borrower and any Guarantor of Borrower's Loan to third parties as permitted by law, including with respect to any Guarantor to consumer credit reporting agencies. Each Borrower and each Guarantor also agree that Lender may release information to comply with governmental reporting or legal process that Lender believes may be required, whether or not such is in fact required, or when necessary or helpful in completing a transaction, or when investigating a loss or potential loss. Each Borrower and each Guarantor is hereby notified that a negative credit report reflecting on Borrower's and/or any Guarantor's credit record may be submitted to a credit reporting agency (including with respect to any Guarantor to consumer credit reporting agencies) if Borrower or such Guarantor fails to fulfill the terms of their respective credit obligations hereunder. Borrower and Guarantor acknowledge that any credit reporting on the Loan shall be at the sole discretion of Lender (subject to applicable law) and that Lender has the right to report the Loan to Guarantor's personal credit file (if a natural person) should Guarantor not pay any Obligation pursuant to the guaranty set forth in this Agreement.

24. **ATTORNEYS' FEES AND COLLECTION COSTS.** To the extent not prohibited by applicable law, Borrower and Guarantor shall pay to Lender on demand any and all expenses, including, but not limited to, collection costs, all attorneys' fees and expenses, and all other expenses of like or unlike nature which may be expended by Lender to obtain or enforce payment of Obligations either as against Borrower or any Guarantor or surety of Borrower or in the prosecution or defense of any action or concerning any matter arising out of or connected with the subject matter of this Agreement, the Obligations or the Collateral or any of Lender's rights or interests therein or thereto, including, without limiting the generality of the foregoing, any counsel fees or expenses incurred in any bankruptcy or insolvency proceedings and all costs and expenses (including search fees) incurred or paid by Lender in connection with the administration, supervision, protection or realization on any security held by Lender for the debt secured hereby, whether such security was granted by Borrower or by any other person primarily or secondarily liable (with or without recourse) with respect to such debt, and all costs and expenses incurred by Lender in connection with the defense, settlement or satisfaction of any action, claim or demand asserted against Lender in connection therewith, which amounts shall be considered advances to protect Lender's security and shall be secured hereby. To the extent permitted by applicable law, all such expenses will become a part of the Obligations and, at Lender's option, will: (i) be payable on demand; (ii) be added to the balance of the Loan and be apportioned among and be payable with any installment payments to become due during the remaining term of the Loan; or (iii) be treated as a balloon payment that will be due and payable at the Loan's maturity. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon an Event of Default.

25. **BORROWER'S REPORTS.** Promptly upon Lender's written request, Borrower and each Guarantor agrees to provide Lender with such information about the financial condition and operations of Borrower or any Guarantor, as Lender may, from time to time, reasonably request. Borrower also agrees promptly upon becoming aware of any Event of Default, or the occurrence or existence of an event which, with the passage of time or the giving of notice or both, would constitute an Event of Default hereunder, to promptly provide notice thereof to Lender in writing.

26. **TELEPHONE COMMUNICATIONS.** Notwithstanding any current or prior election to opt in or to opt out of receiving telemarketing calls or SMS messages (including text messages) from the Lender, its affiliates, marketing partners, agents and others calling at

# BUSINESS LOAN AND SECURITY AGREEMENT

Lender's request or on its behalf, Borrowers and Guarantors hereby expressly consent to receive calls and messages, including auto- dialed and pre-recorded message calls and SMS messages (including text messages) from Lender, its affiliates, and agents calling at Lender's request or on its behalf, arising out of or relating to your application, loan, and/or account, at any telephone numbers (including any cellular or mobile telephone numbers) that Borrowers and/or Guarantors have provided or may provide in the future, or otherwise may be in Lender's possession or that Lender may reasonably associate with your account through skip tracing, caller ID capture or other means. Borrowers and Guarantors agree that such communications may be initiated using an automated telephone dialing system.

**27. INDEMNIFICATION AND LIMITATION OF LIABILITY.** Except for Lender's gross negligence or willful misconduct, Borrower will indemnify and save Lender harmless from all losses, costs, damage, liabilities, or expenses (including, without limitation, court costs and reasonable attorneys' fees) that Lender may sustain or incur by reason of defending or protecting Lender's security interest or the priority thereof or enforcing the Obligations, or in the prosecution or defense of any action or proceeding concerning any matter arising out of or in connection with this Agreement and/or any other documents now or hereafter executed in connection with this Agreement and/or the Obligations and/or the Collateral. IN NO EVENT WILL WE BE LIABLE FOR ANY CLAIMS ASSERTED BY BORROWER UNDER ANY THEORY OF LAW, INCLUDING ANY TORT OR CONTRACT THEORY FOR LOST PROFITS, LOST REVENUES, LOST BUSINESS OPPORTUNITIES, EXEMPLARY, PUNITIVE, SPECIAL, INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES, EACH OF WHICH BORROWER HEREBY EXPRESSLY WAIVES. This provision shall survive the repayment of the Obligations and the termination of this Agreement.

**28. MERGERS, CONSOLIDATIONS OR SALES.** Borrower represents and agrees that Borrower will not (i) merge or consolidate with or into any other business entity; (ii) enter into any joint venture or partnership with any person, firm or corporation; or (iii) substantially assign its assets to any other business entity or person.

**29. CHANGE IN LEGAL STATUS.** Without Lender's written consent, Borrower represents and agrees that Borrower will not change (i) its name, (ii) its place of business (or if more than one place of business, its chief executive office), (iii) it mailing address, (iv) its organizational identification number, or (v) its type of organization, jurisdiction of organization or other legal structure. Borrower shall promptly notify Lender in writing of any change concerning its organizational identification number.

**30. DEFAULT.** The occurrence of any one or more of the following events (herein, "Events of Default") shall constitute, without notice or demand, a default under this Agreement and all other agreements between Lender and Borrower and instruments and papers given Lender by Borrower, whether such agreements, instruments, or papers now exist or hereafter arise: (i) Lender is unable to collect any Automatic Payment Plan payment and/or, Borrower fails to pay any Obligations when due; (ii) Borrower fails to comply with, promptly, punctually and faithfully perform or observe any term, condition or promise within this Agreement; (iii) the determination by Lender that any statement, representation or warranty heretofore, now or hereafter made by Borrower or Guarantor to Lender, in any documents, instrument, agreement, application or paper was not true or accurate when given; (iv) the occurrence of any event such that any indebtedness of Borrower from any lender other than Lender could be accelerated, notwithstanding that such acceleration has not taken place; (v) the occurrence of any event that would cause a lien creditor, as that term is defined in Section 9–102 of the Uniform Commercial Code, (other than Lender) to take priority over the Loan made by Lender; (vi) a filing against or relating to Borrower (unless consented to in writing by Lender) of (a) a federal tax lien in favor of the United States of America or any political subdivision of the United States of America, or (b) a state tax lien in favor of any state of the United States of America or any political subdivision of any such state; (vii) the occurrence of any event of default under any other agreement between Lender and Borrower or instrument or paper given Lender by Borrower, whether such agreement, instrument, or paper now exists or hereafter arises (notwithstanding that Lender may not have exercised its rights upon default under any such other agreement, instrument or paper); (viii) any act by, against, or relating to Borrower, or its property or assets, which act constitutes the application for, consent to, or sufferance of the appointment of a receiver, trustee or other person, pursuant to court action or otherwise, over all, or any part of Borrower's property; (ix) the granting of any trust mortgage or execution of an assignment for the benefit of the creditors of Borrower, or the occurrence of any other voluntary or involuntary liquidation or extension of debt agreement for Borrower; (x) the failure by Borrower to generally pay the debts of Borrower as they mature; (xi) adjudication of bankruptcy or insolvency relative to Borrower; (xii) the entry of an order for relief or similar order with respect to Borrower in any proceeding pursuant to Title 11 of the United States Code entitled "Bankruptcy" (the "Bankruptcy Code") or any other federal bankruptcy law; (xiii) the filing of any complaint, application or petition by or against Borrower initiating any matter in which Borrower is or may be granted any relief from the debts of Borrower pursuant to the Bankruptcy Code or any other insolvency statute or procedure; (xiv) the calling or sufferance of a meeting of creditors of Borrower; (xv) the meeting by Borrower with a formal or informal creditor's committee; (xvi) the offering by or entering into by Borrower of any composition, extension or any other arrangement seeking relief or extension for the debts of Borrower, or the initiation of any other judicial or non-judicial proceeding or agreement by, against or including Borrower that seeks or intends to accomplish a material reorganization or arrangement with creditors;(xvii) the entry of any material judgment against Borrower, which judgment is not satisfied or appealed from (with execution or similar process stayed) within fifteen (15) days of its entry; (xviii) the occurrence of any event or circumstance with respect to Borrower such that Lender shall believe in good faith that the prospect of payment of all or any part of the Obligations or the performance by Borrower under this Agreement or any other agreement between Lender and Borrower is impaired or there shall occur any material adverse change in the business or financial condition of Borrower (such event specifically includes, but is not limited to, taking additional financing from a credit card advance, cash advance company or

an additional working capital loan without the prior written consent of Lender); (xix) the entry of any court order that enjoins, restrains or in any way prevents Borrower from conducting all or any part of its business affairs in the ordinary course of business; (xx) the occurrence of any uninsured loss, theft, damage or destruction to any material asset(s) of Borrower; (xxi) any act by or against, or relating to Borrower or its assets pursuant to which any creditor of Borrower seeks to reclaim or repossess or reclaims or repossesses all or a portion of Borrower's assets; (xxii) the termination of existence, dissolution or liquidation of Borrower or the ceasing to carry on actively any substantial part of Borrower's current business; (xxiii) this Agreement shall, at any time after its execution and delivery and for any reason, cease to be in full force and effect or shall be declared null and void, or the validity or enforceability hereof shall be contested by Borrower or any Guarantor of Borrower, including denial of any further liability or obligation hereunder;(xxiv) any Guarantor or person signing a support agreement in favor of Lender shall repudiate, purport to revoke or fail to perform his or her obligations under his guaranty or support agreement in favor of Lender or any corporate guarantor shall cease to exist; (xxv) any material change occurs in Borrower's ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held); (xxvi) if Borrower is a partnership, any general or managing partner dies; if Borrower is a corporation, any principal officer or 50% or greater shareholder dies; if Borrower is a limited liability company, any managing member dies; if Borrower is any other form of business entity, any person(s) directly or indirectly controlling fifty percent (50%) or more of the ownership interests of such entity dies.

**31. RIGHTS AND REMEDIES UPON DEFAULT.** Subject to applicable law, if an Event of Default occurs under this Agreement, at any time thereafter, Lender may exercise any one or more of the following rights and remedies:

A. Debit Amounts Due From Borrower's Accounts: Lender may debit from Borrower's Designated Checking Account all Automatic Payment Plan payments that Lender was unable to collect and/or the amount of any other Obligations that Borrower failed to pay.

B. Accelerate Indebtedness: Lender may declare the entire Obligations immediately due and payable, without notice to Borrower notwithstanding Section 33.

C. Assemble Collateral: Lender may require Borrower and/or Guarantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Borrower and/or Guarantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter, provided Lender does so without a breach of the peace or a trespass, upon the property of Borrower and/or Guarantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Borrower and/or Guarantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Borrower and/or Guarantor after repossession.

D. Sell the Collateral: Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Borrower and/or Guarantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Borrower, Guarantor and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after an Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Obligations secured by this Agreement. To the extent permitted by applicable law, all such expenses will become a part of the Obligations and, at Lender's option, will: (i) be payable on demand; (ii) be added to the balance of the Loan and be apportioned among and be payable with any installment payments to become due during either (a) the term of any applicable insurance policy or (b) the remaining term of the Loan; or (iii) be treated as a balloon payment that will be due and payable at the Loan's maturity.

E. Appoint Receiver: Lender shall have the right to have a Receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Obligations. The Receiver may serve without bond if permitted by law. Lender's right to the appointment of a Receiver shall exist whether or not the apparent value of the Collateral exceeds the Obligations by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

F. Collect Revenues, Apply Accounts: Lender, either itself or through a Receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income and revenues therefrom and hold the same as security for the Obligations or apply it to payment of the Obligations in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose or realize on the Collateral as Lender may determine, whether or not any amount included within the Obligations is then due. For these purposes, Lender may, on behalf of and in the name of Borrower and/or Guarantor, receive, open and dispose of mail addressed to Borrower; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment or storage of any Collateral.

# BUSINESS LOAN AND SECURITY AGREEMENT

To facilitate collections, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

G. Obtain Deficiency: If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Borrower and/or Guarantor for any deficiency remaining on the Obligations due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Borrower and/or Guarantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

H. Other Rights and Remedies: Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity or otherwise.

I. Election of Remedies: Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, any related documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower under the Agreement, after Borrower's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**32. CONSENT TO JURISDICTION AND VENUE.** Subject to Section 33 below, Borrowers and Guarantors each consent to the jurisdiction of the federal and Utah state courts and agree that any action or proceeding to enforce or arising out of this Agreement may only be brought or in the United States District Court for the District of Utah or in any court of the State of Utah, and Borrower and Guarantors waive personal service of process. Borrowers and Guarantors each waive any objections, including *forum non conveniens,* to the bringing of any such proceeding in such jurisdictions.

**33. ARBITRATION.** To the extent that a claim or dispute arises out of, or in relation to this Agreement, including without limitation, the terms, construction, interpretation, performance, termination, breach, or enforceability of this Agreement, Borrower(s) and Guarantor(s) hereby agree that the claim or dispute may be resolved by mandatory binding arbitration in Utah at the sole election of the Lender within thirty (30) days after the claim or dispute arises. If Lender so elects, the parties agree that (i) the arbitration shall be administered by JAMS and the arbitration shall be conducted in accordance with the Expedited Procedures of the JAMS Comprehensive Arbitration Rules and Procedures except as otherwise agreed in this Agreement; (ii) the arbitrator shall be chosen in accordance with the procedures of JAMS and shall base the award on applicable Utah law; (iii) the arbitration shall be conducted by a single arbitrator; (iv) judgment on the award may be entered in any court having jurisdiction, subject to Section 32 above; and (iv) the costs of the arbitration shall be divided equally between the parties. This arbitration section is governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16.

**34. SERVICE OF PROCESS.** Borrower and Guarantor(s) consent to service of process and legal notices made by Certified or Priority Mail delivered by the United States Postal Service and addressed to the Borrower's mailing address set forth on the first page of this Agreement or any other address(es) provided in writing to Lender by Borrower or Guarantor(s), and unless applicable law or rules provide otherwise, any such service will be deemed complete upon dispatch. Borrower and Guarantor(s) agree that it will be precluded from asserting that it did not receive service of process or any other notice mailed to the Borrower's mailing address set forth on the first page of this Agreement unless (i) it furnishes a Certified mail return receipt that is addressed to Libertas Funding, LLC, 411 West Putnam Avenue, Suite 220, Greenwich, CT 06830 ATTN: Customer Service and that is signed by the Lender demonstrating that Lender was provided with notice of a change in Borrower's and/or Guarantor's(s') (as applicable) mailing address, and (ii) service of process by Lender was sent to an address other than the address of Borrower and/or Guarantor(s) (as applicable) specified in such notice sent by Certified mail return receipt.

**35. NO WAIVER BY LENDER.** No delay or omission on the part of Lender in exercising any rights under this Agreement, any related guaranty or applicable law shall operate as a waiver of such right or any other right. Waiver on any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion. All Lender's rights and remedies, whether evidenced hereby or by any other agreement, instrument or paper, shall be cumulative and may be exercised singularly or concurrently.

**36. ASSIGNMENT.** This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties hereto; provided, however, that Borrowers may not assign this Agreement or any rights or duties hereunder without Lender's prior written consent and any prohibited assignment shall be absolutely null and void. No consent to an assignment by Lender shall release Borrowers from its Obligations. Lender may assign this Agreement and its rights and duties hereunder and no consent or approval by Borrower is required in connection with any such assignment. Lender reserves the right to sell, assign, transfer, negotiate or grant participations in all or any part of, or any interest in Lender's rights and benefits hereunder. In connection with any assignment or participation, Lender may disclose all documents and information that Lender now or hereafter may have relating to Borrower or Borrower's business. To the extent that Lender assigns its rights and obligations hereunder to another party, Lender thereafter shall be released from such assigned obligations to Borrower and such assignment shall affect a novation between Borrower and such other party. Libertas Funding, LLC ("Libertas") (in its capacity as Servicer) or a successor servicer (if any) shall, acting solely for this purpose as a non-fiduciary agent of Lender, maintain at one of its offices in the United States a copy of each assignment agreement delivered to it with respect to this Loan and a register for the recordation of the name of each assignee of this Loan, and principal and interest amount of this Loan owing to, such assignee pursuant to the terms

hereof. The entries in such register shall be conclusive, and Borrower, Lender and each such assignee may treat each person whose name is recorded therein pursuant to the terms hereof as a "Lender" hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The register maintained for this Loan shall be available for inspection by Borrower and any such assignee of this Loan, at any reasonable time upon reasonable prior notice to Libertas (in its capacity as Servicer) or the applicable successor servicer (if any). This Section 35 shall be construed so that this Loan is at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Internal Revenue Code and any related Treasury regulations (or any other relevant or successor provisions of the Internal Revenue Code or of such Treasury regulations)

**37. INTERPRETATION.** Paragraph and section headings used in this Agreement are for convenience only and shall not affect the construction of this Agreement. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against Lender or Borrower, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by all parties, having had the opportunity to consult counsel, and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of all parties hereto.

**38. SEVERABILITY.** If one or more provisions of this Agreement (or the application thereof) is determined invalid, illegal or unenforceable in any respect in any jurisdiction, the same shall not invalidate or render illegal or unenforceable such provision (or its application) in any other jurisdiction or any other provision of this Agreement (or its application).

**39. NOTICES.** Except as otherwise provided in this Agreement, notice under this Agreement must be in writing. Notice to Lender will be deemed received by Lender at address set forth in Section 47 (or to any other address as may be specified by either party by a notice given as provided herein), by U.S. mail, postage prepaid, first class mail; in person; by registered mail; by certified mail; by nationally recognized overnight courier; or when sent by electronic mail. Notice to Borrower and/or any personal guarantor will be deemed given when sent to Borrower's last known address or electronic mail address in Lender's records for this Loan.

**40. RECORDKEEPING AND AUDIT REQUIREMENTS.** Lender shall have no obligation to maintain any electronic records or any documents, schedules, invoices or any other paper delivered to Lender by Borrower in connection with this Agreement or any other agreement other than as required by law. Borrower will at all times keep accurate and complete records of Borrower's accounts and Collateral. At Lender's request, Borrower shall deliver to Lender: (i) schedules of accounts and general intangibles; and (ii) such other information regarding the Collateral as Lender shall request. Lender, or any of its agents, shall have the right to call any telephone numbers that Borrower has provided or may provide in the future or otherwise in the Lender's possession (including any cellular or mobile telephone numbers),at intervals to be determined by Lender. Lender, or any of its agents, shall have the right to without hindrance or delay, to inspect, audit, check, and make extracts from any copies of the books, records, journals, orders, receipts, correspondence that relate to Borrower's accounts and Collateral or other transactions between the parties thereto and the general financial condition of Borrower. Lender, or any of its agents, may remove any of such records temporarily for the purpose of having copies made thereof. If Borrower was referred to Lender for this Loan by a third-party (the "Referring Party"), then Borrower consents to Lender sharing certain reasonable information about Borrower with the Referring Party for purposes of the Referring Party verifying and/or auditing loans made through such Referring Party's referrals as well as the servicing and collection of Borrower's Loan account. Wherever appropriate in this Agreement, a singular term shall be construed to the mean the plural where necessary, and a plural term the singular. For example, if at any time two parties shall constitute Borrower, then the relevant term shall refer to both parties together.

**41. GOVERNING LAW.** Subject to Section 33 above, our relationship including this Agreement and any claim, dispute or controversy (whether in contract, tort, or otherwise) at any time arising from or relating to this Agreement is governed by, and this Agreement will be construed in accordance with federal law and (to the extent not preempted by federal law) Utah law without regard to internal principles of conflict of laws. The legality, enforceability and interpretation of this Agreement and the amounts contracted for, charged and reserved under this Agreement will be governed by such laws. Borrower understands and agrees that (i) Lender is located in Utah,(ii) Lender makes all credit decisions from Lender's office in Utah, (iii) the Loan is made in Utah (that is, no binding contract will be formed until Lender receives and accepts Borrower's signed Agreement in Utah) and (iv) Borrower's payments are not accepted until received by Lender in Utah.

**42. WAIVER OF NOTICES AND OTHER TERMS.** Except for any notices provided for in this Agreement, Borrower and any person who has obligations pursuant to this Agreement (*e.g.*, a Guarantor), to the extent not prohibited by applicable law hereby, waives demand, notice of nonpayment, notice of intention to accelerate, notice of acceleration, presentment, protest, notice of dishonor and notice of protest. To the extent permitted by applicable law, Borrower and any person who has obligations pursuant to this Agreement also agrees: Lender is not required to file suit, show diligence in collection against Borrower or any person who has obligations pursuant to this Agreement, or proceed against any Collateral; Lender may, but will not be obligated to, substitute, exchange or release any Collateral; Lender may release any Collateral, or fail to realize upon or perfect Lender's security interest in any Collateral; Lender may, but will not be obligated to, sue one or more persons without joining or suing others; and Lender may modify, renew, or extend this Agreement (repeatedly and for any length of time) without notice to or approval by any person who has obligations pursuant to this Agreement (other than the party with whom the modification, renewal or extension is made).

# BUSINESS LOAN AND SECURITY AGREEMENT

**43. MONITORING, RECORDING AND ELECTRONIC COMMUNICATIONS.** In order to ensure a high quality of service for Lender's customers, Lender, or its servicing agent, may monitor and/or record telephone calls between Borrower and /or Guarantor and Lender's employees or agents. Borrower acknowledges that Lender may do so and agrees in advance to any such monitoring or recording of telephone calls. Borrower also agrees that Lender may communicate with Borrower electronically by email and text.

**44. JURY TRIAL WAIVER AND CLASS ACTION WAIVER.** To the extent not prohibited by applicable law, Borrower, Guarantors and Lender waive their right to a trial by jury of any claim or cause of action based upon, arising out of or related to the Agreement and all other documentation evidencing the Obligations, in any legal action or proceeding. Subject to Section 33 above, any such claim or cause of action shall be tried by court sitting without a jury.

**THE PARTIES HERETO (LENDER, BORROWERS AND GUARANTORS) WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST ANY OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR AGAINST PUBLIC POLICY. TO THE EXTENT ANY PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST ANY OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.**

**45. CONFIDENTIALITY.** Borrower and Guarantor (if any) shall not make, publish or otherwise disseminate in any manner a copy of this Agreement or any public statement or description of the terms of this Agreement, except to its employees, advisors and similar persons who have a legitimate need to know its contents.

**46. ENTIRE AGREEMENT.** The accompanying Business Loan and Security Agreement Supplement and the Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) and any other documents required by Lender now or in the future in connection with this Agreement and Borrower's Loan are hereby incorporated into and made a part of this Agreement. This Agreement is the entire agreement of the parties with respect to the subject matter hereof and supersedes any prior written or verbal communications or instruments relating thereto, including any agreement, authorization, or consent, or communication between Borrower or Guarantor (if any) and an Independent Sales Organization that may have referred Borrower to Lender. Notwithstanding any agreement, authorization, or consent, or communication Borrower (or Guarantor if any) and an Independent Sales Organization, Borrower and Guarantor (if any) shall only have opt-out rights with respect to any agreement, authorization, or consent as provided in this Agreement or as otherwise provided in any other agreement, authorization, or consent between Borrower (or Guarantor if any) and Lender or its Servicer, Libertas. If Borrower (or Guarantor if any) wishes to exercise any applicable opt-out right, it must directly contact Lender or Servicer.

**47. COUNTERPARTS; ELECTRONIC SIGNATURES.** This Agreement may be executed in one or more counterparts, each of which counterparts shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument. For purposes of the execution of this Agreement, signatures delivered by electronic, or fax transmission shall be treated in all respects as original signatures.

**48. CUSTOMER SERVICE CONTACT INFORMATION.** If you have questions or comments about your Loan, you may contact us by (i) e-mail at Customerservice@libertasfunding.com, (ii) telephone at (800) 704-8675 or (iii) WebBank c/o Libertas Funding, LLC, 411 West Putnam Avenue, Suite 220, Greenwich, CT 06830, Attn: Customer Service.

**49. GRANT OF LICENSE TO USE LIBERTAS CUSTOMER PORTAL.** Subject to Borrower's compliance with this Agreement and the Terms of Use for Libertas' Customer Portal, Borrower is granted a nonexclusive, revocable, non-transferable, non-sublicensable, limited right and royalty-free license to use Libertas' Customer Portal, effective solely during the term of the Loan and so long as an Event of Default has not occurred. The license granted to Borrower is personal, and no rights hereunder may be transferred by Borrower without express written approval. The license granted hereunder may be terminated without notice at any time after an Event of Default has occurred.

**50. CERTIFICATION AND SIGNATURES.** By executing this Agreement or authorizing the person signing or affirming below to execute on its behalf, Borrower certifies that Borrower has received a copy of this Agreement and that Borrower has read, understands and agrees to be bound by its terms. Each person signing or affirming below certifies that such person is signing on behalf of the Borrower.

# BUSINESS LOAN AND SECURITY AGREEMENT

ARC MANAGEMENT GROUP, LLC

By: Bill Wilson

William Wilson

BORROWER

02-09-2023

William Wilson

By: Bill Wilson

William Wilson

OWNER

02-09-2023

Thresa Wilson

By: Thresa Wilson
Thresa Wilson (Feb 9, 2023 19:07 EST)

Thresa Wilson

OWNER

02-09-2023

# BUSINESS LOAN AND SECURITY AGREEMENT

## AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT) AND DIRECT PAYMENTS (ACH DEBITS)

**This Authorization Agreement for Direct Deposit ("ACH Credit") and Direct Payments ("ACH Debits") is part of (and incorporated by reference into) the Business Loan and Security Agreement. Borrower should keep this important legal document for Borrower's records.**

**DISBURSMENT OF LOAN PROCEEDS.** By executing this Authorization Agreement for Direct Deposit ("ACH Credit") and Direct Payments ("ACH Debits"), Borrower authorizes Lender to disburse the Loan proceeds less the amount of any applicable fees upon Loan approval by initiating an ACH credit, wire transfer or similar means to the business checking account indicated below (or a substitute business checking account Borrower later identifies and is acceptable to Lender) (hereinafter referred to as the "Designated Checking Account") in the disbursal amount set forth in the accompanying Business Loan and Security Agreement Supplement. This authorization is to remain in full force and effect until Lender has received written notification from Borrower of its termination in such time and in such manner as to afford Lender and Borrower's depository bank a reasonable opportunity to act on it.

**AUTOMATIC PAYMENT PLAN.** Enrollment in Lender's Automatic Payment Plan is required for Loan approval. By executing this Authorization Agreement for Direct Deposit ("ACH Credit") and Direct Payments ("ACH Debits"), Borrower agrees to, and hereby, enrolls in the Automatic Payment Plan and authorizes Lender to collect payments required under the terms of Borrower's Business Loan and Security Agreement by initiating ACH debit entries to the Designated Checking Account in the amounts and on the dates provided in the payment schedule set forth in the accompanying Business Loan and Security Agreement Supplement. Borrower authorizes Lender to increase the amount of any scheduled ACH debit entry or assess multiple ACH debits for the amount of any previously scheduled payment(s) that was not paid as provided in the payment schedule and any unpaid Fees. This authorization is to remain in full force and effect until Lender has received written notification from Borrower of its termination in such time and in such manner as to afford Lender and Borrower's depository bank a reasonable opportunity to act on it. Lender may suspend or terminate Borrower's enrollment in the Automatic Payment Plan immediately if Borrower fails to keep the Designated Checking Account in good standing or if there are insufficient funds in the Designated Checking Account to process any payment (or if Lender is otherwise unable to collect any amounts by ACH debit owed to Lender under the Loan or under any other loan or extension of credit by Lender to Borrower). **If Borrower revokes the authorization or Lender suspends or terminates Borrower's enrollment in the Automatic Payment Plan, Borrower still will be responsible for making timely payments pursuant to the alternative payment methods described in the Business Loan and Security Agreement.**

**Provisional Payment**. Credit given by us to you with respect to an automated clearing house ("ACH") credit entry is provisional until we receive final settlement. If we do not receive such final settlement, you are hereby notified and agree that we are entitled to a refund of the amount credited to you in connection with such entry, and the party making to you via such entry (i.e., the originator of the entry) shall not be deemed to have paid you in the amount of such entry.

**Notice of Receipt of Entry.** Under the operating rules of the National Automated Clearing House Association ("NACHA"), which are applicable to ACH transactions involving your account, we are not required to give next day notice to you of receipt of an ACH item and we will not do so.

**BUSINESS PURPOSE ACCOUNT.** By executing this Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits), Borrower attests that the Designated Checking Account was established for business purposes and not for personal, family or household purposes.

**ACCOUNT CHANGES.** Borrower agrees to promptly notify Lender in writing if there are any changes to the account and routing numbers of the Designated Checking Account.

**MISCELLANEOUS.** Lender is not responsible for any fees charged by Borrower's bank as the result of credits or debits initiated under this authorization. The origination of ACH transactions to Borrower's account must comply with the provisions of U.S. law. Borrower agrees to be bound by NACHA rules of the Electronic Payments Association. Borrower agrees to provide to Lender at all times, "Live Contemporaneous Access" to all of its bank accounts in order for Lender to evaluate Borrower's compliance with the Agreement, and for collections in the Event of Default ("Borrower's Accounts")."Live Contemporaneous Access" shall be defined as: Borrower, at all times and including but not limited to, providing Lender with accurate login information necessary to access all of Borrower's Accounts, such as usernames and passwords, answers to challenge questions, and security tokens. Borrower shall provide notice to Lender in the event Borrower makes any changes to the Designated Checking Account, including in the event Borrower closes the Designated Checking Account.

**DESIGNATED CHECKING ACCOUNT DETAILS:**

**Routing Number:** 061000227

**Account Number:** 2000029095971

**Tax ID:** 03-0607765

ARC MANAGEMENT GROUP, LLC

By: Bill Wilson

William Wilson

BORROWER

02-09-2023

William Wilson

By: Bill Wilson

William Wilson

OWNER

02-09-2023

Thresa Wilson

By: Thresa Wilson
Thresa Wilson (Feb 9, 2023 19:07 EST)

Thresa Wilson

---

OWNER

---

02-09-2023

---

# Guaranty

**THIS GUARANTY CREATES SPECIFIC LEGAL OBLIGATIONS FOR GUARANTOR(S). PLEASE READ THE GUARANTY, WHICH INCLUDES THE BUSINESS LOAN AND SECURITY AGREEMENT AND ASSOCIATED SUPPLEMENT, CAREFULLY BEFORE SIGNING.**

Each Guarantor, jointly and severally, absolutely and unconditionally guarantee the prompt payment to Lender, including its successors and assignees, of any and all Obligations incurred by the Borrower pursuant to the Agreement and agree to the terms of the Agreement (this "Guaranty"). Each Guarantor further agrees to repay the Obligations on demand, without requiring Lender first to enforce payment against Borrower. This is a guarantee of payment and not of collection. This is an absolute, irrevocable, unconditional, primary, and continuing obligation and will remain in full force and effect until all amounts owed to Lender pursuant to the Agreement are satisfied in full. Each Guarantor represents and warrants that (i) it is a legal resident of the United States of America and (ii) Guarantor does not intend to file for reorganization or liquidation under the bankruptcy or reorganization laws of any jurisdiction.

This Guaranty shall be construed in accordance with the laws of the State of Utah, and shall inure to the benefit of Lender, its successors and assigns. Each Guarantor **agrees that the Guaranty is subject to the Arbitration Agreement set forth above in Section 33**. To the extent not prohibited by applicable law, each of the undersigned Guarantors waives its right to a trial by jury of any claim or cause of action based upon, arising out of or related to this guaranty, the Agreement and all other documentation evidencing the Obligations, in any legal action or proceeding. Subject to Section 33 above, any such claim or cause of action shall be tried by court sitting without a jury.

ABI Holding LLC

By: *Bill Wilson*

William Wilson

GUARANTOR

02-09-2023

Healthtech Receivables MGMT., INC.

By: *Bill Wilson*

William Wilson

GUARANTOR

02-09-2023

The J.D. Stuart Law Group, LLC

By:

Bill Wilson

William Wilson

GUARANTOR

02-09-2023

Wilzara Property Management Group LLC

By: Bill Wilson

William Wilson

GUARANTOR

02-09-2023

William Wilson

By: Bill Wilson

William Wilson

GUARANTOR

02-09-2023

Thresa Wilson

By: Thresa Wilson
Thresa Wilson (Feb 9, 2023 19:07 EST)

Thresa Wilson

GUARANTOR

______________________________

02-09-2023

______________________________

**SCHEDULE 11 (ADDITIONAL PLEDGED COLLATERAL)**

**Clarizen Approved 9.13.22**

# BUSINESS LOAN AND SECURITY AGREEMENT SUPPLEMENT

*This Business Loan and Security Agreement Supplement is part of (and incorporated by reference into) the Business Loan and Security Agreement. Borrower should keep this important legal document for Borrower's records.*

| YOUR LOAN DETAILS | |
|---|---|
| **Borrower/Business Legal Name:** | ARC MANAGEMENT GROUP, LLC |
| **D/B/A:** | ARC MANAGEMENT GROUP, LLC |
| **Federal Tax ID #:** | 03-0607765 |
| **Physical Address (Business Location):** | 1825 Barrett Lakes Blvd., #505 Kennesaw, Georgia 30144 |
| **Mailing Address (If different from Physical Address):** | 1825 Barrett Lakes Blvd., #505 Kennesaw, Georgia 30144 |
| **Lender:** | WebBank |
| **Loan Amount:** | $ 725,000.00 |
| **Factor Rate:** | 1.360 |
| **Term:** | 18 Months |
| **DAILY Payment Amount *:** | $ 2,608.47 |
| **Origination Fee:**<br>(Deducted at time of disbursement) | $ 0.00 |
| **Prepayment:** | **The above stated Factor Rate will be reduced, as set forth below, if the Loan is paid off prior to the end of the scheduled term. The discounted Factor Rate will be as follows:**<br>**Loan paid off within one (1) month of disbursement/funding:** **1.075**<br>**Loan paid off within two (2) months of disbursement/funding:** **1.095**<br>**Loan paid off within three (3) months of disbursement/funding:** **1.115**<br>**Loan paid off within four (4) months of disbursement/funding:** **1.135**<br>**Loan paid off within five (5) months of disbursement/funding:** **1.155**<br>**Loan paid off within six (6) months of disbursement/funding:** **1.175** |
| **Application ID:** | APP-0000002135 |

* For loans with MONTHLY payments, the first payment will occur fourteen (14) calendar days after the day the loan is funded.

# BUSINESS LOAN AND SECURITY AGREEMENT SUPPLEMENT

*This Business Loan and Security Agreement Supplement is part of (and incorporated by reference into) the Business Loan and Security Agreement. Borrower should keep this important legal document for Borrower's records.*

*This tool is provided to help you understand and assess the cost of your business financing. The calculations below involve certain key assumptions about this Loan, including that the Loan is paid off in its entirety according to the agreed payment schedule and that no repayments are missed or late.*

| Loan Amount | Disbursement Amount[1] | Repayment Amount[2] | Term |
|---|---|---|---|
| $ 725,000.00 | $ 725,000.00 | $ 986,000.00 | 18 Months (repaid DAILY) |

| METRIC | METRIC CALCULATION | | METRIC EXPLANATION |
|---|---|---|---|
| **Total Cost-of-Funds**<br>**$ 261,000.00** | Origination Fee:<br>Cost-of-Funds<br>**Total Cost-of-Funds:** | **$ 0.00**<br>**$ 261,000.00**<br>**$ 261,000.00** | The Origination Fee is deducted from the Loan Amount at the time of disbursement.<br>Cost-of-Funds is the Loan Amount multiplied by the Factor Rate minus the Loan Amount.<br>This is the total amount that you will pay for the Loan.<br>The Total Cost-of-Funds amount does not include fees and other charges you can avoid, such as Returned Payment Fees, Bank Block Fees and Default Waiver Fees.[2] |
| **Factor Rate**<br>**1.360** | **1.360** | | This is the rate that determines the Cost-of-Funds. |
| **Average Monthly Payment**<br>**$ 54,777.78** | Repayment Amount:<br>Term (in months):<br>Average Monthly Payment: | **$ 986,000.00**<br>18 Months<br>**$ 54,777.78** | This is the average monthly repayment amount of the Loan, which does not include fees and other charges you can avoid, such as Returned Payment Fees, Bank Block Fees and Default Waiver Fees.[2]<br>The actual repayment frequency for the Loan will be DAILY. This is an estimate for comparison purposes only. |
| **Cents on the Dollar *(excluding fees)***<br>**0.36 ¢** | Cost-of Funds:<br>Loan Amount:<br>Cents on the Dollar (excluding fees): | $ 261,000.00<br>$ 725,000.00<br>**0.36 ¢** | This is the Cost-of-Funds paid per dollar borrowed. This amount is exclusive of fees. |
| **Prepayment** | Does prepayment of this Loan result in any new fees or charges?<br>Does the prepayment of this Loan decrease the Repayment Amount? | | **No**<br>**Yes**<br>(See Prepayment Section above and Section 20 of the accompanying Business Loan and Security Agreement for specific details regarding prepayment). |

[1] The Disbursement Amount is the Loan Amount less the Origination Fee and any applicable tax withheld. Note that the Disbursement Amount may not be the amount deposited to your Designated Checking Bank Account. The amount that will be deposited to your Designated Checking Account may be reduced by any amounts owed to Lender from a prior loan or used to pay off an amount owed to a third-party and/or tax liability.

[2] Your business may incur other fees that are not a condition of borrowing, such as Returned Payment Fees, Bank Block Fees or Default Waiver Fees. Those fees are not reflected above. See Section 20 of the accompanying Business Loan and Security Agreement for details on these fees.

# BUSINESS LOAN AND SECURITY AGREEMENT SUPPLEMENT

*This Business Loan and Security Agreement Supplement is part of (and incorporated by reference into) the Business Loan and Security Agreement. Borrower should keep this important legal document for Borrower's records.*

| FEES | |
|---|---|
| **Mandatory Fees:** | |
| **Origination Fee:** | **$ 0.00** |
| **Florida Documentary Stamp Tax++:** ***(For Florida Loan Transactions Only)*** | **$ 0.00** |
| **Other Potential Fees:** | |
| **Returned Payment Fee:** | $ 35.00 per instance. |
| **Bank Block Fee:** | $ 100.00 per instance. |
| **Default Waiver Fee:** | $ 2,500.00 per instance. |
| | See Section 20 of the accompanying Business Loan and Security Agreement for more details regarding these Fees. |

++ The Florida documentary stamp tax is an excise tax imposed on certain documents executed, delivered, or recorded in Florida. Tax is paid to the Clerk of Court when the document is recorded. When a taxable document is not recorded, the tax must be paid directly to the Florida Department of Revenue. Libertas on behalf of WebBank withholds applicable Florida documentary stamp taxes owed by Borrowers at the time the loan is made and forwards the tax payment to the Florida Department of Revenue on behalf of the Borrower.

| CERTAIN DISCLOSURES | |
|---|---|
| **USA Patriot Act Notice.**<br><br>**Important Information About Procedures For Opening A New Account** | To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account.<br><br>What this means for you: When you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents. |
| **Loan Pricing Disclosure** | Lender uses a system of risk-based pricing to determine the Cost-of-funds. Risk-based pricing is a system that evaluates the risk factors of your application and adjusts the Cost-of-Funds rate up or down based on this risk evaluation. Although Lender believes that its loan process provides expedited turnaround time and efficient access to capital, this loan may be a higher cost loan than loans that may be available through other lenders. |
| **Loan for Specific Purposes Only** | The proceeds of the requested Loan may solely be used for business purposes as set forth in the accompanying Business Loan and Security Agreement. **IN ADDITION, THE LOAN WILL NOT BE USED FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES OR FOR ILLEGAL PURPOSES.** Borrower understands that Borrower's agreement not to use the Loan proceeds for personal, family or household purposes means that certain important duties imposed upon entities making loans for consumer/personal purposes, and certain important rights conferred upon consumers, pursuant to federal or state law **will not apply** to this transaction. |

# BUSINESS LOAN AND SECURITY AGREEMENT

1. **INTRODUCTION.** This Business Loan and Security Agreement together with the accompanying Business Loan and Security Agreement Supplement and the accompanying Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits), (collectively this "Agreement") governs your business loan ("Loan") made by WebBank. Please read it and keep it for your reference. In this Agreement, the words "you," "your" and "Borrower" mean the Borrower identified on the signature page of this Business Loan and Security Agreement. Each Guarantor identified on the signature page of this Business Loan and Security Agreement shall be referred to as "Guarantor" or "Guarantors" in this Agreement. The words "Lender", "we", "us", and "our" mean WebBank or its successor(s) and assign(s).

2. **EFFECTIVE DATE.** This Agreement begins on the date we accept this Agreement in Utah. We may accept this Agreement without signing it by sending you the Disbursement Amount. Borrower understands and agrees that Lender may postpone, without penalty, the disbursement of the Disbursement Amount to Borrower until in Lender's sole discretion all required security interests have been perfected and Lender has received all required personal guarantees or other documentation. If there is a delay in your receipt of the Disbursement Amount, you agree that there will be no adverse consequence to you or us.

3. **AUTHORIZATION.** Borrower agrees that the Loan made by Lender to Borrower shall be conclusively deemed to have been authorized by Borrower and to have been made pursuant to a duly authorized request on its behalf.

4. **LOAN FOR BUSINESS PURPOSES ONLY.** The proceeds of the requested Loan may solely be used for business purposes and not for any other purposes. In addition, the Loan will not be used for personal, family or household purposes or illegal purposes, and Borrower and Guarantors are forever estopped from taking the position that such Loan (including Advances, if any) are or were used for such personal, family or household purposes. Borrower understands that Borrower's agreement not to use the Loan proceeds for personal, family or household purposes means that certain important duties imposed upon entities making loans for personal, family or household purposes, and certain important rights conferred upon such persons, pursuant to federal or state law will not apply **to the Loan or the Agreement. Borrower also understands that Lender will be unable to confirm whether the use of the Loan conforms to this section. Borrower and Guarantors agree that a breach by Borrower of the provisions of this section will not affect Lender's right to (i) enforce Borrower's and Guarantor's promise to pay for all amounts owed under this Agreement, regardless of the purpose for which the Loan is in fact obtained or (ii) use any remedy legally available to Lender, even if that remedy would not have been available had the Loan been made for personal, family or household purposes.**

5. **DISBURSEMENT OF LOAN PROCEEDS, MAINTENANCE OF BORROWER'S BANK ACCOUNT, AND RIGHT TO CANCEL.** If Borrower applied and was approved for a Loan, Borrower's Loan will be disbursed upon approval as provided in the accompanying Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits). Borrower agrees to maintain sufficient funds to meet its Obligations (defined below) under the Agreement (including keeping such account open until the Total Repayment Amount has been completely repaid) in the account identified in the Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits), which is the account that was reviewed in conjunction with underwriting and approval of this Loan.

**Right to Cancel.** Notwithstanding anything to the contrary set forth in this Agreement, the Borrower shall have the right to cancel this Agreement any time until the midnight of the second Business Day following the date Disbursement Amount is initiated by Lender by notifying the Lender or the Servicer of such cancellation by notice sent in accordance with section 38 of this Agreement. Upon timely delivering such cancellation notice to Lender or Servicer, and further provided that Borrower has otherwise complied with the provisions of this Agreement, Borrower shall refund the entire amount of the Disbursement Amount back to the Lender within three (3) Business Days following the date disbursement of the Disbursement Amount is initiated by Lender. Upon such refund of the Disbursement Amount back to Lender, this Agreement shall become null and void and the parties shall have no remaining obligations to or rights against each other except that the Lender shall have the right to keep, as fair and adequate compensation for its costs of entering into this Agreement with Borrower, the entire amount of Weekly Payment Amount or Daily Payment Amount as well as the Origination Fee (as set forth above) received by the Lender prior to the date when Lender receives the Disbursement Amount back from Borrower.

6. **PROMISE TO PAY.** Borrower agrees to pay Lender the Total Repayment Amount in accordance with this Agreement Borrower agrees to enroll in Lender's Automatic Payment Plan and authorizes Lender to debit required payments as provided in the accompanying Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits). Borrower also authorizes Lender to otherwise collect amounts owed to it as provided in this Agreement.

7. **ALTERNATIVE PAYMENT METHODS.** If Borrower knows that for any reason Lender will be unable to process a payment under Lender's Automatic Payment Plan, then Borrower must either restore sufficient funds such that the missed payment can be collected as provided in the accompanying Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) or promptly send the Lender the amount of the missed payment via wire transfer or by delivering a check. If Borrower

# BUSINESS LOAN AND SECURITY AGREEMENT

elects to send payments by postal mail, then Borrower agrees to send such payments to WebBank c/o Libertas Funding, LLC, 411 West Putnam Avenue, Suite 220, Greenwich, CT 06830, Attn: Customer Service. All alternative payments must be made in good funds by check, money order, wire transfer, automatic transfer from an account at an institution offering such service, or other instrument in U.S. Dollars. Borrower understands and agrees that payments made at any other address than as specified by Lender may result in a delay in processing and/or crediting. If Borrower while enrolled in the Automatic Payment Plan makes a payment by mail, or by any pay-by-phone, on-line service, or any other service that Lender makes available, Lender may either treat such payment as an additional payment and continue to process Borrower's scheduled Automatic Payment Plan payments as required by this Agreement may reduce any scheduled Automatic Payment Plan payment by the amount of any such additional payment received.

8. **APPLICATION OF PAYMENTS.** Subject to applicable law, Lender reserves the right to allocate and apply payments received on Borrower's Loan between principal, Cost-of-Funds and fees in any manner Lender chooses in Lender's sole discretion.

9. **POSTDATED CHECKS, RESTRICTED ENDORSEMENT CHECKS AND OTHER DISPUTED OR QUALIFIED PAYMENTS.** Lender can accept late, postdated or partial payments without losing any of Lender's rights under this Agreement (a postdated check is a check dated later than the day it was actually presented for payment). Lender is under no obligation to hold a postdated check and Lender reserves the right to process every item presented as if dated the same date received by Lender or Lender's check processor unless Borrower gives Lender adequate notice and a reasonable opportunity to act on it. Except where such notice and opportunity is given, Borrower may not hold Lender liable for depositing any postdated check. **Borrower agrees not to send Lender partial payments marked "paid in full," "without recourse," or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Agreement. All notices and written communications concerning postdated checks, restricted endorsement checks (including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount) or any other disputed, nonconforming or qualified payments, must be mailed or delivered to WebBank c/o Libertas Funding, LLC, 411 West Putnam Avenue, Suite 220, Greenwich, CT 06830, Attn: Customer Service.**

10. **PREPAYMENT.** Borrower may prepay Borrower's Loan in whole on any Business Day by paying Lender the sum total of the outstanding Total Repayment Amount and any fees as determined by Lender's records in accordance with Section 8. Borrower may prepay Borrower's Loan in part on any Business Day and such payment shall be applied against the Total Repayment Amount and any fees. The Total Repayment Amount shall be reduced by the prepayment factor as set forth on Page 1 of the accompanying Business Loan and Security Agreement Supplement. For example, if the Loan's Factor Rate is 1.30 but the loan is paid off within one (1) month of disbursement/funding, the Factor Rate shall be reduced by the "one-month prepayment factor" as set forth on Page 1 of the accompanying Business Loan and Security Agreement Supplement.

11. **SECURITY INTEREST**. Borrower hereby grants to Lender, the secured party hereunder, a continuing security interest in and to any and all "Collateral" as described below to secure payment and performance of all debts, liabilities and obligations of Borrower to Lender hereunder and also any and all other debts, liabilities and obligations of Borrower to Lender of every kind and description, direct or indirect, absolute or contingent, primary or secondary, due or to become due, now existing or hereafter arising, related to the Loan described in this Agreement, whether or not contemplated by the parties at the time of the granting of this security interest, regardless of how they arise or by what agreement or instrument they may be evidenced or whether evidenced by any agreement or instrument and includes obligations to perform acts and refrain from taking action as well as obligations to pay money including, without limitation, amounts paid to Borrower or on their behalf, all Cost-of-funds, fees and expenses (all hereinafter called "Obligations"). The Collateral includes the following property that Borrower (and Guarantor, if applicable, pursuant to Section 12) now owns or shall acquire or create immediately upon the acquisition or creation thereof: (i) any and all amounts owing to Borrower now or in the future from any merchant processor(s) processing charges made by customers of Borrower via credit card or debit card transactions; (ii) all other tangible and intangible personal property, including, but not limited to (a) cash and cash equivalents, (b) inventory, (c) equipment, (d) investment property including certified and uncertified securities, securities accounts, security entitlements, commodity contracts and commodity accounts, (e) instruments, including promissory notes (f) chattel paper, including tangible chattel paper and electronic chattel paper, (g) documents, (h) letter of credit rights, (i) accounts, including health-care insurance receivables, (j) deposit accounts, (k) commercial tort claims, (l) general intangibles, including payment intangibles and software and (m) as-extracted collateral as such terms may from time to time be defined in the Uniform Commercial Code; and (iii) any and all proceeds of any of the foregoing, including insurance proceeds or other proceeds from the sale, destruction, loss, or other disposition of any of the foregoing, and sums due from a third party who has damaged or destroyed any of the foregoing or from that party's insurer. The security interest Borrower (or Guarantor, if applicable, pursuant to Section 12) grants includes all accessions, attachments, accessories, parts, supplies and replacements for the Collateral, all products, proceeds and collections thereof and all records and data relating thereto. Lender disclaims any security interest in household goods in which Lender is forbidden by law from taking a security interest. In addition to the Collateral described above, Borrower or Guarantor hereby grant to the Lender a security interest in collateral specified on Schedule 11 (attached hereto and made a part hereof).

# BUSINESS LOAN AND SECURITY AGREEMENT

**12. PROTECTING THE SECURITY INTEREST.** Borrower agrees that Lender and/or Lender's Representative may file any financing statement, lien entry form or other document required in order to perfect, amend or continue Lender's security interest in the Collateral and Borrower agrees to cooperate with Lender and Lender's Representative as may be necessary to accomplish said filing and to do whatever Lender and Lender's Representative deems necessary to protect Lender's security interest in the Collateral. Borrower and Guarantor each agree that, if any Guarantor is a corporate entity, then Lender or Lender's Representative may file any financing statement, lien entry form or other document against such Guarantor or its property that Lender and/or Lender's Representative requires in order to perfect, amend or continue Lender's security interest in the Collateral. Any such Guarantor agrees to cooperate with Lender and Lender's Representative as may be necessary to accomplish said filing and to do whatever Lender or Lender's Representative deems necessary to protect Lender's security interest in the Collateral. In this Agreement, "Lender's Representative" means any entity or individual that is designated by Lender to serve in such capacity.

**13. LOCATION OF COLLATERAL; TRANSACTIONS INVOLVING COLLATERAL.** Unless Lender has agreed otherwise in writing, Borrower agrees and warrants that (i) all Collateral (or records of the Collateral in the case of accounts, chattel paper and general intangibles) shall be located at Borrower's address as shown in the application,(ii) except for inventory sold or accounts collected in the ordinary course of Borrower's business, Borrower shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral, (iii) no one else has any interest in or claim against the Collateral that Borrower has not already told Lender about in writing prior to Lender disbursing the Disbursement Amount, (iv) Borrower shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance or charge, other than the security interest provided for in this Agreement and(v) Borrower shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral for less than the fair market value thereof. Borrower shall defend Lender's rights in the Collateral against the claims and demands of all other persons. All proceeds from any unauthorized disposition of the Collateral shall be held in trust for Lender, shall not be co-mingled with any other funds and shall immediately be delivered to Lender. This requirement, however, does not constitute consent by Lender to any such disposition.

**14. TAXES, ASSESSMENTS AND LIENS.** Borrower (and Guarantor, if applicable, pursuant to Section 12) will complete and file all necessary federal, state and local tax returns and will pay when due all taxes, assessments, levies and liens upon the Collateral and provide evidence of such payments to Lender upon request.

FOR FLORIDA LOANS: Florida documentary stamp tax required by law in the amount of $ 0.00 will be paid directly to the Florida Department of Revenue. Borrower agrees to pay such tax and further agrees that the Loan proceeds shall be reduced by said tax amount. The Lender shall forward the tax payment to the Florida Department of Revenue.

**15. INSURANCE.** Borrower (and Guarantor, if applicable, pursuant to Section 12) shall procure and maintain such insurance as Lender may require with respect to the Collateral, in form, amounts and coverage reasonably acceptable to Lender and issued by a company reasonably acceptable to Lender naming Lender as loss payee. If Borrower at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may obtain such insurance as Lender deems appropriate at Borrower's sole cost and expense as further provided in Section 18. Borrower (and Guarantor, if applicable, pursuant to Section 12) shall promptly notify Lender of any loss of or damage to the Collateral.

**16. REPAIRS AND MAINTENANCE.** Borrower (and Guarantor, if applicable, pursuant to Section 12) agrees to only use the Collateral for its originally intended purposes and keep and maintain the Collateral in good order, repair and condition at all times, and to cause others to so use, keep, and maintain, while this Agreement remains in effect. Borrower (and Guarantor, if applicable, pursuant to Section 12) further agrees to pay when due all claims for work done on, or services rendered, or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**17. INSPECTION OF COLLATERAL AND PLACE OF BUSINESS; USE OF PHOTOGRAPHS AND TESTIMONIALS.** Lender and Lender's designated representatives and agents shall have the right during Borrower's normal business hours and at any other reasonable time to examine the Collateral wherever located and the interior and exterior of any Borrower place of business. During an examination of any Borrower place of business, Lender may examine, among other things, whether Borrower (i) has a place of business that is separate from any personal residence, (ii) is open for business, (iii) has sufficient inventory to conduct Borrower's business and (iv) has one or more credit card terminals if Borrower processes credit card transactions. When performing an examination, Lender may photograph the interior and exterior of any Borrower place of business, including any signage, and may photograph any individual who has signed the Agreement ("Signatory") unless the Signatory previously has notified Lender that he or she does not authorize Lender to photograph the Signatory. Lender may obtain testimonials from any Signatory, including testimonials on why Borrower needed the Loan and how the Loan has helped Borrower. Any photograph and testimonial will become and remain the sole property of Lender. Borrower and each Signatory release Lender from any claims that may arise regarding the use of any photograph or testimonial, including any claims of defamation, invasion of privacy or infringement of moral rights, rights of publicity or copyright.

# BUSINESS LOAN AND SECURITY AGREEMENT

**18. LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any related documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any related documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate to protect the Collateral, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. To the extent permitted by applicable law, all such expenses will become a part of the Obligations and, at Lender's option, will: (i) be payable on demand; (ii) be added to the balance of the Loan and be apportioned among and be payable with any installment payments to become due during the remaining term of the Loan; or (iii) be treated as a balloon payment that will be due and payable at the Loan's maturity. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon an Event of Default.

**19. BORROWER'S REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants that: (i) Borrower will comply with all laws, statutes, regulations and ordinances pertaining to the conduct of Borrower's business and promises to hold Lender harmless from any damages, liabilities, costs, expenses (including attorneys' fees) or other harm arising out of any violation thereof; (ii) Borrower's principal executive office and the office where Borrower keeps its records concerning its accounts, contract rights and other property, is that shown in the application; (iii) Borrower is duly organized, licensed, validly existing and in good standing under the laws of its state of formation and shall hereafter remain in good standing in that state, and is duly qualified, licensed and in good standing in every other state in which it is doing business, and shall hereafter remain duly qualified, licensed and in good standing in every other state in which it is doing business, and shall hereafter remain duly qualified, licensed and in good standing in every other state in which the failure to qualify or become licensed could have a material adverse effect on the financial condition, business or operations of Borrower; (iv) the true and correct legal name of the Borrower is set forth in the application; (v) the aggregate ownership percentage of the Signatories is greater than or equal to fifty percent (50%) of the Borrower's business (if the aggregate ownership percentage is less than fifty percent (50%), the Borrower has furnished evidence that the sworn signatories have the authority to bind the Borrower in entering into this Agreement and all actions contemplated hereby); (vi) the execution, delivery and performance of this Agreement, and any other document executed in connection herewith, are within Borrower's powers, have been duly authorized, are not in contravention of law or the terms of Borrower's charter, by-laws or other constating documents, or of any indenture, agreement or undertaking to which Borrower is a party; (vii) all constating documents and all amendments thereto of Borrower have been duly filed and are in proper order and any capital stock issued by Borrower and outstanding was and is properly issued and all books and records of Borrower are accurate and up to date and will be so maintained; (viii) Borrower (a) is subject to no charter, corporate or other legal restriction, or any judgment, award, decree, order, governmental rule or regulation or contractual restriction that could have a material adverse effect on its financial condition, business or prospects, and (b) is in compliance with its charter, by-laws and other constating documents, all contractual requirements by which it may be bound and all applicable laws, rules and regulations other than laws, rules or regulations the validity or applicability of which it is contesting in good faith or provisions of any of the foregoing the failure to comply with which cannot reasonably be expected to materially adversely affect its financial condition, business or prospects or the value of the Collateral; (ix) there is no action, suit, proceeding or investigation pending or, to Borrower's knowledge, threatened against or affecting it or any of its assets before or by any court or other governmental authority which, if determined adversely to it, would have a material adverse effect on its financial condition, business or prospects or the value of the Collateral;(x) all information provided by Borrower(s) and/or Guarantor(s) as part of the application process for the Loan was true and complete; (xi) Borrower does not intend to file for reorganization or liquidation under the bankruptcy or reorganization laws of any jurisdiction; and (xii) Borrower is not presently insolvent within the meaning of the Uniform Commercial Code as well as the United States Bankruptcy Code.

**20. COST-OF-FUNDS AND FEES.** Borrower agrees to pay in full the Cost-of-Funds set forth in the accompanying Business Loan and Security Agreement Supplement. In addition to any other fees described in this Agreement, Borrower agrees to pay the following fees:

A. Origination Fee: A one-time Origination Fee in the amount set forth in the accompanying Business Loan and Security Agreement Supplement. Borrower agrees that this fee will be immediately deducted from the proceeds of Borrower's Loan.

B. Returned Payment Fee: A Returned Payment Fee in the amount set forth in the accompanying Business Loan and Security Agreement Supplement each and every instance a payment processed on Borrower's Loan is returned unpaid or dishonored for any reason.

C. Bank Block Fee: A Bank Block Fee in the amount set forth in the accompanying Business Loan and Security Agreement Supplement each and every instance wherein Lender is blocked or otherwise prevented from accessing Borrower's Designated Bank Account for purposes of a scheduled payment as required by this Agreement.

D. Default Waiver Fee: A Default Waiver Fee in the amount set forth in the accompanying Business Loan and Security Agreement Supplement each and every instance when Lender, in its sole discretion and without any requirement to do so, agrees to waive an Event of Default.

# BUSINESS LOAN AND SECURITY AGREEMENT

Payments made by Borrower hereunder will be applied and allocated between Loan principal, Cost-of- funds, and fees in the manner set forth in Section 8.

21. **INTEREST AND FEES EXCEEDING PERMITTED LIMIT**. If the Loan is subject to a law that sets maximum charges, and that law is finally interpreted so that the Cost-of-funds, interest, Origination Fee, or other fees collected or to be collected in connection with this Agreement exceed the permitted limits, then (i) any such charge will be reduced by the amount necessary to reduce the charge to the permitted limit and (ii) if required by applicable law, any sums already collected from Borrower that exceed the permitted limits will be refunded or credited to Borrower.

22. **ONLINE CUSTOMER PORTAL**. When Borrower signs in with Borrower's valid username and password at https://portal.libertasfunding.com/ Borrower can obtain information about the Borrower's Loan, such as the outstanding balance, transactions and fees. No additional paper statement will be mailed to Borrower. Borrower agrees not to share Borrower's usemame and password to https://portal.libertasfunding.com/ with any third-party.

23. **FINANCIAL INFORMATION AND REEVALUATION OF CREDIT.** Each Borrower and each Guarantor (if any) authorize Lender to obtain business, and personal credit bureau reports and investigative reports in Borrower's and any Guarantor's name, respectively, in connection with Borrower's application and at any time and from time to time during the term of the Loan, including: for purposes of deciding whether to approve the requested Loan; for any update, renewal, or extension of credit; for any review or other account servicing purposes; for engaging in account or Guaranty collections; and/or any other lawful purpose. Upon Borrower's (or Guarantor's) request, Lender will advise if Lender obtained a credit report and/or investigative report and Lender will give Borrower or Guarantor (if any) the credit bureau's name and address. Each Borrower and each Guarantor (if any) agree to submit current financial information, and any other information requested by Lender in any format requested by Lender in Borrower's name and in the name of each Guarantor, respectively, at any time promptly upon Lender's request. Borrower authorizes Lender to act as Borrower's agent for purposes of accessing and retrieving transaction history information regarding Borrower from Borrower's designated merchant processor(s). Lender may, but is not required to, report Lender's credit experiences with Borrower and any Guarantor of Borrower's Loan to third parties as permitted by law, including with respect to any Guarantor to consumer credit reporting agencies. Each Borrower and each Guarantor also agree that Lender may release information to comply with governmental reporting or legal process that Lender believes may be required, whether or not such is in fact required, or when necessary or helpful in completing a transaction, or when investigating a loss or potential loss. Each Borrower and each Guarantor is hereby notified that a negative credit report reflecting on Borrower's and/or any Guarantor's credit record may be submitted to a credit reporting agency (including with respect to any Guarantor to consumer credit reporting agencies) if Borrower or such Guarantor fails to fulfill the terms of their respective credit obligations hereunder. Borrower and Guarantor acknowledge that any credit reporting on the Loan shall be at the sole discretion of Lender (subject to applicable law) and that Lender has the right to report the Loan to Guarantor's personal credit file (if a natural person) should Guarantor not pay any Obligation pursuant to the guaranty set forth in this Agreement.

24. **ATTORNEYS' FEES AND COLLECTION COSTS.** To the extent not prohibited by applicable law, Borrower and Guarantor shall pay to Lender on demand any and all expenses, including, but not limited to, collection costs, all attorneys' fees and expenses, and all other expenses of like or unlike nature which may be expended by Lender to obtain or enforce payment of Obligations either as against Borrower or any Guarantor or surety of Borrower or in the prosecution or defense of any action or concerning any matter arising out of or connected with the subject matter of this Agreement, the Obligations or the Collateral or any of Lender's rights or interests therein or thereto, including, without limiting the generality of the foregoing, any counsel fees or expenses incurred in any bankruptcy or insolvency proceedings and all costs and expenses (including search fees) incurred or paid by Lender in connection with the administration, supervision, protection or realization on any security held by Lender for the debt secured hereby, whether such security was granted by Borrower or by any other person primarily or secondarily liable (with or without recourse) with respect to such debt, and all costs and expenses incurred by Lender in connection with the defense, settlement or satisfaction of any action, claim or demand asserted against Lender in connection therewith, which amounts shall be considered advances to protect Lender's security and shall be secured hereby. To the extent permitted by applicable law, all such expenses will become a part of the Obligations and, at Lender's option, will: (i) be payable on demand; (ii) be added to the balance of the Loan and be apportioned among and be payable with any installment payments to become due during the remaining term of the Loan; or (iii) be treated as a balloon payment that will be due and payable at the Loan's maturity. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon an Event of Default.

25. **BORROWER'S REPORTS.** Promptly upon Lender's written request, Borrower and each Guarantor agrees to provide Lender with such information about the financial condition and operations of Borrower or any Guarantor, as Lender may, from time to time, reasonably request. Borrower also agrees promptly upon becoming aware of any Event of Default, or the occurrence or existence of an event which, with the passage of time or the giving of notice or both, would constitute an Event of Default hereunder, to promptly provide notice thereof to Lender in writing.

26. **TELEPHONE COMMUNICATIONS.** Notwithstanding any current or prior election to opt in or to opt out of receiving telemarketing calls or SMS messages (including text messages) from the Lender, its affiliates, marketing partners, agents and others calling at

Lender's request or on its behalf, Borrowers and Guarantors hereby expressly consent to receive calls and messages, including auto- dialed and pre-recorded message calls and SMS messages (including text messages) from Lender, its affiliates, and agents calling at Lender's request or on its behalf, arising out of or relating to your application, loan, and/or account, at any telephone numbers (including any cellular or mobile telephone numbers) that Borrowers and/or Guarantors have provided or may provide in the future, or otherwise may be in Lender's possession or that Lender may reasonably associate with your account through skip tracing, caller ID capture or other means. Borrowers and Guarantors agree that such communications may be initiated using an automated telephone dialing system.

**27. INDEMNIFICATION AND LIMITATION OF LIABILITY.** Except for Lender's gross negligence or willful misconduct, Borrower will indemnify and save Lender harmless from all losses, costs, damage, liabilities, or expenses (including, without limitation, court costs and reasonable attorneys' fees) that Lender may sustain or incur by reason of defending or protecting Lender's security interest or the priority thereof or enforcing the Obligations, or in the prosecution or defense of any action or proceeding concerning any matter arising out of or in connection with this Agreement and/or any other documents now or hereafter executed in connection with this Agreement and/or the Obligations and/or the Collateral. IN NO EVENT WILL WE BE LIABLE FOR ANY CLAIMS ASSERTED BY BORROWER UNDER ANY THEORY OF LAW, INCLUDING ANY TORT OR CONTRACT THEORY FOR LOST PROFITS, LOST REVENUES, LOST BUSINESS OPPORTUNITIES, EXEMPLARY, PUNITIVE, SPECIAL, INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES, EACH OF WHICH BORROWER HEREBY EXPRESSLY WAIVES. This provision shall survive the repayment of the Obligations and the termination of this Agreement.

**28. MERGERS, CONSOLIDATIONS OR SALES.** Borrower represents and agrees that Borrower will not (i) merge or consolidate with or into any other business entity; (ii) enter into any joint venture or partnership with any person, firm or corporation; or (iii) substantially assign its assets to any other business entity or person.

**29. CHANGE IN LEGAL STATUS.** Without Lender's written consent, Borrower represents and agrees that Borrower will not change (i) its name, (ii) its place of business (or if more than one place of business, its chief executive office), (iii) it mailing address, (iv) its organizational identification number, or (v) its type of organization, jurisdiction of organization or other legal structure. Borrower shall promptly notify Lender in writing of any change concerning its organizational identification number.

**30. DEFAULT.** The occurrence of any one or more of the following events (herein, "Events of Default") shall constitute, without notice or demand, a default under this Agreement and all other agreements between Lender and Borrower and instruments and papers given Lender by Borrower, whether such agreements, instruments, or papers now exist or hereafter arise: (i) Lender is unable to collect any Automatic Payment Plan payment and/or, Borrower fails to pay any Obligations when due; (ii) Borrower fails to comply with, promptly, punctually and faithfully perform or observe any term, condition or promise within this Agreement; (iii) the determination by Lender that any statement, representation or warranty heretofore, now or hereafter made by Borrower or Guarantor to Lender, in any documents, instrument, agreement, application or paper was not true or accurate when given; (iv) the occurrence of any event such that any indebtedness of Borrower from any lender other than Lender could be accelerated, notwithstanding that such acceleration has not taken place; (v) the occurrence of any event that would cause a lien creditor, as that term is defined in Section 9-102 of the Uniform Commercial Code, (other than Lender) to take priority over the Loan made by Lender; (vi) a filing against or relating to Borrower (unless consented to in writing by Lender) of (a) a federal tax lien in favor of the United States of America or any political subdivision of the United States of America, or (b) a state tax lien in favor of any state of the United States of America or any political subdivision of any such state; (vii) the occurrence of any event of default under any other agreement between Lender and Borrower or instrument or paper given Lender by Borrower, whether such agreement, instrument, or paper now exists or hereafter arises (notwithstanding that Lender may not have exercised its rights upon default under any such other agreement, instrument or paper); (viii) any act by, against, or relating to Borrower, or its property or assets, which act constitutes the application for, consent to, or sufferance of the appointment of a receiver, trustee or other person, pursuant to court action or otherwise, over all, or any part of Borrower's property; (ix) the granting of any trust mortgage or execution of an assignment for the benefit of the creditors of Borrower, or the occurrence of any other voluntary or involuntary liquidation or extension of debt agreement for Borrower; (x) the failure by Borrower to generally pay the debts of Borrower as they mature; (xi) adjudication of bankruptcy or insolvency relative to Borrower; (xii) the entry of an order for relief or similar order with respect to Borrower in any proceeding pursuant to Title 11 of the United States Code entitled "Bankruptcy" (the "Bankruptcy Code") or any other federal bankruptcy law; (xiii) the filing of any complaint, application or petition by or against Borrower initiating any matter in which Borrower is or may be granted any relief from the debts of Borrower pursuant to the Bankruptcy Code or any other insolvency statute or procedure; (xiv) the calling or sufferance of a meeting of creditors of Borrower; (xv) the meeting by Borrower with a formal or informal creditor's committee; (xvi) the offering by or entering into by Borrower of any composition, extension or any other arrangement seeking relief or extension for the debts of Borrower, or the initiation of any other judicial or non-judicial proceeding or agreement by, against or including Borrower that seeks or intends to accomplish a material reorganization or arrangement with creditors;(xvii) the entry of any material judgment against Borrower, which judgment is not satisfied or appealed from (with execution or similar process stayed) within fifteen (15) days of its entry; (xviii) the occurrence of any event or circumstance with respect to Borrower such that Lender shall believe in good faith that the prospect of payment of all or any part of the Obligations or the performance by Borrower under this Agreement or any other agreement between Lender and Borrower is impaired or there shall occur any material adverse change in the business or financial condition of Borrower (such event specifically includes, but is not limited to, taking additional financing from a credit card advance, cash advance company or

# BUSINESS LOAN AND SECURITY AGREEMENT

an additional working capital loan without the prior written consent of Lender); (xix) the entry of any court order that enjoins, restrains or in any way prevents Borrower from conducting all or any part of its business affairs in the ordinary course of business; (xx) the occurrence of any uninsured loss, theft, damage or destruction to any material asset(s) of Borrower; (xxi) any act by or against, or relating to Borrower or its assets pursuant to which any creditor of Borrower seeks to reclaim or repossess or reclaims or repossesses all or a portion of Borrower's assets; (xxii) the termination of existence, dissolution or liquidation of Borrower or the ceasing to carry on actively any substantial part of Borrower's current business; (xxiii) this Agreement shall, at any time after its execution and delivery and for any reason, cease to be in full force and effect or shall be declared null and void, or the validity or enforceability hereof shall be contested by Borrower or any Guarantor of Borrower, including denial of any further liability or obligation hereunder;(xxiv) any Guarantor or person signing a support agreement in favor of Lender shall repudiate, purport to revoke or fail to perform his or her obligations under his guaranty or support agreement in favor of Lender or any corporate guarantor shall cease to exist; (xxv) any material change occurs in Borrower's ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held); (xxvi) if Borrower is a partnership, any general or managing partner dies; if Borrower is a corporation, any principal officer or 50% or greater shareholder dies; if Borrower is a limited liability company, any managing member dies; if Borrower is any other form of business entity, any person(s) directly or indirectly controlling fifty percent (50%) or more of the ownership interests of such entity dies.

**31. RIGHTS AND REMEDIES UPON DEFAULT.** Subject to applicable law, if an Event of Default occurs under this Agreement, at any time thereafter, Lender may exercise any one or more of the following rights and remedies:

A. Debit Amounts Due From Borrower's Accounts: Lender may debit from Borrower's Designated Checking Account all Automatic Payment Plan payments that Lender was unable to collect and/or the amount of any other Obligations that Borrower failed to pay.

B. Accelerate Indebtedness: Lender may declare the entire Obligations immediately due and payable, without notice to Borrower notwithstanding Section 33.

C. Assemble Collateral: Lender may require Borrower and/or Guarantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Borrower and/or Guarantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter, provided Lender does so without a breach of the peace or a trespass, upon the property of Borrower and/or Guarantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Borrower and/or Guarantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Borrower and/or Guarantor after repossession.

D. Sell the Collateral: Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Borrower and/or Guarantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Borrower, Guarantor and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after an Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Obligations secured by this Agreement. To the extent permitted by applicable law, all such expenses will become a part of the Obligations and, at Lender's option, will: (i) be payable on demand; (ii) be added to the balance of the Loan and be apportioned among and be payable with any installment payments to become due during either (a) the term of any applicable insurance policy or (b) the remaining term of the Loan; or (iii) be treated as a balloon payment that will be due and payable at the Loan's maturity.

E. Appoint Receiver: Lender shall have the right to have a Receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Obligations. The Receiver may serve without bond if permitted by law. Lender's right to the appointment of a Receiver shall exist whether or not the apparent value of the Collateral exceeds the Obligations by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

F. Collect Revenues, Apply Accounts: Lender, either itself or through a Receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income and revenues therefrom and hold the same as security for the Obligations or apply it to payment of the Obligations in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose or realize on the Collateral as Lender may determine, whether or not any amount included within the Obligations is then due. For these purposes, Lender may, on behalf of and in the name of Borrower and/or Guarantor, receive, open and dispose of mail addressed to Borrower; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment or storage of any Collateral.

To facilitate collections, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

G. Obtain Deficiency: If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Borrower and/or Guarantor for any deficiency remaining on the Obligations due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Borrower and/or Guarantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

H. Other Rights and Remedies: Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity or otherwise.

I. Election of Remedies: Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, any related documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower under the Agreement, after Borrower's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

32. **CONSENT TO JURISDICTION AND VENUE.** Subject to Section 33 below, Borrowers and Guarantors each consent to the jurisdiction of the federal and Utah state courts and agree that any action or proceeding to enforce or arising out of this Agreement may only be brought or in the United States District Court for the District of Utah or in any court of the State of Utah, and Borrower and Guarantors waive personal service of process. Borrowers and Guarantors each waive any objections, including *forum non conveniens,* to the bringing of any such proceeding in such jurisdictions.

33. **ARBITRATION.** To the extent that a claim or dispute arises out of, or in relation to this Agreement, including without limitation, the terms, construction, interpretation, performance, termination, breach, or enforceability of this Agreement, Borrower(s) and Guarantor(s) hereby agree that the claim or dispute may be resolved by mandatory binding arbitration in Utah at the sole election of the Lender within thirty (30) days after the claim or dispute arises. If Lender so elects, the parties agree that (i) the arbitration shall be administered by JAMS and the arbitration shall be conducted in accordance with the Expedited Procedures of the JAMS Comprehensive Arbitration Rules and Procedures except as otherwise agreed in this Agreement; (ii) the arbitrator shall be chosen in accordance with the procedures of JAMS and shall base the award on applicable Utah law; (iii) the arbitration shall be conducted by a single arbitrator; (iv) judgment on the award may be entered in any court having jurisdiction, subject to Section 32 above; and (iv) the costs of the arbitration shall be divided equally between the parties. This arbitration section is governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16.

34. **SERVICE OF PROCESS.** Borrower and Guarantor(s) consent to service of process and legal notices made by Certified or Priority Mail delivered by the United States Postal Service and addressed to the Borrower's mailing address set forth on the first page of this Agreement or any other address(es) provided in writing to Lender by Borrower or Guarantor(s), and unless applicable law or rules provide otherwise, any such service will be deemed complete upon dispatch. Borrower and Guarantor(s) agree that it will be precluded from asserting that it did not receive service of process or any other notice mailed to the Borrower's mailing address set forth on the first page of this Agreement unless (i) it furnishes a Certified mail return receipt that is addressed to Libertas Funding, LLC, 411 West Putnam Avenue, Suite 220, Greenwich, CT 06830 ATTN: Customer Service and that is signed by the Lender demonstrating that Lender was provided with notice of a change in Borrower's and/or Guarantor's(s') (as applicable) mailing address, and (ii) service of process by Lender was sent to an address other than the address of Borrower and/or Guarantor(s) (as applicable) specified in such notice sent by Certified mail return receipt.

35. **NO WAIVER BY LENDER.** No delay or omission on the part of Lender in exercising any rights under this Agreement, any related guaranty or applicable law shall operate as a waiver of such right or any other right. Waiver on any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion. All Lender's rights and remedies, whether evidenced hereby or by any other agreement, instrument or paper, shall be cumulative and may be exercised singularly or concurrently.

36. **ASSIGNMENT.** This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties hereto; provided, however, that Borrowers may not assign this Agreement or any rights or duties hereunder without Lender's prior written consent and any prohibited assignment shall be absolutely null and void. No consent to an assignment by Lender shall release Borrowers from its Obligations. Lender may assign this Agreement and its rights and duties hereunder and no consent or approval by Borrower is required in connection with any such assignment. Lender reserves the right to sell, assign, transfer, negotiate or grant participations in all or any part of, or any interest in Lender's rights and benefits hereunder. In connection with any assignment or participation, Lender may disclose all documents and information that Lender now or hereafter may have relating to Borrower or Borrower's business. To the extent that Lender assigns its rights and obligations hereunder to another party, Lender thereafter shall be released from such assigned obligations to Borrower and such assignment shall affect a novation between Borrower and such other party. Libertas Funding, LLC ("Libertas") (in its capacity as Servicer) or a successor servicer (if any) shall, acting solely for this purpose as a non-fiduciary agent of Lender, maintain at one of its offices in the United States a copy of each assignment agreement delivered to it with respect to this Loan and a register for the recordation of the name of each assignee of this Loan, and principal and interest amount of this Loan owing to, such assignee pursuant to the terms

hereof. The entries in such register shall be conclusive, and Borrower, Lender and each such assignee may treat each person whose name is recorded therein pursuant to the terms hereof as a "Lender" hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The register maintained for this Loan shall be available for inspection by Borrower and any such assignee of this Loan, at any reasonable time upon reasonable prior notice to Libertas (in its capacity as Servicer) or the applicable successor servicer (if any). This Section 35 shall be construed so that this Loan is at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Internal Revenue Code and any related Treasury regulations (or any other relevant or successor provisions of the Internal Revenue Code or of such Treasury regulations)

**37. INTERPRETATION.** Paragraph and section headings used in this Agreement are for convenience only and shall not affect the construction of this Agreement. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against Lender or Borrower, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by all parties, having had the opportunity to consult counsel, and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of all parties hereto.

**38. SEVERABILITY.** If one or more provisions of this Agreement (or the application thereof) is determined invalid, illegal or unenforceable in any respect in any jurisdiction, the same shall not invalidate or render illegal or unenforceable such provision (or its application) in any other jurisdiction or any other provision of this Agreement (or its application).

**39. NOTICES.** Except as otherwise provided in this Agreement, notice under this Agreement must be in writing. Notice to Lender will be deemed received by Lender at address set forth in Section 47 (or to any other address as may be specified by either party by a notice given as provided herein), by U.S. mail, postage prepaid, first class mail; in person; by registered mail; by certified mail; by nationally recognized overnight courier; or when sent by electronic mail. Notice to Borrower and/or any personal guarantor will be deemed given when sent to Borrower's last known address or electronic mail address in Lender's records for this Loan.

**40. RECORDKEEPING AND AUDIT REQUIREMENTS.** Lender shall have no obligation to maintain any electronic records or any documents, schedules, invoices or any other paper delivered to Lender by Borrower in connection with this Agreement or any other agreement other than as required by law. Borrower will at all times keep accurate and complete records of Borrower's accounts and Collateral. At Lender's request, Borrower shall deliver to Lender: (i) schedules of accounts and general intangibles; and (ii) such other information regarding the Collateral as Lender shall request. Lender, or any of its agents, shall have the right to call any telephone numbers that Borrower has provided or may provide in the future or otherwise in the Lender's possession (including any cellular or mobile telephone numbers),at intervals to be determined by Lender. Lender, or any of its agents, shall have the right to without hindrance or delay, to inspect, audit, check, and make extracts from any copies of the books, records, journals, orders, receipts, correspondence that relate to Borrower's accounts and Collateral or other transactions between the parties thereto and the general financial condition of Borrower. Lender, or any of its agents, may remove any of such records temporarily for the purpose of having copies made thereof. If Borrower was referred to Lender for this Loan by a third-party (the "Referring Party"), then Borrower consents to Lender sharing certain reasonable information about Borrower with the Referring Party for purposes of the Referring Party verifying and/or auditing loans made through such Referring Party's referrals as well as the servicing and collection of Borrower's Loan account. Wherever appropriate in this Agreement, a singular term shall be construed to the mean the plural where necessary, and a plural term the singular. For example, if at any time two parties shall constitute Borrower, then the relevant term shall refer to both parties together.

**41. GOVERNING LAW.** Subject to Section 33 above, our relationship including this Agreement and any claim, dispute or controversy (whether in contract, tort, or otherwise) at any time arising from or relating to this Agreement is governed by, and this Agreement will be construed in accordance with federal law and (to the extent not preempted by federal law) Utah law without regard to internal principles of conflict of laws. The legality, enforceability and interpretation of this Agreement and the amounts contracted for, charged and reserved under this Agreement will be governed by such laws. Borrower understands and agrees that (i) Lender is located in Utah,(ii) Lender makes all credit decisions from Lender's office in Utah, (iii) the Loan is made in Utah (that is, no binding contract will be formed until Lender receives and accepts Borrower's signed Agreement in Utah) and (iv) Borrower's payments are not accepted until received by Lender in Utah.

**42. WAIVER OF NOTICES AND OTHER TERMS.** Except for any notices provided for in this Agreement, Borrower and any person who has obligations pursuant to this Agreement (*e.g.*, a Guarantor), to the extent not prohibited by applicable law hereby, waives demand, notice of nonpayment, notice of intention to accelerate, notice of acceleration, presentment, protest, notice of dishonor and notice of protest. To the extent permitted by applicable law, Borrower and any person who has obligations pursuant to this Agreement also agrees: Lender is not required to file suit, show diligence in collection against Borrower or any person who has obligations pursuant to this Agreement, or proceed against any Collateral; Lender may, but will not be obligated to, substitute, exchange or release any Collateral; Lender may release any Collateral, or fail to realize upon or perfect Lender's security interest in any Collateral; Lender may, but will not be obligated to, sue one or more persons without joining or suing others; and Lender may modify, renew, or extend this Agreement (repeatedly and for any length of time) without notice to or approval by any person who has obligations pursuant to this Agreement (other than the party with whom the modification, renewal or extension is made).

# BUSINESS LOAN AND SECURITY AGREEMENT

43. **MONITORING, RECORDING AND ELECTRONIC COMMUNICATIONS.** In order to ensure a high quality of service for Lender's customers, Lender, or its servicing agent, may monitor and/or record telephone calls between Borrower and /or Guarantor and Lender's employees or agents. Borrower acknowledges that Lender may do so and agrees in advance to any such monitoring or recording of telephone calls. Borrower also agrees that Lender may communicate with Borrower electronically by email and text.

44. **JURY TRIAL WAIVER AND CLASS ACTION WAIVER.** To the extent not prohibited by applicable law, Borrower, Guarantors and Lender waive their right to a trial by jury of any claim or cause of action based upon, arising out of or related to the Agreement and all other documentation evidencing the Obligations, in any legal action or proceeding. Subject to Section 33 above, any such claim or cause of action shall be tried by court sitting without a jury.

**THE PARTIES HERETO (LENDER, BORROWERS AND GUARANTORS) WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST ANY OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR AGAINST PUBLIC POLICY. TO THE EXTENT ANY PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST ANY OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.**

45. **CONFIDENTIALITY.** Borrower and Guarantor (if any) shall not make, publish or otherwise disseminate in any manner a copy of this Agreement or any public statement or description of the terms of this Agreement, except to its employees, advisors and similar persons who have a legitimate need to know its contents.

46. **ENTIRE AGREEMENT.** The accompanying Business Loan and Security Agreement Supplement and the Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) and any other documents required by Lender now or in the future in connection with this Agreement and Borrower's Loan are hereby incorporated into and made a part of this Agreement. This Agreement is the entire agreement of the parties with respect to the subject matter hereof and supersedes any prior written or verbal communications or instruments relating thereto, including any agreement, authorization, or consent, or communication between Borrower or Guarantor (if any) and an Independent Sales Organization that may have referred Borrower to Lender. Notwithstanding any agreement, authorization, or consent, or communication Borrower (or Guarantor if any) and an Independent Sales Organization, Borrower and Guarantor (if any) shall only have opt-out rights with respect to any agreement, authorization, or consent as provided in this Agreement or as otherwise provided in any other agreement, authorization, or consent between Borrower (or Guarantor if any) and Lender or its Servicer, Libertas. If Borrower (or Guarantor if any) wishes to exercise any applicable opt-out right, it must directly contact Lender or Servicer.

47. **COUNTERPARTS; ELECTRONIC SIGNATURES.** This Agreement may be executed in one or more counterparts, each of which counterparts shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument. For purposes of the execution of this Agreement, signatures delivered by electronic, or fax transmission shall be treated in all respects as original signatures.

48. **CUSTOMER SERVICE CONTACT INFORMATION.** If you have questions or comments about your Loan, you may contact us by (i) e-mail at Customerservice@libertasfunding.com, (ii) telephone at (800) 704-8675 or (iii) WebBank c/o Libertas Funding, LLC, 411 West Putnam Avenue, Suite 220, Greenwich, CT 06830, Attn: Customer Service.

49. **GRANT OF LICENSE TO USE LIBERTAS CUSTOMER PORTAL.** Subject to Borrower's compliance with this Agreement and the Terms of Use for Libertas' Customer Portal, Borrower is granted a nonexclusive, revocable, non-transferable, non-sublicensable, limited right and royalty-free license to use Libertas' Customer Portal, effective solely during the term of the Loan and so long as an Event of Default has not occurred. The license granted to Borrower is personal, and no rights hereunder may be transferred by Borrower without express written approval. The license granted hereunder may be terminated without notice at any time after an Event of Default has occurred.

50. **CERTIFICATION AND SIGNATURES.** By executing this Agreement or authorizing the person signing or affirming below to execute on its behalf, Borrower certifies that Borrower has received a copy of this Agreement and that Borrower has read, understands and agrees to be bound by its terms. Each person signing or affirming below certifies that such person is signing on behalf of the Borrower.

# BUSINESS LOAN AND SECURITY AGREEMENT

ARC MANAGEMENT GROUP, LLC

By: Bill Wilson

William Wilson

BORROWER

12-12-2022

William Wilson

By: Bill Wilson

William Wilson

OWNER

12-12-2022

Thresa Wilson

By: Thresa Wilson
Thresa Wilson (Dec 12, 2022 10:59 EST)

Thresa Wilson

OWNER

12-12-2022

# BUSINESS LOAN AND SECURITY AGREEMENT

## AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT) AND DIRECT PAYMENTS (ACH DEBITS)

**This Authorization Agreement for Direct Deposit ("ACH Credit") and Direct Payments ("ACH Debits") is part of (and incorporated by reference into) the Business Loan and Security Agreement. Borrower should keep this important legal document for Borrower's records.**

**DISBURSMENT OF LOAN PROCEEDS.** By executing this Authorization Agreement for Direct Deposit ("ACH Credit") and Direct Payments ("ACH Debits"), Borrower authorizes Lender to disburse the Loan proceeds less the amount of any applicable fees upon Loan approval by initiating an ACH credit, wire transfer or similar means to the business checking account indicated below (or a substitute business checking account Borrower later identifies and is acceptable to Lender) (hereinafter referred to as the "Designated Checking Account") in the disbursal amount set forth in the accompanying Business Loan and Security Agreement Supplement. This authorization is to remain in full force and effect until Lender has received written notification from Borrower of its termination in such time and in such manner as to afford Lender and Borrower's depository bank a reasonable opportunity to act on it.

**AUTOMATIC PAYMENT PLAN.** Enrollment in Lender's Automatic Payment Plan is required for Loan approval. By executing this Authorization Agreement for Direct Deposit ("ACH Credit") and Direct Payments ("ACH Debits"), Borrower agrees to, and hereby, enrolls in the Automatic Payment Plan and authorizes Lender to collect payments required under the terms of Borrower's Business Loan and Security Agreement by initiating ACH debit entries to the Designated Checking Account in the amounts and on the dates provided in the payment schedule set forth in the accompanying Business Loan and Security Agreement Supplement. Borrower authorizes Lender to increase the amount of any scheduled ACH debit entry or assess multiple ACH debits for the amount of any previously scheduled payment(s) that was not paid as provided in the payment schedule and any unpaid Fees. This authorization is to remain in full force and effect until Lender has received written notification from Borrower of its termination in such time and in such manner as to afford Lender and Borrower's depository bank a reasonable opportunity to act on it. Lender may suspend or terminate Borrower's enrollment in the Automatic Payment Plan immediately if Borrower fails to keep the Designated Checking Account in good standing or if there are insufficient funds in the Designated Checking Account to process any payment (or if Lender is otherwise unable to collect any amounts by ACH debit owed to Lender under the Loan or under any other loan or extension of credit by Lender to Borrower). **If Borrower revokes the authorization or Lender suspends or terminates Borrower's enrollment in the Automatic Payment Plan, Borrower still will be responsible for making timely payments pursuant to the alternative payment methods described in the Business Loan and Security Agreement.**

**Provisional Payment**. Credit given by us to you with respect to an automated clearing house ("ACH") credit entry is provisional until we receive final settlement. If we do not receive such final settlement, you are hereby notified and agree that we are entitled to a refund of the amount credited to you in connection with such entry, and the party making to you via such entry (i.e., the originator of the entry) shall not be deemed to have paid you in the amount of such entry.

**Notice of Receipt of Entry**. Under the operating rules of the National Automated Clearing House Association ("NACHA"), which are applicable to ACH transactions involving your account, we are not required to give next day notice to you of receipt of an ACH item and we will not do so.

**BUSINESS PURPOSE ACCOUNT.** By executing this Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits), Borrower attests that the Designated Checking Account was established for business purposes and not for personal, family or household purposes.

**ACCOUNT CHANGES.** Borrower agrees to promptly notify Lender in writing if there are any changes to the account and routing numbers of the Designated Checking Account.

**MISCELLANEOUS.** Lender is not responsible for any fees charged by Borrower's bank as the result of credits or debits initiated under this authorization. The origination of ACH transactions to Borrower's account must comply with the provisions of U.S. law. Borrower agrees to be bound by NACHA rules of the Electronic Payments Association. Borrower agrees to provide to Lender at all times, "Live Contemporaneous Access" to all of its bank accounts in order for Lender to evaluate Borrower's compliance with the Agreement, and for collections in the Event of Default ("Borrower's Accounts")."Live Contemporaneous Access" shall be defined as: Borrower, at all times and including but not limited to, providing Lender with accurate login information necessary to access all of Borrower's Accounts, such as usernames and passwords, answers to challenge questions, and security tokens. Borrower shall provide notice to Lender in the event Borrower makes any changes to the Designated Checking Account, including in the event Borrower closes the Designated Checking Account.

## DESIGNATED CHECKING ACCOUNT DETAILS:

**Routing Number:** 061000227

**Account Number:** 2000029095971

**Tax ID:** 03-0607765

ARC MANAGEMENT GROUP, LLC

By: Bill Wilson

William Wilson

BORROWER

12-12-2022

William Wilson

By: Bill Wilson

William Wilson

OWNER

12-12-2022

Thresa Wilson

By: Thresa Wilson
Thresa Wilson (Dec 12, 2022 10:59 EST)

Thresa Wilson

---

OWNER

---

12-12-2022

---

# Guaranty

**THIS GUARANTY CREATES SPECIFIC LEGAL OBLIGATIONS FOR GUARANTOR(S). PLEASE READ THE GUARANTY, WHICH INCLUDES THE BUSINESS LOAN AND SECURITY AGREEMENT AND ASSOCIATED SUPPLEMENT, CAREFULLY BEFORE SIGNING.**

Each Guarantor, jointly and severally, absolutely and unconditionally guarantee the prompt payment to Lender, including its successors and assignees, of any and all Obligations incurred by the Borrower pursuant to the Agreement and agree to the terms of the Agreement (this "Guaranty"). Each Guarantor further agrees to repay the Obligations on demand, without requiring Lender first to enforce payment against Borrower. This is a guarantee of payment and not of collection. This is an absolute, irrevocable, unconditional, primary, and continuing obligation and will remain in full force and effect until all amounts owed to Lender pursuant to the Agreement are satisfied in full. Each Guarantor represents and warrants that (i) it is a legal resident of the United States of America and (ii) Guarantor does not intend to file for reorganization or liquidation under the bankruptcy or reorganization laws of any jurisdiction.

This Guaranty shall be construed in accordance with the laws of the State of Utah, and shall inure to the benefit of Lender, its successors and assigns. Each Guarantor **agrees that the Guaranty is subject to the Arbitration Agreement set forth above in Section 33**. To the extent not prohibited by applicable law, each of the undersigned Guarantors waives its right to a trial by jury of any claim or cause of action based upon, arising out of or related to this guaranty, the Agreement and all other documentation evidencing the Obligations, in any legal action or proceeding. Subject to Section 33 above, any such claim or cause of action shall be tried by court sitting without a jury.

ABI Holding LLC

By: Bill Wilson

William Wilson

GUARANTOR

12-12-2022

Healthtech Receivables MGMT., INC.

By: Bill Wilson

William Wilson

GUARANTOR

12-12-2022

The J.D. Stuart Law Group, LLC

By:

Bill Wilson

William Wilson

GUARANTOR

12-12-2022

Wilzara Property Management Group LLC

By: Bill Wilson

William Wilson

GUARANTOR

12-12-2022

William Wilson

By: Bill Wilson

William Wilson

GUARANTOR

12-12-2022

Thresa Wilson

By: Thresa Wilson
Thresa Wilson (Dec 12, 2022 10:59 EST)

Thresa Wilson

GUARANTOR

_______________________________________________

12-12-2022

_______________________________________________

**SCHEDULE 11 (ADDITIONAL PLEDGED COLLATERAL)**

**Clarizen Approved 9.13.22**

# BUSINESS LOAN AND SECURITY AGREEMENT SUPPLEMENT

*This Business Loan and Security Agreement Supplement is part of (and incorporated by reference into) the Business Loan and Security Agreement. Borrower should keep this important legal document for Borrower's records.*

| YOUR LOAN DETAILS | |
|---|---|
| **Borrower/Business Legal Name:** | ARC MANAGEMENT GROUP, LLC |
| **D/B/A:** | ARC MANAGEMENT GROUP, LLC |
| **Federal Tax ID #:** | 03-0607765 |
| **Physical Address (Business Location):** | 1825 Barrett Lakes Blvd. #505 Kennesaw, Georgia 30144 |
| **Mailing Address (If different from Physical Address):** | 1825 Barrett Lakes Blvd. #505 Kennesaw, Georgia 30144 |
| **Lender:** | WebBank |
| **Loan Amount:** | $ 1,260,655.69 |
| **Factor Rate:** | 1.350 |
| **Term:** | 18 Months |
| **DAILY Payment Amount *:** | $ 4,502.34 |
| **Origination Fee:**<br>(Deducted at time of disbursement) | $ 6,303.28 |
| **Prepayment:** | **The above stated Factor Rate will be reduced, as set forth below, if the Loan is paid off prior to the end of the scheduled term. The discounted Factor Rate will be as follows:**<br>**Loan paid off within one (1) month of disbursement/funding: 1.075**<br>**Loan paid off within two (2) months of disbursement/funding: 1.095**<br>**Loan paid off within three (3) months of disbursement/funding: 1.115**<br>**Loan paid off within four (4) months of disbursement/funding: 1.135**<br>**Loan paid off within five (5) months of disbursement/funding: 1.155**<br>**Loan paid off within six (6) months of disbursement/funding: 1.175** |
| **Application ID:** | APP-0000001939 |

* For loans with MONTHLY payments, the first payment will occur fourteen (14) calendar days after the day the loan is funded.

# BUSINESS LOAN AND SECURITY AGREEMENT SUPPLEMENT

*This Business Loan and Security Agreement Supplement is part of (and incorporated by reference into) the Business Loan and Security Agreement. Borrower should keep this important legal document for Borrower's records.*

*This tool is provided to help you understand and assess the cost of your business financing. The calculations below involve certain key assumptions about this Loan, including that the Loan is paid off in its entirety according to the agreed payment schedule and that no repayments are missed or late.*

| Loan Amount | Disbursement Amount[1] | Repayment Amount[2] | Term |
|---|---|---|---|
| **$ 1,260,655.69** | **$ 1,254,352.41** | **$ 1,701,885.18** | **18 Months** (repaid DAILY) |

| METRIC | METRIC CALCULATION | METRIC EXPLANATION |
|---|---|---|
| **Total Cost-of-Funds**<br><br>**$ 447,532.77** | Origination Fee: **$ 6,303.28**<br>Cost-of-Funds **$ 441,229.49**<br><br>**Total Cost-of-Funds: $ 447,532.77** | The Origination Fee is deducted from the Loan Amount at the time of disbursement.<br>Cost-of-Funds is the Loan Amount multiplied by the Factor Rate minus the Loan Amount.<br>This is the total amount that you will pay for the Loan.<br><br>The Total Cost-of-Funds amount does not include fees and other charges you can avoid, such as Returned Payment Fees, Bank Block Fees and Default Waiver Fees.[2] |
| **Factor Rate**<br><br>**1.350** | **1.350** | This is the rate that determines the Cost-of-Funds. |
| **Average Monthly Payment**<br><br>**$ 94,549.18** | Repayment Amount: **$ 1,701,885.18**<br><br>Term (in months): 18 Months<br><br>Average Monthly Payment: **$ 94,549.18** | This is the average monthly repayment amount of the Loan, which does not include fees and other charges you can avoid, such as Returned Payment Fees, Bank Block Fees and Default Waiver Fees.[2]<br><br>The actual repayment frequency for the Loan will be DAILY. This is an estimate for comparison purposes only. |
| **Cents on the Dollar (*excluding fees*)**<br><br>**0.35 ¢** | Cost-of Funds: $ 441,229.49<br><br>Loan Amount: $ 1,260,655.69<br><br>Cents on the Dollar (excluding fees): **0.35 ¢** | This is the Cost-of-Funds paid per dollar borrowed. This amount is exclusive of fees. |
| **Prepayment** | Does prepayment of this Loan result in any new fees or charges?<br>Does the prepayment of this Loan decrease the Repayment Amount? | **No**<br><br>**Yes**<br>(See Prepayment Section above and Section 20 of the accompanying Business Loan and Security Agreement for specific details regarding prepayment). |

[1] The Disbursement Amount is the Loan Amount less the Origination Fee and any applicable tax withheld. Note that the Disbursement Amount may not be the amount deposited to your Designated Checking Bank Account. The amount that will be deposited to your Designated Checking Account may be reduced by any amounts owed to Lender from a prior loan or used to pay off an amount owed to a third-party and/or tax liability.

[2] Your business may incur other fees that are not a condition of borrowing, such as Returned Payment Fees, Bank Block Fees or Default Waiver Fees. Those fees are not reflected above. See Section 20 of the accompanying Business Loan and Security Agreement for details on these fees.

# BUSINESS LOAN AND SECURITY AGREEMENT SUPPLEMENT

*This Business Loan and Security Agreement Supplement is part of (and incorporated by reference into) the Business Loan and Security Agreement. Borrower should keep this important legal document for Borrower's records.*

| FEES | |
|---|---|
| **Mandatory Fees:** | |
| **Origination Fee:** | **$ 6,303.28** |
| **Florida Documentary Stamp Tax++:** ***(For Florida Loan Transactions Only)*** | **$ 0.00** |
| **Other Potential Fees:** | |
| **Returned Payment Fee:** | $ 35.00 per instance. |
| **Bank Block Fee:** | $ 100.00 per instance. |
| **Default Waiver Fee:** | $ 2,500.00 per instance. |
| | See Section 20 of the accompanying Business Loan and Security Agreement for more details regarding these Fees. |

++ The Florida documentary stamp tax is an excise tax imposed on certain documents executed, delivered, or recorded in Florida. Tax is paid to the Clerk of Court when the document is recorded. When a taxable document is not recorded, the tax must be paid directly to the Florida Department of Revenue. Libertas on behalf of WebBank withholds applicable Florida documentary stamp taxes owed by Borrowers at the time the loan is made and forwards the tax payment to the Florida Department of Revenue on behalf of the Borrower.

| CERTAIN DISCLOSURES | |
|---|---|
| **USA Patriot Act Notice.**<br><br>**Important Information About Procedures For Opening A New Account** | To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account.<br><br>What this means for you: When you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents. |
| **Loan Pricing Disclosure** | Lender uses a system of risk-based pricing to determine the Cost-of-funds. Risk-based pricing is a system that evaluates the risk factors of your application and adjusts the Cost-of-Funds rate up or down based on this risk evaluation. Although Lender believes that its loan process provides expedited turnaround time and efficient access to capital, this loan may be a higher cost loan than loans that may be available through other lenders. |
| **Loan for Specific Purposes Only** | The proceeds of the requested Loan may solely be used for business purposes as set forth in the accompanying Business Loan and Security Agreement. **IN ADDITION, THE LOAN WILL NOT BE USED FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES OR FOR ILLEGAL PURPOSES.** Borrower understands that Borrower's agreement not to use the Loan proceeds for personal, family or household purposes means that certain important duties imposed upon entities making loans for consumer/personal purposes, and certain important rights conferred upon consumers, pursuant to federal or state law **will not apply** to this transaction. |

# BUSINESS LOAN AND SECURITY AGREEMENT

1. **INTRODUCTION.** This Business Loan and Security Agreement together with the accompanying Business Loan and Security Agreement Supplement and the accompanying Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits), (collectively this "Agreement") governs your business loan ("Loan") made by WebBank. Please read it and keep it for your reference. In this Agreement, the words "you," "your" and "Borrower" mean the Borrower identified on the signature page of this Business Loan and Security Agreement. Each Guarantor identified on the signature page of this Business Loan and Security Agreement shall be referred to as "Guarantor" or "Guarantors" in this Agreement. The words "Lender", "we", "us", and "our" mean WebBank or its successor(s) and assign(s).

2. **EFFECTIVE DATE.** This Agreement begins on the date we accept this Agreement in Utah. We may accept this Agreement without signing it by sending you the Disbursement Amount. Borrower understands and agrees that Lender may postpone, without penalty, the disbursement of the Disbursement Amount to Borrower until in Lender's sole discretion all required security interests have been perfected and Lender has received all required personal guarantees or other documentation. If there is a delay in your receipt of the Disbursement Amount, you agree that there will be no adverse consequence to you or us.

3. **AUTHORIZATION.** Borrower agrees that the Loan made by Lender to Borrower shall be conclusively deemed to have been authorized by Borrower and to have been made pursuant to a duly authorized request on its behalf.

4. **LOAN FOR BUSINESS PURPOSES ONLY.** The proceeds of the requested Loan may solely be used for business purposes and not for any other purposes. In addition, the Loan will not be used for personal, family or household purposes or illegal purposes, and Borrower and Guarantors are forever estopped from taking the position that such Loan (including Advances, if any) are or were used for such personal, family or household purposes. Borrower understands that Borrower's agreement not to use the Loan proceeds for personal, family or household purposes means that certain important duties imposed upon entities making loans for personal, family or household purposes, and certain important rights conferred upon such persons, pursuant to federal or state law **will not apply to the Loan or the Agreement. Borrower also understands that Lender will be unable to confirm whether the use of the Loan conforms to this section. Borrower and Guarantors agree that a breach by Borrower of the provisions of this section will not affect Lender's right to (i) enforce Borrower's and Guarantor's promise to pay for all amounts owed under this Agreement, regardless of the purpose for which the Loan is in fact obtained or (ii) use any remedy legally available to Lender, even if that remedy would not have been available had the Loan been made for personal, family or household purposes.**

5. **DISBURSEMENT OF LOAN PROCEEDS, MAINTENANCE OF BORROWER'S BANK ACCOUNT, AND RIGHT TO CANCEL.** If Borrower applied and was approved for a Loan, Borrower's Loan will be disbursed upon approval as provided in the accompanying Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits). Borrower agrees to maintain sufficient funds to meet its Obligations (defined below) under the Agreement (including keeping such account open until the Total Repayment Amount has been completely repaid) in the account identified in the Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits), which is the account that was reviewed in conjunction with underwriting and approval of this Loan.
**Right to Cancel.** Notwithstanding anything to the contrary set forth in this Agreement, the Borrower shall have the right to cancel this Agreement any time until the midnight of the second Business Day following the date Disbursement Amount is initiated by Lender by notifying the Lender or the Servicer of such cancellation by notice sent in accordance with section 38 of this Agreement. Upon timely delivering such cancellation notice to Lender or Servicer, and further provided that Borrower has otherwise complied with the provisions of this Agreement, Borrower shall refund the entire amount of the Disbursement Amount back to the Lender within three (3) Business Days following the date disbursement of the Disbursement Amount is initiated by Lender. Upon such refund of the Disbursement Amount back to Lender, this Agreement shall become null and void and the parties shall have no remaining obligations to or rights against each other except that the Lender shall have the right to keep, as fair and adequate compensation for its costs of entering into this Agreement with Borrower, the entire amount of Weekly Payment Amount or Daily Payment Amount as well as the Origination Fee (as set forth above) received by the Lender prior to the date when Lender receives the Disbursement Amount back from Borrower.

6. **PROMISE TO PAY.** Borrower agrees to pay Lender the Total Repayment Amount in accordance with this Agreement Borrower agrees to enroll in Lender's Automatic Payment Plan and authorizes Lender to debit required payments as provided in the accompanying Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits). Borrower also authorizes Lender to otherwise collect amounts owed to it as provided in this Agreement.

7. **ALTERNATIVE PAYMENT METHODS.** If Borrower knows that for any reason Lender will be unable to process a payment under Lender's Automatic Payment Plan, then Borrower must either restore sufficient funds such that the missed payment can be collected as provided in the accompanying Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) or promptly send the Lender the amount of the missed payment via wire transfer or by delivering a check. If Borrower

elects to send payments by postal mail, then Borrower agrees to send such payments to WebBank c/o Libertas Funding, LLC, 411 West Putnam Avenue, Suite 220, Greenwich, CT 06830, Attn: Customer Service. All alternative payments must be made in good funds by check, money order, wire transfer, automatic transfer from an account at an institution offering such service, or other instrument in U.S. Dollars. Borrower understands and agrees that payments made at any other address than as specified by Lender may result in a delay in processing and/or crediting. If Borrower while enrolled in the Automatic Payment Plan makes a payment by mail, or by any pay-by-phone, on-line service, or any other service that Lender makes available, Lender may either treat such payment as an additional payment and continue to process Borrower's scheduled Automatic Payment Plan payments as required by this Agreement may reduce any scheduled Automatic Payment Plan payment by the amount of any such additional payment received.

**8. APPLICATION OF PAYMENTS.** Subject to applicable law, Lender reserves the right to allocate and apply payments received on Borrower's Loan between principal, Cost-of-Funds and fees in any manner Lender chooses in Lender's sole discretion.

**9. POSTDATED CHECKS, RESTRICTED ENDORSEMENT CHECKS AND OTHER DISPUTED OR QUALIFIED PAYMENTS.** Lender can accept late, postdated or partial payments without losing any of Lender's rights under this Agreement (a postdated check is a check dated later than the day it was actually presented for payment). Lender is under no obligation to hold a postdated check and Lender reserves the right to process every item presented as if dated the same date received by Lender or Lender's check processor unless Borrower gives Lender adequate notice and a reasonable opportunity to act on it. Except where such notice and opportunity is given, Borrower may not hold Lender liable for depositing any postdated check. **Borrower agrees not to send Lender partial payments marked "paid in full," "without recourse," or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Agreement. All notices and written communications concerning postdated checks, restricted endorsement checks (including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount) or any other disputed, nonconforming or qualified payments, must be mailed or delivered to WebBank c/o Libertas Funding, LLC, 411 West Putnam Avenue, Suite 220, Greenwich, CT 06830, Attn: Customer Service.**

**10. PREPAYMENT.** Borrower may prepay Borrower's Loan in whole on any Business Day by paying Lender the sum total of the outstanding Total Repayment Amount and any fees as determined by Lender's records in accordance with Section 8. Borrower may prepay Borrower's Loan in part on any Business Day and such payment shall be applied against the Total Repayment Amount and any fees. The Total Repayment Amount shall be reduced by the prepayment factor as set forth on Page 1 of the accompanying Business Loan and Security Agreement Supplement. For example, if the Loan's Factor Rate is 1.30 but the loan is paid off within one (1) month of disbursement/funding, the Factor Rate shall be reduced by the "one-month prepayment factor" as set forth on Page 1 of the accompanying Business Loan and Security Agreement Supplement.

**11. SECURITY INTEREST.** Borrower hereby grants to Lender, the secured party hereunder, a continuing security interest in and to any and all "Collateral" as described below to secure payment and performance of all debts, liabilities and obligations of Borrower to Lender hereunder and also any and all other debts, liabilities and obligations of Borrower to Lender of every kind and description, direct or indirect, absolute or contingent, primary or secondary, due or to become due, now existing or hereafter arising, related to the Loan described in this Agreement, whether or not contemplated by the parties at the time of the granting of this security interest, regardless of how they arise or by what agreement or instrument they may be evidenced or whether evidenced by any agreement or instrument and includes obligations to perform acts and refrain from taking action as well as obligations to pay money including, without limitation, amounts paid to Borrower or on their behalf, all Cost-of-funds, fees and expenses (all hereinafter called "Obligations"). The Collateral includes the following property that Borrower (and Guarantor, if applicable, pursuant to Section 12) now owns or shall acquire or create immediately upon the acquisition or creation thereof: (i) any and all amounts owing to Borrower now or in the future from any merchant processor(s) processing charges made by customers of Borrower via credit card or debit card transactions; (ii) all other tangible and intangible personal property, including, but not limited to (a) cash and cash equivalents, (b) inventory, (c) equipment, (d) investment property including certified and uncertified securities, securities accounts, security entitlements, commodity contracts and commodity accounts, (e) instruments, including promissory notes (f) chattel paper, including tangible chattel paper and electronic chattel paper, (g) documents, (h) letter of credit rights, (i) accounts, including health-care insurance receivables, (j) deposit accounts, (k) commercial tort claims, (l) general intangibles, including payment intangibles and software and (m) as-extracted collateral as such terms may from time to time be defined in the Uniform Commercial Code; and (iii) any and all proceeds of any of the foregoing, including insurance proceeds or other proceeds from the sale, destruction, loss, or other disposition of any of the foregoing, and sums due from a third party who has damaged or destroyed any of the foregoing or from that party's insurer. The security interest Borrower (or Guarantor, if applicable, pursuant to Section 12) grants includes all accessions, attachments, accessories, parts, supplies and replacements for the Collateral, all products, proceeds and collections thereof and all records and data relating thereto. Lender disclaims any security interest in household goods in which Lender is forbidden by law from taking a security interest. In addition to the Collateral described above, Borrower or Guarantor hereby grant to the Lender a security interest in collateral specified on Schedule 11 (attached hereto and made a part hereof).

# BUSINESS LOAN AND SECURITY AGREEMENT

**12. PROTECTING THE SECURITY INTEREST.** Borrower agrees that Lender and/or Lender's Representative may file any financing statement, lien entry form or other document required in order to perfect, amend or continue Lender's security interest in the Collateral and Borrower agrees to cooperate with Lender and Lender's Representative as may be necessary to accomplish said filing and to do whatever Lender and Lender's Representative deems necessary to protect Lender's security interest in the Collateral. Borrower and Guarantor each agree that, if any Guarantor is a corporate entity, then Lender or Lender's Representative may file any financing statement, lien entry form or other document against such Guarantor or its property that Lender and/or Lender's Representative requires in order to perfect, amend or continue Lender's security interest in the Collateral. Any such Guarantor agrees to cooperate with Lender and Lender's Representative as may be necessary to accomplish said filing and to do whatever Lender or Lender's Representative deems necessary to protect Lender's security interest in the Collateral. In this Agreement, "Lender's Representative" means any entity or individual that is designated by Lender to serve in such capacity.

**13. LOCATION OF COLLATERAL; TRANSACTIONS INVOLVING COLLATERAL.** Unless Lender has agreed otherwise in writing, Borrower agrees and warrants that (i) all Collateral (or records of the Collateral in the case of accounts, chattel paper and general intangibles) shall be located at Borrower's address as shown in the application,(ii) except for inventory sold or accounts collected in the ordinary course of Borrower's business, Borrower shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral, (iii) no one else has any interest in or claim against the Collateral that Borrower has not already told Lender about in writing prior to Lender disbursing the Disbursement Amount, (iv) Borrower shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance or charge, other than the security interest provided for in this Agreement and(v) Borrower shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral for less than the fair market value thereof. Borrower shall defend Lender's rights in the Collateral against the claims and demands of all other persons. All proceeds from any unauthorized disposition of the Collateral shall be held in trust for Lender, shall not be co-mingled with any other funds and shall immediately be delivered to Lender. This requirement, however, does not constitute consent by Lender to any such disposition.

**14. TAXES, ASSESSMENTS AND LIENS.** Borrower (and Guarantor, if applicable, pursuant to Section 12) will complete and file all necessary federal, state and local tax returns and will pay when due all taxes, assessments, levies and liens upon the Collateral and provide evidence of such payments to Lender upon request.

FOR FLORIDA LOANS: Florida documentary stamp tax required by law in the amount of $ 0.00 will be paid directly to the Florida Department of Revenue. Borrower agrees to pay such tax and further agrees that the Loan proceeds shall be reduced by said tax amount. The Lender shall forward the tax payment to the Florida Department of Revenue.

**15. INSURANCE.** Borrower (and Guarantor, if applicable, pursuant to Section 12) shall procure and maintain such insurance as Lender may require with respect to the Collateral, in form, amounts and coverage reasonably acceptable to Lender and issued by a company reasonably acceptable to Lender naming Lender as loss payee. If Borrower at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may obtain such insurance as Lender deems appropriate at Borrower's sole cost and expense as further provided in Section 18. Borrower (and Guarantor, if applicable, pursuant to Section 12) shall promptly notify Lender of any loss of or damage to the Collateral.

**16. REPAIRS AND MAINTENANCE.** Borrower (and Guarantor, if applicable, pursuant to Section 12) agrees to only use the Collateral for its originally intended purposes and keep and maintain the Collateral in good order, repair and condition at all times, and to cause others to so use, keep, and maintain, while this Agreement remains in effect. Borrower (and Guarantor, if applicable, pursuant to Section 12) further agrees to pay when due all claims for work done on, or services rendered, or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**17. INSPECTION OF COLLATERAL AND PLACE OF BUSINESS; USE OF PHOTOGRAPHS AND TESTIMONIALS.** Lender and Lender's designated representatives and agents shall have the right during Borrower's normal business hours and at any other reasonable time to examine the Collateral wherever located and the interior and exterior of any Borrower place of business. During an examination of any Borrower place of business, Lender may examine, among other things, whether Borrower (i) has a place of business that is separate from any personal residence, (ii) is open for business, (iii) has sufficient inventory to conduct Borrower's business and (iv) has one or more credit card terminals if Borrower processes credit card transactions. When performing an examination, Lender may photograph the interior and exterior of any Borrower place of business, including any signage, and may photograph any individual who has signed the Agreement ("Signatory") unless the Signatory previously has notified Lender that he or she does not authorize Lender to photograph the Signatory. Lender may obtain testimonials from any Signatory, including testimonials on why Borrower needed the Loan and how the Loan has helped Borrower. Any photograph and testimonial will become and remain the sole property of Lender. Borrower and each Signatory release Lender from any claims that may arise regarding the use of any photograph or testimonial, including any claims of defamation, invasion of privacy or infringement of moral rights, rights of publicity or copyright.

# BUSINESS LOAN AND SECURITY AGREEMENT

**18. LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any related documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any related documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate to protect the Collateral, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. To the extent permitted by applicable law, all such expenses will become a part of the Obligations and, at Lender's option, will: (i) be payable on demand; (ii) be added to the balance of the Loan and be apportioned among and be payable with any installment payments to become due during the remaining term of the Loan; or (iii) be treated as a balloon payment that will be due and payable at the Loan's maturity. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon an Event of Default.

**19. BORROWER'S REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants that: (i) Borrower will comply with all laws, statutes, regulations and ordinances pertaining to the conduct of Borrower's business and promises to hold Lender harmless from any damages, liabilities, costs, expenses (including attorneys' fees) or other harm arising out of any violation thereof; (ii) Borrower's principal executive office and the office where Borrower keeps its records concerning its accounts, contract rights and other property, is that shown in the application; (iii) Borrower is duly organized, licensed, validly existing and in good standing under the laws of its state of formation and shall hereafter remain in good standing in that state, and is duly qualified, licensed and in good standing in every other state in which it is doing business, and shall hereafter remain duly qualified, licensed and in good standing in every other state in which it is doing business, and shall hereafter remain duly qualified, licensed and in good standing in every other state in which the failure to qualify or become licensed could have a material adverse effect on the financial condition, business or operations of Borrower; (iv) the true and correct legal name of the Borrower is set forth in the application; (v) the aggregate ownership percentage of the Signatories is greater than or equal to fifty percent (50%) of the Borrower's business (if the aggregate ownership percentage is less than fifty percent (50%), the Borrower has furnished evidence that the sworn signatories have the authority to bind the Borrower in entering into this Agreement and all actions contemplated hereby); (vi) the execution, delivery and performance of this Agreement, and any other document executed in connection herewith, are within Borrower's powers, have been duly authorized, are not in contravention of law or the terms of Borrower's charter, by-laws or other constating documents, or of any indenture, agreement or undertaking to which Borrower is a party; (vii) all constating documents and all amendments thereto of Borrower have been duly filed and are in proper order and any capital stock issued by Borrower and outstanding was and is properly issued and all books and records of Borrower are accurate and up to date and will be so maintained; (viii) Borrower (a) is subject to no charter, corporate or other legal restriction, or any judgment, award, decree, order, governmental rule or regulation or contractual restriction that could have a material adverse effect on its financial condition, business or prospects, and (b) is in compliance with its charter, by-laws and other constating documents, all contractual requirements by which it may be bound and all applicable laws, rules and regulations other than laws, rules or regulations the validity or applicability of which it is contesting in good faith or provisions of any of the foregoing the failure to comply with which cannot reasonably be expected to materially adversely affect its financial condition, business or prospects or the value of the Collateral; (ix) there is no action, suit, proceeding or investigation pending or, to Borrower's knowledge, threatened against or affecting it or any of its assets before or by any court or other governmental authority which, if determined adversely to it, would have a material adverse effect on its financial condition, business or prospects or the value of the Collateral;(x) all information provided by Borrower(s) and/or Guarantor(s) as part of the application process for the Loan was true and complete; (xi) Borrower does not intend to file for reorganization or liquidation under the bankruptcy or reorganization laws of any jurisdiction; and (xii) Borrower is not presently insolvent within the meaning of the Uniform Commercial Code as well as the United States Bankruptcy Code.

**20. COST-OF-FUNDS AND FEES.** Borrower agrees to pay in full the Cost-of-Funds set forth in the accompanying Business Loan and Security Agreement Supplement. In addition to any other fees described in this Agreement, Borrower agrees to pay the following fees:

A. Origination Fee: A one-time Origination Fee in the amount set forth in the accompanying Business Loan and Security Agreement Supplement. Borrower agrees that this fee will be immediately deducted from the proceeds of Borrower's Loan.

B. Returned Payment Fee: A Returned Payment Fee in the amount set forth in the accompanying Business Loan and Security Agreement Supplement each and every instance a payment processed on Borrower's Loan is returned unpaid or dishonored for any reason.

# BUSINESS LOAN AND SECURITY AGREEMENT

C. Bank Block Fee: A Bank Block Fee in the amount set forth in the accompanying Business Loan and Security Agreement Supplement each and every instance wherein Lender is blocked or otherwise prevented from accessing Borrower's Designated Bank Account for purposes of a scheduled payment as required by this Agreement.

D. Default Waiver Fee: A Default Waiver Fee in the amount set forth in the accompanying Business Loan and Security Agreement Supplement each and every instance when Lender, in its sole discretion and without any requirement to do so, agrees to waive an Event of Default.

Payments made by Borrower hereunder will be applied and allocated between Loan principal, Cost-of- funds, and fees in the manner set forth in Section 8.

21. **INTEREST AND FEES EXCEEDING PERMITTED LIMIT**. If the Loan is subject to a law that sets maximum charges, and that law is finally interpreted so that the Cost-of-funds, interest, Origination Fee, or other fees collected or to be collected in connection with this Agreement exceed the permitted limits, then (i) any such charge will be reduced by the amount necessary to reduce the charge to the permitted limit and (ii) if required by applicable law, any sums already collected from Borrower that exceed the permitted limits will be refunded or credited to Borrower.

22. **ONLINE CUSTOMER PORTAL**. When Borrower signs in with Borrower's valid username and password at https://portal.libertasfunding.com/ Borrower can obtain information about the Borrower's Loan, such as the outstanding balance, transactions and fees. No additional paper statement will be mailed to Borrower. Borrower agrees not to share Borrower's usemame and password to https://portal.libertasfunding.com/ with any third-party.

23. **FINANCIAL INFORMATION AND REEVALUATION OF CREDIT.** Each Borrower and each Guarantor (if any) authorize Lender to obtain business, and personal credit bureau reports and investigative reports in Borrower's and any Guarantor's name, respectively, in connection with Borrower's application and at any time and from time to time during the term of the Loan, including: for purposes of deciding whether to approve the requested Loan; for any update, renewal, or extension of credit; for any review or other account servicing purposes; for engaging in account or Guaranty collections; and/or any other lawful purpose. Upon Borrower's (or Guarantor's) request, Lender will advise if Lender obtained a credit report and/or investigative report and Lender will give Borrower or Guarantor (if any) the credit bureau's name and address. Each Borrower and each Guarantor (if any) agree to submit current financial information, and any other information requested by Lender in any format requested by Lender in Borrower's name and in the name of each Guarantor, respectively, at any time promptly upon Lender's request. Borrower authorizes Lender to act as Borrower's agent for purposes of accessing and retrieving transaction history information regarding Borrower from Borrower's designated merchant processor(s). Lender may, but is not required to, report Lender's credit experiences with Borrower and any Guarantor of Borrower's Loan to third parties as permitted by law, including with respect to any Guarantor to consumer credit reporting agencies. Each Borrower and each Guarantor also agree that Lender may release information to comply with governmental reporting or legal process that Lender believes may be required, whether or not such is in fact required, or when necessary or helpful in completing a transaction, or when investigating a loss or potential loss. Each Borrower and each Guarantor is hereby notified that a negative credit report reflecting on Borrower's and/or any Guarantor's credit record may be submitted to a credit reporting agency (including with respect to any Guarantor to consumer credit reporting agencies) if Borrower or such Guarantor fails to fulfill the terms of their respective credit obligations hereunder. Borrower and Guarantor acknowledge that any credit reporting on the Loan shall be at the sole discretion of Lender (subject to applicable law) and that Lender has the right to report the Loan to Guarantor's personal credit file (if a natural person) should Guarantor not pay any Obligation pursuant to the guaranty set forth in this Agreement.

24. **ATTORNEYS' FEES AND COLLECTION COSTS.** To the extent not prohibited by applicable law, Borrower and Guarantor shall pay to Lender on demand any and all expenses, including, but not limited to, collection costs, all attorneys' fees and expenses, and all other expenses of like or unlike nature which may be expended by Lender to obtain or enforce payment of Obligations either as against Borrower or any Guarantor or surety of Borrower or in the prosecution or defense of any action or concerning any matter arising out of or connected with the subject matter of this Agreement, the Obligations or the Collateral or any of Lender's rights or interests therein or thereto, including, without limiting the generality of the foregoing, any counsel fees or expenses incurred in any bankruptcy or insolvency proceedings and all costs and expenses (including search fees) incurred or paid by Lender in connection with the administration, supervision, protection or realization on any security held by Lender for the debt secured hereby, whether such security was granted by Borrower or by any other person primarily or secondarily liable (with or without recourse) with respect to such debt, and all costs and expenses incurred by Lender in connection with the defense, settlement or satisfaction of any action, claim or demand asserted against Lender in connection therewith, which amounts shall be considered advances to protect Lender's security and shall be secured hereby. To the extent permitted by applicable law, all such expenses will become a part of the Obligations and, at Lender's option, will: (i) be payable on demand; (ii) be added to the balance of the Loan and be apportioned among and be payable with any installment payments to become due during the remaining term of the Loan; or (iii) be treated as a balloon payment that will be due and payable at the Loan's maturity. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon an Event of Default.

# BUSINESS LOAN AND SECURITY AGREEMENT

**25. BORROWER'S REPORTS.** Promptly upon Lender's written request, Borrower and each Guarantor agrees to provide Lender with such information about the financial condition and operations of Borrower or any Guarantor, as Lender may, from time to time, reasonably request. Borrower also agrees promptly upon becoming aware of any Event of Default, or the occurrence or existence of an event which, with the passage of time or the giving of notice or both, would constitute an Event of Default hereunder, to promptly provide notice thereof to Lender in writing.

**26. TELEPHONE COMMUNICATIONS.** Notwithstanding any current or prior election to opt in or to opt out of receiving telemarketing calls or SMS messages (including text messages) from the Lender, its affiliates, marketing partners, agents and others calling at Lender's request or on its behalf, Borrowers and Guarantors hereby expressly consent to receive calls and messages, including auto-dialed and pre-recorded message calls and SMS messages (including text messages) from Lender, its affiliates, and agents calling at Lender's request or on its behalf, arising out of or relating to your application, loan, and/or account, at any telephone numbers (including any cellular or mobile telephone numbers) that Borrowers and/or Guarantors have provided or may provide in the future, or otherwise may be in Lender's possession or that Lender may reasonably associate with your account through skip tracing, caller ID capture or other means. Borrowers and Guarantors agree that such communications may be initiated using an automated telephone dialing system.

**27. INDEMNIFICATION AND LIMITATION OF LIABILITY.** Except for Lender's gross negligence or willful misconduct, Borrower will indemnify and save Lender harmless from all losses, costs, damage, liabilities, or expenses (including, without limitation, court costs and reasonable attorneys' fees) that Lender may sustain or incur by reason of defending or protecting Lender's security interest or the priority thereof or enforcing the Obligations, or in the prosecution or defense of any action or proceeding concerning any matter arising out of or in connection with this Agreement and/or any other documents now or hereafter executed in connection with this Agreement and/or the Obligations and/or the Collateral. IN NO EVENT WILL WE BE LIABLE FOR ANY CLAIMS ASSERTED BY BORROWER UNDER ANY THEORY OF LAW, INCLUDING ANY TORT OR CONTRACT THEORY FOR LOST PROFITS, LOST REVENUES, LOST BUSINESS OPPORTUNITIES, EXEMPLARY, PUNITIVE, SPECIAL, INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES, EACH OF WHICH BORROWER HEREBY EXPRESSLY WAIVES. This provision shall survive the repayment of the Obligations and the termination of this Agreement.

**28. MERGERS, CONSOLIDATIONS OR SALES.** Borrower represents and agrees that Borrower will not (i) merge or consolidate with or into any other business entity; (ii) enter into any joint venture or partnership with any person, firm or corporation; or (iii) substantially assign its assets to any other business entity or person.

**29. CHANGE IN LEGAL STATUS.** Without Lender's written consent, Borrower represents and agrees that Borrower will not change (i) its name, (ii) its place of business (or if more than one place of business, its chief executive office), (iii) it mailing address, (iv) its organizational identification number, or (v) its type of organization, jurisdiction of organization or other legal structure. Borrower shall promptly notify Lender in writing of any change concerning its organizational identification number.

**30. DEFAULT.** The occurrence of any one or more of the following events (herein, "Events of Default") shall constitute, without notice or demand, a default under this Agreement and all other agreements between Lender and Borrower and instruments and papers given Lender by Borrower, whether such agreements, instruments, or papers now exist or hereafter arise: (i) Lender is unable to collect any Automatic Payment Plan payment and/or, Borrower fails to pay any Obligations when due; (ii) Borrower fails to comply with, promptly, punctually and faithfully perform or observe any term, condition or promise within this Agreement; (iii) the determination by Lender that any statement, representation or warranty heretofore, now or hereafter made by Borrower or Guarantor to Lender, in any documents, instrument, agreement, application or paper was not true or accurate when given; (iv) the occurrence of any event such that any indebtedness of Borrower from any lender other than Lender could be accelerated, notwithstanding that such acceleration has not taken place; (v) the occurrence of any event that would cause a lien creditor, as that term is defined in Section 9-102 of the Uniform Commercial Code, (other than Lender) to take priority over the Loan made by Lender; (vi) a filing against or relating to Borrower (unless consented to in writing by Lender) of (a) a federal tax lien in favor of the United States of America or any political subdivision of the United States of America, or (b) a state tax lien in favor of any state of the United States of America or any political subdivision of any such state; (vii) the occurrence of any event of default under any other agreement between Lender and Borrower or instrument or paper given Lender by Borrower, whether such agreement, instrument, or paper now exists or hereafter arises (notwithstanding that Lender may not have exercised its rights upon default under any such other agreement, instrument or paper); (viii) any act by, against, or relating to Borrower, or its property or assets, which act constitutes the application for, consent to, or sufferance of the appointment of a receiver, trustee or other person, pursuant to court action or otherwise, over all, or any part of Borrower's property; (ix) the granting of any trust mortgage or execution of an assignment for the benefit of the creditors of Borrower, or the occurrence of any other voluntary or involuntary liquidation or extension of debt agreement for Borrower; (x) the failure by Borrower to generally pay the debts of Borrower as they mature; (xi) adjudication of bankruptcy or insolvency relative to Borrower; (xii) the entry of an order for relief or similar order with respect to Borrower in any proceeding pursuant to Title 11 of the United States Code entitled "Bankruptcy" (the "Bankruptcy Code") or any other federal bankruptcy law; (xiii) the filing of any complaint, application or petition by or against Borrower initiating any matter in which Borrower is or may be granted any relief from the debts of Borrower pursuant to the Bankruptcy Code or any

# BUSINESS LOAN AND SECURITY AGREEMENT

other insolvency statute or procedure; (xiv) the calling or sufferance of a meeting of creditors of Borrower; (xv) the meeting by Borrower with a formal or informal creditor's committee; (xvi) the offering by or entering into by Borrower of any composition, extension or any other arrangement seeking relief or extension for the debts of Borrower, or the initiation of any other judicial or non-judicial proceeding or agreement by, against or including Borrower that seeks or intends to accomplish a material reorganization or arrangement with creditors;(xvii) the entry of any material judgment against Borrower, which judgment is not satisfied or appealed from (with execution or similar process stayed) within fifteen (15) days of its entry; (xviii) the occurrence of any event or circumstance with respect to Borrower such that Lender shall believe in good faith that the prospect of payment of all or any part of the Obligations or the performance by Borrower under this Agreement or any other agreement between Lender and Borrower is impaired or there shall occur any material adverse change in the business or financial condition of Borrower (such event specifically includes, but is not limited to, taking additional financing from a credit card advance, cash advance company or an additional working capital loan without the prior written consent of Lender); (xix) the entry of any court order that enjoins, restrains or in any way prevents Borrower from conducting all or any part of its business affairs in the ordinary course of business; (xx) the occurrence of any uninsured loss, theft, damage or destruction to any material asset(s) of Borrower; (xxi) any act by or against, or relating to Borrower or its assets pursuant to which any creditor of Borrower seeks to reclaim or repossess or reclaims or repossesses all or a portion of Borrower's assets; (xxii) the termination of existence, dissolution or liquidation of Borrower or the ceasing to carry on actively any substantial part of Borrower's current business; (xxiii) this Agreement shall, at any time after its execution and delivery and for any reason, cease to be in full force and effect or shall be declared null and void, or the validity or enforceability hereof shall be contested by Borrower or any Guarantor of Borrower, including denial of any further liability or obligation hereunder;(xxiv) any Guarantor or person signing a support agreement in favor of Lender shall repudiate, purport to revoke or fail to perform his or her obligations under his guaranty or support agreement in favor of Lender or any corporate guarantor shall cease to exist; (xxv) any material change occurs in Borrower's ownership or organizational structure (acknowledging that any change in ownership will be deemed material when ownership is closely held); (xxvi) if Borrower is a partnership, any general or managing partner dies; if Borrower is a corporation, any principal officer or 50% or greater shareholder dies; if Borrower is a limited liability company, any managing member dies; if Borrower is any other form of business entity, any person(s) directly or indirectly controlling fifty percent (50%) or more of the ownership interests of such entity dies.

**31. RIGHTS AND REMEDIES UPON DEFAULT.** Subject to applicable law, if an Event of Default occurs under this Agreement, at any time thereafter, Lender may exercise any one or more of the following rights and remedies:

A. Debit Amounts Due From Borrower's Accounts: Lender may debit from Borrower's Designated Checking Account all Automatic Payment Plan payments that Lender was unable to collect and/or the amount of any other Obligations that Borrower failed to pay.

B. Accelerate Indebtedness: Lender may declare the entire Obligations immediately due and payable, without notice to Borrower notwithstanding Section 33.

C. Assemble Collateral: Lender may require Borrower and/or Guarantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Borrower and/or Guarantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter, provided Lender does so without a breach of the peace or a trespass, upon the property of Borrower and/or Guarantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Borrower and/or Guarantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Borrower and/or Guarantor after repossession.

D. Sell the Collateral: Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Borrower and/or Guarantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Borrower, Guarantor and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after an Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Obligations secured by this Agreement. To the extent permitted by applicable law, all such expenses will become a part of the Obligations and, at Lender's option, will: (i) be payable on demand; (ii) be added to the balance of the Loan and be apportioned among and be payable with any installment payments to become due during either (a) the term of any applicable insurance policy or (b) the remaining term of the Loan; or (iii) be treated as a balloon payment that will be due and payable at the Loan's maturity.

E. Appoint Receiver: Lender shall have the right to have a Receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Obligations. The Receiver may serve without bond if permitted by law. Lender's right to the appointment of a Receiver shall exist whether or not the apparent value of the Collateral exceeds the Obligations by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

# BUSINESS LOAN AND SECURITY AGREEMENT

F. Collect Revenues, Apply Accounts: Lender, either itself or through a Receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income and revenues therefrom and hold the same as security for the Obligations or apply it to payment of the Obligations in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose or realize on the Collateral as Lender may determine, whether or not any amount included within the Obligations is then due. For these purposes, Lender may, on behalf of and in the name of Borrower and/or Guarantor, receive, open and dispose of mail addressed to Borrower; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment or storage of any Collateral. To facilitate collections, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

G. Obtain Deficiency: If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Borrower and/or Guarantor for any deficiency remaining on the Obligations due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Borrower and/or Guarantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

H. Other Rights and Remedies: Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity or otherwise.

I. Election of Remedies: Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, any related documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower under the Agreement, after Borrower's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

32. **CONSENT TO JURISDICTION AND VENUE.** Subject to Section 33 below, Borrowers and Guarantors each consent to the jurisdiction of the federal and Utah state courts and agree that any action or proceeding to enforce or arising out of this Agreement may only be brought or in the United States District Court for the District of Utah or in any court of the State of Utah, and Borrower and Guarantors waive personal service of process. Borrowers and Guarantors each waive any objections, including *forum non conveniens,* to the bringing of any such proceeding in such jurisdictions.

33. **ARBITRATION.** To the extent that a claim or dispute arises out of, or in relation to this Agreement, including without limitation, the terms, construction, interpretation, performance, termination, breach, or enforceability of this Agreement, Borrower(s) and Guarantor(s) hereby agree that the claim or dispute may be resolved by mandatory binding arbitration in Utah at the sole election of the Lender within thirty (30) days after the claim or dispute arises. If Lender so elects, the parties agree that (i) the arbitration shall be administered by JAMS and the arbitration shall be conducted in accordance with the Expedited Procedures of the JAMS Comprehensive Arbitration Rules and Procedures except as otherwise agreed in this Agreement; (ii) the arbitrator shall be chosen in accordance with the procedures of JAMS and shall base the award on applicable Utah law; (iii) the arbitration shall be conducted by a single arbitrator; (iv) judgment on the award may be entered in any court having jurisdiction, subject to Section 32 above; and (iv) the costs of the arbitration shall be divided equally between the parties. This arbitration section is governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16.

34. **NO WAIVER BY LENDER.** No delay or omission on the part of Lender in exercising any rights under this Agreement, any related guaranty or applicable law shall operate as a waiver of such right or any other right. Waiver on any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion. All Lender's rights and remedies, whether evidenced hereby or by any other agreement, instrument or paper, shall be cumulative and may be exercised singularly or concurrently.

35. **ASSIGNMENT.** This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties hereto; provided, however, that Borrowers may not assign this Agreement or any rights or duties hereunder without Lender's prior written consent and any prohibited assignment shall be absolutely null and void. No consent to an assignment by Lender shall release Borrowers from its Obligations. Lender may assign this Agreement and its rights and duties hereunder and no consent or approval by Borrower is required in connection with any such assignment. Lender reserves the right to sell, assign, transfer, negotiate or grant participations in all or any part of, or any interest in Lender's rights and benefits hereunder. In connection with any assignment or participation, Lender may disclose all documents and information that Lender now or hereafter may have relating to Borrower or Borrower's business. To the extent that Lender assigns its rights and obligations hereunder to another party, Lender thereafter shall be released from such assigned obligations to Borrower and such assignment shall affect a novation between Borrower and such other party. Libertas Funding, LLC ("Libertas") (in its capacity as Servicer) or a successor servicer (if any) shall, acting solely for this purpose as a non-fiduciary agent of Lender, maintain at one of its offices in the United States a copy of each assignment agreement delivered to it with respect to this Loan and a register for the recordation of the name of each assignee of this Loan, and principal and interest amount of this Loan owing to, such assignee pursuant to the terms hereof. The entries in such register shall be conclusive, and Borrower, Lender and each such assignee may treat each person whose name is recorded therein pursuant to the terms hereof as a "Lender" hereunder for all purposes of this Agreement,

notwithstanding notice to the contrary. The register maintained for this Loan shall be available for inspection by Borrower and any such assignee of this Loan, at any reasonable time upon reasonable prior notice to Libertas (in its capacity as Servicer) or the applicable successor servicer (if any). This Section 35 shall be construed so that this Loan is at all times maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2) and 881(c)(2) of the Internal Revenue Code and any related Treasury regulations (or any other relevant or successor provisions of the Internal Revenue Code or of such Treasury regulations)

**36. INTERPRETATION.** Paragraph and section headings used in this Agreement are for convenience only and shall not affect the construction of this Agreement. Neither this Agreement nor any uncertainty or ambiguity herein shall be construed or resolved against Lender or Borrower, whether under any rule of construction or otherwise. On the contrary, this Agreement has been reviewed by all parties, having had the opportunity to consult counsel, and shall be construed and interpreted according to the ordinary meaning of the words used so as to fairly accomplish the purposes and intentions of all parties hereto.

**37. SEVERABILITY.** If one or more provisions of this Agreement (or the application thereof) is determined invalid, illegal or unenforceable in any respect in any jurisdiction, the same shall not invalidate or render illegal or unenforceable such provision (or its application) in any other jurisdiction or any other provision of this Agreement (or its application).

**38. NOTICES.** Except as otherwise provided in this Agreement, notice under this Agreement must be in writing. Notice to Lender will be deemed received by Lender at address set forth in Section 47 (or to any other address as may be specified by either party by a notice given as provided herein), by U.S. mail, postage prepaid, first class mail; in person; by registered mail; by certified mail; by nationally recognized overnight courier; or when sent by electronic mail. Notice to Borrower and/or any personal guarantor will be deemed given when sent to Borrower's last known address or electronic mail address in Lender's records for this Loan.

**39. RECORDKEEPING AND AUDIT REQUIREMENTS.** Lender shall have no obligation to maintain any electronic records or any documents, schedules, invoices or any other paper delivered to Lender by Borrower in connection with this Agreement or any other agreement other than as required by law. Borrower will at all times keep accurate and complete records of Borrower's accounts and Collateral. At Lender's request, Borrower shall deliver to Lender: (i) schedules of accounts and general intangibles; and (ii) such other information regarding the Collateral as Lender shall request. Lender, or any of its agents, shall have the right to call any telephone numbers that Borrower has provided or may provide in the future or otherwise in the Lender's possession (including any cellular or mobile telephone numbers),at intervals to be determined by Lender. Lender, or any of its agents, shall have the right to without hindrance or delay, to inspect, audit, check, and make extracts from any copies of the books, records, journals, orders, receipts, correspondence that relate to Borrower's accounts and Collateral or other transactions between the parties thereto and the general financial condition of Borrower. Lender, or any of its agents, may remove any of such records temporarily for the purpose of having copies made thereof. If Borrower was referred to Lender for this Loan by a third-party (the "Referring Party"), then Borrower consents to Lender sharing certain reasonable information about Borrower with the Referring Party for purposes of the Referring Party verifying and/or auditing loans made through such Referring Party's referrals as well as the servicing and collection of Borrower's Loan account. Wherever appropriate in this Agreement, a singular term shall be construed to the mean the plural where necessary, and a plural term the singular. For example, if at any time two parties shall constitute Borrower, then the relevant term shall refer to both parties together.

**40. GOVERNING LAW.** Subject to Section 33 above, our relationship including this Agreement and any claim, dispute or controversy (whether in contract, tort, or otherwise) at any time arising from or relating to this Agreement is governed by, and this Agreement will be construed in accordance with federal law and (to the extent not preempted by federal law) Utah law without regard to internal principles of conflict of laws. The legality, enforceability and interpretation of this Agreement and the amounts contracted for, charged and reserved under this Agreement will be governed by such laws. Borrower understands and agrees that (i) Lender is located in Utah,(ii) Lender makes all credit decisions from Lender's office in Utah, (iii) the Loan is made in Utah (that is, no binding contract will be formed until Lender receives and accepts Borrower's signed Agreement in Utah) and (iv) Borrower's payments are not accepted until received by Lender in Utah.

**41. WAIVER OF NOTICES AND OTHER TERMS.** Except for any notices provided for in this Agreement, Borrower and any person who has obligations pursuant to this Agreement (*e.g.*, a Guarantor), to the extent not prohibited by applicable law hereby, waives demand, notice of nonpayment, notice of intention to accelerate, notice of acceleration, presentment, protest, notice of dishonor and notice of protest. To the extent permitted by applicable law, Borrower and any person who has obligations pursuant to this Agreement also agrees: Lender is not required to file suit, show diligence in collection against Borrower or any person who has obligations pursuant to this Agreement, or proceed against any Collateral; Lender may, but will not be obligated to, substitute, exchange or release any Collateral; Lender may release any Collateral, or fail to realize upon or perfect Lender's security interest in any Collateral; Lender may, but will not be obligated to, sue one or more persons without joining or suing others; and Lender may modify, renew, or extend this Agreement (repeatedly and for any length of time) without notice to or approval by any person who has obligations pursuant to this Agreement (other than the party with whom the modification, renewal or extension is made).

# BUSINESS LOAN AND SECURITY AGREEMENT

**42. MONITORING, RECORDING AND ELECTRONIC COMMUNICATIONS.** In order to ensure a high quality of service for Lender's customers, Lender, or its servicing agent, may monitor and/or record telephone calls between Borrower and /or Guarantor and Lender's employees or agents. Borrower acknowledges that Lender may do so and agrees in advance to any such monitoring or recording of telephone calls. Borrower also agrees that Lender may communicate with Borrower electronically by email and text.

**43. JURY TRIAL WAIVER AND CLASS ACTION WAIVER.** To the extent not prohibited by applicable law, Borrower, Guarantors and Lender waive their right to a trial by jury of any claim or cause of action based upon, arising out of or related to the Agreement and all other documentation evidencing the Obligations, in any legal action or proceeding. Subject to Section 33 above, any such claim or cause of action shall be tried by court sitting without a jury.

**THE PARTIES HERETO (LENDER, BORROWERS AND GUARANTORS) WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST ANY OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR AGAINST PUBLIC POLICY. TO THE EXTENT ANY PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST ANY OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.**

**44. CONFIDENTIALITY.** Borrower and Guarantor (if any) shall not make, publish or otherwise disseminate in any manner a copy of this Agreement or any public statement or description of the terms of this Agreement, except to its employees, advisors and similar persons who have a legitimate need to know its contents.

**45. ENTIRE AGREEMENT.** The accompanying Business Loan and Security Agreement Supplement and the Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) and any other documents required by Lender now or in the future in connection with this Agreement and Borrower's Loan are hereby incorporated into and made a part of this Agreement. This Agreement is the entire agreement of the parties with respect to the subject matter hereof and supersedes any prior written or verbal communications or instruments relating thereto, including any agreement, authorization, or consent, or communication between Borrower or Guarantor (if any) and an Independent Sales Organization that may have referred Borrower to Lender. Notwithstanding any agreement, authorization, or consent, or communication Borrower (or Guarantor if any) and an Independent Sales Organization, Borrower and Guarantor (if any) shall only have opt-out rights with respect to any agreement, authorization, or consent as provided in this Agreement or as otherwise provided in any other agreement, authorization, or consent between Borrower (or Guarantor if any) and Lender or its Servicer, Libertas. If Borrower (or Guarantor if any) wishes to exercise any applicable opt-out right, it must directly contact Lender or Servicer.

**46. COUNTERPARTS; ELECTRONIC SIGNATURES.** This Agreement may be executed in one or more counterparts, each of which counterparts shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument. For purposes of the execution of this Agreement, signatures delivered by electronic, or fax transmission shall be treated in all respects as original signatures.

**47. CUSTOMER SERVICE CONTACT INFORMATION**. If you have questions or comments about your Loan, you may contact us by (i) e-mail at Customerservice@libertasfunding.com, (ii) telephone at (800) 704-8675 or (iii) WebBank c/o Libertas Funding, LLC, 411 West Putnam Avenue, Suite 220, Greenwich, CT 06830, Attn: Customer Service.

**48. GRANT OF LICENSE TO USE LIBERTAS CUSTOMER PORTAL.** Subject to Borrower's compliance with this Agreement and the Terms of Use for Libertas' Customer Portal, Borrower is granted a nonexclusive, revocable, non-transferable, non-sublicensable, limited right and royalty-free license to use Libertas' Customer Portal, effective solely during the term of the Loan and so long as an Event of Default has not occurred. The license granted to Borrower is personal, and no rights hereunder may be transferred by Borrower without express written approval. The license granted hereunder may be terminated without notice at any time after an Event of Default has occurred.

**49. CERTIFICATION AND SIGNATURES.** By executing this Agreement or authorizing the person signing or affirming below to execute on its behalf, Borrower certifies that Borrower has received a copy of this Agreement and that Borrower has read, understands and agrees to be bound by its terms. Each person signing or affirming below certifies that such person is signing on behalf of the Borrower.

# BUSINESS LOAN AND SECURITY AGREEMENT

ARC MANAGEMENT GROUP, LLC

By: Bill Wilson

William Wilson

BORROWER

08-04-2022

William Wilson

By: Bill Wilson

William Wilson

OWNER

08-04-2022

Thresa Wilson

By: Thresa Wilson
Thresa Wilson (Aug 5, 2022 10:26 EDT)

Thresa Wilson

OWNER

08-04-2022

# BUSINESS LOAN AND SECURITY AGREEMENT

## AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT) AND DIRECT PAYMENTS (ACH DEBITS)

**This Authorization Agreement for Direct Deposit ("ACH Credit") and Direct Payments ("ACH Debits") is part of (and incorporated by reference into) the Business Loan and Security Agreement. Borrower should keep this important legal document for Borrower's records.**

**DISBURSMENT OF LOAN PROCEEDS.** By executing this Authorization Agreement for Direct Deposit ("ACH Credit") and Direct Payments ("ACH Debits"), Borrower authorizes Lender to disburse the Loan proceeds less the amount of any applicable fees upon Loan approval by initiating an ACH credit, wire transfer or similar means to the business checking account indicated below (or a substitute business checking account Borrower later identifies and is acceptable to Lender) (hereinafter referred to as the "Designated Checking Account") in the disbursal amount set forth in the accompanying Business Loan and Security Agreement Supplement. This authorization is to remain in full force and effect until Lender has received written notification from Borrower of its termination in such time and in such manner as to afford Lender and Borrower's depository bank a reasonable opportunity to act on it.

**AUTOMATIC PAYMENT PLAN.** Enrollment in Lender's Automatic Payment Plan is required for Loan approval. By executing this Authorization Agreement for Direct Deposit ("ACH Credit") and Direct Payments ("ACH Debits"), Borrower agrees to, and hereby, enrolls in the Automatic Payment Plan and authorizes Lender to collect payments required under the terms of Borrower's Business Loan and Security Agreement by initiating ACH debit entries to the Designated Checking Account in the amounts and on the dates provided in the payment schedule set forth in the accompanying Business Loan and Security Agreement Supplement. Borrower authorizes Lender to increase the amount of any scheduled ACH debit entry or assess multiple ACH debits for the amount of any previously scheduled payment(s) that was not paid as provided in the payment schedule and any unpaid Fees. This authorization is to remain in full force and effect until Lender has received written notification from Borrower of its termination in such time and in such manner as to afford Lender and Borrower's depository bank a reasonable opportunity to act on it. Lender may suspend or terminate Borrower's enrollment in the Automatic Payment Plan immediately if Borrower fails to keep the Designated Checking Account in good standing or if there are insufficient funds in the Designated Checking Account to process any payment (or if Lender is otherwise unable to collect any amounts by ACH debit owed to Lender under the Loan or under any other loan or extension of credit by Lender to Borrower). **If Borrower revokes the authorization or Lender suspends or terminates Borrower's enrollment in the Automatic Payment Plan, Borrower still will be responsible for making timely payments pursuant to the alternative payment methods described in the Business Loan and Security Agreement.**

**Provisional Payment.** Credit given by us to you with respect to an automated clearing house ("ACH") credit entry is provisional until we receive final settlement. If we do not receive such final settlement, you are hereby notified and agree that we are entitled to a refund of the amount credited to you in connection with such entry, and the party making to you via such entry (i.e., the originator of the entry) shall not be deemed to have paid you in the amount of such entry.

**Notice of Receipt of Entry.** Under the operating rules of the National Automated Clearing House Association ("NACHA"), which are applicable to ACH transactions involving your account, we are not required to give next day notice to you of receipt of an ACH item and we will not do so.

**BUSINESS PURPOSE ACCOUNT.** By executing this Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits), Borrower attests that the Designated Checking Account was established for business purposes and not for personal, family or household purposes.

**ACCOUNT CHANGES.** Borrower agrees to promptly notify Lender in writing if there are any changes to the account and routing numbers of the Designated Checking Account.

**MISCELLANEOUS.** Lender is not responsible for any fees charged by Borrower's bank as the result of credits or debits initiated under this authorization. The origination of ACH transactions to Borrower's account must comply with the provisions of U.S. law. Borrower agrees to be bound by NACHA rules of the Electronic Payments Association. Borrower agrees to provide to Lender at all times, "Live Contemporaneous Access" to all of its bank accounts in order for Lender to evaluate Borrower's compliance with the Agreement, and for collections in the Event of Default ("Borrower's Accounts")."Live Contemporaneous Access" shall be defined as: Borrower, at all times and including but not limited to, providing Lender with accurate login information necessary to access all of Borrower's Accounts, such as usernames and passwords, answers to challenge questions, and security tokens. Borrower shall provide notice to Lender in the event Borrower makes any changes to the Designated Checking Account, including in the event Borrower closes the Designated Checking Account.

**DESIGNATED CHECKING ACCOUNT DETAILS:**

**Routing Number:** 061000227

**Account Number:** 2000029095971

**Tax ID:** 03-0607765

ARC MANAGEMENT GROUP, LLC

By: Bill Wilson

William Wilson

BORROWER

08-04-2022

William Wilson

By: Bill Wilson

William Wilson

OWNER

08-04-2022

Thresa Wilson

By: Thresa Wilson
Thresa Wilson (Aug 5, 2022 10:26 EDT)

Thresa Wilson

---

OWNER

---

08-04-2022

---

# Guaranty

**THIS GUARANTY CREATES SPECIFIC LEGAL OBLIGATIONS FOR GUARANTOR(S). PLEASE READ THE GUARANTY, WHICH INCLUDES THE BUSINESS LOAN AND SECURITY AGREEMENT AND ASSOCIATED SUPPLEMENT, CAREFULLY BEFORE SIGNING.**

Each Guarantor, jointly and severally, absolutely and unconditionally guarantee the prompt payment to Lender, including its successors and assignees, of any and all Obligations incurred by the Borrower pursuant to the Agreement and agree to the terms of the Agreement (this "Guaranty"). Each Guarantor further agrees to repay the Obligations on demand, without requiring Lender first to enforce payment against Borrower. This is a guarantee of payment and not of collection. This is an absolute, irrevocable, unconditional, primary, and continuing obligation and will remain in full force and effect until all amounts owed to Lender pursuant to the Agreement are satisfied in full. Each Guarantor represents and warrants that (i) it is a legal resident of the United States of America and (ii) Guarantor does not intend to file for reorganization or liquidation under the bankruptcy or reorganization laws of any jurisdiction.

This Guaranty shall be construed in accordance with the laws of the State of Utah, and shall inure to the benefit of Lender, its successors and assigns. Each Guarantor **agrees that the Guaranty is subject to the Arbitration Agreement set forth above in Section 33**. To the extent not prohibited by applicable law, each of the undersigned Guarantors waives its right to a trial by jury of any claim or cause of action based upon, arising out of or related to this guaranty, the Agreement and all other documentation evidencing the Obligations, in any legal action or proceeding. Subject to Section 33 above, any such claim or cause of action shall be tried by court sitting without a jury.

Healthtech Receivables MGMT., INC.

By: Bill Wilson

William Wilson

GUARANTOR

08-04-2022

The J.D. Stuart Law Group, LLC

By: Bill Wilson

William Wilson

GUARANTOR

08-04-2022

Wilzara Property Management Group LLC

By: Bill Wilson

---

William Wilson

---

GUARANTOR

---

08-04-2022

---

ABI Holding LLC

By: Thresa Wilson
Thresa Wilson (Aug 5, 2022 10:26 EDT)

---

William Wilson

---

GUARANTOR

---

08-04-2022

---

William Wilson

By: Bill Wilson

---

William Wilson

---

GUARANTOR

---

08-04-2022

---

Thresa Wilson

By: Thresa Wilson
Thresa Wilson (Aug 5, 2022 10:26 EDT)

---

Thresa Wilson

---

GUARANTOR

______________________________________________

08-04-2022

______________________________________________

**SCHEDULE 11 (ADDITIONAL PLEDGED COLLATERAL)**

**Clarizen Approved 4.12.22**

# ADDENDUM TO BUSINESS LOAN AND SECURITY AGREEMENT

This Business Loan and Security Agreement Addendum ("Addendum") dated 08-04-2022 is part of the Business Loan and Security Agreement. Borrower should retain this important legal document for Borrower's records.

Reference is made to that certain Business Loan And Security Agreement ("Agreement") dated 08-04-2022 entered into by and between WebBank (the "Lender") and ARC MANAGEMENT GROUP, LLC (the "Borrower") (collectively the "Parties").

A. The Borrower hereby agrees as follows: ARC MANAGEMENT GROUP, LLC hereby authorizes the Lender or Libertas Funding, LLC ("Lender's Servicer") to execute the third-party payment(s) detailed below (see "G. Third- Party Payment Schedule" below).

B. Borrower understands that all transactions detailed in this Addendum will be executed using the proceeds of the loan detailed in the Agreement referenced above.

C. Borrower further understands that the Lender/Lender's Servicer will cause third-party payments to be made only with respect to the transaction(s) detailed below and that any and all invoices owed outside of this Addendum in the ordinary course of the Borrower's business, or otherwise, are and remain the Borrower's sole responsibility.

D. Borrower further understands that Lender/Lender's Servicer are responsible only for disbursing the Payment Amounts in Section G pursuant to the payment instructions from the Borrower and that Lender/Lender's Servicer will not be held responsible for any under/overstatements of balances or inaccurate wiring instructions provided to the Lender/Lender's Servicer. Any over or underpayments to Third-Party(ies) are the responsibility of the Borrower. Any changes to these instructions may be provided in a new Addendum executed by Borrower and delivered to Lender/Lender's Servicer in sufficient time for Lender/Lender's Servicer to act on it.

E. In the event Borrower chooses not to execute the Agreement, all parts of this Addendum shall be considered null and void.

F. Except as provided in this Addendum, all terms and conditions of the Agreement and its Supplement shall remain in full force and effect.

G. Third-Party Payment Schedule

| **Third-Party** | **Payment Amount** |
|---|---|
| Web Bank | $ 554,352.41 |

All other terms of the Agreement and its Supplement remain unchanged.

**ACCEPTED AND AGREED:**

Borrower: ARC MANAGEMENT GROUP, LLC

By: Bill Wilson

Name William Wilson

Title: OWNER

Borrower: ARC MANAGEMENT GROUP, LLC

By: Thresa Wilson
Thresa Wilson (Aug 5, 2022 10:26 EDT)

Name Thresa Wilson

Title: OWNER

**Please attach payoff letter(s) or payoff information below.**

**EXHIBIT "D" FOLLOWS**

GSCCCA eFile1: EF_009236228_001613787_007 Received:Friday, February 10, 2023 2:15:54 PM Page 1 of 3

[redacted]

FILED & RECORDED
Monday, February 13, 2023 11:18:08 AM
File Number: 007-2023-006398
Janie J. Jones
Barrow County Clerk of Superior Court

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Name: Wolters Kluwer Lien Solutions Phone: 800-331-3282 Fax: 818-662-4141

B. E-MAIL CONTACT AT FILER (optional)
uccfilingreturn@wolterskluwer.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

Lien Solutions
P.O. Box 29071
Glendale, CA 91209-9071

91326205
GAGA

File with: Barrow, GA

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

1a. ORGANIZATION'S NAME: ARC MANAGEMENT GROUP, LLC

OR

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |
| **1c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| 1825 Barrett Lakes Blvd. Suite #505 | Kennesaw | GA | 30144 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

2a. ORGANIZATION'S NAME: The J.D. Stuart Law Group, LLC

OR

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |
| **2c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| 1825 Barrett Lakes Blvd. STE #505 | Kennesaw | GA | 30144 | USA |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

3a. ORGANIZATION'S NAME: C T CORPORATION SYSTEM, AS REPRESENTATIVE

OR

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|
| | | | | |
| **3c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| 330 N Brand Blvd, Suite 700; Attn: SPRS | Glendale | CA | 91203 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
All assets and property of the debtor (excluding any building or mobile home as defined in 12 C.F.R. § 339.2) related to contract dated 02/09/2023, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, including, but not limited to, all inventory, chattel paper, accounts, equipment, general intangibles, receivables, fixtures, credit card receivables, documents, instruments, investment property, letter-of-credit rights and deposit accounts; whether any of the foregoing is owned now or hereafter acquired; All accessions, additions, replacements and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; and all products and proceeds relating to any of the foregoing.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
91326205

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

Prepared by Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282



WB

[redacted]

FILED & RECORDED
Monday, August 8, 2022 12:04:52 PM
File Number: 007-2022-047686
Janie J. Jones
Barrow County Clerk of Superior Court

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Name: Wolters Kluwer Lien Solutions Phone: 800-331-3282 Fax: 818-662-4141

B. E-MAIL CONTACT AT FILER (optional)
uccfilingreturn@wolterskluwer.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

Lien Solutions
P.O. Box 29071
Glendale, CA 91209-9071

88063214
GAGA

File with: Barrow, GA

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

1a. ORGANIZATION'S NAME: ARC MANAGEMENT GROUP, LLC

OR

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1825 Barrett Lakes Blvd. #505 | Kennesaw | GA | 30144 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

2a. ORGANIZATION'S NAME: The J.D. Stuart Law Group, LLC

OR

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1825 Barrett Lakes Blvd. #505 | Kennesaw | GA | 30144 | USA |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

3a. ORGANIZATION'S NAME: C T CORPORATION SYSTEM, AS REPRESENTATIVE

OR

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 330 N Brand Blvd, Suite 700; Attn: SPRS | Glendale | CA | 91203 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

All assets and property of the debtor (excluding any building or mobile home as defined in 12 C.F.R. § 339.2) related to contract dated 08/04/2022, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, including, but not limited to, all inventory, chattel paper, accounts, equipment, general intangibles, receivables, fixtures, credit card receivables, documents, instruments, investment property, letter-of-credit rights and deposit accounts; whether any of the foregoing is owned now or hereafter acquired; All accessions, additions, replacements and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; and all products and proceeds relating to any of the foregoing.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
88063214



Prepared by Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282



WB

GSCCCA eFile1: EF_009005190_001570543_007 Received:Monday, December 12, 2022 6:52:53 PM Page 1 of 3

[redacted]

FILED & RECORDED
Wednesday, December 14, 2022 8:47:02 AM
File Number: 007-2022-072654
Janie J. Jones
Barrow County Clerk of Superior Court

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Name: Wolters Kluwer Lien Solutions Phone: 800-331-3282 Fax: 818-662-4141

B. E-MAIL CONTACT AT FILER (optional)
uccfilingreturn@wolterskluwer.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

Lien Solutions
P.O. Box 29071
Glendale, CA 91209-9071

90346366
GAGA

File with: Barrow, GA

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

1a. ORGANIZATION'S NAME: ARC MANAGEMENT GROUP, LLC

OR

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1825 Barrett Lakes Blvd. Suite #505 | Kennesaw | GA | 30144 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

2a. ORGANIZATION'S NAME: The J.D. Stuart Law Group, LLC

OR

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1825 Barrett Lakes Blvd. STE #505 | Kennesaw | GA | 30144 | USA |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

3a. ORGANIZATION'S NAME: C T CORPORATION SYSTEM, AS REPRESENTATIVE

OR

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 330 N Brand Blvd, Suite 700; Attn: SPRS | Glendale | CA | 91203 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
All assets and property of the debtor (excluding any building or mobile home as defined in 12 C.F.R. § 339.2) related to contract dated 12/12/2022, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, including, but not limited to, all inventory, chattel paper, accounts, equipment, general intangibles, receivables, fixtures, credit card receivables, documents, instruments, investment property, letter-of-credit rights and deposit accounts; whether any of the foregoing is owned now or hereafter acquired; All accessions, additions, replacements and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; and all products and proceeds relating to any of the foregoing.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
90346366

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

Prepared by Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282

**EXHIBIT "E" FOLLOWS**

GSCCCA eFile1: EF_008961468_001563682_007 Received:Thursday, December 1, 2022 1:26:42 PM Page 1 of 1

[redacted]

FILED & RECORDED
Monday, December 5, 2022 2:04:00 PM
File Number: 007-2022-070860
Janie J. Jones
Barrow County Clerk of Superior Court

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Name: Wolters Kluwer Lien Solutions Phone: 800-331-3282 Fax: 818-662-4141

B. E-MAIL CONTACT AT FILER (optional)
uccfilingreturn@wolterskluwer.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address) 45014 - Samson Horus

Lien Solutions
P.O. Box 29071
Glendale, CA 91209-9071

90163096
GAGA

File with: Barrow, GA

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

1a. ORGANIZATION'S NAME: ARC MANAGEMENT GROUP, LLC

OR

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1825 BARRETT LAKES BLVD, ST 505 | KENNESAW | GA | 30144 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

2a. ORGANIZATION'S NAME:

OR

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

3a. ORGANIZATION'S NAME: Samson MCA LLC

OR

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 17 State Street Suite 630 | New York | NY | 10004 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

NOTICE PURSUANT TO AN AGREEMENT BETWEEN DEBTOR AND SECURED PARTY. DEBTOR HAS AGREED NOT TO FURTHER ENCUMBER THE COLLATERAL DESCRIBED HEREIN. THE FURTHER ENCUMBERING OF WHICH MAY CONSTITUTE THE TORTIOUS INTERFERENCE WITH THE SECURED PARTY'S RIGHT BY SUCH ENCUMBRANCER IN THE EVENT THAT ANY ENTITY IS GRANTE A SECURITY INTEREST IN DEBTOR'S ACCOUNTS, CHATTEL PAPER OR GENERAL INTANGIBLES CONTRARY TO THE ABOVE. THE SECURED PARTY ASSERTS A CLAIM TO ANY PROCEEDS THEROF RECEIVED BY SUCH ENTITY.

Accounts, accounts receivable, contracts, real property leases, notes, bills, acceptances, chooses in action, chattel paper, instruments, documents and other forms of obligations at any time owing to the Grantor arising out of goods sold or leased or for services rendered by Grantor, the proceeds thereof and all of Grantor's rights with respect to any goods represented thereby, whether or not delivered, goods returned by customers and all rights as an unpaid vendor or lienor, including rights of stoppage in transit and of recovering possession by proceedings including replevin and reclamation, together hereafter created, relating thereto (collectively referred to hereinafter as "Receivables"):
Inventory, including without limitation, all goods manufactured or acquired for sale or lease, and any piece goods, raw materials, work in process and finished merchandise, findings or component materials and all supplies, goods, incidentals, office supplies, packaging materials, and any and all items used or consumed in the operation of the business of Grantor or which may contribute to the finished product or to the sale, promotion and shipment thereof, in which Grantor now or at any time hereafter may have an interest, whether or not the same is in transit or in the constructive, actual or exclusive occupancy or possession of Grantor or is held by Grantor or by others for Grantor's account (collectively referred to hereinafter as "Inventory")

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
90163096

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

Prepared by Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282



5

**EXHIBIT "F" FOLLOWS**

LIBERTAS

**Libertas Funding, LLC**
411 West Putnam Ave Suite 220, Greenwich, CT 06380

## AGREEMENT OF SALE OF FUTURE RECEIPTS

This **AGREEMENT OF SALE OF FUTURE RECEIVABLES** (this "Agreement") dated as of **04/03/2023**, is made by and between **Libertas Funding, LLC**, a Connecticut Limited Liability Company as purchaser ("Purchaser"), the merchant whose name, address and other pertinent information is set forth below, as seller ("Merchant"), and the individual owner/guarantor of the Merchant whose name, address and other pertinent information are set forth below ("Guarantor"). For good and valuable consideration, the mutual receipt and sufficiency of which is hereby acknowledged, the parties to this Agreement agree as follows:

**Merchant Information (see addendum)**

| | |
|---|---|
| **Merchant Legal Name:** ARC MANAGEMENT GROUP, LLC, et al. | **DBA Name:** Arc Management Group |
| **Entity Type:** Limited Liability Company | **FEIN:** *****7765 |
| **State Of Incorporation:** GA | **Bank Name:** WELLS FARGO BANK, NA |
| **Address:** 1825 Barrett Lakes Blvd., Suite 505, KENNESAW, GA, 30144 | **Phone:** 4044171884 |

**OWNER INFORMATION (referred to individually or collectively as the ("Owner"))**

| | | |
|---|---|---|
| **Name of Owner Guarantor 1:** WILLIAM DONALD WILSON | **Cell Phone:** [redacted] | **Social Security #:** *****1178 |
| **Home Address:** [redacted] | **City/State:** [redacted] | **Zip Code:** [redacted] |
| **Ownership %:** 50 | **Email:** [redacted] | |

| | | |
|---|---|---|
| **Name of Owner Guarantor 2:** [redacted] | **Cell Phone:** [redacted] | **Social Security #:** *****3349 |
| **Home Address:** [redacted] | **City/State:** [redacted] | **Zip Code:** [redacted] |
| **Ownership %:** 50 | **Email:** [redacted] | |

## PRIMARY TERMS

THIS AGREEMENT INCLUDES A JURY TRIAL AND CLASS ACTION WAIVER. PLEASE READ IT CAREFULLY.

In this Agreement, you are selling to us a specified amount of future payments your customers make for your goods and services, as further defined below ("Future Receipts"). We agree to buy from you (and you agree to sell to us) the amount of Future Receipts shown below (the "Amount Sold") in exchange for the "Purchase Price" shown below. In order to deliver to us the Amount Sold, you assign to us the share of your Future Receipts ("Specified Percentage") shown below, every Business Day from the date we deliver the Purchase Price until we have received the entire Amount Sold and all fees or other amounts due under this Agreement (the "Completion Amount").

We are buying Future Receipts from you, not loaning you money. You are not required to pay interest on the Purchase Price and this Agreement has no term or required payment amounts that are not subject to change based on your future revenue. Instead, your obligation is to deliver to us the Specified Percentage of your Future Receipts as they are generated in the ordinary course of your business. This means that your obligation to us aligns with your cash flow. When your Future Receipts decline because business is slow, you will be able to deliver Future Receipts to us more slowly.

By purchasing Future Receipts from you, we assume risks such as not obtaining the Future Receipts we bought as quickly as we anticipated, or not receiving all of them if you go out of business. However, you are not allowed to engage in "bad acts" that unfairly prevent us from receiving what we paid for. For example, unless you cease operations, you are not allowed to change the bank account in which we collect our Daily Delivery Amounts (see below) without our approval, block our ability to collect our Daily Delivery Amounts, sell your Future Receipts to another funding company (stacking) or close your business and start up another similar business right away. Additionally, you are representing that the information that you provided us is accurate in all material respects and that you have not omitted providing us with information that is material to your business. The details on this are below.

EXHIBIT D12

## Detailed Terms and Conditions

**KEY BUSINESS TERMS AND DEFINITIONS:**

| | | |
|---|---|---|
| **Amount Sold** | $978,870.00 | The dollar value of Future Receipts that Merchant agrees to sell to Purchaser. |
| **Purchase Price** | $730,500.00 | The total amount that Purchaser agrees to pay for the Amount Sold. |
| **Future Receipts** | $1,445,330.43 | All sums received by or payable to Merchant from its customers as payment for Merchant's goods and/or services in the ordinary course of Merchant's business after Merchant receives the Purchase Price from Purchaser. Future Receipts include, among other things, payments by cash, physical or electronic checks, credit cards, charge cards, debit cards, other payment cards, ACH or other electronic payments, and any other form of funds transfer or payment. When the Payment Card Split Method of delivering Future Receipts is used, Purchaser will collect only Future Receipts processed through the Approved Card Processor (defined below). |
| **Direct Payments to Third Parties/Renewals** | $230,451.21 | Amounts paid to Purchaser and/or Other Funders. |
| **Total Amount Sent to Merchant** | $500,048.79 | The Purchase Price minus the Origination Fee (see below) minus Direct Payments to Third Parties/Renewals (see above). |
| **Specified Percentage** | 20% | The percentage of Future Receipts that the Merchant is required to deliver to Purchaser until the entire Completion Amount is delivered to Purchaser in accordance with this Agreement. |
| **Daily Delivery Amount** | $3,329.49 | The dollar amount that Merchant and Purchaser agree to be an approximation of the Specified Percentage of Future Receipts each Business Day as of the date of this Agreement, based upon the information provided by Merchant to Purchaser concerning Merchant's most recent receipts. |
| **Discount Factor** | 1.34 | The adjustment to the Amount Sold that enables us to calculate the Purchase Price. |
| **Origination Fee** | $0.00 | The amount Purchaser will deduct from the Purchase Price and retain to compensate it for due diligence and other costs in evaluating whether to purchase the Amount Sold. |
| **Repurchase Price (applicable discounts)** | None | The discounted price Merchant may pay to end this financing transaction early by repurchasing Future Receipts sold to Purchaser but not yet delivered. The Repurchase Price is equal to the discount factor set forth in the column to the left for each month following the Commencement Date. This shall be multiplied by the Purchase price unless amounts collected prior to the date in which the Repurchase price is paid. |
| **Good Faith Estimate of Term** | 12 Months | This Agreement has no term. However, based on your historical revenue, we have estimated how long it will take you to deliver the Amount Sold to us under this Agreement. |
| **Commencement Date** | | The date when the Purchase Price is paid to Merchant. |
| **Business Day** | | Monday through Friday except bank holidays. |
| **Remittance Method** | ACH | Method of remittance agreed upon by Purchaser and Merchant. |

**Note: The bold type terms in the tables above and below shall constitute defined terms with respect to this Agreement. PLEASE NOTE THAT THE PURCHASER WILL NOT TAKE MORE THAN THE EXPECTED DAILY REMITTANCE WITHOUT THE CONSENT OF THE MERCHANT.**

I. SALE OF FUTURE RECEIPTS; PAYMENT OF PURCHASE PRICE:

1. **Sale of Future Receipts; Not a Loan.** In exchange for the Purchase Price, Merchant hereby sells, assigns, transfers and conveys (hereinafter, the "Sale") to Purchaser all of Merchant's right, title and interest in and to the Specified Percentage of its Future Receipts until the Completion Amount is delivered to Purchaser. This Sale is made without recourse against Merchant and Guarantor except as specifically set forth in this Agreement. By virtue of this Agreement, Merchant transfers to Purchaser full and complete ownership of the Amount Sold and Merchant retains no legal or equitable interest therein. Merchant and Purchaser agree that the Purchase Price is payment for the assignment and sale of the Amount Sold and that this transaction is not intended to be, nor shall it be construed as, a loan from Purchaser to Merchant. Furthermore, Purchaser's ability to collect the Amount Sold is contingent on the continued operation of Merchant's business, and the timing of deliveries of the Specified Percentage of Future Receipts will depend on how quickly Merchant's business generates Future Receipts.**Merchant and Guarantor expressly agree not to take the position that this transaction is a loan, and they expressly waive any and all claims and defenses based on that position in any action or proceeding arising out of this Agreement, including without limitation claims or defenses of usury.**

2. Purchaser's Acceptance through Payment of Purchase Price.
   a. Should Purchaser wish to accept this Agreement after the satisfactory completion of Purchaser's due diligence (in its discretion), Purchaser may accept the Agreement without signing it by sending Merchant the Purchase Price minus the Origination Fee, subject to Section 2(b) below.
   b. If Merchant previously sold Future Receipts to Purchaser but has not yet remitted the full Completion Amount pursuant to the prior transaction, Merchant hereby requests to repurchase the undelivered balance of the Amount Sold from that transaction and directs Purchaser to deduct the repurchase price from the Purchase Price and apply it to complete the prior transaction. Similarly, if Merchant previously obtained a loan from Purchaser and has a balance due on such loan, Merchant hereby instructs Purchaser to deduct the balance due on the prior loan from the Purchase Price and apply it to pay off the prior loan. In the event that the agreement for the prior sale of Future Receipts does not permit repurchase of any portion of the amount sold, such agreement is hereby amended to permit repurchase on the same terms as

set forth in this Agreement.

II. DELIVERY OF AMOUNT SOLD:

3. Method of Delivery of Amount Sold. Purchaser offers three methods by which Merchant may deliver the Specified Percentage of its Future Receipts to Purchaser: each Business Day ACH debits by Purchaser from Merchant's bank account, daily remittances from Merchant's payment card processor, and a lockbox arrangement. Each of these methods is described below. The method to be used initially is specified on the first page of this Agreement. The method of delivery may be changed by written agreement between Purchaser and Merchant.

a. Direct Debit Method.
Under the Direct Debit Method, Merchant agrees to deposit all Future Receipts into one (and only one) bank account which shall be preapproved by Purchaser (the "Approved Bank Account"). Merchant shall execute an ACH Authorization allowing Purchaser to debit directly from the Approved Bank Account each Business Day the Daily Delivery Amount via ACH debit, as specified below.

b. Payment Card Split Method.
Under the Payment Card Split Method, Merchant shall exclusively use a single Approved Card Processor (defined below) to process all payments made by credit, debit, and other payment cards for Merchant's goods and services. Merchant shall instruct such Approved Card Processor to remit each Business Day to Purchaser the Specified Percentage of the Future Receipts for that Business Day, and to remit the balance (less any fees charged by the Approved Card Processor) to Merchant.

c. Lockbox Method.
Under the Lockbox Method, Merchant agrees to deposit all Future Receipts into a special bank account established jointly by Purchaser and Merchant in accordance with a lockbox arrangement among Merchant, Purchaser and a banking institution chosen by Purchaser (the "Lockbox Account"), and Purchaser shall debit each Business Day the Daily Delivery Amount from the Lockbox Account.

4. Direct Debit Method and Lockbox Method Provisions. The following terms apply if either the Direct Debit Method or the Lockbox Method is used, unless otherwise specified herein.

a. Daily Delivery Amount. Purchaser and Merchant agree that, for efficiency purposes, Merchant may deliver the Specified Percentage of Future Receipts each Business Day by remitting the Daily Delivery Amount, which Purchaser has calculated to be roughly equivalent to the Specified Percentage of Merchant's historical revenue each Business Day. Purchaser, Merchant, and Guarantor acknowledge that Merchant's actual Future Receipts may vary each Business Day or from Merchant's historical revenue, but they agree that the Daily Delivery Amount is a fair and reasonable estimate of the Specified Percentage of Future Receipts. The Daily Delivery Amount may be adjusted as set forth in Section 11. Merchant also has the right to reconcile any difference between the Daily Delivery Amounts received in a given four-week period and the Specified Percentage of Future Receipts actually generated during that four-week period, as set forth in Sections 10 and 11.

At any time during the term of this Agreement, Purchaser may change the method by which it will accept the Daily Delivery by providing Merchant with written instructions of a new method of delivery of Daily Delivery to Purchaser.

5. Timing of Daily Deliveries. Merchant hereby authorizes Purchaser to debit the Daily Delivery Amount from the Approved Bank Account or the Lockbox Account, as applicable, via ACH or electronic checks once each Business Day. If a debit is scheduled to occur on a bank holiday, the debit shall be made on the following Business Day. Debits of the Daily Delivery Amount shall commence on a date selected by Purchaser which shall be no later than 15 days following the Commencement Date. Daily deliveries shall continue until Purchaser has received the Completion Amount, unless Merchant files for bankruptcy and/or goes out of business in the ordinary course, without first committing a Bad Act (as defined below). In the event that the final daily delivery results in Purchaser receiving more than Amount Sold (not including fees), Purchaser shall refund any amount in excess of the Amount Sold (not including fees) within 5 business days of the final daily delivery.

6. Approved Bank Account. If the Direct Debit Method is used, and for the purpose of allowing Purchaser to debit any fees due under this Agreement if the Payment Card Split Method is used, Merchant designates the bank account below as the Approved Bank Account, subject to approval by Purchaser. Merchant agrees to designate a different bank account acceptable to Purchaser if Purchaser does not approve the account designated below. In the event the Approved Bank Account becomes unavailable or Purchaser requests that a different bank account be used for any reason (such as difficulties debiting the Daily Delivery Amount from such bank account), Merchant shall arrange for another Approved Bank Account immediately, and in no event later than five calendar days after the prior account becomes unavailable or Purchaser requests the designation of a new Approved Bank Account. If any daily delivery (or multiple daily deliveries) required under the Direct Debit Method does not occur due to a change in the Approved Bank Account, Purchaser may debit the missed daily deliveries together with the next daily delivery.
**Account Number: 2000029095971 Routing Number: 061000227**

7. Lockbox Account. If the Lockbox Method is used, Merchant hereby authorizes Purchaser to initiate a lockbox arrangement and to instruct Merchant's Approved Card Processor and Merchant's invoiced customers/clients/vendees to deposit all sums due to Merchant from each of those parties directly to the Lockbox Account. If required, Merchant shall enter into a lockbox agreement with Purchaser and the banking institution chosen by Purchaser, and complete any additional paperwork, for the purpose of establishing the Lockbox Account.

8. Third Party Appointment and Authorization. By signing below, Merchant acknowledges that Purchaser may, at any time, at Purchaser's sole discretion, and without prior notice, appoint a third party, which may be an affiliate of Purchaser, including, without limitation, Kinetic Direct Funding, LLC (such third party being the "Servicing Agent") to perform any or all of the actions authorized by the ACH Authorization and the Agreement. Merchant further agrees and acknowledges that Servicing Agent shall have all of the same rights, responsibilities, and authorizations granted to Purchaser by the ACH Authorization and the Agreement. For purposes of clarity, any Servicing Agent may perform any and all activities to service the Agreement, including the collection of Future Receipts (as set forth above) and fees, as if it was the Purchaser.

9. Fees Associated with Daily Deliveries. It shall be Merchant's exclusive responsibility to pay to its banking institution and/or Purchaser's banking institution directly (or to compensate Purchaser if it is charged) all fees, charges and expenses incurred by either Merchant or Purchaser due to rejected electronic checks or ACH debit attempts, overdrafts or rejections by Merchant's banking institution of the transactions contemplated by this Agreement.

10. Merchant's Right to Reconciliation of Daily Deliveries.

a. Merchant shall have the right, in its sole and absolute discretion but subject to the provisions of Section 11 below, to request retroactive reconciliation of any difference between the Daily Delivery Amounts received by Purchaser through the four daily deliveries immediately preceding the day when such request for reconciliation is received by Purchaser (each such four-week period, a "Reconciliation Month") and the Specified Percentage of Future Receipts actually generated during that Reconciliation Month.
b. Purchaser will perform each timely requested reconciliation (each, a "Reconciliation") within five (5) Business Days following its receipt of the Merchant's request for reconciliation by either crediting or debiting the difference back to or from the Approved Bank Account or the Lockbox Account, as applicable, so that the total amount debited by Purchaser from the Approved Bank Account or the Lockbox Account (as applicable) during the Reconciliation Month at issue is equal to the Specified Percentage of the Future Receipts that Merchant actually collected during the Reconciliation Month at issue.

III. Request for Reconciliation Procedure.

11. Merchant's Right for Reconciliation of Daily Deliveries.

a. It shall be Merchant's sole responsibility and right hereunder to initiate Reconciliation of Merchant's actual Future Receipts during any Reconciliation Month by sending a request for reconciliation to Purchaser.
b. Any such request for Reconciliation of Merchant's Daily receipts for a specific Reconciliation Month shall be in writing, shall include a copy of Merchant's bank statement(s) and credit card processing statement(s) for the Reconciliation Month at issue, and must be received by Purchaser via email at customer.service@libertasfunding.com within five (5) Business Days after the last day of the Reconciliation Month at issue (time being of the essence). Any request for Reconciliation received after this deadline will not be honored.
c. Merchant shall have the right to request Reconciliation as many times during the term of this Agreement as it deems proper, and Purchaser shall comply with such request, provided that:
   i. Each such request is made in accordance with the terms of this Section 11.
   ii. If a request for Reconciliation is timely made after Purchaser has received the Completion Amount, and the Reconciliation results in part of the Completion Amount being refunded to Merchant, then Purchaser shall continue to receive daily deliveries until it receives the Completion Amount.
   iii. If Purchaser becomes aware that it has received funds that it is not entitled to, then Purchaser shall return those funds to the Merchant without request by the Merchant for reconciliation as set forth above.
d. Unless Purchaser has received the Completion Amount, Purchaser is entitled to continue receiving daily deliveries whether or not Merchant has made a request for Reconciliation. Merchant agrees not to take any action to interfere with daily deliveries based on the pendency of a request for Reconciliation.

12. Adjustment of Daily Delivery Amount.

a. If a Reconciliation is performed that results in a refund to the Merchant of at least 20% of the aggregate Daily Delivery Amounts received by Purchaser during the applicable Reconciliation Month, Merchant shall have the option to request, subject to the requirements of Section 13 below, modification ("Adjustment") of the Daily Delivery Amount on a going-forward basis. Purchaser in its sole and absolute discretion may allow a temporary Adjustment upon Merchant's proof of circumstances warranting such Adjustment, such as a natural disaster requiring temporary closure of Merchant's business. After an Adjustment is granted, the adjusted Daily Delivery Amount shall replace and supersede the amount of the Daily Delivery Amount set forth in the preamble of this Agreement and future daily deliveries shall be made in the adjusted amount. All Adjustments made in accordance with this section or other sections of this Agreement, shall be effective for one-month, after which time, the Merchant must provide Purchaser with its bank statements each month to allow Purchaser to re-evaluate the Merchant's information to determine whether a continued Adjustment is warranted.
b. The Adjustment of the Daily Delivery Amount shall be performed by Purchaser within five (5) Business Days following its receipt of the Merchant's request for Adjustment.

13. Request for Adjustment Procedure.

a. It shall be Merchant's sole responsibility and right to initiate the Adjustment by sending a request for Adjustment to Purchaser.
b. A request for Adjustment (an "Adjustment Request") shall be in writing, shall include copies of: (i) Merchant's three (3) consecutive bank statements for the Approved Bank Account or Lockbox Account, as applicable, immediately preceding the date of Purchaser's receipt of the Adjustment Request; (ii) Merchant's three (3) consecutive payment card processing statements immediately preceding the date of Purchaser's receipt of the Adjustment Request; and/or (iii) Merchant's bank statements and payment card processing statements previously provided by Merchant to Purchaser when applying to sell Future Receipts to Purchaser, or when applying for the most recent Adjustment that was made, if applicable. The Adjustment Request shall be sent by email to Purchaser at **customer.service@libertasfunding.com** within five (5) Business Days after the date that is the later of the last day for which activity is shown on the latest bank statement enclosed with the Adjustment Request and the last day for which activity is shown on the latest card processing statement enclosed with the Adjustment Request (time being of the essence). Any Adjustment Request received after this deadline will not be honored.
c. Merchant may request Adjustment of the Daily Delivery Amount as many times as it deems proper, and Purchaser shall comply with such Adjustment Requests, provided that:
   i. Each Adjustment Request is made in accordance with the requirements set forth in this Section 12;
   ii. No Adjustment Request may be made after Purchaser has received the Completion Amount; and
   iii. Unless Purchaser has received the Completion Amount, Purchaser is entitled to continue receiving daily deliveries whether or not Merchant has made an Adjustment Request. Merchant agrees not to take any action to interfere with daily deliveries based on the pendency of an Adjustment Request.

IV. Payment Card Split Method Provisions. The following terms (see Sections 14-16) apply if the Payment Cared Split Method is used, unless otherwise specified herein.

14. Approved Card Processor. Merchant agrees to enter into a payment card processing agreement with a payment card processor approved by Purchaser (the "Approved Card Processor") in order to obtain card processing services for credit cards, charge cards, debit cards, prepaid cards, or other payment cards used to purchase Merchant's goods and/or services. If Merchant has entered into a payment card processing agreement before

the date of this Agreement, Merchant may request that Purchaser review such agreement and any other information it deems pertinent for approval of the existing payment card processor in the sole and absolute discretion of Purchaser. Merchant agrees to process all of its payment card transactions through the Approved Card Processor, and not to switch to a different payment card processor or use an additional payment card processor without Purchaser's express written consent. If Purchaser permits Merchant to use a different payment card processor, the new processor shall become the Approved Card Processor. In the event the Approved Card Processor becomes unavailable or Purchaser requests that a different payment card processor be used for any reason (such as the Approved Card Processor failing to timely deliver the Specified Percentage of Future Receipts to Purchaser on a consistent basis), Merchant shall arrange for another Approved Card Processor immediately, and in no event later than five calendar days after the Approved Card Processor becomes unavailable or Purchaser requests the designation of a new Approved Card Processor.

15. Processing Arrangement. Merchant hereby authorizes and directs the Approved Card Processor, and any other processor, acquirer, service provider, or financial institution taking custody of, holding, possessing, or issuing payment instructions with respect to Future Receipts (together, the "Receipts Custodians") to deliver the Specified Percentage of Future Receipts on each Business Day (the "Daily Delivery Amount") to Purchaser rather than Merchant until Purchaser has received the Completion Amount, or, in the event that Purchaser declares the entire Completion Amount to be deliverable based on a breach of this Agreement, to deliver this amount. On days when banks are not open, the Specified Percentage will be delivered to Purchaser on the next banking day. For example, the Specified Percentage for Friday, Saturday, and Sunday will be delivered on the following Monday (or Tuesday if Monday is a bank holiday). Merchant acknowledges that the Approved Card Processor will be acting on behalf of Purchaser to collect the Specified Percentage of Future Receipts. Merchant agrees that the Future Receipts sold under this Agreement are Purchaser's property. Purchaser shall have no obligation to refund or return the Amount Sold or any portion thereof to Merchant in the event that the Approved Card Processor or any other Receipts Custodian initiates a refund, credit, reversal, or chargeback of a transaction subject to this Agreement, as such adjustments typically are netted against future card volume. Merchant agrees that when a Receipts Custodian takes custody of, holds, possesses, or issues payment instructions with respect to Future Receipts, it does so in trust for Purchaser. If there has not been a default, a Receipts Custodian will not deliver any particular day's Daily Amount to us if that Daily Amount has already been delivered to us by another Receipts Custodian. **Merchant agrees that it does not have the right to revoke or otherwise seek to override the authorization and direction set forth in this section and that this authorization may only be revoked by Purchaser.** You agree that a Receipts Custodian may rely on any instructions issued by us with respect to the delivery of the Future Receipts, including an instruction to deliver all Future Receipts to us in the event we declare the Completion Amount to be deliverable based on a breach of this Agreement. You waive and release any and all claims you may have against any Receipts Custodian that are in any way related to the Receipts Custodian delivering Future Receipts to us as described in this section. You authorize each Receipts Custodian to provide us with any and all information we request about the Receivables that Receipts Custodian possesses or has access to, including without limitation information about daily volumes, number of transactions, distributions, chargebacks, offsets, withdrawals, and totals. **YOU, YOUR SUCCESSORS AND PERMITTED ASSIGNEES AND AFFILIATES, AGREE TO FOREVER DEFEND, PROTECT, INDEMNIFY AND HOLD HARMLESS PURCHASER, EACH RECEIPTS CUSTODIAN, AND THEIR AND OUR SUCCESSORS, ASSIGNS, OFFICERS, DIRECTORS, MANAGERS, MEMBERS, AFFILIATES, AND REPRESENTATIVES AGAINST ALL DAMAGES, EXPENSES, CLAIMS, SUITS, DEMANDS, COSTS, ATTORNEYS' FEES OR LOSSES ARISING OUT OF OR ALLEGED TO HAVE ARISEN OUT OF OR IN CONNECTION WITH DELIVERING FUTURE RECEIPTS TO US AS DESCRIBED IN THIS SECTION. IN NO EVENT WILL WE OR THE RECEIPTS CUSTODIANS BE LIABLE TO YOU OR TO ANY THIRD PARTY FOR ANY LOSS OF USE, REVENUE OR PROFIT OR LOSS OF DATA OR FOR ANY DIRECT, CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL OR PUNITIVE DAMAGES, WHETHER ARISING OUT OF BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, REGARDLESS OF WHETHER SUCH DAMAGE WAS FORESEEABLE AND WHETHER OR NOT SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.**The Parties agree that any amounts due a Receipts Custodian under your agreement with such Receipts Custodian or otherwise take priority over amounts to be delivered to us under this Agreement. The Parties agree that each Receipts Custodian is a third-party beneficiary of this Agreement and may rely on this Agreement even though it is not a party to this Agreement. You grant to us an irrevocable power of attorney, coupled with an interest, and appoint us and our designees as your attorney-in-fact, to take any and all actions necessary or appropriate to direct any new or additional processor to make payment to us as contemplated by this Section.

a. **Processing Trial.** After this Agreement has been executed by Purchaser and Merchant, Purchaser has the option in its sole and absolute discretion to conduct a processing trial (the "Processing Trial") to determine whether the Specified Percentage will be correctly processed and/or reported by the Approved Card Processor to Purchaser. If Purchaser elects to conduct a Processing Trial, Merchant acknowledges and agrees that Purchaser will decide in its sole and absolute discretion whether to purchase the Amount Sold after completion of the Processing Trial. If Purchaser elects not to do so, any amounts received by Purchaser during the Processing Trial shall be refunded to the Merchant.

V. 16. MERCHANT'S OBLIGATIONS, COVENANTS, REPRESENTATIONS AND WARRANTIES Merchant agrees, covenants, represents, and warrants as follows at the time it executes this Agreement and on a continuing basis until such time as Purchaser has received the Completion Amount or Merchant has filed for bankruptcy or gone out of business in the ordinary course:

a. Business Purpose; Use of Purchase Price. **MERCHANT REPRESENTS AND WARRANTS THAT IT IS ENTERING INTO THIS AGREEMENT SOLELY FOR BUSINESS PURPOSES AND NOT FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES.** Merchant agrees to use the Purchase Price exclusively for the benefit and advancement of Merchant's business operations and for no other purpose.

b. Financial Condition and Financial Information. Merchant represents and warrants that its bank and financial statements, copies of which have been furnished to Purchaser, and future statements which may be furnished hereafter pursuant to this Agreement or upon Purchaser's request, fairly represent the financial condition of Merchant or other information set forth therein as of the dates such statements are issued, and prior to execution of the Agreement there have been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant has a continuing, affirmative obligation to advise Purchaser of any material adverse change in its financial condition, operation, or ownership. Purchaser may request statements at any time during the term of this Agreement and Merchant shall provide them to Purchaser within Five (5) Business Days. Merchant's failure to do so is a material breach of this Agreement.

c. Read Only Access to the Approved Bank Account and Approved Card Account. Merchant hereby agrees that, until Purchaser has received the Completion Amount, Purchaser shall have the right to perform ongoing read-only electronic monitoring of transactions occurring in the Approved Bank Account and Merchant's account with the Approved Card Processor (the "Approved Card Account"). Merchant agrees to provide Purchaser all required online access codes for the Approved Bank Account and the Approved Card Account. If Purchaser's electronic (online) access to Merchant's Approved Bank Account or the Approved Card Account is disabled for any reason, Merchant shall immediately and diligently undertake all steps required of it to restore Purchaser's access to both accounts. Merchant's failure to comply with the provisions of this Section 16 shall constitute Merchant's material breach of its obligations under this Agreement.

d. Governmental Approvals. Merchant represents and warrants that it is in compliance and, until Purchaser receives the Completion Amount, shall be in compliance with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged.

e. Good Standing. Merchant represents and warrants that it is a corporation/limited liability company/limited partnership/other type of business entity that is in good standing and duly incorporated or otherwise organized and validly existing under the laws of its jurisdiction of incorporation or organization and has full power and authority necessary to carry its business as it is now being conducted.

f. Authorization. Merchant represents and warrants that it has all requisite power to execute, deliver and perform this Agreement and consummate the transactions contemplated hereunder; entering into this Agreement will not result in breach or violation of, or default under, any agreement or instrument by which Merchant is bound or any statute, rule, regulation, order, or other law to which Merchant is subject, nor require the obtaining of any consent, approval, permit or license from any governmental authority having jurisdiction over Merchant. All organizational and other proceedings required to be taken by Merchant to authorize the execution, delivery and performance of this Agreement have been taken. The person signing this Agreement on behalf of Merchant represents and warrants that he or she has full power and authority to bind Merchant to perform its obligations under this Agreement.

g. Accounting Records and Tax Returns. Merchant shall treat receipt of the Purchase Price and delivery of the Specified Percentage of Future Receipts in a manner consistent with its nature as a true sale of Future Receipts in its accounting records and tax returns and further agrees that Purchaser is entitled to audit Merchant's accounting records upon reasonable Notice in order to verify compliance. Merchant hereby waives any rights of privacy, confidentiality, or taxpayer privilege in any litigation or arbitration arising out of this Agreement in which Merchant asserts that this transaction is anything other than a sale of future receipts.

h. Taxes; Workers Compensation Insurance. Merchant will promptly pay, when due, all taxes, including, without limitation, income, employment, sales and use taxes, imposed upon Merchant's business by law, and will maintain workers compensation insurance required by applicable governmental authorities.

i. Business Insurance. Merchant will maintain general liability and business-interruption insurance in the amounts and against risks as are satisfactory to Purchaser and shall provide Purchaser proof of such insurance upon request.

j. No Change of Business. You will not materially change the goods or services you sell, materially change the nature of your business, change the business entity through which you carry on your business, change any of the locations where you operate your business, or change the name under which you do business without first notifying us and obtaining our prior written consent.

k. No Closing of Business. Merchant represents and warrants that it has no current plans to close its business either temporarily (for renovations, repairs or any other purpose), or permanently. Merchant agrees that, until Purchaser receives the Completion Amount, Merchant will not voluntarily close its business on a permanent or temporary basis for renovations, repairs, or any other purposes. Notwithstanding the foregoing, Merchant shall have the right to close its business temporarily if such closing is necessitated by a requirement to conduct renovations or repairs imposed upon Merchant's business by legal authorities having jurisdiction over Merchant's business (such as from a health department or fire department) or if such closing is necessitated by circumstances outside Merchant's reasonable control. Prior to any such temporary closure of its business, Merchant shall provide Purchaser ten (10) Business Days' advance notice, or as much notice as reasonably possible under the circumstances.

l. No Pending Bankruptcy. As of the date of Merchant's execution of this Agreement, Merchant is not insolvent, has not filed, and does not contemplate filing, any petition for bankruptcy protection under Title 11 of the United States Code, and there has been no involuntary bankruptcy petition brought or threatened against Merchant. Merchant represents that it has not consulted with a bankruptcy attorney on the issue of filing bankruptcy within the six-month period immediately preceding the date of this Agreement. A breach of any of these representations shall be a material breach of this Agreement. If you go out of business or become the subject of a voluntary or involuntary bankruptcy filing within forty-five (45) days of our purchasing the Amount Sold, you agree that there will be a rebuttable presumption of a material breach.

m. Estoppel Certificate. Each time that we request, you will, upon at least one (1) day's prior notice from us, execute, acknowledge and deliver to us and/or to any other person, person firm or corporation specified by us, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which all or any portion of the Amount Sold has been delivered.

n. Unencumbered Future Receipts. Merchant has and will continue to have good, complete and marketable title to all Future Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests other than by virtue or entering into this Agreement. Merchant shall not sell Future Receipts or obtain any additional financing before Purchaser has received the Completion Amount without Purchaser's express written consent. Merchant shall not take any action inconsistent with or in derogation of Purchaser's ownership of the Amount Sold.

o. No Default Under Contracts with Third Parties. Merchant's execution of and/or performance of its obligations under this Agreement will not cause or create an event of default by Merchant under any contract which Merchant is or may become a party to, or otherwise violate any of Merchant's obligations to third parties.

p. Right of Access. In order to ensure Merchant's compliance with the terms of this Agreement, Merchant hereby grants Purchaser the right to enter, without notice, the premises of Merchant's business for the purpose of inspecting and checking Seller's transaction processing terminals to ensure the terminals are properly programmed to submit and or batch Merchant's Future Receipts to its Approved Card Processor and to ensure that Merchant has not violated any other provision of this Agreement. Furthermore, Merchant hereby grants Purchaser and its employees and consultants' access to Merchant's employees and records and all other items of property located at the Merchant's place of business during the term of this Agreement. Merchant hereby agrees to provide Purchaser, upon request, all and any information concerning Merchant's business operations, banking relationships, names and contact information of Merchant's suppliers, vendors and landlord(s), to allow Purchaser to interview any of those parties regarding any matters relevant to this Agreement.

q. Phone Recordings and Contact. Merchant agrees that any call between Merchant and Purchaser and its owners, managers, employees and agents may be recorded and/or monitored.

r. Knowledge and Experience of Decision Makers. The persons authorized to make management and financial decisions on behalf of Merchant with respect to this Agreement have such knowledge, experience and skill in financial and business matters in general and with respect to transactions of a nature similar to the one contemplated by this Agreement so as to be capable of evaluating the merits and risks of, and making an informed business decision with regard to, Merchant entering into this Agreement.

s. Merchant's Due Diligence. The person authorized to sign this Agreement on behalf of Merchant: (i) has received all information that such person deemed necessary to make an informed decision with respect to a transaction contemplated by this Agreement; and (ii) has had unrestricted opportunity to make such investigation as such person desired pertaining to the transaction contemplated by this Agreement and verify any such information furnished to him or her by Purchaser.

t. Arm's-Length Transaction. The person signing this Agreement of behalf of Merchant: (a) has read and fully understands content of this

Agreement; (b) has consulted to the extent he/she wished with Merchant's own counsel in connection with the entering into this Agreement; (c) he or she has made sufficient investigation and inquiry to determine whether this Agreement is fair and reasonable to Merchant, and whether this Agreement adequately reflects his or her understanding of its terms.

u. Integration; No Reliance on Oral Representations. This Agreement contains the entire agreement between Merchant and Purchaser with respect to the subject matter of this Agreement and supersedes each course of conduct previously pursued or acquiesced in, and each oral agreement and representation previously made, by the parties with respect thereto (if any), whether or not relied or acted upon. No course of performance or other conduct subsequently pursued or acquiesced in, and no oral agreement or representation subsequently made, whether or not relied or acted upon, and no usage of trade, whether or not relied or acted upon, shall amend this Agreement or impair or otherwise affect the parties' obligations pursuant to this Agreement or any rights and remedies of the parties to this Agreement.

VI. PLEDGE OF SECURITY:

17. Acknowledgment of Security Interest and Security Agreement. The Future Receipts sold by Merchant to Purchaser pursuant to this Agreement are "accounts" or "payment intangibles" as those terms are defined in the Uniform Commercial Code in effect in the state in which Merchant is located (the "UCC"). Such Sale shall constitute and shall be construed and treated for all purposes as a true and complete sale, conveying good title to the Future Receipts free and clear of any liens and encumbrances, from Merchant to Purchaser. To the extent the Future Receipts are "accounts" or "payment intangibles" then (i) the sale of the Future Receipts creates a security interest as defined in the UCC; (ii) this Agreement constitutes a "security agreement" under the UCC; and (iii) Purchaser has all the rights of a secured party under the UCC with respect to such Future Receipts. Merchant further agrees that, with or without an Event of Default, Purchaser may notify account debtors, or other persons obligated on the Future Receipts, on holding the Future Receipts of Merchant's sale of the Future Receipts and may instruct them to make payment or otherwise render performance to or for the benefit of Purchaser.

18. Financing Statements. Merchant authorizes Purchaser to file one or more UCC-1 forms consistent with the UCC to give notice that the Amount Sold is the sole property of Purchaser. The UCC filing may state that such sale is intended to be a sale and not an assignment for security and may state that Merchant is prohibited from obtaining any financing that impairs the value of the Amount Sold or Purchaser's ability to collect same. Merchant authorizes Purchaser to debit the Approved Bank Account or Lockbox Account, as applicable, for all costs incurred by Purchaser associated with the filing, amendment or termination of any UCC filings.

19. Security. You understand that we have the right to take delivery of the Future Receipts we purchased as they are generated in the ordinary course of your business. The Security Interest granted in this section is being given solely for the purpose of ensuring that you do not take any action to deprive us of that right. This Security Interest does not mean that we have made a loan to you, does not create a debt, and does not make you a debtor or us a creditor. As security for the prompt and complete performance of any and all obligations, covenants, and agreements of Merchant under this Agreement, now or hereafter arising from, out of, or relating to this Agreement, whether direct, indirect, contingent or otherwise (hereinafter referred to collectively as the "Merchant Obligations"), Merchant hereby pledges, assigns and hypothecates to Purchaser and grants to Purchaser a continuing, perfected and first priority lien upon and security interest in, to and under all of Merchant's right, title and interest in and to the following (collectively, the "Collateral"), whether now existing or hereafter from time to time acquired:

a. all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined by Article 9 of the UCC, now or hereafter owned or acquired by Merchant; and
b. all Merchant's proceeds, as that term is defined by Article 9 of the UCC.

20. Termination of Pledge. Upon the performance by Merchant in full of the Merchant Obligations, the security interest in the Collateral pursuant to this Pledge shall automatically terminate without any further act of either party being required, and all rights to the Collateral shall revert to Merchant. Upon any such termination, Purchaser will execute, acknowledge (where applicable) and deliver such satisfactions, releases and termination statements, as Merchant shall reasonably request.

21. Representations with Respect to Collateral. Merchant hereby represents and warrants to Purchaser that: the execution, delivery and performance by Merchant of this Pledge, and the remedies in respect of the Collateral under this Pledge (i) have been duly authorized; (ii) do not require the approval of any governmental authority or other third party or require any action of, or filing with, any governmental authority or other third party to authorize same (other than the filing of the UCC-1s); (iii) do not and shall not (A) violate or result in the breach of any provision of law or regulation, any order or decree of any court or other governmental authority, or (B) violate, result in the breach of or constitute a default under or conflict with any indenture, mortgage, deed of trust, agreement or any other instrument to which Merchant is a party or by which any of Merchant's assets (including, without limitation, the Collateral) are bound.

22. Further Assurances. Upon the request of Purchaser, Merchant at its sole cost and expense, shall execute and deliver all such further UCC-1s, continuation statements, assurances and assignments of the Collateral, and consents with respect to the pledge of the Collateral and the execution of this Pledge, and shall execute and deliver such further instruments, agreements and other documents and do such further acts and things, as Purchaser may request in order to more fully effectuate the purposes of this Pledge and the assignment of the Collateral and obtain the full benefits of this Pledge and the rights and powers herein created.

23. Attorney-in-fact. Merchant hereby authorizes Purchaser at any time to take any action and to execute any instrument, including without limitation to file one or more financing statements and/or continuation statements, to evidence and perfect the security interest created hereby and irrevocably appoints Purchaser as its true and lawful attorney-in-fact, which power of attorney shall be coupled with an interest, with full authority in the place and stead of Merchant and in the name of Merchant or otherwise, from time to time, in Purchaser's sole and absolute discretion, including without limitation (a) for the purpose of executing such statements in the name of and on behalf of Merchant, and thereafter filing any such financing and/or continuation statements and (b) to receive, endorse and collect all instruments made payable to Merchant.

VII. EVENTS OF DEFAULT AND REMEDIES:

24. Events of Default by Merchant. The occurrence of any of the following events shall constitute an "Event of Default" by Merchant:

a. **Events of Default.**
b. **Bad Acts.** If you commit any of the following acts ("Bad Acts") without our prior written consent before we receive the Completion Amount,

 

you will be in default:

i. you sell, transfer or otherwise encumber or attempt to sell, transfer or otherwise encumber Future Receipts, whether or not such Future Receipts are part of the Amount Sold, sometimes referred to as "stacking" our Purchase Price with other funding companies;
ii. you encumber or allow any encumbrance to attach to our interest in the Amount Sold;
iii. you sell all or substantially all of your assets used in the operation of your business to a third party;
iv. you materially change the operation of your business (e.g., changes in industry, concept, size, etc.);
v. you stop accepting a particular method of payment while you remain open for business;
vi. you change your legal name or jurisdiction of formation, or carry-on business through a different business entity;
vii. you change, close, or terminate the Approved Bank Account or Approved Card Processor, or interfere with the lockbox arrangement, without our express written consent;
viii. you do not obtain a replacement Approved Bank Account or Approved Card Processor acceptable to us within fifteen (15) days after your bank or processor terminates its relationship with you;
ix. you process any card transaction through a payment card processor other than the Approved Card Processor;
x. you provide us with false or misleading information about your business or revenue (in your application or otherwise) that is material to our decision to purchase Future Receipts from you;
xi. you deposit or cause to be deposited by others Future Receipts into any account other than the Approved Bank Account or Lockbox Account, if applicable;
xii. you take or fail to take an action that hinders our taking delivery of our Specified Percentage of Future Receipts from the Approved Bank Account, Lockbox Account, or any Receivables Custodian, as applicable;
xiii. you disconnect or interfere with the operation of Purchaser's bank monitoring software; or
xiv. you commit any act or omission specified in this Agreement to be a material breach. However, we will not consider any of these acts to be Bad Acts if they occur because you go out of business in the ordinary course. These Bad Acts are prohibited solely to protect our ability to collect the Amount Sold and receive the benefit of our bargain. They do not create any obligation for Merchant to deliver Future Receipts to Purchaser if they are simply not generated by Merchant's business.

c. Other Breaches. If you commit an act that is not a Bad Act but that otherwise violates a term or covenant in this Agreement (an "Other Breach"), you will be in default.

25. **Remedies.** If you commit a Bad Act, you will be liable to us in an amount in cash equal to (a) the undelivered portion of the Amount Sold, plus (b) any other fees and other amounts due to us under this Agreement, plus (c) any additional amounts you would owe us for committing an Other Breach. If you commit an Other Breach, you will be liable to us for all damages resulting from the Other Breach, including, but not limited to, our reasonable attorneys' fees, expenses and costs incurred in any proceeding pursued against you to recover the amounts due us under this Agreement. You agree to pay us the amounts due or we may (d) withdraw such amounts from the Approved Bank Account or Lockbox Account, as applicable, or any other account into which you deposit Future Receipts, via ACH or electronic checks; (e) direct the Approved Card Processor, any other Receipts Custodian, and/or any other payment card processor you use in violation of this Agreement to deliver all of your Future Receipts to us until we have received the amount due; (f) enforce our rights as a secured creditor under the UCC including, without limitation, notifying any of your account debtor(s) of our security interest; (g) enforce Guarantor's personal guaranty of performance provisions of this Agreement against the Guarantor(s) without first seeking recourse from Merchant; (h) commence a suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Merch ant's and Guarantor's obligations hereunder or any other legal or equitable right or remedy including without limitation Purchaser's rights of a secured party under the UCC. All rights available to us are cumulative and not exclusive of any other remedies available to us in law or equity.

26. **Power of Attorney.** Each Merchant and Guarantor irrevocably appoints Purchaser and its representatives as their respective agents and attorneys-in-fact with full authority to take any action or execute any instrument or document to do the following: (A) to settle all obligations due to Purchaser from any payment card processor and/or account debtor(s) of Merchant; (B) upon occurrence of a Bad Act, to perform any and all such obligations of Merchant under this Agreement, including without limitation (i) to collect monies due or to become due under or in respect of any of the Collateral; (ii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) above; (iii) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to Purchaser; and (iv) to file any claims or take any action or institute any proceeding against Merchant and/or Guarantor which Purchaser may deem necessary for the collection of any portion of the undelivered Amount Sold from the Collateral, or otherwise to enforce its rights under this Agreement.

27. **Service of Process.** Merchant and Guarantor(s) consent to service of process and legal notices made by Certified or Priority Mail delivered by the United States Postal Service and addressed to the respective party's address set forth on the first page of this Agreement or any other address(es) provided in writing to Purchaser by Merchant or Guarantor(s), and unless applicable law or rules provide otherwise, any such service or legal notice will be deemed complete upon dispatch. Merchant and Guarantor(s) agree that it will be precluded from asserting that it did not receive service of process or any other legal notice mailed to the address located in the Merchant Information and Owner Information sections set forth on the first page of this Agreement if it does not furnish a certified mail return receipt signed by Purchaser demonstrating that Purchaser was provided with a notice of a change of address.

VIII. ADDITIONAL TERMS:

28. **Fees.** In addition to all other sums due to Purchaser under this Agreement, Merchant shall pay to Purchaser:

a. An Origination Fee of $0.00 upon entering into this Agreement as reimbursement of Purchaser's costs associated with entering into this Agreement (the cost of due diligence on the Merchant's business, financial and legal due diligence, etc.)
b. A Non-Sufficient Funds ("NSF") fee of $35 in each and every instance when delivery of the Daily Delivery Amount to Purchaser has failed due to insufficient funds in the Merchant's Approved Bank Account or Lockbox Account, as applicable; provided, however, that no NSF fee shall be due when the delivery failed because Merchant's business did not generate sufficient Future Receipts to cover the Daily Delivery Amount and Merchant promptly requested Reconciliation and/or Adjustment.
c. $100 in each and every instance when Merchant blocks Purchaser's access (or otherwise prevents Purchaser from accessing) Merchant's bank accounts.
d. $2,500 in each and every instance when, upon occurrence of an Event of Default, Purchaser shall have agreed to waive Merchant's default.

29. **Financial Condition.** Merchant and its Guarantor(s) authorize Purchaser and its agents to investigate their financial responsibility and history

and will provide to Purchaser any bank or financial statements, tax returns, etc., as deems necessary prior to or at any time after execution of this Agreement. A photocopy or electronic image of this authorization will be deemed as acceptable for release of financial information. Purchaser is authorized to update such information and financial profiles from time to time as it deems appropriate.

30. Transactional History. Merchant shall execute written authorization(s) to their bank(s) to provide Purchaser with Merchant's banking and/or credit-card processing history.

31. No Liability. In no event shall Purchaser be liable for any claims asserted by Merchant or its Guarantor under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by Merchant and Guarantor(s).

32. Right to Cancel.

i. Notwithstanding anything to the contrary set forth in this Agreement, Purchaser shall have the right to cancel this agreement any time prior to its delivery of the Purchase Price to Merchant and, upon such cancellation, this Agreement shall become null, and void and the parties shall have no obligation to, or rights against, each other, except that all sums delivered by Merchant to Purchaser on account of entering into this Agreement shall be promptly returned to Merchant.
ii. Notwithstanding anything to the contrary set forth in this Agreement, in the event Merchant has not been in default under this Agreement, Merchant shall have the right to cancel this Agreement any time until the midnight of the second (2nd) Business Day following the date of its receipt of the Purchase Price by notifying Purchaser of such cancellation by notice sent in accordance with this Agreement. Upon timely delivering such cancellation notice to Purchaser, and further provided that Merchant has otherwise complied with the provisions of this Agreement, Merchant shall refund the entire amount of the Purchase Price back to Purchaser within five (5) Business Days following the date of Merchant's receipt of the Purchase Price. Upon such refund of the Purchase Price back to Purchaser, this Agreement shall become null and void and the parties shall have no remaining obligations to or rights against each other except that Purchaser shall have the right keep, as fair and adequate compensation for its costs of entering into this Agreement with Merchant, the Origination Fee and all Daily Delivery Amounts received by Purchaser prior to the date when this Agreement is terminated.

IX. GUARANTY OF PERFORMANCE OF MERCHANT'S OBLIGATIONS:

33. Guarantor's Representations. Guarantor represents and warrants to Purchaser that:

a. Guarantor is an owner, officer, or manager of Merchant and will directly benefit from Purchaser and Merchant entering into the Agreement.
b. Guarantor understands and acknowledges that Purchaser is not willing to enter into the Agreement unless Guarantor irrevocably, absolutely and unconditionally guarantees prompt and complete performance of any and all liabilities, obligations, covenants or agreements of Merchant under this Agreement, now or hereafter arising from, out of or relating to this Agreement, whether direct, indirect, contingent or otherwise (hereinafter referred to collectively as the "Merchant Obligations").

34. Guaranty of Merchant's Obligations. Guarantor hereby irrevocably, absolutely and unconditionally guarantees to Purchaser prompt, full, faithful, and complete performance and observance of all Merchant Obligations; and Guarantor unconditionally covenants to Purchaser that if Merchant shall at any time breach any of the Merchant Obligations, Guarantor shall perform (or cause to be performed) the Merchant Obligations and pay all damages and other amounts stipulated in this Agreement with respect to the non-performance of the Merchant Obligations, or any of them.

35. Guarantor's Other Agreements. Guarantor will not dispose, convey, sell or otherwise transfer, or cause Merchant to dispose, convey, sell or otherwise transfer, any material business assets of Merchant without the prior written consent of Purchaser, which consent may be withheld for any reason, until Purchaser has received the Completion Amount. Guarantor shall pay to Purchaser upon demand all expenses (including, without limitation, reasonable attorneys' fees and disbursements) incurred as the result of, or incidental to, or relating to, the enforcement or protection of Purchaser's rights against Merchant and Guarantor under the Agreement. This Guaranty is binding upon Guarantor and Guarantor's heirs, legal representatives, successors and assigns and shall inure to the benefit of and may be enforced by the successors an assign of Purchaser. The obligation of Guarantor shall be unconditional and absolute, regardless of the unenforceability of any provision of any agreement between Merchant and Purchaser, or the existence of any defense, setoff or counterclaim, which Merchant may assert. Purchaser is hereby authorized, without notice or demand and without affecting the liability of Guarantor hereunder, to at any time renew or extend Merchant's obligations under the Agreement or otherwise modify, amend or change the terms of the Agreement.

36. Two Or More Guarantors. If there is more than one Guarantor, "Guarantor" in this Agreement shall mean all Guarantors and the obligations of the Guarantors hereunder shall be joint and several.

37. Waiver; Remedies. No failure on the part of Purchaser to exercise, and no delay in exercising, any right under this Guaranty shall operate as a waiver, nor shall any single or partial exercise of any right under this Guaranty preclude any other or further exercise of any other right. The remedies provided in this Guaranty are cumulative and not exclusive of any remedies provided by law or equity. In the event that Merchant fails to perform any obligation under the Agreement, Purchaser may enforce its rights under this Guaranty without first seeking to obtain performance for such default from Merchant or any other guarantor.

38. Acknowledgment of Purchase. Guarantor acknowledges and agrees that the Purchase Price paid by Purchaser to Merchant in exchange for the Amount Sold is adequate consideration for the purchase of the Amount Sold and is not a loan or financial accommodation from Purchaser to Merchant. Guarantor specifically acknowledges Purchaser is not a lender, bank, or credit card processor, and that Purchaser has not offered any loans to Merchant. Guarantor waives any claims or defenses of usury in any action arising out of this Agreement.

39. Severability. If for any reason any court of competent jurisdiction finds any provisions of this Agreement applicable to the Guarantor to be void or voidable, the parties agree that the court may reform such provision(s) to render the provision(s) enforceable ensuring that the restrictions and prohibitions contained in those provisions shall be effective to the fullest extent allowed under applicable law.

40. Opportunity for Attorney Review. Guarantor represents that he/she has carefully read this Agreement and has, or had an opportunity to, consult with his or her attorney. Guarantor understands the contents of this Agreement, signs it as his or her free act and deed and agrees to be bound by the provisions hereof.

X. MISCELLANEOUS:

41. Modifications; Agreements. No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by all parties.

42. Assignment. Purchaser may assign, transfer or sell its rights or delegate its duties hereunder, either in whole or in part without prior notice to the Merchant or the Guarantor. Neither Merchant nor Guarantor shall have the right to assign their respective rights or obligations under this Agreement without first obtaining Purchaser's written consent.

43. Notices. All notices, requests, consent, demands and other communications required or permitted to be given under this Agreement, other than service of process and legal notices (see section 27 above), shall be delivered by Certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in the Merchant Information and Owner Information sections on in the first page of this Agreement unless the Merchant and/or Guarantor(s) has received a Certified mail return receipt signed by Purchaser demonstrating that the Purchaser was provided with Merchant's and/or Guarantors'(s') notice of a change of address. Notices governed by this section shall become effective as of the date of the receipt.

44. Waiver Remedies. No failure on the part of any party to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

45. Binding Effect. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.

46. Governing Law, Venue and Jurisdiction. This Agreement shall be governed by and construed exclusively in accordance with the laws of the State of New York, without regard to any applicable principles of conflicts of law. Any lawsuit, action or proceeding arising out of or in connection with this Agreement shall be instituted exclusively in any court sitting in New York State (the "Acceptable Forums"). Each party signing this Agreement agrees that the Acceptable Forums are convenient, and irrevocably submits to the jurisdiction of the Acceptable Forums and waives any and all objections to inconvenience of the jurisdiction or venue. Should a proceeding be initiated in any other forum, the parties waive any right to oppose any motion or application made by either party to transfer such proceeding to an Acceptable Forum.

47. Survival of Representation, etc. All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been complied with and satisfied in full and this Agreement shall have terminated.

48. Severability. In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

49. Waiver of Class Action; Waiver of Jury Trial. By entering into this agreement, the parties agree that they may bring claims against the other only in their individual capacity, and **THE PARTIES ARE EACH EXPRESSLY WAIVING ANY AND ALL RIGHT TO PARTICIPATE AS A REPRESENTATIVE OR MEMBER IN ANY CLASS ACTION, PUTATIVE OR PURPORTED CLASS ACTION, REPRESENTATIVE ACTION, PRIVATE ATTORNEY GENERAL ACTION, OR SIMILAR ACTION RELATING TO ANY CLAIMS (AS HEREINAFTER DEFINED), WHETHER BROUGHT UNDER STATE OR FEDERAL LAW.**The parties are each expressly waiving any and all right to join or consolidate claims in any proceeding with those of any other person (except any obligors and guarantors of the same agreement). Further, **BY ENTERING INTO THIS AGREEMENT, THE PARTIES ARE EACH EXPRESSLY WAIVING THEIR RESPECTIVE RIGHTS TO A JURY TRIAL FOR ALL CLAIMS.** The term "Claim" means any claim, dispute, or controversy (whether based on contract, tort, statute, or otherwise, and whether seeking monetary or any form of non-monetary relief) arising out of or relating to this Agreement or the relationship between or among the parties (collectively, "Claims"). The term Claims is to be given its broadest possible meaning, and includes pre-existing, present, and future Claims, and Claims regarding the enforceability or scope of this waiver. For purposes of this waiver only, the term "party" means that party and all of its respective parents, subsidiaries, affiliates, predecessors, successors, assigns, agents, vendors, employees, officers, and directors. **THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.**

50. Captions. The captions in this Agreement are inserted for convenience of reference only and in no way define, describe or limit the scope or intent of this contract or any of the provisions hereof.

51. Counterparts and Facsimile Signatures. This Agreement can be signed in one or more counterparts, each of which shall constitute an original and all of which when take together shall constitute one and the same agreement. Signatures delivered via facsimile and/or via Portable Digital Format (PDF) shall be deemed acceptable for all purposes, including without limitation the evidentially purposes.

The balance of this page left intentionally blank

**MERCHANT NAME: ARC MANAGEMENT GROUP, LLC, et al.**
(legal name of the business)

By: *Bill Wilson*

Name: WILLIAM DONALD WILSON
Title: CEO
FEIN: 030607765

**OWNER/GUARANTOR #1:**

*Bill Wilson*

Name: WILLIAM DONALD WILSON
SSN: 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

**OWNER/GUARANTOR #2:**

*Thresa Wilson*
Thresa Wilson (Apr 3, 2023 16:34 EDT)

Name: THRESA LARAE WILSON
SSN: 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

## Libertas Funding, LLC Electronic Fund Transfer Authorization

This Libertas Funding, LLC Electronic Fund Transfer Authorization (the "Authorization") supplements the foregoing concurrent Agreement of Sale of Future Receipts (the "Agreement"). Except as noted below, capitalized terms in this Authorization have the meaning set forth in the Agreement.

You irrevocably authorize us (which includes for the purposes of this authorization, our agents, service providers, successors, and assigns) to take delivery of each Daily Delivery Amount by initiating an electronic fund transfer via the Automated Clearing House network or similar network (an "ACH") from the business deposit account specified below, any substitute account you later specify, or any other account containing your Future Receipts (collectively, the "Account") on or after the date the associated Future Receipts were created. You authorize us to initiate a single ACH for the combined amounts of different Daily Delivery Amounts as permitted by the Agreement. You further authorize us initiate ACHs to the Account for any amounts that come due under the Agreement, including ACHs for the Completion Amount in the event you commit a Bad Act. You also authorize us to initiate ACH credits or debits to the Account to correct any errors we may make in processing a payment. In the event that an ACH is returned unpaid, you authorize us to reinitiate the ACH until it is paid and to initiate a separate ACH or to add to a reinitiated ACH the amount of any dishonored payment fee that we charge. You agree that you will not cancel this Authorization or instruct any depository holding Future Receipts we purchased to reject our ACHs. You promise that the Account specified below and any substitute Account you provide us is used for business purposes and not for personal, family or household purposes and that you are an authorized signor on these Accounts.

Business Deposit Account Information:

Account Number: 2000029095971 Routing Number: 061000227
Depository Name: WELLS FARGO BANK, NA Depository City/State: KENNESAW/GA

Type of Account

☑ Business Checking ___ Business Savings
___ Other Business Acct. (specify): ______________________

By signing below, you agree to the terms of this Libertas Funding, LLC Electronic Fund Transfer Authorization.

ACCEPTED AND AGREED:

Seller: ARC MANAGEMENT GROUP, LLC, et al.

By: X Bill Wilson

Name: WILLIAM DONALD WILSON

Title: CEO

By: X Bill Wilson

Owner: WILLIAM DONALD WILSON

By: X Thresa Wilson
Thresa Wilson (Apr 3, 2023 16:34 EDT)
Owner: THRESA LARAE WILSON

## ADDENDUM TO CONTRACT

**Addendum to Merchant Agreement 387598**

This is an addendum ("Addendum") to that certain merchant agreement (the "Merchant Agreement") entered into by and among Libertas Funding, LLC (the "Purchaser"), WILLIAM DONALD WILSON (the "Owner") and ARC MANAGEMENT GROUP, LLC (the "Seller") dated as of April 3, 2023.

WHEREAS, the Purchaser, the Owner and Seller wish to modify the Merchant Agreement as set forth herein.

Now therefore, for good and valuable consideration, the parties agree as follows:

A. The Owner and Seller are hereafter referred to collectively as the Merchant (the "Merchant")
B. I, WILLIAM DONALD WILSON, acting on behalf of ARC MANAGEMENT GROUP, LLC hereby authorize Purchaser to execute the payment(s) detailed below in section H "Merchant Agreement Payment Schedule".
C. Merchant understands that all transactions detailed in this addendum will be executed using the proceeds of the receivables purchase detailed in the Merchant Agreement.
D. In the event Merchant chooses to execute the Merchant Agreement, Merchant agrees that the transaction(s) listed below will constitute full remittance of receivables for the merchant agreement(s) Specified in section H (the "Specified Merchant Agreement(s)").
E. As of 04/03/2023, it is agreed that the Merchant has a receivable balance of $230,451.21 relating to the Specified Merchant Agreement(s), notwithstanding any returned payments or associated fees.
F. Upon execution of the Merchant Agreement Merchant agrees to waive the rights to any and all legal remedies guaranteed under the Specified Merchant Agreement(s)
G. This Addendum shall be governed by the laws of the state of New York.
H. **Merchant Agreement Payment Schedule:**

| Specified Merchant Agreement(s) | Amount Paid |
|---|---|
| 382352 | $230,451.21 |

All other terms of the referenced Merchant Agreement remain unchanged.

By their signatures below the parties agreed to be bound by this addendum.

ACCEPTED AND AGREED:

Purchaser: Libertas Funding, LLC

By: ______________________

Name: Randy Saluck

Title: CEO, Libertas Funding LLC

ACCEPTED AND AGREED:

Seller: ARC MANAGEMENT GROUP, LLC, et al.

By: X *Bill Wilson*

Name: WILLIAM DONALD WILSON

Title: CEO

By: X *Bill Wilson*

Owner: WILLIAM DONALD WILSON

By: X *Thresa Wilson*
Thresa Wilson (Apr 3, 2023 16:34 EDT)

Owner: THRESA LARAE WILSON

LIBERTAS

Seller Definition Addendum to the Agreement of Sale of Future Receipts Dated:

April 3rd, 2023

Purchaser and Guarantor(s) hereby agree that "Merchant" is defined as follows:

**Name:** ARC MANAGEMENT GROUP, LLC
**Address:** 1825 Barrett Lakes Blvd., Suite 505 KENNESAW, GA 30144
**FEIN:** 030607765

**Name:** WILZARA PROPERTY MANAGEMENT GROUP LLC
**Address:** 12655 OLD SURREY PL ROSWELL, GA 30075
**FEIN:** 0

**Name:** THE J.D. STUART LAW GROUP, LLC
**Address:** 1825 BARRETT LAKES BLVD NW STE 500 KENNESAW, GA 30144
**FEIN:** 0

**Name:** HEALTHTECH RECEIVABLES MGT, INC
**Address:** 3450 BUSCHWOOD PARK DR STE 150 TAMPA, FL 33618
**FEIN:** 0

**Name:** ABI HOLDING LLC
**Address:** 1825 BARRET LAKES BLVD NW STE 505 KENNESAW , GA 30144
**FEIN:** 0

**Name:** ARC MANAGEMENT GROUP OF GEORGIA, LLC
**Address:** 1825 BARRETT LAKES BLVD; SUITE 505 KENNESAW , GA 30144
**FEIN:** 0

**ARC MANAGEMENT GROUP, LLC**

Agreed to by: Bill Wilson (Signature), their CEO (Title)

Print Owner's Name William Wilson

**WILZARA PROPERTY MANAGEMENT GROUP LLC**

Agreed to by: Bill Wilson (Signature), their CEO (Title)

Print Owner's Name William Wilson

**THE J.D. STUART LAW GROUP, LLC**

Agreed to by: Bill Wilson (Signature), their CEO (Title)

Print Owner's Name William Wilson

**HEALTHTECH RECEIVABLES MGT, INC**

Agreed to by: Bill Wilson (Signature), their The J.D. Stuart Law Group, LLC (Title)

Print Owner's Name William Wilson

**ABI HOLDING LLC**

Agreed to by: Bill Wilson (Signature), their CEO (Title)

Print Owner's Name William Wilson

**ARC MANAGEMENT GROUP OF GEORGIA, LLC**

Agreed to by: Bill Wilson (Signature), their CEO (Title)

Print Owner's Name William Wilson

**Purchaser: Libertas Funding, LLC**

Agreed to by: ______________________ (Signature), its ______________________ (Title)

# ADDENDUM TO CONTRACT

## Addendum to Merchant Agreement 387598

**Purchase Price: $730,500.00 Purchased Percentage: 20% Purchased Amount: $978,870.00**

This is an addendum ("Addendum") to that certain merchant agreement 387598 (the "Merchant Agreement") entered into by and among Libertas Funding, LLC (the "Purchaser"), WILLIAM DONALD WILSON (the "Owner") and ARC MANAGEMENT GROUP, LLC (the "Seller" or "Merchant") dated as of April 3, 2023

WHEREAS, the Purchaser and Seller wish to modify the Merchant Agreement as set forth herein.

Now therefore, for good and valuable consideration, the parties agree as follows:

A. Except as provided in this Addendum, all terms and conditions of the Merchant Agreement shall remain in full force and effect. All capitalized terms not defined in this Addendum shall have the meaning set forth in the Merchant Agreement.
B. Merchant acknowledges, accepts, and agrees that as long as the Seller has not delivered all of the Daily Deliveries in connection with the Merchant Agreement, the Merchant understands that taking an additional short-term (12 months or less in expected term) cash advance based on credit card receivables or an ACH-based cash advance or loan based on total sales or deposits with any company (other than the Purchaser or the Purchaser's wholly-owned subsidiaries) would constitute an event of default under the Merchant Agreement, unless the Merchant receives a written authorization from the Purchaser prior to it taking such additional financing.
C. Merchant acknowledges, accepts, and agrees that a breach of this addendum (particularly section B above) will constitute a breach/event of default of the Merchant Agreement and that doing so will result in the immediate acceleration of all Daily Deliveries.
D. This Addendum shall be governed by the laws of the State of New York.
E. This Addendum may only be modified in writing by Purchaser and Merchant.

By their signatures below the parties agreed to be bound by this addendum.

**ACCEPTED AND AGREED:**

**Purchaser: Libertas Funding, LLC**

By: ______________________

Name: Randy Saluck

Title: CEO, Libertas Funding LLC

**ACCEPTED AND AGREED:**

**Seller: ARC MANAGEMENT GROUP, LLC, et al.**

By: X Bill Wilson

Name: WILLIAM DONALD WILSON

Title: CEO

By: X Bill Wilson

Owner: WILLIAM DONALD WILSON

By: X Thresa Wilson
Thresa Wilson (Apr 3, 2023 16:34 EDT)

Owner: THRESA LARAE WILSON

# ARC MANAGEMENT GROUP LLC - CONTRACT

Final Audit Report 2023-04-03

| | |
|---|---|
| Created: | 2023-04-03 |
| By: | stips group (stips@libertasfunding.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAiuClGBnU2cDf9yGEPTX1HST_texqxLyu |

## "ARC MANAGEMENT GROUP LLC - CONTRACT" History

Document created by stips group (stips@libertasfunding.com)
2023-04-03 - 8:25:01 PM GMT- IP address: 45.62.183.178

Document emailed to William Wilson (bwilson@arcmgmt.com) for signature
2023-04-03 - 8:31:25 PM GMT

Email viewed by William Wilson (bwilson@arcmgmt.com)
2023-04-03 - 8:32:14 PM GMT- IP address: 70.46.59.202

Document e-signed by William Wilson (bwilson@arcmgmt.com)
Signature Date: 2023-04-03 - 8:33:26 PM GMT - Time Source: server- IP address: 70.46.59.202

Document emailed to twilson@arcmgmt.com for signature
2023-04-03 - 8:33:27 PM GMT

Email viewed by twilson@arcmgmt.com
2023-04-03 - 8:33:35 PM GMT- IP address: 70.46.59.202

Signer twilson@arcmgmt.com entered name at signing as Thresa Wilson
2023-04-03 - 8:34:03 PM GMT- IP address: 70.46.59.202

Document e-signed by Thresa Wilson (twilson@arcmgmt.com)
Signature Date: 2023-04-03 - 8:34:05 PM GMT - Time Source: server- IP address: 70.46.59.202

Agreement completed.
2023-04-03 - 8:34:05 PM GMT

Names and email addresses are entered into the Acrobat Sign service by Acrobat Sign users and are unverified unless otherwise noted.

Adobe Acrobat Sign

LIBERTAS

Libertas Funding, LLC
411 West Putnam Ave Suite 220, Greenwich, CT 06380

## AGREEMENT OF SALE OF FUTURE RECEIPTS

This **AGREEMENT OF SALE OF FUTURE RECEIVABLES** (this "Agreement") dated as of **04/11/2023**, is made by and between **Libertas Funding, LLC**, a Connecticut Limited Liability Company as purchaser ("Purchaser"), the merchant whose name, address and other pertinent information is set forth below, as seller ("Merchant"), and the individual owner/guarantor of the Merchant whose name, address and other pertinent information are set forth below ("Guarantor"). For good and valuable consideration, the mutual receipt and sufficiency of which is hereby acknowledged, the parties to this Agreement agree as follows:

**Merchant Information (see addendum)**

| | |
|---|---|
| **Merchant Legal Name:** ARC MANAGEMENT GROUP, LLC, et al. | **DBA Name:** Arc Management Group |
| **Entity Type:** Limited Liability Company | **FEIN:** *****7765 |
| **State Of Incorporation:** GA | **Bank Name:** WELLS FARGO BANK, NA |
| **Address:** 1825 Barrett Lakes Blvd., Suite 505, KENNESAW,GA, 30144 | **Phone:** 4044171884 |

OWNER INFORMATION (referred to individually or collectively as the ("Owner"))

| | | |
|---|---|---|
| **Name of Owner Guarantor 1:** WILLIAM WILSON | **Cell Phone:** [redacted] | **Social Security #:** *****1178 |
| **Home Address:** [redacted] | **City/State:** [redacted] | **Zip Code:** [redacted] |
| **Ownership %:** 50 | **Email:** [redacted] | |

| | | |
|---|---|---|
| **Name of Owner Guarantor 2:** THRESA WILSON | **Cell Phone:** [redacted] | **Social Security #:** *****3349 |
| **Home Address:** [redacted] | **City/State:** [redacted] | **Zip Code:** [redacted] |
| **Ownership %:** 50 | **Email:** [redacted] | |

## PRIMARY TERMS

THIS AGREEMENT INCLUDES A JURY TRIAL AND CLASS ACTION WAIVER. PLEASE READ IT CAREFULLY.

In this Agreement, you are selling to us a specified amount of future payments your customers make for your goods and services, as further defined below ("Future Receipts"). We agree to buy from you (and you agree to sell to us) the amount of Future Receipts shown below (the "Amount Sold") in exchange for the "Purchase Price" shown below. In order to deliver to us the Amount Sold, you assign to us the share of your Future Receipts ("Specified Percentage") shown below, every Business Day from the date we deliver the Purchase Price until we have received the entire Amount Sold and all fees or other amounts due under this Agreement (the "Completion Amount").

We are buying Future Receipts from you, not loaning you money. You are not required to pay interest on the Purchase Price and this Agreement has no term or required payment amounts that are not subject to change based on your future revenue. Instead, your obligation is to deliver to us the Specified Percentage of your Future Receipts as they are generated in the ordinary course of your business. This means that your obligation to us aligns with your cash flow. When your Future Receipts decline because business is slow, you will be able to deliver Future Receipts to us more slowly.

By purchasing Future Receipts from you, we assume risks such as not obtaining the Future Receipts we bought as quickly as we anticipated, or not receiving all of them if you go out of business. However, you are not allowed to engage in "bad acts" that unfairly prevent us from receiving what we paid for. For example, unless you cease operations, you are not allowed to change the bank account in which we collect our Daily Delivery Amounts (see below) without our approval, block our ability to collect our Daily Delivery Amounts, sell your Future Receipts to another funding company (stacking) or close your business and start up another similar business right away. Additionally, you are representing that the information that you provided us is accurate in all material respects and that you have not omitted providing us with information that is material to your business. The details on this are below.

## Detailed Terms and Conditions

KEY BUSINESS TERMS AND DEFINITIONS:

| | | |
|---|---|---|
| **Amount Sold** | $3,030,300.00 | The dollar value of Future Receipts that Merchant agrees to sell to Purchaser. |
| **Purchase Price** | $2,340,000.00 | The total amount that Purchaser agrees to pay for the Amount Sold. |
| **Future Receipts** | $1,417,817.27 | All sums received by or payable to Merchant from its customers as payment for Merchant's goods and/or services in the ordinary course of Merchant's business after Merchant receives the Purchase Price from Purchaser. Future Receipts include, among other things, payments by cash, physical or electronic checks, credit cards, charge cards, debit cards, other payment cards, ACH or other electronic payments, and any other form of funds transfer or payment. When the Payment Card Split Method of delivering Future Receipts is used, Purchaser will collect only Future Receipts processed through the Approved Card Processor (defined below). |
| **Direct Payments to Third Parties/Renewals** | $1,335,939.44 | Amounts paid to Purchaser and/or Other Funders. |
| **Total Amount Sent to Merchant** | $1,004,060.56 | The Purchase Price minus the Origination Fee (see below) minus Direct Payments to Third Parties/Renewals (see above). |
| **Specified Percentage** | 20% | The percentage of Future Receipts that the Merchant is required to deliver to Purchaser until the entire Completion Amount is delivered to Purchaser in accordance with this Agreement. |
| **Daily Delivery Amount** | $12,025.00 | The dollar amount that Merchant and Purchaser agree to be an approximation of the Specified Percentage of Future Receipts each Business Day as of the date of this Agreement, based upon the information provided by Merchant to Purchaser concerning Merchant's most recent receipts. |
| **Discount Factor** | 1.295 | The adjustment to the Amount Sold that enables us to calculate the Purchase Price. |
| **Origination Fee** | $0.00 | The amount Purchaser will deduct from the Purchase Price and retain to compensate it for due diligence and other costs in evaluating whether to purchase the Amount Sold. |
| **Repurchase Price (applicable discounts)** | None | The discounted price Merchant may pay to end this financing transaction early by repurchasing Future Receipts sold to Purchaser but not yet delivered. The Repurchase Price is equal to the discount factor set forth in the column to the left for each month following the Commencement Date. This shall be multiplied by the Purchase price unless amounts collected prior to the date in which the Repurchase price is paid. |
| **Good Faith Estimate of Term** | 12 Months | This Agreement has no term. However, based on your historical revenue, we have estimated how long it will take you to deliver the Amount Sold to us under this Agreement. |
| **Commencement Date** | | The date when the Purchase Price is paid to Merchant. |
| **Business Day** | | Monday through Friday except bank holidays. |
| **Remittance Method** | ACH | Method of remittance agreed upon by Purchaser and Merchant. |

**Note: The bold type terms in the tables above and below shall constitute defined terms with respect to this Agreement. PLEASE NOTE THAT THE PURCHASER WILL NOT TAKE MORE THAN THE EXPECTED DAILY REMITTANCE WITHOUT THE CONSENT OF THE MERCHANT.**

I. SALE OF FUTURE RECEIPTS; PAYMENT OF PURCHASE PRICE:

1. Sale of Future Receipts; Not a Loan. In exchange for the Purchase Price, Merchant hereby sells, assigns, transfers and conveys (hereinafter, the "Sale") to Purchaser all of Merchant's right, title and interest in and to the Specified Percentage of its Future Receipts until the Completion Amount is delivered to Purchaser. This Sale is made without recourse against Merchant and Guarantor except as specifically set forth in this Agreement. By virtue of this Agreement, Merchant transfers to Purchaser full and complete ownership of the Amount Sold and Merchant retains no legal or equitable interest therein. Merchant and Purchaser agree that the Purchase Price is payment for the assignment and sale of the Amount Sold and that this transaction is not intended to be, nor shall it be construed as, a loan from Purchaser to Merchant. Furthermore, Purchaser's ability to collect the Amount Sold is contingent on the continued operation of Merchant's business, and the timing of deliveries of the Specified Percentage of Future Receipts will depend on how quickly Merchant's business generates Future Receipts. **Merchant and Guarantor expressly agree not to take the position that this transaction is a loan, and they expressly waive any and all claims and defenses based on that position in any action or proceeding arising out of this Agreement, including without limitation claims or defenses of usury.**

2. Purchaser's Acceptance through Payment of Purchase Price.
   a. Should Purchaser wish to accept this Agreement after the satisfactory completion of Purchaser's due diligence (in its discretion), Purchaser may accept the Agreement without signing it by sending Merchant the Purchase Price minus the Origination Fee, subject to Section 2(b) below.
   b. If Merchant previously sold Future Receipts to Purchaser but has not yet remitted the full Completion Amount pursuant to the prior transaction, Merchant hereby requests to repurchase the undelivered balance of the Amount Sold from that transaction and directs Purchaser to deduct the repurchase price from the Purchase Price and apply it to complete the prior transaction. Similarly, if Merchant previously obtained a loan from Purchaser and has a balance due on such loan, Merchant hereby instructs Purchaser to deduct the balance due on the prior loan from the Purchase Price and apply it to pay off the prior loan. In the event that the agreement for the prior sale of Future Receipts does not permit repurchase of any portion of the amount sold, such agreement is hereby amended to permit repurchase on the same terms as

set forth in this Agreement.

II. DELIVERY OF AMOUNT SOLD:

3. Method of Delivery of Amount Sold. Purchaser offers three methods by which Merchant may deliver the Specified Percentage of its Future Receipts to Purchaser: each Business Day ACH debits by Purchaser from Merchant's bank account, daily remittances from Merchant's payment card processor, and a lockbox arrangement. Each of these methods is described below. The method to be used initially is specified on the first page of this Agreement. The method of delivery may be changed by written agreement between Purchaser and Merchant.

a. Direct Debit Method.
Under the Direct Debit Method, Merchant agrees to deposit all Future Receipts into one (and only one) bank account which shall be preapproved by Purchaser (the "Approved Bank Account"). Merchant shall execute an ACH Authorization allowing Purchaser to debit directly from the Approved Bank Account each Business Day the Daily Delivery Amount via ACH debit, as specified below.

b. Payment Card Split Method.
Under the Payment Card Split Method, Merchant shall exclusively use a single Approved Card Processor (defined below) to process all payments made by credit, debit, and other payment cards for Merchant's goods and services. Merchant shall instruct such Approved Card Processor to remit each Business Day to Purchaser the Specified Percentage of the Future Receipts for that Business Day, and to remit the balance (less any fees charged by the Approved Card Processor) to Merchant.

c. Lockbox Method.
Under the Lockbox Method, Merchant agrees to deposit all Future Receipts into a special bank account established jointly by Purchaser and Merchant in accordance with a lockbox arrangement among Merchant, Purchaser and a banking institution chosen by Purchaser (the "Lockbox Account"), and Purchaser shall debit each Business Day the Daily Delivery Amount from the Lockbox Account.

4. Direct Debit Method and Lockbox Method Provisions. The following terms apply if either the Direct Debit Method or the Lockbox Method is used, unless otherwise specified herein.

a. Daily Delivery Amount. Purchaser and Merchant agree that, for efficiency purposes, Merchant may deliver the Specified Percentage of Future Receipts each Business Day by remitting the Daily Delivery Amount, which Purchaser has calculated to be roughly equivalent to the Specified Percentage of Merchant's historical revenue each Business Day. Purchaser, Merchant, and Guarantor acknowledge that Merchant's actual Future Receipts may vary each Business Day or from Merchant's historical revenue, but they agree that the Daily Delivery Amount is a fair and reasonable estimate of the Specified Percentage of Future Receipts. The Daily Delivery Amount may be adjusted as set forth in Section 11. Merchant also has the right to reconcile any difference between the Daily Delivery Amounts received in a given four-week period and the Specified Percentage of Future Receipts actually generated during that four-week period, as set forth in Sections 10 and 11.

At any time during the term of this Agreement, Purchaser may change the method by which it will accept the Daily Delivery by providing Merchant with written instructions of a new method of delivery of Daily Delivery to Purchaser.

5. Timing of Daily Deliveries. Merchant hereby authorizes Purchaser to debit the Daily Delivery Amount from the Approved Bank Account or the Lockbox Account, as applicable, via ACH or electronic checks once each Business Day. If a debit is scheduled to occur on a bank holiday, the debit shall be made on the following Business Day. Debits of the Daily Delivery Amount shall commence on a date selected by Purchaser which shall be no later than 15 days following the Commencement Date. Daily deliveries shall continue until Purchaser has received the Completion Amount, unless Merchant files for bankruptcy and/or goes out of business in the ordinary course, without first committing a Bad Act (as defined below). In the event that the final daily delivery results in Purchaser receiving more than Amount Sold (not including fees), Purchaser shall refund any amount in excess of the Amount Sold (not including fees) within 5 business days of the final daily delivery.

6. Approved Bank Account. If the Direct Debit Method is used, and for the purpose of allowing Purchaser to debit any fees due under this Agreement if the Payment Card Split Method is used, Merchant designates the bank account below as the Approved Bank Account, subject to approval by Purchaser. Merchant agrees to designate a different bank account acceptable to Purchaser if Purchaser does not approve the account designated below. In the event the Approved Bank Account becomes unavailable or Purchaser requests that a different bank account be used for any reason (such as difficulties debiting the Daily Delivery Amount from such bank account), Merchant shall arrange for another Approved Bank Account immediately, and in no event later than five calendar days after the prior account becomes unavailable or Purchaser requests the designation of a new Approved Bank Account. If any daily delivery (or multiple daily deliveries) required under the Direct Debit Method does not occur due to a change in the Approved Bank Account, Purchaser may debit the missed daily deliveries together with the next daily delivery.
**Account Number: 2000029095971 Routing Number: 061000227**

7. Lockbox Account. If the Lockbox Method is used, Merchant hereby authorizes Purchaser to initiate a lockbox arrangement and to instruct Merchant's Approved Card Processor and Merchant's invoiced customers/clients/vendees to deposit all sums due to Merchant from each of those parties directly to the Lockbox Account. If required, Merchant shall enter into a lockbox agreement with Purchaser and the banking institution chosen by Purchaser, and complete any additional paperwork, for the purpose of establishing the Lockbox Account.

8. Third Party Appointment and Authorization. By signing below, Merchant acknowledges that Purchaser may, at any time, at Purchaser's sole discretion, and without prior notice, appoint a third party, which may be an affiliate of Purchaser, including, without limitation, Kinetic Direct Funding, LLC (such third party being the "Servicing Agent") to perform any or all of the actions authorized by the ACH Authorization and the Agreement. Merchant further agrees and acknowledges that Servicing Agent shall have all of the same rights, responsibilities, and authorizations granted to Purchaser by the ACH Authorization and the Agreement. For purposes of clarity, any Servicing Agent may perform any and all activities to service the Agreement, including the collection of Future Receipts (as set forth above) and fees, as if it was the Purchaser.

9. Fees Associated with Daily Deliveries. It shall be Merchant's exclusive responsibility to pay to its banking institution and/or Purchaser's banking institution directly (or to compensate Purchaser if it is charged) all fees, charges and expenses incurred by either Merchant or Purchaser due to rejected electronic checks or ACH debit attempts, overdrafts or rejections by Merchant's banking institution of the transactions contemplated by this Agreement.

10. Merchant's Right to Reconciliation of Daily Deliveries.

a. Merchant shall have the right, in its sole and absolute discretion but subject to the provisions of Section 11 below, to request retroactive reconciliation of any difference between the Daily Delivery Amounts received by Purchaser through the four daily deliveries immediately preceding the day when such request for reconciliation is received by Purchaser (each such four-week period, a "Reconciliation Month") and the Specified Percentage of Future Receipts actually generated during that Reconciliation Month.

b. Purchaser will perform each timely requested reconciliation (each, a "Reconciliation") within five (5) Business Days following its receipt of the Merchant's request for reconciliation by either crediting or debiting the difference back to or from the Approved Bank Account or the Lockbox Account, as applicable, so that the total amount debited by Purchaser from the Approved Bank Account or the Lockbox Account (as applicable) during the Reconciliation Month at issue is equal to the Specified Percentage of the Future Receipts that Merchant actually collected during the Reconciliation Month at issue.

III. Request for Reconciliation Procedure.

11. Merchant's Right for Reconciliation of Daily Deliveries.

a. It shall be Merchant's sole responsibility and right hereunder to initiate Reconciliation of Merchant's actual Future Receipts during any Reconciliation Month by sending a request for reconciliation to Purchaser.

b. Any such request for Reconciliation of Merchant's Daily receipts for a specific Reconciliation Month shall be in writing, shall include a copy of Merchant's bank statement(s) and credit card processing statement(s) for the Reconciliation Month at issue, and must be received by Purchaser via email at customer.service@libertasfunding.com within five (5) Business Days after the last day of the Reconciliation Month at issue (time being of the essence). Any request for Reconciliation received after this deadline will not be honored.

c. Merchant shall have the right to request Reconciliation as many times during the term of this Agreement as it deems proper, and Purchaser shall comply with such request, provided that:
   i. Each such request is made in accordance with the terms of this Section 11.
   ii. If a request for Reconciliation is timely made after Purchaser has received the Completion Amount, and the Reconciliation results in part of the Completion Amount being refunded to Merchant, then Purchaser shall continue to receive daily deliveries until it receives the Completion Amount.
   iii. If Purchaser becomes aware that it has received funds that it is not entitled to, then Purchaser shall return those funds to the Merchant without request by the Merchant for reconciliation as set forth above.

d. Unless Purchaser has received the Completion Amount, Purchaser is entitled to continue receiving daily deliveries whether or not Merchant has made a request for Reconciliation. Merchant agrees not to take any action to interfere with daily deliveries based on the pendency of a request for Reconciliation.

12. Adjustment of Daily Delivery Amount.

a. If a Reconciliation is performed that results in a refund to the Merchant of at least 20% of the aggregate Daily Delivery Amounts received by Purchaser during the applicable Reconciliation Month, Merchant shall have the option to request, subject to the requirements of Section 13 below, modification ("Adjustment") of the Daily Delivery Amount on a going-forward basis. Purchaser in its sole and absolute discretion may allow a temporary Adjustment upon Merchant's proof of circumstances warranting such Adjustment, such as a natural disaster requiring temporary closure of Merchant's business. After an Adjustment is granted, the adjusted Daily Delivery Amount shall replace and supersede the amount of the Daily Delivery Amount set forth in the preamble of this Agreement and future daily deliveries shall be made in the adjusted amount. All Adjustments made in accordance with this section or other sections of this Agreement, shall be effective for one-month, after which time, the Merchant must provide Purchaser with its bank statements each month to allow Purchaser to re-evaluate the Merchant's information to determine whether a continued Adjustment is warranted.

b. The Adjustment of the Daily Delivery Amount shall be performed by Purchaser within five (5) Business Days following its receipt of the Merchant's request for Adjustment.

13. Request for Adjustment Procedure.

a. It shall be Merchant's sole responsibility and right to initiate the Adjustment by sending a request for Adjustment to Purchaser.

b. A request for Adjustment (an "Adjustment Request") shall be in writing, shall include copies of: (i) Merchant's three (3) consecutive bank statements for the Approved Bank Account or Lockbox Account, as applicable, immediately preceding the date of Purchaser's receipt of the Adjustment Request; (ii) Merchant's three (3) consecutive payment card processing statements immediately preceding the date of Purchaser's receipt of the Adjustment Request; and/or (iii) Merchant's bank statements and payment card processing statements previously provided by Merchant to Purchaser when applying to sell Future Receipts to Purchaser, or when applying for the most recent Adjustment that was made, if applicable. The Adjustment Request shall be sent by email to Purchaser at customer.service@libertasfunding.com within five (5) Business Days after the date that is the later of the last day for which activity is shown on the latest bank statement enclosed with the Adjustment Request and the last day for which activity is shown on the latest card processing statement enclosed with the Adjustment Request (time being of the essence). Any Adjustment Request received after this deadline will not be honored.

c. Merchant may request Adjustment of the Daily Delivery Amount as many times as it deems proper, and Purchaser shall comply with such Adjustment Requests, provided that:
   i. Each Adjustment Request is made in accordance with the requirements set forth in this Section 12;
   ii. No Adjustment Request may be made after Purchaser has received the Completion Amount; and
   iii. Unless Purchaser has received the Completion Amount, Purchaser is entitled to continue receiving daily deliveries whether or not Merchant has made an Adjustment Request. Merchant agrees not to take any action to interfere with daily deliveries based on the pendency of an Adjustment Request.

IV. Payment Card Split Method Provisions. The following terms (see Sections 14-16) apply if the Payment Cared Split Method is used, unless otherwise specified herein.

14. Approved Card Processor. Merchant agrees to enter into a payment card processing agreement with a payment card processor approved by Purchaser (the "Approved Card Processor") in order to obtain card processing services for credit cards, charge cards, debit cards, prepaid cards, or other payment cards used to purchase Merchant's goods and/or services. If Merchant has entered into a payment card processing agreement before

the date of this Agreement, Merchant may request that Purchaser review such agreement and any other information it deems pertinent for approval of the existing payment card processor in the sole and absolute discretion of Purchaser. Merchant agrees to process all of its payment card transactions through the Approved Card Processor, and not to switch to a different payment card processor or use an additional payment card processor without Purchaser's express written consent. If Purchaser permits Merchant to use a different payment card processor, the new processor shall become the Approved Card Processor. In the event the Approved Card Processor becomes unavailable or Purchaser requests that a different payment card processor be used for any reason (such as the Approved Card Processor failing to timely deliver the Specified Percentage of Future Receipts to Purchaser on a consistent basis), Merchant shall arrange for another Approved Card Processor immediately, and in no event later than five calendar days after the Approved Card Processor becomes unavailable or Purchaser requests the designation of a new Approved Card Processor.

15. **Processing Arrangement.** Merchant hereby authorizes and directs the Approved Card Processor, and any other processor, acquirer, service provider, or financial institution taking custody of, holding, possessing, or issuing payment instructions with respect to Future Receipts (together, the "Receipts Custodians") to deliver the Specified Percentage of Future Receipts on each Business Day (the "Daily Delivery Amount") to Purchaser rather than Merchant until Purchaser has received the Completion Amount, or, in the event that Purchaser declares the entire Completion Amount to be deliverable based on a breach of this Agreement, to deliver this amount. On days when banks are not open, the Specified Percentage will be delivered to Purchaser on the next banking day. For example, the Specified Percentage for Friday, Saturday, and Sunday will be delivered on the following Monday (or Tuesday if Monday is a bank holiday). Merchant acknowledges that the Approved Card Processor will be acting on behalf of Purchaser to collect the Specified Percentage of Future Receipts. Merchant agrees that the Future Receipts sold under this Agreement are Purchaser's property. Purchaser shall have no obligation to refund or return the Amount Sold or any portion thereof to Merchant in the event that the Approved Card Processor or any other Receipts Custodian initiates a refund, credit, reversal, or chargeback of a transaction subject to this Agreement, as such adjustments typically are netted against future card volume. Merchant agrees that when a Receipts Custodian takes custody of, holds, possesses, or issues payment instructions with respect to Future Receipts, it does so in trust for Purchaser. If there has not been a default, a Receipts Custodian will not deliver any particular day's Daily Amount to us if that Daily Amount has already been delivered to us by another Receipts Custodian. **Merchant agrees that it does not have the right to revoke or otherwise seek to override the authorization and direction set forth in this section and that this authorization may only be revoked by Purchaser.** You agree that a Receipts Custodian may rely on any instructions issued by us with respect to the delivery of the Future Receipts, including an instruction to deliver all Future Receipts to us in the event we declare the Completion Amount to be deliverable based on a breach of this Agreement. You waive and release any and all claims you may have against any Receipts Custodian that are in any way related to the Receipts Custodian delivering Future Receipts to us as described in this section. You authorize each Receipts Custodian to provide us with any and all information we request about the Receivables that Receipts Custodian possesses or has access to, including without limitation information about daily volumes, number of transactions, distributions, chargebacks, offsets, withdrawals, and totals. **YOU, YOUR SUCCESSORS AND PERMITTED ASSIGNEES AND AFFILIATES, AGREE TO FOREVER DEFEND, PROTECT, INDEMNIFY AND HOLD HARMLESS PURCHASER, EACH RECEIPTS CUSTODIAN, AND THEIR AND OUR SUCCESSORS, ASSIGNS, OFFICERS, DIRECTORS, MANAGERS, MEMBERS, AFFILIATES, AND REPRESENTATIVES AGAINST ALL DAMAGES, EXPENSES, CLAIMS, SUITS, DEMANDS, COSTS, ATTORNEYS' FEES OR LOSSES ARISING OUT OF OR ALLEGED TO HAVE ARISEN OUT OF OR IN CONNECTION WITH DELIVERING FUTURE RECEIPTS TO US AS DESCRIBED IN THIS SECTION. IN NO EVENT WILL WE OR THE RECEIPTS CUSTODIANS BE LIABLE TO YOU OR TO ANY THIRD PARTY FOR ANY LOSS OF USE, REVENUE OR PROFIT OR LOSS OF DATA OR FOR ANY DIRECT, CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL OR PUNITIVE DAMAGES, WHETHER ARISING OUT OF BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, REGARDLESS OF WHETHER SUCH DAMAGE WAS FORESEEABLE AND WHETHER OR NOT SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.**The Parties agree that any amounts due a Receipts Custodian under your agreement with such Receipts Custodian or otherwise take priority over amounts to be delivered to us under this Agreement. The Parties agree that each Receipts Custodian is a third-party beneficiary of this Agreement and may rely on this Agreement even though it is not a party to this Agreement. You grant to us an irrevocable power of attorney, coupled with an interest, and appoint us and our designees as your attorney-in-fact, to take any and all actions necessary or appropriate to direct any new or additional processor to make payment to us as contemplated by this Section.

a. **Processing Trial.** After this Agreement has been executed by Purchaser and Merchant, Purchaser has the option in its sole and absolute discretion to conduct a processing trial (the "Processing Trial") to determine whether the Specified Percentage will be correctly processed and/or reported by the Approved Card Processor to Purchaser. If Purchaser elects to conduct a Processing Trial, Merchant acknowledges and agrees that Purchaser will decide in its sole and absolute discretion whether to purchase the Amount Sold after completion of the Processing Trial. If Purchaser elects not to do so, any amounts received by Purchaser during the Processing Trial shall be refunded to the Merchant.

V. 16. **MERCHANT'S OBLIGATIONS, COVENANTS, REPRESENTATIONS AND WARRANTIES** Merchant agrees, covenants, represents, and warrants as follows at the time it executes this Agreement and on a continuing basis until such time as Purchaser has received the Completion Amount or Merchant has filed for bankruptcy or gone out of business in the ordinary course:

a. **Business Purpose; Use of Purchase Price.** **MERCHANT REPRESENTS AND WARRANTS THAT IT IS ENTERING INTO THIS AGREEMENT SOLELY FOR BUSINESS PURPOSES AND NOT FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES.** Merchant agrees to use the Purchase Price exclusively for the benefit and advancement of Merchant's business operations and for no other purpose.

b. **Financial Condition and Financial Information.** Merchant represents and warrants that its bank and financial statements, copies of which have been furnished to Purchaser, and future statements which may be furnished hereafter pursuant to this Agreement or upon Purchaser's request, fairly represent the financial condition of Merchant or other information set forth therein as of the dates such statements are issued, and prior to execution of the Agreement there have been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant has a continuing, affirmative obligation to advise Purchaser of any material adverse change in its financial condition, operation, or ownership. Purchaser may request statements at any time during the term of this Agreement and Merchant shall provide them to Purchaser within Five (5) Business Days. Merchant's failure to do so is a material breach of this Agreement.

c. **Read Only Access to the Approved Bank Account and Approved Card Account.** Merchant hereby agrees that, until Purchaser has received the Completion Amount, Purchaser shall have the right to perform ongoing read-only electronic monitoring of transactions occurring in the Approved Bank Account and Merchant's account with the Approved Card Processor (the "Approved Card Account"). Merchant agrees to provide Purchaser all required online access codes for the Approved Bank Account and the Approved Card Account. If Purchaser's electronic (online) access to Merchant's Approved Bank Account or the Approved Card Account is disabled for any reason, Merchant shall immediately and diligently undertake all steps required of it to restore Purchaser's access to both accounts. Merchant's failure to comply with the provisions of this Section 16 shall constitute Merchant's material breach of its obligations under this Agreement.

d. **Governmental Approvals.** Merchant represents and warrants that it is in compliance and, until Purchaser receives the Completion Amount, shall be in compliance with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged.

e. **Good Standing.** Merchant represents and warrants that it is a corporation/limited liability company/limited partnership/other type of business entity that is in good standing and duly incorporated or otherwise organized and validly existing under the laws of its jurisdiction of incorporation or organization and has full power and authority necessary to carry its business as it is now being conducted.

f. **Authorization.** Merchant represents and warrants that it has all requisite power to execute, deliver and perform this Agreement and consummate the transactions contemplated hereunder; entering into this Agreement will not result in breach or violation of, or default under, any agreement or instrument by which Merchant is bound or any statute, rule, regulation, order, or other law to which Merchant is subject, nor require the obtaining of any consent, approval, permit or license from any governmental authority having jurisdiction over Merchant. All organizational and other proceedings required to be taken by Merchant to authorize the execution, delivery and performance of this Agreement have been taken. The person signing this Agreement on behalf of Merchant represents and warrants that he or she has full power and authority to bind Merchant to perform its obligations under this Agreement.

g. **Accounting Records and Tax Returns.** Merchant shall treat receipt of the Purchase Price and delivery of the Specified Percentage of Future Receipts in a manner consistent with its nature as a true sale of Future Receipts in its accounting records and tax returns and further agrees that Purchaser is entitled to audit Merchant's accounting records upon reasonable Notice in order to verify compliance. Merchant hereby waives any rights of privacy, confidentiality, or taxpayer privilege in any litigation or arbitration arising out of this Agreement in which Merchant asserts that this transaction is anything other than a sale of future receipts.

h. **Taxes; Workers Compensation Insurance.** Merchant will promptly pay, when due, all taxes, including, without limitation, income, employment, sales and use taxes, imposed upon Merchant's business by law, and will maintain workers compensation insurance required by applicable governmental authorities.

i. **Business Insurance.** Merchant will maintain general liability and business-interruption insurance in the amounts and against risks as are satisfactory to Purchaser and shall provide Purchaser proof of such insurance upon request.

j. **No Change of Business.** You will not materially change the goods or services you sell, materially change the nature of your business, change the business entity through which you carry on your business, change any of the locations where you operate your business, or change the name under which you do business without first notifying us and obtaining our prior written consent.

k. **No Closing of Business.** Merchant represents and warrants that it has no current plans to close its business either temporarily (for renovations, repairs or any other purpose), or permanently. Merchant agrees that, until Purchaser receives the Completion Amount, Merchant will not voluntarily close its business on a permanent or temporary basis for renovations, repairs, or any other purposes. Notwithstanding the foregoing, Merchant shall have the right to close its business temporarily if such closing is necessitated by a requirement to conduct renovations or repairs imposed upon Merchant's business by legal authorities having jurisdiction over Merchant's business (such as from a health department or fire department) or if such closing is necessitated by circumstances outside Merchant's reasonable control. Prior to any such temporary closure of its business, Merchant shall provide Purchaser ten (10) Business Days' advance notice, or as much notice as reasonably possible under the circumstances.

l. **No Pending Bankruptcy.** As of the date of Merchant's execution of this Agreement, Merchant is not insolvent, has not filed, and does not contemplate filing, any petition for bankruptcy protection under Title 11 of the United States Code, and there has been no involuntary bankruptcy petition brought or threatened against Merchant. Merchant represents that it has not consulted with a bankruptcy attorney on the issue of filing bankruptcy within the six-month period immediately preceding the date of this Agreement. A breach of any of these representations shall be a material breach of this Agreement. If you go out of business or become the subject of a voluntary or involuntary bankruptcy filing within forty-five (45) days of our purchasing the Amount Sold, you agree that there will be a rebuttable presumption of a material breach.

m. **Estoppel Certificate.** Each time that we request, you will, upon at least one (1) day's prior notice from us, execute, acknowledge and deliver to us and/or to any other person, person firm or corporation specified by us, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which all or any portion of the Amount Sold has been delivered.

n. **Unencumbered Future Receipts.** Merchant has and will continue to have good, complete and marketable title to all Future Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests other than by virtue or entering into this Agreement. Merchant shall not sell Future Receipts or obtain any additional financing before Purchaser has received the Completion Amount without Purchaser's express written consent. Merchant shall not take any action inconsistent with or in derogation of Purchaser's ownership of the Amount Sold.

o. **No Default Under Contracts with Third Parties.** Merchant's execution of and/or performance of its obligations under this Agreement will not cause or create an event of default by Merchant under any contract which Merchant is or may become a party to, or otherwise violate any of Merchant's obligations to third parties.

p. **Right of Access.** In order to ensure Merchant's compliance with the terms of this Agreement, Merchant hereby grants Purchaser the right to enter, without notice, the premises of Merchant's business for the purpose of inspecting and checking Seller's transaction processing terminals to ensure the terminals are properly programmed to submit and or batch Merchant's Future Receipts to its Approved Card Processor and to ensure that Merchant has not violated any other provision of this Agreement. Furthermore, Merchant hereby grants Purchaser and its employees and consultants' access to Merchant's employees and records and all other items of property located at the Merchant's place of business during the term of this Agreement. Merchant hereby agrees to provide Purchaser, upon request, all and any information concerning Merchant's business operations, banking relationships, names and contact information of Merchant's suppliers, vendors and landlord(s), to allow Purchaser to interview any of those parties regarding any matters relevant to this Agreement.

q. **Phone Recordings and Contact.** Merchant agrees that any call between Merchant and Purchaser and its owners, managers, employees and agents may be recorded and/or monitored.

r. **Knowledge and Experience of Decision Makers.** The persons authorized to make management and financial decisions on behalf of Merchant with respect to this Agreement have such knowledge, experience and skill in financial and business matters in general and with respect to transactions of a nature similar to the one contemplated by this Agreement so as to be capable of evaluating the merits and risks of, and making an informed business decision with regard to, Merchant entering into this Agreement.

s. **Merchant's Due Diligence.** The person authorized to sign this Agreement on behalf of Merchant: (i) has received all information that such person deemed necessary to make an informed decision with respect to a transaction contemplated by this Agreement; and (ii) has had unrestricted opportunity to make such investigation as such person desired pertaining to the transaction contemplated by this Agreement and verify any such information furnished to him or her by Purchaser.

t. **Arm's-Length Transaction.** The person signing this Agreement of behalf of Merchant: (a) has read and fully understands content of this

Agreement; (b) has consulted to the extent he/she wished with Merchant's own counsel in connection with the entering into this Agreement; (c) he or she has made sufficient investigation and inquiry to determine whether this Agreement is fair and reasonable to Merchant, and whether this Agreement adequately reflects his or her understanding of its terms.

u. Integration; No Reliance on Oral Representations. This Agreement contains the entire agreement between Merchant and Purchaser with respect to the subject matter of this Agreement and supersedes each course of conduct previously pursued or acquiesced in, and each oral agreement and representation previously made, by the parties with respect thereto (if any), whether or not relied or acted upon. No course of performance or other conduct subsequently pursued or acquiesced in, and no oral agreement or representation subsequently made, whether or not relied or acted upon, and no usage of trade, whether or not relied or acted upon, shall amend this Agreement or impair or otherwise affect the parties' obligations pursuant to this Agreement or any rights and remedies of the parties to this Agreement.

VI. PLEDGE OF SECURITY:

17. Acknowledgment of Security Interest and Security Agreement. The Future Receipts sold by Merchant to Purchaser pursuant to this Agreement are "accounts" or "payment intangibles" as those terms are defined in the Uniform Commercial Code in effect in the state in which Merchant is located (the "UCC"). Such Sale shall constitute and shall be construed and treated for all purposes as a true and complete sale, conveying good title to the Future Receipts free and clear of any liens and encumbrances, from Merchant to Purchaser. To the extent the Future Receipts are "accounts" or "payment intangibles" then (i) the sale of the Future Receipts creates a security interest as defined in the UCC; (ii) this Agreement constitutes a "security agreement" under the UCC; and (iii) Purchaser has all the rights of a secured party under the UCC with respect to such Future Receipts. Merchant further agrees that, with or without an Event of Default, Purchaser may notify account debtors, or other persons obligated on the Future Receipts, on holding the Future Receipts of Merchant's sale of the Future Receipts and may instruct them to make payment or otherwise render performance to or for the benefit of Purchaser.

18. Financing Statements. Merchant authorizes Purchaser to file one or more UCC-1 forms consistent with the UCC to give notice that the Amount Sold is the sole property of Purchaser. The UCC filing may state that such sale is intended to be a sale and not an assignment for security and may state that Merchant is prohibited from obtaining any financing that impairs the value of the Amount Sold or Purchaser's ability to collect same. Merchant authorizes Purchaser to debit the Approved Bank Account or Lockbox Account, as applicable, for all costs incurred by Purchaser associated with the filing, amendment or termination of any UCC filings.

19. Security. You understand that we have the right to take delivery of the Future Receipts we purchased as they are generated in the ordinary course of your business. The Security Interest granted in this section is being given solely for the purpose of ensuring that you do not take any action to deprive us of that right. This Security Interest does not mean that we have made a loan to you, does not create a debt, and does not make you a debtor or us a creditor. As security for the prompt and complete performance of any and all obligations, covenants, and agreements of Merchant under this Agreement, now or hereafter arising from, out of, or relating to this Agreement, whether direct, indirect, contingent or otherwise (hereinafter referred to collectively as the "Merchant Obligations"), Merchant hereby pledges, assigns and hypothecates to Purchaser and grants to Purchaser a continuing, perfected and first priority lien upon and security interest in, to and under all of Merchant's right, title and interest in and to the following (collectively, the "Collateral"), whether now existing or hereafter from time to time acquired:

a. all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined by Article 9 of the UCC, now or hereafter owned or acquired by Merchant; and
b. all Merchant's proceeds, as that term is defined by Article 9 of the UCC.

20. Termination of Pledge. Upon the performance by Merchant in full of the Merchant Obligations, the security interest in the Collateral pursuant to this Pledge shall automatically terminate without any further act of either party being required, and all rights to the Collateral shall revert to Merchant. Upon any such termination, Purchaser will execute, acknowledge (where applicable) and deliver such satisfactions, releases and termination statements, as Merchant shall reasonably request.

21. Representations with Respect to Collateral. Merchant hereby represents and warrants to Purchaser that: the execution, delivery and performance by Merchant of this Pledge, and the remedies in respect of the Collateral under this Pledge (i) have been duly authorized; (ii) do not require the approval of any governmental authority or other third party or require any action of, or filing with, any governmental authority or other third party to authorize same (other than the filing of the UCC-1s); (iii) do not and shall not (A) violate or result in the breach of any provision of law or regulation, any order or decree of any court or other governmental authority, or (B) violate, result in the breach of or constitute a default under or conflict with any indenture, mortgage, deed of trust, agreement or any other instrument to which Merchant is a party or by which any of Merchant's assets (including, without limitation, the Collateral) are bound.

22. Further Assurances. Upon the request of Purchaser, Merchant at its sole cost and expense, shall execute and deliver all such further UCC-1s, continuation statements, assurances and assignments of the Collateral, and consents with respect to the pledge of the Collateral and the execution of this Pledge, and shall execute and deliver such further instruments, agreements and other documents and do such further acts and things, as Purchaser may request in order to more fully effectuate the purposes of this Pledge and the assignment of the Collateral and obtain the full benefits of this Pledge and the rights and powers herein created.

23. Attorney-in-fact. Merchant hereby authorizes Purchaser at any time to take any action and to execute any instrument, including without limitation to file one or more financing statements and/or continuation statements, to evidence and perfect the security interest created hereby and irrevocably appoints Purchaser as its true and lawful attorney-in-fact, which power of attorney shall be coupled with an interest, with full authority in the place and stead of Merchant and in the name of Merchant or otherwise, from time to time, in Purchaser's sole and absolute discretion, including without limitation (a) for the purpose of executing such statements in the name of and on behalf of Merchant, and thereafter filing any such financing and/or continuation statements and (b) to receive, endorse and collect all instruments made payable to Merchant.

VII. EVENTS OF DEFAULT AND REMEDIES:

24. Events of Default by Merchant. The occurrence of any of the following events shall constitute an "Event of Default" by Merchant:

a. **Events of Default.**
b. **Bad Acts.** If you commit any of the following acts ("Bad Acts") without our prior written consent before we receive the Completion Amount,

you will be in default:

i. you sell, transfer or otherwise encumber or attempt to sell, transfer or otherwise encumber Future Receipts, whether or not such Future Receipts are part of the Amount Sold, sometimes referred to as "stacking" our Purchase Price with other funding companies;
ii. you encumber or allow any encumbrance to attach to our interest in the Amount Sold;
iii. you sell all or substantially all of your assets used in the operation of your business to a third party;
iv. you materially change the operation of your business (e.g., changes in industry, concept, size, etc.);
v. you stop accepting a particular method of payment while you remain open for business;
vi. you change your legal name or jurisdiction of formation, or carry-on business through a different business entity;
vii. you change, close, or terminate the Approved Bank Account or Approved Card Processor, or interfere with the lockbox arrangement, without our express written consent;
viii. you do not obtain a replacement Approved Bank Account or Approved Card Processor acceptable to us within fifteen (15) days after your bank or processor terminates its relationship with you;
ix. you process any card transaction through a payment card processor other than the Approved Card Processor;
x. you provide us with false or misleading information about your business or revenue (in your application or otherwise) that is material to our decision to purchase Future Receipts from you;
xi. you deposit or cause to be deposited by others Future Receipts into any account other than the Approved Bank Account or Lockbox Account, if applicable;
xii. you take or fail to take an action that hinders our taking delivery of our Specified Percentage of Future Receipts from the Approved Bank Account, Lockbox Account, or any Receivables Custodian, as applicable;
xiii. you disconnect or interfere with the operation of Purchaser's bank monitoring software; or
xiv. you commit any act or omission specified in this Agreement to be a material breach. However, we will not consider any of these acts to be Bad Acts if they occur because you go out of business in the ordinary course. These Bad Acts are prohibited solely to protect our ability to collect the Amount Sold and receive the benefit of our bargain. They do not create any obligation for Merchant to deliver Future Receipts to Purchaser if they are simply not generated by Merchant's business.

c. Other Breaches. If you commit an act that is not a Bad Act but that otherwise violates a term or covenant in this Agreement (an "Other Breach"), you will be in default.

25. Remedies. If you commit a Bad Act, you will be liable to us in an amount in cash equal to (a) the undelivered portion of the Amount Sold, plus (b) any other fees and other amounts due to us under this Agreement, plus (c) any additional amounts you would owe us for committing an Other Breach. If you commit an Other Breach, you will be liable to us for all damages resulting from the Other Breach, including, but not limited to, our reasonable attorneys' fees, expenses and costs incurred in any proceeding pursued against you to recover the amounts due us under this Agreement. You agree to pay us the amounts due or we may (d) withdraw such amounts from the Approved Bank Account or Lockbox Account, as applicable, or any other account into which you deposit Future Receipts, via ACH or electronic checks; (e) direct the Approved Card Processor, any other Receipts Custodian, and/or any other payment card processor you use in violation of this Agreement to deliver all of your Future Receipts to us until we have received the amount due; (f) enforce our rights as a secured creditor under the UCC including, without limitation, notifying any of your account debtor(s) of our security interest; (g) enforce Guarantor's personal guaranty of performance provisions of this Agreement against the Guarantor(s) without first seeking recourse from Merchant; (h) commence a suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Merch ant's and Guarantor's obligations hereunder or any other legal or equitable right or remedy including without limitation Purchaser's rights of a secured party under the UCC. All rights available to us are cumulative and not exclusive of any other remedies available to us in law or equity.

26. Power of Attorney. Each Merchant and Guarantor irrevocably appoints Purchaser and its representatives as their respective agents and attorneys-in-fact with full authority to take any action or execute any instrument or document to do the following: (A) to settle all obligations due to Purchaser from any payment card processor and/or account debtor(s) of Merchant; (B) upon occurrence of a Bad Act, to perform any and all such obligations of Merchant under this Agreement, including without limitation (i) to collect monies due or to become due under or in respect of any of the Collateral; (ii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) above; (iii) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to Purchaser; and (iv) to file any claims or take any action or institute any proceeding against Merchant and/or Guarantor which Purchaser may deem necessary for the collection of any portion of the undelivered Amount Sold from the Collateral, or otherwise to enforce its rights under this Agreement.

27. Service of Process. Merchant and Guarantor(s) consent to service of process and legal notices made by Certified or Priority Mail delivered by the United States Postal Service and addressed to the respective party's address set forth on the first page of this Agreement or any other address(es) provided in writing to Purchaser by Merchant or Guarantor(s), and unless applicable law or rules provide otherwise, any such service or legal notice will be deemed complete upon dispatch. Merchant and Guarantor(s) agree that it will be precluded from asserting that it did not receive service of process or any other legal notice mailed to the address located in the Merchant Information and Owner Information sections set forth on the first page of this Agreement if it does not furnish a certified mail return receipt signed by Purchaser demonstrating that Purchaser was provided with a notice of a change of address.

VIII. ADDITIONAL TERMS:

28. Fees. In addition to all other sums due to Purchaser under this Agreement, Merchant shall pay to Purchaser:

a. An Origination Fee of $0.00 upon entering into this Agreement as reimbursement of Purchaser's costs associated with entering into this Agreement (the cost of due diligence on the Merchant's business, financial and legal due diligence, etc.)
b. A Non-Sufficient Funds ("NSF") fee of $35 in each and every instance when delivery of the Daily Delivery Amount to Purchaser has failed due to insufficient funds in the Merchant's Approved Bank Account or Lockbox Account, as applicable; provided, however, that no NSF fee shall be due when the delivery failed because Merchant's business did not generate sufficient Future Receipts to cover the Daily Delivery Amount and Merchant promptly requested Reconciliation and/or Adjustment.
c. $100 in each and every instance when Merchant blocks Purchaser's access (or otherwise prevents Purchaser from accessing) Merchant's bank accounts.
d. $2,500 in each and every instance when, upon occurrence of an Event of Default, Purchaser shall have agreed to waive Merchant's default.

29. Financial Condition. Merchant and its Guarantor(s) authorize Purchaser and its agents to investigate their financial responsibility and history

and will provide to Purchaser any bank or financial statements, tax returns, etc., as deems necessary prior to or at any time after execution of this Agreement. A photocopy or electronic image of this authorization will be deemed as acceptable for release of financial information. Purchaser is authorized to update such information and financial profiles from time to time as it deems appropriate.

30. Transactional History. Merchant shall execute written authorization(s) to their bank(s) to provide Purchaser with Merchant's banking and/or credit-card processing history.

31. No Liability. In no event shall Purchaser be liable for any claims asserted by Merchant or its Guarantor under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by Merchant and Guarantor(s).

32. Right to Cancel.

i. Notwithstanding anything to the contrary set forth in this Agreement, Purchaser shall have the right to cancel this agreement any time prior to its delivery of the Purchase Price to Merchant and, upon such cancellation, this Agreement shall become null, and void and the parties shall have no obligation to, or rights against, each other, except that all sums delivered by Merchant to Purchaser on account of entering into this Agreement shall be promptly returned to Merchant.
ii. Notwithstanding anything to the contrary set forth in this Agreement, in the event Merchant has not been in default under this Agreement, Merchant shall have the right to cancel this Agreement any time until the midnight of the second (2nd) Business Day following the date of its receipt of the Purchase Price by notifying Purchaser of such cancellation by notice sent in accordance with this Agreement. Upon timely delivering such cancellation notice to Purchaser, and further provided that Merchant has otherwise complied with the provisions of this Agreement, Merchant shall refund the entire amount of the Purchase Price back to Purchaser within five (5) Business Days following the date of Merchant's receipt of the Purchase Price. Upon such refund of the Purchase Price back to Purchaser, this Agreement shall become null and void and the parties shall have no remaining obligations to or rights against each other except that Purchaser shall have the right keep, as fair and adequate compensation for its costs of entering into this Agreement with Merchant, the Origination Fee and all Daily Delivery Amounts received by Purchaser prior to the date when this Agreement is terminated.

IX. GUARANTY OF PERFORMANCE OF MERCHANT'S OBLIGATIONS:

33. Guarantor's Representations. Guarantor represents and warrants to Purchaser that:

a. Guarantor is an owner, officer, or manager of Merchant and will directly benefit from Purchaser and Merchant entering into the Agreement.
b. Guarantor understands and acknowledges that Purchaser is not willing to enter into the Agreement unless Guarantor irrevocably, absolutely and unconditionally guarantees prompt and complete performance of any and all liabilities, obligations, covenants or agreements of Merchant under this Agreement, now or hereafter arising from, out of or relating to this Agreement, whether direct, indirect, contingent or otherwise (hereinafter referred to collectively as the "Merchant Obligations").

34. Guaranty of Merchant's Obligations. Guarantor hereby irrevocably, absolutely and unconditionally guarantees to Purchaser prompt, full, faithful, and complete performance and observance of all Merchant Obligations; and Guarantor unconditionally covenants to Purchaser that if Merchant shall at any time breach any of the Merchant Obligations, Guarantor shall perform (or cause to be performed) the Merchant Obligations and pay all damages and other amounts stipulated in this Agreement with respect to the non-performance of the Merchant Obligations, or any of them.

35. Guarantor's Other Agreements. Guarantor will not dispose, convey, sell or otherwise transfer, or cause Merchant to dispose, convey, sell or otherwise transfer, any material business assets of Merchant without the prior written consent of Purchaser, which consent may be withheld for any reason, until Purchaser has received the Completion Amount. Guarantor shall pay to Purchaser upon demand all expenses (including, without limitation, reasonable attorneys' fees and disbursements) incurred as the result of, or incidental to, or relating to, the enforcement or protection of Purchaser's rights against Merchant and Guarantor under the Agreement. This Guaranty is binding upon Guarantor and Guarantor's heirs, legal representatives, successors and assigns and shall inure to the benefit of and may be enforced by the successors an assign of Purchaser. The obligation of Guarantor shall be unconditional and absolute, regardless of the unenforceability of any provision of any agreement between Merchant and Purchaser, or the existence of any defense, setoff or counterclaim, which Merchant may assert. Purchaser is hereby authorized, without notice or demand and without affecting the liability of Guarantor hereunder, to at any time renew or extend Merchant's obligations under the Agreement or otherwise modify, amend or change the terms of the Agreement.

36. Two Or More Guarantors. If there is more than one Guarantor, "Guarantor" in this Agreement shall mean all Guarantors and the obligations of the Guarantors hereunder shall be joint and several.

37. Waiver; Remedies. No failure on the part of Purchaser to exercise, and no delay in exercising, any right under this Guaranty shall operate as a waiver, nor shall any single or partial exercise of any right under this Guaranty preclude any other or further exercise of any other right. The remedies provided in this Guaranty are cumulative and not exclusive of any remedies provided by law or equity. In the event that Merchant fails to perform any obligation under the Agreement, Purchaser may enforce its rights under this Guaranty without first seeking to obtain performance for such default from Merchant or any other guarantor.

38. Acknowledgment of Purchase. Guarantor acknowledges and agrees that the Purchase Price paid by Purchaser to Merchant in exchange for the Amount Sold is adequate consideration for the purchase of the Amount Sold and is not a loan or financial accommodation from Purchaser to Merchant. Guarantor specifically acknowledges Purchaser is not a lender, bank, or credit card processor, and that Purchaser has not offered any loans to Merchant. Guarantor waives any claims or defenses of usury in any action arising out of this Agreement.

39. Severability. If for any reason any court of competent jurisdiction finds any provisions of this Agreement applicable to the Guarantor to be void or voidable, the parties agree that the court may reform such provision(s) to render the provision(s) enforceable ensuring that the restrictions and prohibitions contained in those provisions shall be effective to the fullest extent allowed under applicable law.

40. Opportunity for Attorney Review. Guarantor represents that he/she has carefully read this Agreement and has, or had an opportunity to, consult with his or her attorney. Guarantor understands the contents of this Agreement, signs it as his or her free act and deed and agrees to be bound by the provisions hereof.

X. MISCELLANEOUS:

41. Modifications; Agreements. No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by all parties.

42. Assignment. Purchaser may assign, transfer or sell its rights or delegate its duties hereunder, either in whole or in part without prior notice to the Merchant or the Guarantor. Neither Merchant nor Guarantor shall have the right to assign their respective rights or obligations under this Agreement without first obtaining Purchaser's written consent.

43. Notices. All notices, requests, consent, demands and other communications required or permitted to be given under this Agreement, other than service of process and legal notices (see section 27 above), shall be delivered by Certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in the Merchant Information and Owner Information sections on in the first page of this Agreement unless the Merchant and/or Guarantor(s) has received a Certified mail return receipt signed by Purchaser demonstrating that the Purchaser was provided with Merchant's and/or Guarantors'(s') notice of a change of address. Notices governed by this section shall become effective as of the date of the receipt.

44. Waiver Remedies. No failure on the part of any party to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

45. Binding Effect. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.

46. Governing Law, Venue and Jurisdiction. This Agreement shall be governed by and construed exclusively in accordance with the laws of the State of New York, without regard to any applicable principles of conflicts of law. Any lawsuit, action or proceeding arising out of or in connection with this Agreement shall be instituted exclusively in any court sitting in New York State (the "Acceptable Forums"). Each party signing this Agreement agrees that the Acceptable Forums are convenient, and irrevocably submits to the jurisdiction of the Acceptable Forums and waives any and all objections to inconvenience of the jurisdiction or venue. Should a proceeding be initiated in any other forum, the parties waive any right to oppose any motion or application made by either party to transfer such proceeding to an Acceptable Forum.

47. Survival of Representation, etc. All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been complied with and satisfied in full and this Agreement shall have terminated.

48. Severability. In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

49. Waiver of Class Action; Waiver of Jury Trial. By entering into this agreement, the parties agree that they may bring claims against the other only in their individual capacity, and **THE PARTIES ARE EACH EXPRESSLY WAIVING ANY AND ALL RIGHT TO PARTICIPATE AS A REPRESENTATIVE OR MEMBER IN ANY CLASS ACTION, PUTATIVE OR PURPORTED CLASS ACTION, REPRESENTATIVE ACTION, PRIVATE ATTORNEY GENERAL ACTION, OR SIMILAR ACTION RELATING TO ANY CLAIMS (AS HEREINAFTER DEFINED), WHETHER BROUGHT UNDER STATE OR FEDERAL LAW.**The parties are each expressly waiving any and all right to join or consolidate claims in any proceeding with those of any other person (except any obligors and guarantors of the same agreement). Further, **BY ENTERING INTO THIS AGREEMENT, THE PARTIES ARE EACH EXPRESSLY WAIVING THEIR RESPECTIVE RIGHTS TO A JURY TRIAL FOR ALL CLAIMS.** The term "Claim" means any claim, dispute, or controversy (whether based on contract, tort, statute, or otherwise, and whether seeking monetary or any form of non-monetary relief) arising out of or relating to this Agreement or the relationship between or among the parties (collectively, "Claims"). The term Claims is to be given its broadest possible meaning, and includes pre-existing, present, and future Claims, and Claims regarding the enforceability or scope of this waiver. For purposes of this waiver only, the term "party" means that party and all of its respective parents, subsidiaries, affiliates, predecessors, successors, assigns, agents, vendors, employees, officers, and directors. **THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.**

50. Captions. The captions in this Agreement are inserted for convenience of reference only and in no way define, describe or limit the scope or intent of this contract or any of the provisions hereof.

51. Counterparts and Facsimile Signatures. This Agreement can be signed in one or more counterparts, each of which shall constitute an original and all of which when take together shall constitute one and the same agreement. Signatures delivered via facsimile and/or via Portable Digital Format (PDF) shall be deemed acceptable for all purposes, including without limitation the evidentially purposes.

The balance of this page left intentionally blank

**MERCHANT NAME: ARC MANAGEMENT GROUP, LLC, et al.**
(legal name of the business)

By: *Bill Wilson*

Name: WILLIAM WILSON
Title: CEO
FEIN: 030607765

**OWNER/GUARANTOR #1:**

*Bill Wilson*

Name: WILLIAM WILSON
SSN: 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

**OWNER/GUARANTOR #2:**

*Thresa Wilson*
Thresa Wilson (Apr 12, 2023 08:42 EDT)

Name: THRESA WILSON
SSN: 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

## Libertas Funding, LLC Electronic Fund Transfer Authorization

This Libertas Funding, LLC Electronic Fund Transfer Authorization (the "Authorization") supplements the foregoing concurrent Agreement of Sale of Future Receipts (the "Agreement"). Except as noted below, capitalized terms in this Authorization have the meaning set forth in the Agreement.

You irrevocably authorize us (which includes for the purposes of this authorization, our agents, service providers, successors, and assigns) to take delivery of each Daily Delivery Amount by initiating an electronic fund transfer via the Automated Clearing House network or similar network (an "ACH") from the business deposit account specified below, any substitute account you later specify, or any other account containing your Future Receipts (collectively, the "Account") on or after the date the associated Future Receipts were created. You authorize us to initiate a single ACH for the combined amounts of different Daily Delivery Amounts as permitted by the Agreement. You further authorize us initiate ACHs to the Account for any amounts that come due under the Agreement, including ACHs for the Completion Amount in the event you commit a Bad Act. You also authorize us to initiate ACH credits or debits to the Account to correct any errors we may make in processing a payment. In the event that an ACH is returned unpaid, you authorize us to reinitiate the ACH until it is paid and to initiate a separate ACH or to add to a reinitiated ACH the amount of any dishonored payment fee that we charge. You agree that you will not cancel this Authorization or instruct any depository holding Future Receipts we purchased to reject our ACHs. You promise that the Account specified below and any substitute Account you provide us is used for business purposes and not for personal, family or household purposes and that you are an authorized signor on these Accounts.

Business Deposit Account Information:

**Account Number**: 2000029095971 **Routing Number**: 061000227
**Depository Name**: WELLS FARGO BANK, NA **Depository City/State**: KENNESAW/GA

**Type of Account**

___ Business Checking ___ Business Savings
___ Other Business Acct. (specify): ______________________

By signing below, you agree to the terms of this Libertas Funding, LLC Electronic Fund Transfer Authorization.

**ACCEPTED AND AGREED:**

**Seller: ARC MANAGEMENT GROUP, LLC, et al.**

By: X Bill Wilson

Name: WILLIAM WILSON

Title CEO

By: X Bill Wilson

Owner: WILLIAM WILSON

By: Thresa Wilson
Thresa Wilson (Apr 12, 2023 08:42 EDT)
Owner: THRESA WILSON

# ADDENDUM TO CONTRACT

## Addendum to Merchant Agreement 383166

This is an addendum ("Addendum") to that certain merchant agreement (the "Merchant Agreement") entered into by and among Libertas Funding, LLC (the "Purchaser"), WILLIAM WILSON (the "Owner") and ARC MANAGEMENT GROUP, LLC (the "Seller") dated as of April 11, 2023.

WHEREAS, the Purchaser, the Owner and Seller wish to modify the Merchant Agreement as set forth herein.

Now therefore, for good and valuable consideration, the parties agree as follows:

A. The Owner and Seller are hereafter referred to collectively as the Merchant (the "Merchant")
B. I, WILLIAM WILSON, acting on behalf of ARC MANAGEMENT GROUP, LLC hereby authorize Purchaser to execute the payment(s) detailed below in section H "Merchant Agreement Payment Schedule".
C. Merchant understands that all transactions detailed in this addendum will be executed using the proceeds of the receivables purchase detailed in the Merchant Agreement.
D. In the event Merchant chooses to execute the Merchant Agreement, Merchant agrees that the transaction(s) listed below will constitute full remittance of receivables for the merchant agreement(s) Specified in section H (the "Specified Merchant Agreement(s)").
E. As of 04/11/2023, it is agreed that the Merchant has a receivable balance of $1,335,939.44 relating to the Specified Merchant Agreement(s), notwithstanding any returned payments or associated fees.
F. Upon execution of the Merchant Agreement Merchant agrees to waive the rights to any and all legal remedies guaranteed under the Specified Merchant Agreement(s)
G. This Addendum shall be governed by the laws of the state of New York.
H. **Merchant Agreement Payment Schedule:**

| Specified Merchant Agreement(s) | Amount Paid |
|---|---|
| 359802 | $753,749.16 |
| 359802 | $582,190.28 |

All other terms of the referenced Merchant Agreement remain unchanged.

By their signatures below the parties agreed to be bound by this addendum.

**ACCEPTED AND AGREED:**

**Purchaser: Libertas Funding, LLC**

By: ______________________

Name: Randy Saluck

Title: CEO, Libertas Funding LLC

**ACCEPTED AND AGREED:**

**Seller: ARC MANAGEMENT GROUP, LLC, et al.**

By: X Bill Wilson

Name: WILLIAM WILSON

Title: CEO

By: X Bill Wilson

Owner: WILLIAM WILSON

By: X Thresa Wilson
Thresa Wilson (Apr 12, 2023 08:42 EDT)

Owner: THRESA WILSON

LIBERTAS

Seller Definition Addendum to the Agreement of Sale of Future Receipts Dated:

April 11th, 2023

Purchaser and Guarantor(s) hereby agree that "Merchant" is defined as follows:

**Name:** ARC MANAGEMENT GROUP, LLC
**Address:** 1825 Barrett Lakes Blvd., Suite 505 KENNESAW, GA 30144
**FEIN:** 030607765

**Name:** WILZARA PROPERTY MANAGEMENT GROUP LLC
**Address:** 12655 OLD SURREY PL ROSWELL, GA 30075
**FEIN:** 0

**Name:** THE J.D. STUART LAW GROUP, LLC
**Address:** 1825 BARRETT LAKES BLVD NW STE 500 KENNESAW, GA 30144
**FEIN:** 0

**Name:** HEALTHTECH RECEIVABLES MGT, INC
**Address:** 3450 BUSCHWOOD PARK DR STE 150 TAMPA, FL 33618
**FEIN:** 0

**ARC MANAGEMENT GROUP, LLC**

Agreed to by: Bill Wilson (Signature), their CEO (Title)

Print Owner's Name William Wilson

**WILZARA PROPERTY MANAGEMENT GROUP LLC**

Agreed to by: Bill Wilson (Signature), their CEO (Title)

Print Owner's Name William Wilson

**THE J.D. STUART LAW GROUP, LLC**

Agreed to by: Bill Wilson (Signature), their CEO (Title)

Print Owner's Name William Wilson

**HEALTHTECH RECEIVABLES MGT, INC**

Agreed to by: Bill Wilson (Signature), their CEO (Title)

Print Owner's Name William Wilson

**Purchaser: Libertas Funding, LLC**

Agreed to by: ____________________ (Signature), its ____________________ (Title)

# ADDENDUM TO CONTRACT

## Addendum to Merchant Agreement 383166

**Purchase Price: $2,340,000.00 Purchased Percentage: 20% Purchased Amount: $3,030,300.00**

This is an addendum ("Addendum") to that certain merchant agreement 383166 (the "Merchant Agreement") entered into by and among Libertas Funding, LLC (the "Purchaser"), WILLIAM WILSON (the "Owner") and ARC MANAGEMENT GROUP, LLC (the "Seller" or "Merchant") dated as of April 11, 2023

WHEREAS, the Purchaser and Seller wish to modify the Merchant Agreement as set forth herein.

Now therefore, for good and valuable consideration, the parties agree as follows:

A. Except as provided in this Addendum, all terms and conditions of the Merchant Agreement shall remain in full force and effect. All capitalized terms not defined in this Addendum shall have the meaning set forth in the Merchant Agreement.
B. Merchant acknowledges, accepts, and agrees that as long as the Seller has not delivered all of the Daily Deliveries in connection with the Merchant Agreement, the Merchant understands that taking an additional short-term (12 months or less in expected term) cash advance based on credit card receivables or an ACH-based cash advance or loan based on total sales or deposits with any company (other than the Purchaser or the Purchaser's wholly-owned subsidiaries) would constitute an event of default under the Merchant Agreement, unless the Merchant receives a written authorization from the Purchaser prior to it taking such additional financing.
C. Merchant acknowledges, accepts, and agrees that a breach of this addendum (particularly section B above) will constitute a breach/event of default of the Merchant Agreement and that doing so will result in the immediate acceleration of all Daily Deliveries.
D. This Addendum shall be governed by the laws of the State of New York.
E. This Addendum may only be modified in writing by Purchaser and Merchant.

By their signatures below the parties agreed to be bound by this addendum.

**ACCEPTED AND AGREED:**

**Purchaser: Libertas Funding, LLC**

By: ______________________

Name: Randy Saluck

Title: CEO, Libertas Funding LLC

**ACCEPTED AND AGREED:**

**Seller: ARC MANAGEMENT GROUP, LLC, et al.**

By: X *Bill Wilson*

Name: WILLIAM WILSON

Title: CEO

By: X *Bill Wilson*

Owner: WILLIAM WILSON

By: X *Thresa Wilson*
Thresa Wilson (Apr 12, 2023 08:42 EDT)

Owner: THRESA WILSON

# ARC MANAGEMENT GROUP - CONTRACT

Final Audit Report 2023-04-12

| | |
|---|---|
| Created: | 2023-04-11 |
| By: | stips group (stips@libertasfunding.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAASY4xnrZqOiXuwp85RlnknvTLOovS6qh- |

## "ARC MANAGEMENT GROUP - CONTRACT" History

Document created by stips group (stips@libertasfunding.com)
2023-04-11 - 8:27:46 PM GMT- IP address: 45.62.183.178

Document emailed to William Wilson (bwilson@arcmgmt.com) for signature
2023-04-11 - 8:32:19 PM GMT

Email viewed by William Wilson (bwilson@arcmgmt.com)
2023-04-12 - 0:08:50 AM GMT- IP address: 104.28.39.141

Document e-signed by William Wilson (bwilson@arcmgmt.com)
Signature Date: 2023-04-12 - 12:41:56 PM GMT - Time Source: server- IP address: 12.226.190.210

Document emailed to twilson@arcmgmt.com for signature
2023-04-12 - 12:41:57 PM GMT

Email viewed by twilson@arcmgmt.com
2023-04-12 - 12:42:09 PM GMT- IP address: 12.226.190.210

Signer twilson@arcmgmt.com entered name at signing as Thresa Wilson
2023-04-12 - 12:42:40 PM GMT- IP address: 12.226.190.210

Document e-signed by Thresa Wilson (twilson@arcmgmt.com)
Signature Date: 2023-04-12 - 12:42:42 PM GMT - Time Source: server- IP address: 12.226.190.210

Agreement completed.
2023-04-12 - 12:42:42 PM GMT

Names and email addresses are entered into the Acrobat Sign service by Acrobat Sign users and are unverified unless otherwise noted.

# LIBERTAS

Libertas Funding, LLC
411 West Putnam Ave Suite 220, Greenwich, CT 06380

## AGREEMENT OF SALE OF FUTURE RECEIPTS

This **AGREEMENT OF SALE OF FUTURE RECEIVABLES** (this "Agreement") dated as of **04/12/2023**, is made by and between **Libertas Funding, LLC**, a Connecticut Limited Liability Company as purchaser ("Purchaser"), the merchant whose name, address and other pertinent information is set forth below, as seller ("Merchant"), and the individual owner/guarantor of the Merchant whose name, address and other pertinent information are set forth below ("Guarantor"). For good and valuable consideration, the mutual receipt and sufficiency of which is hereby acknowledged, the parties to this Agreement agree as follows:

**Merchant Information (see addendum)**

| | |
|---|---|
| **Merchant Legal Name:** ARC MANAGEMENT GROUP, LLC, et al. | **DBA Name:** Arc Management Group |
| **Entity Type:** Limited Liability Company | **FEIN:** *****7765 |
| **State Of Incorporation:** GA | **Bank Name:** WELLS FARGO BANK, NA |
| **Address:** 1825 Barrett Lakes Blvd., Suite 505, KENNESAW,GA, 30144 | **Phone:** 4044171884 |

**OWNER INFORMATION (referred to individually or collectively as the ("Owner"))**

| | | |
|---|---|---|
| **Name of Owner Guarantor 1:** WILLIAM WILSON | **Cell Phone:** [redacted] | **Social Security #:** *****1178 |
| **Home Address:** [redacted] | **City/State:** [redacted] | **Zip Code:** [redacted] |
| **Ownership %:** 50 | **Email:** [redacted] | |

| | | |
|---|---|---|
| **Name of Owner Guarantor 2:** THRESA WILSON | **Cell Phone:** [redacted] | **Social Security #:** *****3349 |
| **Home Address:** [redacted] | **City/State:** [redacted] | **Zip Code:** [redacted] |
| **Ownership %:** 50 | **Email:** [redacted] | |

## PRIMARY TERMS

THIS AGREEMENT INCLUDES A JURY TRIAL AND CLASS ACTION WAIVER. PLEASE READ IT CAREFULLY.

In this Agreement, you are selling to us a specified amount of future payments your customers make for your goods and services, as further defined below ("Future Receipts"). We agree to buy from you (and you agree to sell to us) the amount of Future Receipts shown below (the "Amount Sold") in exchange for the "Purchase Price" shown below. In order to deliver to us the Amount Sold, you assign to us the share of your Future Receipts ("Specified Percentage") shown below, every Business Day from the date we deliver the Purchase Price until we have received the entire Amount Sold and all fees or other amounts due under this Agreement (the "Completion Amount").

We are buying Future Receipts from you, not loaning you money. You are not required to pay interest on the Purchase Price and this Agreement has no term or required payment amounts that are not subject to change based on your future revenue. Instead, your obligation is to deliver to us the Specified Percentage of your Future Receipts as they are generated in the ordinary course of your business. This means that your obligation to us aligns with your cash flow. When your Future Receipts decline because business is slow, you will be able to deliver Future Receipts to us more slowly.

By purchasing Future Receipts from you, we assume risks such as not obtaining the Future Receipts we bought as quickly as we anticipated, or not receiving all of them if you go out of business. However, you are not allowed to engage in "bad acts" that unfairly prevent us from receiving what we paid for. For example, unless you cease operations, you are not allowed to change the bank account in which we collect our Daily Delivery Amounts (see below) without our approval, block our ability to collect our Daily Delivery Amounts, sell your Future Receipts to another funding company (stacking) or close your business and start up another similar business right away. Additionally, you are representing that the information that you provided us is accurate in all material respects and that you have not omitted providing us with information that is material to your business. The details on this are below.

## Detailed Terms and Conditions

KEY BUSINESS TERMS AND DEFINITIONS:

| | | |
|---|---|---|
| **Amount Sold** | $3,146,850.00 | The dollar value of Future Receipts that Merchant agrees to sell to Purchaser. |
| **Purchase Price** | $2,430,000.00 | The total amount that Purchaser agrees to pay for the Amount Sold. |
| **Future Receipts** | $1,417,817.27 | All sums received by or payable to Merchant from its customers as payment for Merchant's goods and/or services in the ordinary course of Merchant's business after Merchant receives the Purchase Price from Purchaser. Future Receipts include, among other things, payments by cash, physical or electronic checks, credit cards, charge cards, debit cards, other payment cards, ACH or other electronic payments, and any other form of funds transfer or payment. When the Payment Card Split Method of delivering Future Receipts is used, Purchaser will collect only Future Receipts processed through the Approved Card Processor (defined below). |
| **Direct Payments to Third Parties/Renewals** | $1,329,135.86 | Amounts paid to Purchaser and/or Other Funders. |
| **Total Amount Sent to Merchant** | $1,100,864.14 | The Purchase Price minus the Origination Fee (see below) minus Direct Payments to Third Parties/Renewals (see above). |
| **Specified Percentage** | 20% | The percentage of Future Receipts that the Merchant is required to deliver to Purchaser until the entire Completion Amount is delivered to Purchaser in accordance with this Agreement. |
| **Daily Delivery Amount** | $12,487.50 | The dollar amount that Merchant and Purchaser agree to be an approximation of the Specified Percentage of Future Receipts each Business Day as of the date of this Agreement, based upon the information provided by Merchant to Purchaser concerning Merchant's most recent receipts. |
| **Discount Factor** | 1.295 | The adjustment to the Amount Sold that enables us to calculate the Purchase Price. |
| **Origination Fee** | $0.00 | The amount Purchaser will deduct from the Purchase Price and retain to compensate it for due diligence and other costs in evaluating whether to purchase the Amount Sold. |
| **Repurchase Price (applicable discounts)** | None | The discounted price Merchant may pay to end this financing transaction early by repurchasing Future Receipts sold to Purchaser but not yet delivered. The Repurchase Price is equal to the discount factor set forth in the column to the left for each month following the Commencement Date. This shall be multiplied by the Purchase price unless amounts collected prior to the date in which the Repurchase price is paid. |
| **Good Faith Estimate of Term** | 12 Months | This Agreement has no term. However, based on your historical revenue, we have estimated how long it will take you to deliver the Amount Sold to us under this Agreement. |
| **Commencement Date** | | The date when the Purchase Price is paid to Merchant. |
| **Business Day** | | Monday through Friday except bank holidays. |
| **Remittance Method** | ACH | Method of remittance agreed upon by Purchaser and Merchant. |

**Note: The bold type terms in the tables above and below shall constitute defined terms with respect to this Agreement. PLEASE NOTE THAT THE PURCHASER WILL NOT TAKE MORE THAN THE EXPECTED DAILY REMITTANCE WITHOUT THE CONSENT OF THE MERCHANT.**

I. <u>SALE OF FUTURE RECEIPTS; PAYMENT OF PURCHASE PRICE:</u>

1. **<u>Sale of Future Receipts; Not a Loan.</u>** In exchange for the Purchase Price, Merchant hereby sells, assigns, transfers and conveys (hereinafter, the "Sale") to Purchaser all of Merchant's right, title and interest in and to the Specified Percentage of its Future Receipts until the Completion Amount is delivered to Purchaser. This Sale is made without recourse against Merchant and Guarantor except as specifically set forth in this Agreement. By virtue of this Agreement, Merchant transfers to Purchaser full and complete ownership of the Amount Sold and Merchant retains no legal or equitable interest therein. Merchant and Purchaser agree that the Purchase Price is payment for the assignment and sale of the Amount Sold and that this transaction is not intended to be, nor shall it be construed as, a loan from Purchaser to Merchant. Furthermore, Purchaser's ability to collect the Amount Sold is contingent on the continued operation of Merchant's business, and the timing of deliveries of the Specified Percentage of Future Receipts will depend on how quickly Merchant's business generates Future Receipts.**Merchant and Guarantor expressly agree not to take the position that this transaction is a loan, and they expressly waive any and all claims and defenses based on that position in any action or proceeding arising out of this Agreement, including without limitation claims or defenses of usury.**

2. **<u>Purchaser's Acceptance through Payment of Purchase Price.</u>**
   a. Should Purchaser wish to accept this Agreement after the satisfactory completion of Purchaser's due diligence (in its discretion), Purchaser may accept the Agreement without signing it by sending Merchant the Purchase Price minus the Origination Fee, subject to Section 2(b) below.
   b. If Merchant previously sold Future Receipts to Purchaser but has not yet remitted the full Completion Amount pursuant to the prior transaction, Merchant hereby requests to repurchase the undelivered balance of the Amount Sold from that transaction and directs Purchaser to deduct the repurchase price from the Purchase Price and apply it to complete the prior transaction. Similarly, if Merchant previously obtained a loan from Purchaser and has a balance due on such loan, Merchant hereby instructs Purchaser to deduct the balance due on the prior loan from the Purchase Price and apply it to pay off the prior loan. In the event that the agreement for the prior sale of Future Receipts does not permit repurchase of any portion of the amount sold, such agreement is hereby amended to permit repurchase on the same terms as

set forth in this Agreement.

II. DELIVERY OF AMOUNT SOLD:

3. Method of Delivery of Amount Sold. Purchaser offers three methods by which Merchant may deliver the Specified Percentage of its Future Receipts to Purchaser: each Business Day ACH debits by Purchaser from Merchant's bank account, daily remittances from Merchant's payment card processor, and a lockbox arrangement. Each of these methods is described below. The method to be used initially is specified on the first page of this Agreement. The method of delivery may be changed by written agreement between Purchaser and Merchant.

a. Direct Debit Method.
Under the Direct Debit Method, Merchant agrees to deposit all Future Receipts into one (and only one) bank account which shall be preapproved by Purchaser (the "Approved Bank Account"). Merchant shall execute an ACH Authorization allowing Purchaser to debit directly from the Approved Bank Account each Business Day the Daily Delivery Amount via ACH debit, as specified below.

b. Payment Card Split Method.
Under the Payment Card Split Method, Merchant shall exclusively use a single Approved Card Processor (defined below) to process all payments made by credit, debit, and other payment cards for Merchant's goods and services. Merchant shall instruct such Approved Card Processor to remit each Business Day to Purchaser the Specified Percentage of the Future Receipts for that Business Day, and to remit the balance (less any fees charged by the Approved Card Processor) to Merchant.

c. Lockbox Method.
Under the Lockbox Method, Merchant agrees to deposit all Future Receipts into a special bank account established jointly by Purchaser and Merchant in accordance with a lockbox arrangement among Merchant, Purchaser and a banking institution chosen by Purchaser (the "Lockbox Account"), and Purchaser shall debit each Business Day the Daily Delivery Amount from the Lockbox Account.

4. Direct Debit Method and Lockbox Method Provisions. The following terms apply if either the Direct Debit Method or the Lockbox Method is used, unless otherwise specified herein.

a. Daily Delivery Amount. Purchaser and Merchant agree that, for efficiency purposes, Merchant may deliver the Specified Percentage of Future Receipts each Business Day by remitting the Daily Delivery Amount, which Purchaser has calculated to be roughly equivalent to the Specified Percentage of Merchant's historical revenue each Business Day. Purchaser, Merchant, and Guarantor acknowledge that Merchant's actual Future Receipts may vary each Business Day or from Merchant's historical revenue, but they agree that the Daily Delivery Amount is a fair and reasonable estimate of the Specified Percentage of Future Receipts. The Daily Delivery Amount may be adjusted as set forth in Section 11. Merchant also has the right to reconcile any difference between the Daily Delivery Amounts received in a given four-week period and the Specified Percentage of Future Receipts actually generated during that four-week period, as set forth in Sections 10 and 11.

At any time during the term of this Agreement, Purchaser may change the method by which it will accept the Daily Delivery by providing Merchant with written instructions of a new method of delivery of Daily Delivery to Purchaser.

5. Timing of Daily Deliveries. Merchant hereby authorizes Purchaser to debit the Daily Delivery Amount from the Approved Bank Account or the Lockbox Account, as applicable, via ACH or electronic checks once each Business Day. If a debit is scheduled to occur on a bank holiday, the debit shall be made on the following Business Day. Debits of the Daily Delivery Amount shall commence on a date selected by Purchaser which shall be no later than 15 days following the Commencement Date. Daily deliveries shall continue until Purchaser has received the Completion Amount, unless Merchant files for bankruptcy and/or goes out of business in the ordinary course, without first committing a Bad Act (as defined below). In the event that the final daily delivery results in Purchaser receiving more than Amount Sold (not including fees), Purchaser shall refund any amount in excess of the Amount Sold (not including fees) within 5 business days of the final daily delivery.

6. Approved Bank Account. If the Direct Debit Method is used, and for the purpose of allowing Purchaser to debit any fees due under this Agreement if the Payment Card Split Method is used, Merchant designates the bank account below as the Approved Bank Account, subject to approval by Purchaser. Merchant agrees to designate a different bank account acceptable to Purchaser if Purchaser does not approve the account designated below. In the event the Approved Bank Account becomes unavailable or Purchaser requests that a different bank account be used for any reason (such as difficulties debiting the Daily Delivery Amount from such bank account), Merchant shall arrange for another Approved Bank Account immediately, and in no event later than five calendar days after the prior account becomes unavailable or Purchaser requests the designation of a new Approved Bank Account. If any daily delivery (or multiple daily deliveries) required under the Direct Debit Method does not occur due to a change in the Approved Bank Account, Purchaser may debit the missed daily deliveries together with the next daily delivery.
**Account Number: 2000029095971 Routing Number: 061000227**

7. Lockbox Account. If the Lockbox Method is used, Merchant hereby authorizes Purchaser to initiate a lockbox arrangement and to instruct Merchant's Approved Card Processor and Merchant's invoiced customers/clients/vendees to deposit all sums due to Merchant from each of those parties directly to the Lockbox Account. If required, Merchant shall enter into a lockbox agreement with Purchaser and the banking institution chosen by Purchaser, and complete any additional paperwork, for the purpose of establishing the Lockbox Account.

8. Third Party Appointment and Authorization. By signing below, Merchant acknowledges that Purchaser may, at any time, at Purchaser's sole discretion, and without prior notice, appoint a third party, which may be an affiliate of Purchaser, including, without limitation, Kinetic Direct Funding, LLC (such third party being the "Servicing Agent") to perform any or all of the actions authorized by the ACH Authorization and the Agreement. Merchant further agrees and acknowledges that Servicing Agent shall have all of the same rights, responsibilities, and authorizations granted to Purchaser by the ACH Authorization and the Agreement. For purposes of clarity, any Servicing Agent may perform any and all activities to service the Agreement, including the collection of Future Receipts (as set forth above) and fees, as if it was the Purchaser.

9. Fees Associated with Daily Deliveries. It shall be Merchant's exclusive responsibility to pay to its banking institution and/or Purchaser's banking institution directly (or to compensate Purchaser if it is charged) all fees, charges and expenses incurred by either Merchant or Purchaser due to rejected electronic checks or ACH debit attempts, overdrafts or rejections by Merchant's banking institution of the transactions contemplated by this Agreement.

10. Merchant's Right to Reconciliation of Daily Deliveries.

a. Merchant shall have the right, in its sole and absolute discretion but subject to the provisions of Section 11 below, to request retroactive reconciliation of any difference between the Daily Delivery Amounts received by Purchaser through the four daily deliveries immediately preceding the day when such request for reconciliation is received by Purchaser (each such four-week period, a "Reconciliation Month") and the Specified Percentage of Future Receipts actually generated during that Reconciliation Month.

b. Purchaser will perform each timely requested reconciliation (each, a "Reconciliation") within five (5) Business Days following its receipt of the Merchant's request for reconciliation by either crediting or debiting the difference back to or from the Approved Bank Account or the Lockbox Account, as applicable, so that the total amount debited by Purchaser from the Approved Bank Account or the Lockbox Account (as applicable) during the Reconciliation Month at issue is equal to the Specified Percentage of the Future Receipts that Merchant actually collected during the Reconciliation Month at issue.

III. Request for Reconciliation Procedure.

11. Merchant's Right for Reconciliation of Daily Deliveries.

a. It shall be Merchant's sole responsibility and right hereunder to initiate Reconciliation of Merchant's actual Future Receipts during any Reconciliation Month by sending a request for reconciliation to Purchaser.

b. Any such request for Reconciliation of Merchant's Daily receipts for a specific Reconciliation Month shall be in writing, shall include a copy of Merchant's bank statement(s) and credit card processing statement(s) for the Reconciliation Month at issue, and must be received by Purchaser via email at customer.service@libertasfunding.com within five (5) Business Days after the last day of the Reconciliation Month at issue (time being of the essence). Any request for Reconciliation received after this deadline will not be honored.

c. Merchant shall have the right to request Reconciliation as many times during the term of this Agreement as it deems proper, and Purchaser shall comply with such request, provided that:
   i. Each such request is made in accordance with the terms of this Section 11.
   ii. If a request for Reconciliation is timely made after Purchaser has received the Completion Amount, and the Reconciliation results in part of the Completion Amount being refunded to Merchant, then Purchaser shall continue to receive daily deliveries until it receives the Completion Amount.
   iii. If Purchaser becomes aware that it has received funds that it is not entitled to, then Purchaser shall return those funds to the Merchant without request by the Merchant for reconciliation as set forth above.

d. Unless Purchaser has received the Completion Amount, Purchaser is entitled to continue receiving daily deliveries whether or not Merchant has made a request for Reconciliation. Merchant agrees not to take any action to interfere with daily deliveries based on the pendency of a request for Reconciliation.

12. Adjustment of Daily Delivery Amount.

a. If a Reconciliation is performed that results in a refund to the Merchant of at least 20% of the aggregate Daily Delivery Amounts received by Purchaser during the applicable Reconciliation Month, Merchant shall have the option to request, subject to the requirements of Section 13 below, modification ("Adjustment") of the Daily Delivery Amount on a going-forward basis. Purchaser in its sole and absolute discretion may allow a temporary Adjustment upon Merchant's proof of circumstances warranting such Adjustment, such as a natural disaster requiring temporary closure of Merchant's business. After an Adjustment is granted, the adjusted Daily Delivery Amount shall replace and supersede the amount of the Daily Delivery Amount set forth in the preamble of this Agreement and future daily deliveries shall be made in the adjusted amount. All Adjustments made in accordance with this section or other sections of this Agreement, shall be effective for one-month, after which time, the Merchant must provide Purchaser with its bank statements each month to allow Purchaser to re-evaluate the Merchant's information to determine whether a continued Adjustment is warranted.

b. The Adjustment of the Daily Delivery Amount shall be performed by Purchaser within five (5) Business Days following its receipt of the Merchant's request for Adjustment.

13. Request for Adjustment Procedure.

a. It shall be Merchant's sole responsibility and right to initiate the Adjustment by sending a request for Adjustment to Purchaser.

b. A request for Adjustment (an "Adjustment Request") shall be in writing, shall include copies of: (i) Merchant's three (3) consecutive bank statements for the Approved Bank Account or Lockbox Account, as applicable, immediately preceding the date of Purchaser's receipt of the Adjustment Request; (ii) Merchant's three (3) consecutive payment card processing statements immediately preceding the date of Purchaser's receipt of the Adjustment Request; and/or (iii) Merchant's bank statements and payment card processing statements previously provided by Merchant to Purchaser when applying to sell Future Receipts to Purchaser, or when applying for the most recent Adjustment that was made, if applicable. The Adjustment Request shall be sent by email to Purchaser at **customer.service@libertasfunding.com** within five (5) Business Days after the date that is the later of the last day for which activity is shown on the latest bank statement enclosed with the Adjustment Request and the last day for which activity is shown on the latest card processing statement enclosed with the Adjustment Request (time being of the essence). Any Adjustment Request received after this deadline will not be honored.

c. Merchant may request Adjustment of the Daily Delivery Amount as many times as it deems proper, and Purchaser shall comply with such Adjustment Requests, provided that:
   i. Each Adjustment Request is made in accordance with the requirements set forth in this Section 12;
   ii. No Adjustment Request may be made after Purchaser has received the Completion Amount; and
   iii. Unless Purchaser has received the Completion Amount, Purchaser is entitled to continue receiving daily deliveries whether or not Merchant has made an Adjustment Request. Merchant agrees not to take any action to interfere with daily deliveries based on the pendency of an Adjustment Request.

IV. Payment Card Split Method Provisions. The following terms (see Sections 14-16) apply if the Payment Cared Split Method is used, unless otherwise specified herein.

14. Approved Card Processor. Merchant agrees to enter into a payment card processing agreement with a payment card processor approved by Purchaser (the "Approved Card Processor") in order to obtain card processing services for credit cards, charge cards, debit cards, prepaid cards, or other payment cards used to purchase Merchant's goods and/or services. If Merchant has entered into a payment card processing agreement before

the date of this Agreement, Merchant may request that Purchaser review such agreement and any other information it deems pertinent for approval of the existing payment card processor in the sole and absolute discretion of Purchaser. Merchant agrees to process all of its payment card transactions through the Approved Card Processor, and not to switch to a different payment card processor or use an additional payment card processor without Purchaser's express written consent. If Purchaser permits Merchant to use a different payment card processor, the new processor shall become the Approved Card Processor. In the event the Approved Card Processor becomes unavailable or Purchaser requests that a different payment card processor be used for any reason (such as the Approved Card Processor failing to timely deliver the Specified Percentage of Future Receipts to Purchaser on a consistent basis), Merchant shall arrange for another Approved Card Processor immediately, and in no event later than five calendar days after the Approved Card Processor becomes unavailable or Purchaser requests the designation of a new Approved Card Processor.

15. Processing Arrangement. Merchant hereby authorizes and directs the Approved Card Processor, and any other processor, acquirer, service provider, or financial institution taking custody of, holding, possessing, or issuing payment instructions with respect to Future Receipts (together, the "Receipts Custodians") to deliver the Specified Percentage of Future Receipts on each Business Day (the "Daily Delivery Amount") to Purchaser rather than Merchant until Purchaser has received the Completion Amount, or, in the event that Purchaser declares the entire Completion Amount to be deliverable based on a breach of this Agreement, to deliver this amount. On days when banks are not open, the Specified Percentage will be delivered to Purchaser on the next banking day. For example, the Specified Percentage for Friday, Saturday, and Sunday will be delivered on the following Monday (or Tuesday if Monday is a bank holiday). Merchant acknowledges that the Approved Card Processor will be acting on behalf of Purchaser to collect the Specified Percentage of Future Receipts. Merchant agrees that the Future Receipts sold under this Agreement are Purchaser's property. Purchaser shall have no obligation to refund or return the Amount Sold or any portion thereof to Merchant in the event that the Approved Card Processor or any other Receipts Custodian initiates a refund, credit, reversal, or chargeback of a transaction subject to this Agreement, as such adjustments typically are netted against future card volume. Merchant agrees that when a Receipts Custodian takes custody of, holds, possesses, or issues payment instructions with respect to Future Receipts, it does so in trust for Purchaser. If there has not been a default, a Receipts Custodian will not deliver any particular day's Daily Amount to us if that Daily Amount has already been delivered to us by another Receipts Custodian. **Merchant agrees that it does not have the right to revoke or otherwise seek to override the authorization and direction set forth in this section and that this authorization may only be revoked by Purchaser.** You agree that a Receipts Custodian may rely on any instructions issued by us with respect to the delivery of the Future Receipts, including an instruction to deliver all Future Receipts to us in the event we declare the Completion Amount to be deliverable based on a breach of this Agreement. You waive and release any and all claims you may have against any Receipts Custodian that are in any way related to the Receipts Custodian delivering Future Receipts to us as described in this section. You authorize each Receipts Custodian to provide us with any and all information we request about the Receivables that Receipts Custodian possesses or has access to, including without limitation information about daily volumes, number of transactions, distributions, chargebacks, offsets, withdrawals, and totals. YOU, YOUR SUCCESSORS AND PERMITTED ASSIGNEES AND AFFILIATES, AGREE TO FOREVER DEFEND, PROTECT, INDEMNIFY AND HOLD HARMLESS PURCHASER, EACH RECEIPTS CUSTODIAN, AND THEIR AND OUR SUCCESSORS, ASSIGNS, OFFICERS, DIRECTORS, MANAGERS, MEMBERS, AFFILIATES, AND REPRESENTATIVES AGAINST ALL DAMAGES, EXPENSES, CLAIMS, SUITS, DEMANDS, COSTS, ATTORNEYS' FEES OR LOSSES ARISING OUT OF OR ALLEGED TO HAVE ARISEN OUT OF OR IN CONNECTION WITH DELIVERING FUTURE RECEIPTS TO US AS DESCRIBED IN THIS SECTION. IN NO EVENT WILL WE OR THE RECEIPTS CUSTODIANS BE LIABLE TO YOU OR TO ANY THIRD PARTY FOR ANY LOSS OF USE, REVENUE OR PROFIT OR LOSS OF DATA OR FOR ANY DIRECT, CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL OR PUNITIVE DAMAGES, WHETHER ARISING OUT OF BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, REGARDLESS OF WHETHER SUCH DAMAGE WAS FORESEEABLE AND WHETHER OR NOT SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.The Parties agree that any amounts due a Receipts Custodian under your agreement with such Receipts Custodian or otherwise take priority over amounts to be delivered to us under this Agreement. The Parties agree that each Receipts Custodian is a third-party beneficiary of this Agreement and may rely on this Agreement even though it is not a party to this Agreement. You grant to us an irrevocable power of attorney, coupled with an interest, and appoint us and our designees as your attorney-in-fact, to take any and all actions necessary or appropriate to direct any new or additional processor to make payment to us as contemplated by this Section.

a. **Processing Trial.** After this Agreement has been executed by Purchaser and Merchant, Purchaser has the option in its sole and absolute discretion to conduct a processing trial (the "Processing Trial") to determine whether the Specified Percentage will be correctly processed and/or reported by the Approved Card Processor to Purchaser. If Purchaser elects to conduct a Processing Trial, Merchant acknowledges and agrees that Purchaser will decide in its sole and absolute discretion whether to purchase the Amount Sold after completion of the Processing Trial. If Purchaser elects not to do so, any amounts received by Purchaser during the Processing Trial shall be refunded to the Merchant.

V. 16. MERCHANT'S OBLIGATIONS, COVENANTS, REPRESENTATIONS AND WARRANTIES. Merchant agrees, covenants, represents, and warrants as follows at the time it executes this Agreement and on a continuing basis until such time as Purchaser has received the Completion Amount or Merchant has filed for bankruptcy or gone out of business in the ordinary course:

a. Business Purpose; Use of Purchase Price. MERCHANT REPRESENTS AND WARRANTS THAT IT IS ENTERING INTO THIS AGREEMENT SOLELY FOR BUSINESS PURPOSES AND NOT FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES. Merchant agrees to use the Purchase Price exclusively for the benefit and advancement of Merchant's business operations and for no other purpose.
b. Financial Condition and Financial Information. Merchant represents and warrants that its bank and financial statements, copies of which have been furnished to Purchaser, and future statements which may be furnished hereafter pursuant to this Agreement or upon Purchaser's request, fairly represent the financial condition of Merchant or other information set forth therein as of the dates such statements are issued, and prior to execution of the Agreement there have been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant has a continuing, affirmative obligation to advise Purchaser of any material adverse change in its financial condition, operation, or ownership. Purchaser may request statements at any time during the term of this Agreement and Merchant shall provide them to Purchaser within Five (5) Business Days. Merchant's failure to do so is a material breach of this Agreement.
c. Read Only Access to the Approved Bank Account and Approved Card Account. Merchant hereby agrees that, until Purchaser has received the Completion Amount, Purchaser shall have the right to perform ongoing read-only electronic monitoring of transactions occurring in the Approved Bank Account and Merchant's account with the Approved Card Processor (the "Approved Card Account"). Merchant agrees to provide Purchaser all required online access codes for the Approved Bank Account and the Approved Card Account. If Purchaser's electronic (online) access to Merchant's Approved Bank Account or the Approved Card Account is disabled for any reason, Merchant shall immediately and diligently undertake all steps required of it to restore Purchaser's access to both accounts. Merchant's failure to comply with the provisions of this Section 16 shall constitute Merchant's material breach of its obligations under this Agreement.

d. **Governmental Approvals.** Merchant represents and warrants that it is in compliance and, until Purchaser receives the Completion Amount, shall be in compliance with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged.

e. **Good Standing.** Merchant represents and warrants that it is a corporation/limited liability company/limited partnership/other type of business entity that is in good standing and duly incorporated or otherwise organized and validly existing under the laws of its jurisdiction of incorporation or organization and has full power and authority necessary to carry its business as it is now being conducted.

f. **Authorization.** Merchant represents and warrants that it has all requisite power to execute, deliver and perform this Agreement and consummate the transactions contemplated hereunder; entering into this Agreement will not result in breach or violation of, or default under, any agreement or instrument by which Merchant is bound or any statute, rule, regulation, order, or other law to which Merchant is subject, nor require the obtaining of any consent, approval, permit or license from any governmental authority having jurisdiction over Merchant. All organizational and other proceedings required to be taken by Merchant to authorize the execution, delivery and performance of this Agreement have been taken. The person signing this Agreement on behalf of Merchant represents and warrants that he or she has full power and authority to bind Merchant to perform its obligations under this Agreement.

g. **Accounting Records and Tax Returns.** Merchant shall treat receipt of the Purchase Price and delivery of the Specified Percentage of Future Receipts in a manner consistent with its nature as a true sale of Future Receipts in its accounting records and tax returns and further agrees that Purchaser is entitled to audit Merchant's accounting records upon reasonable Notice in order to verify compliance. Merchant hereby waives any rights of privacy, confidentiality, or taxpayer privilege in any litigation or arbitration arising out of this Agreement in which Merchant asserts that this transaction is anything other than a sale of future receipts.

h. **Taxes; Workers Compensation Insurance.** Merchant will promptly pay, when due, all taxes, including, without limitation, income, employment, sales and use taxes, imposed upon Merchant's business by law, and will maintain workers compensation insurance required by applicable governmental authorities.

i. **Business Insurance.** Merchant will maintain general liability and business-interruption insurance in the amounts and against risks as are satisfactory to Purchaser and shall provide Purchaser proof of such insurance upon request.

j. **No Change of Business.** You will not materially change the goods or services you sell, materially change the nature of your business, change the business entity through which you carry on your business, change any of the locations where you operate your business, or change the name under which you do business without first notifying us and obtaining our prior written consent.

k. **No Closing of Business.** Merchant represents and warrants that it has no current plans to close its business either temporarily (for renovations, repairs or any other purpose), or permanently. Merchant agrees that, until Purchaser receives the Completion Amount, Merchant will not voluntarily close its business on a permanent or temporary basis for renovations, repairs, or any other purposes. Notwithstanding the foregoing, Merchant shall have the right to close its business temporarily if such closing is necessitated by a requirement to conduct renovations or repairs imposed upon Merchant's business by legal authorities having jurisdiction over Merchant's business (such as from a health department or fire department) or if such closing is necessitated by circumstances outside Merchant's reasonable control. Prior to any such temporary closure of its business, Merchant shall provide Purchaser ten (10) Business Days' advance notice, or as much notice as reasonably possible under the circumstances.

l. **No Pending Bankruptcy.** As of the date of Merchant's execution of this Agreement, Merchant is not insolvent, has not filed, and does not contemplate filing, any petition for bankruptcy protection under Title 11 of the United States Code, and there has been no involuntary bankruptcy petition brought or threatened against Merchant. Merchant represents that it has not consulted with a bankruptcy attorney on the issue of filing bankruptcy within the six-month period immediately preceding the date of this Agreement. A breach of any of these representations shall be a material breach of this Agreement. If you go out of business or become the subject of a voluntary or involuntary bankruptcy filing within forty-five (45) days of our purchasing the Amount Sold, you agree that there will be a rebuttable presumption of a material breach.

m. **Estoppel Certificate.** Each time that we request, you will, upon at least one (1) day's prior notice from us, execute, acknowledge and deliver to us and/or to any other person, person firm or corporation specified by us, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which all or any portion of the Amount Sold has been delivered.

n. **Unencumbered Future Receipts.** Merchant has and will continue to have good, complete and marketable title to all Future Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests other than by virtue or entering into this Agreement. Merchant shall not sell Future Receipts or obtain any additional financing before Purchaser has received the Completion Amount without Purchaser's express written consent. Merchant shall not take any action inconsistent with or in derogation of Purchaser's ownership of the Amount Sold.

o. **No Default Under Contracts with Third Parties.** Merchant's execution of and/or performance of its obligations under this Agreement will not cause or create an event of default by Merchant under any contract which Merchant is or may become a party to, or otherwise violate any of Merchant's obligations to third parties.

p. **Right of Access.** In order to ensure Merchant's compliance with the terms of this Agreement, Merchant hereby grants Purchaser the right to enter, without notice, the premises of Merchant's business for the purpose of inspecting and checking Seller's transaction processing terminals to ensure the terminals are properly programmed to submit and or batch Merchant's Future Receipts to its Approved Card Processor and to ensure that Merchant has not violated any other provision of this Agreement. Furthermore, Merchant hereby grants Purchaser and its employees and consultants' access to Merchant's employees and records and all other items of property located at the Merchant's place of business during the term of this Agreement. Merchant hereby agrees to provide Purchaser, upon request, all and any information concerning Merchant's business operations, banking relationships, names and contact information of Merchant's suppliers, vendors and landlord(s), to allow Purchaser to interview any of those parties regarding any matters relevant to this Agreement.

q. **Phone Recordings and Contact.** Merchant agrees that any call between Merchant and Purchaser and its owners, managers, employees and agents may be recorded and/or monitored.

r. **Knowledge and Experience of Decision Makers.** The persons authorized to make management and financial decisions on behalf of Merchant with respect to this Agreement have such knowledge, experience and skill in financial and business matters in general and with respect to transactions of a nature similar to the one contemplated by this Agreement so as to be capable of evaluating the merits and risks of, and making an informed business decision with regard to, Merchant entering into this Agreement.

s. **Merchant's Due Diligence.** The person authorized to sign this Agreement on behalf of Merchant: (i) has received all information that such person deemed necessary to make an informed decision with respect to a transaction contemplated by this Agreement; and (ii) has had unrestricted opportunity to make such investigation as such person desired pertaining to the transaction contemplated by this Agreement and verify any such information furnished to him or her by Purchaser.

t. **Arm's-Length Transaction.** The person signing this Agreement of behalf of Merchant: (a) has read and fully understands content of this

Agreement; (b) has consulted to the extent he/she wished with Merchant's own counsel in connection with the entering into this Agreement; (c) he or she has made sufficient investigation and inquiry to determine whether this Agreement is fair and reasonable to Merchant, and whether this Agreement adequately reflects his or her understanding of its terms.

u. Integration; No Reliance on Oral Representations. This Agreement contains the entire agreement between Merchant and Purchaser with respect to the subject matter of this Agreement and supersedes each course of conduct previously pursued or acquiesced in, and each oral agreement and representation previously made, by the parties with respect thereto (if any), whether or not relied or acted upon. No course of performance or other conduct subsequently pursued or acquiesced in, and no oral agreement or representation subsequently made, whether or not relied or acted upon, and no usage of trade, whether or not relied or acted upon, shall amend this Agreement or impair or otherwise affect the parties' obligations pursuant to this Agreement or any rights and remedies of the parties to this Agreement.

VI. PLEDGE OF SECURITY:

17. Acknowledgment of Security Interest and Security Agreement. The Future Receipts sold by Merchant to Purchaser pursuant to this Agreement are "accounts" or "payment intangibles" as those terms are defined in the Uniform Commercial Code in effect in the state in which Merchant is located (the "UCC"). Such Sale shall constitute and shall be construed and treated for all purposes as a true and complete sale, conveying good title to the Future Receipts free and clear of any liens and encumbrances, from Merchant to Purchaser. To the extent the Future Receipts are "accounts" or "payment intangibles" then (i) the sale of the Future Receipts creates a security interest as defined in the UCC; (ii) this Agreement constitutes a "security agreement" under the UCC; and (iii) Purchaser has all the rights of a secured party under the UCC with respect to such Future Receipts. Merchant further agrees that, with or without an Event of Default, Purchaser may notify account debtors, or other persons obligated on the Future Receipts, on holding the Future Receipts of Merchant's sale of the Future Receipts and may instruct them to make payment or otherwise render performance to or for the benefit of Purchaser.

18. Financing Statements. Merchant authorizes Purchaser to file one or more UCC-1 forms consistent with the UCC to give notice that the Amount Sold is the sole property of Purchaser. The UCC filing may state that such sale is intended to be a sale and not an assignment for security and may state that Merchant is prohibited from obtaining any financing that impairs the value of the Amount Sold or Purchaser's ability to collect same. Merchant authorizes Purchaser to debit the Approved Bank Account or Lockbox Account, as applicable, for all costs incurred by Purchaser associated with the filing, amendment or termination of any UCC filings.

19. Security. You understand that we have the right to take delivery of the Future Receipts we purchased as they are generated in the ordinary course of your business. The Security Interest granted in this section is being given solely for the purpose of ensuring that you do not take any action to deprive us of that right. This Security Interest does not mean that we have made a loan to you, does not create a debt, and does not make you a debtor or us a creditor. As security for the prompt and complete performance of any and all obligations, covenants, and agreements of Merchant under this Agreement, now or hereafter arising from, out of, or relating to this Agreement, whether direct, indirect, contingent or otherwise (hereinafter referred to collectively as the "Merchant Obligations"), Merchant hereby pledges, assigns and hypothecates to Purchaser and grants to Purchaser a continuing, perfected and first priority lien upon and security interest in, to and under all of Merchant's right, title and interest in and to the following (collectively, the "Collateral"), whether now existing or hereafter from time to time acquired:

a. all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined by Article 9 of the UCC, now or hereafter owned or acquired by Merchant; and
b. all Merchant's proceeds, as that term is defined by Article 9 of the UCC.

20. Termination of Pledge. Upon the performance by Merchant in full of the Merchant Obligations, the security interest in the Collateral pursuant to this Pledge shall automatically terminate without any further act of either party being required, and all rights to the Collateral shall revert to Merchant. Upon any such termination, Purchaser will execute, acknowledge (where applicable) and deliver such satisfactions, releases and termination statements, as Merchant shall reasonably request.

21. Representations with Respect to Collateral. Merchant hereby represents and warrants to Purchaser that: the execution, delivery and performance by Merchant of this Pledge, and the remedies in respect of the Collateral under this Pledge (i) have been duly authorized; (ii) do not require the approval of any governmental authority or other third party or require any action of, or filing with, any governmental authority or other third party to authorize same (other than the filing of the UCC-1s); (iii) do not and shall not (A) violate or result in the breach of any provision of law or regulation, any order or decree of any court or other governmental authority, or (B) violate, result in the breach of or constitute a default under or conflict with any indenture, mortgage, deed of trust, agreement or any other instrument to which Merchant is a party or by which any of Merchant's assets (including, without limitation, the Collateral) are bound.

22. Further Assurances. Upon the request of Purchaser, Merchant at its sole cost and expense, shall execute and deliver all such further UCC-1s, continuation statements, assurances and assignments of the Collateral, and consents with respect to the pledge of the Collateral and the execution of this Pledge, and shall execute and deliver such further instruments, agreements and other documents and do such further acts and things, as Purchaser may request in order to more fully effectuate the purposes of this Pledge and the assignment of the Collateral and obtain the full benefits of this Pledge and the rights and powers herein created.

23. Attorney-in-fact. Merchant hereby authorizes Purchaser at any time to take any action and to execute any instrument, including without limitation to file one or more financing statements and/or continuation statements, to evidence and perfect the security interest created hereby and irrevocably appoints Purchaser as its true and lawful attorney-in-fact, which power of attorney shall be coupled with an interest, with full authority in the place and stead of Merchant and in the name of Merchant or otherwise, from time to time, in Purchaser's sole and absolute discretion, including without limitation (a) for the purpose of executing such statements in the name of and on behalf of Merchant, and thereafter filing any such financing and/or continuation statements and (b) to receive, endorse and collect all instruments made payable to Merchant.

VII. EVENTS OF DEFAULT AND REMEDIES:

24. Events of Default by Merchant. The occurrence of any of the following events shall constitute an "Event of Default" by Merchant:

a. Events of Default.
b. Bad Acts. If you commit any of the following acts ("Bad Acts") without our prior written consent before we receive the Completion Amount,

you will be in default:

i. you sell, transfer or otherwise encumber or attempt to sell, transfer or otherwise encumber Future Receipts, whether or not such Future Receipts are part of the Amount Sold, sometimes referred to as "stacking" our Purchase Price with other funding companies;
ii. you encumber or allow any encumbrance to attach to our interest in the Amount Sold;
iii. you sell all or substantially all of your assets used in the operation of your business to a third party;
iv. you materially change the operation of your business (e.g., changes in industry, concept, size, etc.);
v. you stop accepting a particular method of payment while you remain open for business;
vi. you change your legal name or jurisdiction of formation, or carry-on business through a different business entity;
vii. you change, close, or terminate the Approved Bank Account or Approved Card Processor, or interfere with the lockbox arrangement, without our express written consent;
viii. you do not obtain a replacement Approved Bank Account or Approved Card Processor acceptable to us within fifteen (15) days after your bank or processor terminates its relationship with you;
ix. you process any card transaction through a payment card processor other than the Approved Card Processor;
x. you provide us with false or misleading information about your business or revenue (in your application or otherwise) that is material to our decision to purchase Future Receipts from you;
xi. you deposit or cause to be deposited by others Future Receipts into any account other than the Approved Bank Account or Lockbox Account, if applicable;
xii. you take or fail to take an action that hinders our taking delivery of our Specified Percentage of Future Receipts from the Approved Bank Account, Lockbox Account, or any Receivables Custodian, as applicable;
xiii. you disconnect or interfere with the operation of Purchaser's bank monitoring software; or
xiv. you commit any act or omission specified in this Agreement to be a material breach. However, we will not consider any of these acts to be Bad Acts if they occur because you go out of business in the ordinary course. These Bad Acts are prohibited solely to protect our ability to collect the Amount Sold and receive the benefit of our bargain. They do not create any obligation for Merchant to deliver Future Receipts to Purchaser if they are simply not generated by Merchant's business.

c. Other Breaches. If you commit an act that is not a Bad Act but that otherwise violates a term or covenant in this Agreement (an "Other Breach"), you will be in default.

25. **Remedies.** If you commit a Bad Act, you will be liable to us in an amount in cash equal to (a) the undelivered portion of the Amount Sold, plus (b) any other fees and other amounts due to us under this Agreement, plus (c) any additional amounts you would owe us for committing an Other Breach. If you commit an Other Breach, you will be liable to us for all damages resulting from the Other Breach, including, but not limited to, our reasonable attorneys' fees, expenses and costs incurred in any proceeding pursued against you to recover the amounts due us under this Agreement. You agree to pay us the amounts due or we may (d) withdraw such amounts from the Approved Bank Account or Lockbox Account, as applicable, or any other account into which you deposit Future Receipts, via ACH or electronic checks; (e) direct the Approved Card Processor, any other Receipts Custodian, and/or any other payment card processor you use in violation of this Agreement to deliver all of your Future Receipts to us until we have received the amount due; (f) enforce our rights as a secured creditor under the UCC including, without limitation, notifying any of your account debtor(s) of our security interest; (g) enforce Guarantor's personal guaranty of performance provisions of this Agreement against the Guarantor(s) without first seeking recourse from Merchant; (h) commence a suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Merch ant's and Guarantor's obligations hereunder or any other legal or equitable right or remedy including without limitation Purchaser's rights of a secured party under the UCC. All rights available to us are cumulative and not exclusive of any other remedies available to us in law or equity.

26. **Power of Attorney.** Each Merchant and Guarantor irrevocably appoints Purchaser and its representatives as their respective agents and attorneys-in-fact with full authority to take any action or execute any instrument or document to do the following: (A) to settle all obligations due to Purchaser from any payment card processor and/or account debtor(s) of Merchant; (B) upon occurrence of a Bad Act, to perform any and all such obligations of Merchant under this Agreement, including without limitation (i) to collect monies due or to become due under or in respect of any of the Collateral; (ii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) above; (iii) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to Purchaser; and (iv) to file any claims or take any action or institute any proceeding against Merchant and/or Guarantor which Purchaser may deem necessary for the collection of any portion of the undelivered Amount Sold from the Collateral, or otherwise to enforce its rights under this Agreement.

27. **Service of Process.** Merchant and Guarantor(s) consent to service of process and legal notices made by Certified or Priority Mail delivered by the United States Postal Service and addressed to the respective party's address set forth on the first page of this Agreement or any other address(es) provided in writing to Purchaser by Merchant or Guarantor(s), and unless applicable law or rules provide otherwise, any such service or legal notice will be deemed complete upon dispatch. Merchant and Guarantor(s) agree that it will be precluded from asserting that it did not receive service of process or any other legal notice mailed to the address located in the Merchant Information and Owner Information sections set forth on the first page of this Agreement if it does not furnish a certified mail return receipt signed by Purchaser demonstrating that Purchaser was provided with a notice of a change of address.

VIII. **ADDITIONAL TERMS:**

28. **Fees.** In addition to all other sums due to Purchaser under this Agreement, Merchant shall pay to Purchaser:

a. An Origination Fee of $0.00 upon entering into this Agreement as reimbursement of Purchaser's costs associated with entering into this Agreement (the cost of due diligence on the Merchant's business, financial and legal due diligence, etc.)
b. A Non-Sufficient Funds ("NSF") fee of $35 in each and every instance when delivery of the Daily Delivery Amount to Purchaser has failed due to insufficient funds in the Merchant's Approved Bank Account or Lockbox Account, as applicable; provided, however, that no NSF fee shall be due when the delivery failed because Merchant's business did not generate sufficient Future Receipts to cover the Daily Delivery Amount and Merchant promptly requested Reconciliation and/or Adjustment.
c. $100 in each and every instance when Merchant blocks Purchaser's access (or otherwise prevents Purchaser from accessing) Merchant's bank accounts.
d. $2,500 in each and every instance when, upon occurrence of an Event of Default, Purchaser shall have agreed to waive Merchant's default.

29. **Financial Condition.** Merchant and its Guarantor(s) authorize Purchaser and its agents to investigate their financial responsibility and history

and will provide to Purchaser any bank or financial statements, tax returns, etc., as deems necessary prior to or at any time after execution of this Agreement. A photocopy or electronic image of this authorization will be deemed as acceptable for release of financial information. Purchaser is authorized to update such information and financial profiles from time to time as it deems appropriate.

30. Transactional History. Merchant shall execute written authorization(s) to their bank(s) to provide Purchaser with Merchant's banking and/or credit-card processing history.

31. No Liability. In no event shall Purchaser be liable for any claims asserted by Merchant or its Guarantor under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by Merchant and Guarantor(s).

32. Right to Cancel.

i. Notwithstanding anything to the contrary set forth in this Agreement, Purchaser shall have the right to cancel this agreement any time prior to its delivery of the Purchase Price to Merchant and, upon such cancellation, this Agreement shall become null, and void and the parties shall have no obligation to, or rights against, each other, except that all sums delivered by Merchant to Purchaser on account of entering into this Agreement shall be promptly returned to Merchant.
ii. Notwithstanding anything to the contrary set forth in this Agreement, in the event Merchant has not been in default under this Agreement, Merchant shall have the right to cancel this Agreement any time until the midnight of the second (2nd) Business Day following the date of its receipt of the Purchase Price by notifying Purchaser of such cancellation by notice sent in accordance with this Agreement. Upon timely delivering such cancellation notice to Purchaser, and further provided that Merchant has otherwise complied with the provisions of this Agreement, Merchant shall refund the entire amount of the Purchase Price back to Purchaser within five (5) Business Days following the date of Merchant's receipt of the Purchase Price. Upon such refund of the Purchase Price back to Purchaser, this Agreement shall become null and void and the parties shall have no remaining obligations to or rights against each other except that Purchaser shall have the right keep, as fair and adequate compensation for its costs of entering into this Agreement with Merchant, the Origination Fee and all Daily Delivery Amounts received by Purchaser prior to the date when this Agreement is terminated.

IX. GUARANTY OF PERFORMANCE OF MERCHANT'S OBLIGATIONS:

33. Guarantor's Representations. Guarantor represents and warrants to Purchaser that:

a. Guarantor is an owner, officer, or manager of Merchant and will directly benefit from Purchaser and Merchant entering into the Agreement.
b. Guarantor understands and acknowledges that Purchaser is not willing to enter into the Agreement unless Guarantor irrevocably, absolutely and unconditionally guarantees prompt and complete performance of any and all liabilities, obligations, covenants or agreements of Merchant under this Agreement, now or hereafter arising from, out of or relating to this Agreement, whether direct, indirect, contingent or otherwise (hereinafter referred to collectively as the "Merchant Obligations").

34. Guaranty of Merchant's Obligations. Guarantor hereby irrevocably, absolutely and unconditionally guarantees to Purchaser prompt, full, faithful, and complete performance and observance of all Merchant Obligations; and Guarantor unconditionally covenants to Purchaser that if Merchant shall at any time breach any of the Merchant Obligations, Guarantor shall perform (or cause to be performed) the Merchant Obligations and pay all damages and other amounts stipulated in this Agreement with respect to the non-performance of the Merchant Obligations, or any of them.

35. Guarantor's Other Agreements. Guarantor will not dispose, convey, sell or otherwise transfer, or cause Merchant to dispose, convey, sell or otherwise transfer, any material business assets of Merchant without the prior written consent of Purchaser, which consent may be withheld for any reason, until Purchaser has received the Completion Amount. Guarantor shall pay to Purchaser upon demand all expenses (including, without limitation, reasonable attorneys' fees and disbursements) incurred as the result of, or incidental to, or relating to, the enforcement or protection of Purchaser's rights against Merchant and Guarantor under the Agreement. This Guaranty is binding upon Guarantor and Guarantor's heirs, legal representatives, successors and assigns and shall inure to the benefit of and may be enforced by the successors an assign of Purchaser. The obligation of Guarantor shall be unconditional and absolute, regardless of the unenforceability of any provision of any agreement between Merchant and Purchaser, or the existence of any defense, setoff or counterclaim, which Merchant may assert. Purchaser is hereby authorized, without notice or demand and without affecting the liability of Guarantor hereunder, to at any time renew or extend Merchant's obligations under the Agreement or otherwise modify, amend or change the terms of the Agreement.

36. Two Or More Guarantors. If there is more than one Guarantor, "Guarantor" in this Agreement shall mean all Guarantors and the obligations of the Guarantors hereunder shall be joint and several.

37. Waiver; Remedies. No failure on the part of Purchaser to exercise, and no delay in exercising, any right under this Guaranty shall operate as a waiver, nor shall any single or partial exercise of any right under this Guaranty preclude any other or further exercise of any other right. The remedies provided in this Guaranty are cumulative and not exclusive of any remedies provided by law or equity. In the event that Merchant fails to perform any obligation under the Agreement, Purchaser may enforce its rights under this Guaranty without first seeking to obtain performance for such default from Merchant or any other guarantor.

38. Acknowledgment of Purchase. Guarantor acknowledges and agrees that the Purchase Price paid by Purchaser to Merchant in exchange for the Amount Sold is adequate consideration for the purchase of the Amount Sold and is not a loan or financial accommodation from Purchaser to Merchant. Guarantor specifically acknowledges Purchaser is not a lender, bank, or credit card processor, and that Purchaser has not offered any loans to Merchant. Guarantor waives any claims or defenses of usury in any action arising out of this Agreement.

39. Severability. If for any reason any court of competent jurisdiction finds any provisions of this Agreement applicable to the Guarantor to be void or voidable, the parties agree that the court may reform such provision(s) to render the provision(s) enforceable ensuring that the restrictions and prohibitions contained in those provisions shall be effective to the fullest extent allowed under applicable law.

40. Opportunity for Attorney Review. Guarantor represents that he/she has carefully read this Agreement and has, or had an opportunity to, consult with his or her attorney. Guarantor understands the contents of this Agreement, signs it as his or her free act and deed and agrees to be bound by the provisions hereof.

X. MISCELLANEOUS:

41. Modifications; Agreements. No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by all parties.

42. Assignment. Purchaser may assign, transfer or sell its rights or delegate its duties hereunder, either in whole or in part without prior notice to the Merchant or the Guarantor. Neither Merchant nor Guarantor shall have the right to assign their respective rights or obligations under this Agreement without first obtaining Purchaser's written consent.

43. Notices. All notices, requests, consent, demands and other communications required or permitted to be given under this Agreement, other than service of process and legal notices (see section 27 above), shall be delivered by Certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in the Merchant Information and Owner Information sections on in the first page of this Agreement unless the Merchant and/or Guarantor(s) has received a Certified mail return receipt signed by Purchaser demonstrating that the Purchaser was provided with Merchant's and/or Guarantors'(s') notice of a change of address. Notices governed by this section shall become effective as of the date of the receipt.

44. Waiver Remedies. No failure on the part of any party to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

45. Binding Effect. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.

46. Governing Law, Venue and Jurisdiction. This Agreement shall be governed by and construed exclusively in accordance with the laws of the State of New York, without regard to any applicable principles of conflicts of law. Any lawsuit, action or proceeding arising out of or in connection with this Agreement shall be instituted exclusively in any court sitting in New York State (the "Acceptable Forums"). Each party signing this Agreement agrees that the Acceptable Forums are convenient, and irrevocably submits to the jurisdiction of the Acceptable Forums and waives any and all objections to inconvenience of the jurisdiction or venue. Should a proceeding be initiated in any other forum, the parties waive any right to oppose any motion or application made by either party to transfer such proceeding to an Acceptable Forum.

47. Survival of Representation, etc. All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been complied with and satisfied in full and this Agreement shall have terminated.

48. Severability. In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

49. Waiver of Class Action; Waiver of Jury Trial. By entering into this agreement, the parties agree that they may bring claims against the other only in their individual capacity, and **THE PARTIES ARE EACH EXPRESSLY WAIVING ANY AND ALL RIGHT TO PARTICIPATE AS A REPRESENTATIVE OR MEMBER IN ANY CLASS ACTION, PUTATIVE OR PURPORTED CLASS ACTION, REPRESENTATIVE ACTION, PRIVATE ATTORNEY GENERAL ACTION, OR SIMILAR ACTION RELATING TO ANY CLAIMS (AS HEREINAFTER DEFINED), WHETHER BROUGHT UNDER STATE OR FEDERAL LAW.**The parties are each expressly waiving any and all right to join or consolidate claims in any proceeding with those of any other person (except any obligors and guarantors of the same agreement). Further, **BY ENTERING INTO THIS AGREEMENT, THE PARTIES ARE EACH EXPRESSLY WAIVING THEIR RESPECTIVE RIGHTS TO A JURY TRIAL FOR ALL CLAIMS.** The term "Claim" means any claim, dispute, or controversy (whether based on contract, tort, statute, or otherwise, and whether seeking monetary or any form of non-monetary relief) arising out of or relating to this Agreement or the relationship between or among the parties (collectively, "Claims"). The term Claims is to be given its broadest possible meaning, and includes pre-existing, present, and future Claims, and Claims regarding the enforceability or scope of this waiver. For purposes of this waiver only, the term "party" means that party and all of its respective parents, subsidiaries, affiliates, predecessors, successors, assigns, agents, vendors, employees, officers, and directors. **THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.**

50. Captions. The captions in this Agreement are inserted for convenience of reference only and in no way define, describe or limit the scope or intent of this contract or any of the provisions hereof.

51. Counterparts and Facsimile Signatures. This Agreement can be signed in one or more counterparts, each of which shall constitute an original and all of which when take together shall constitute one and the same agreement. Signatures delivered via facsimile and/or via Portable Digital Format (PDF) shall be deemed acceptable for all purposes, including without limitation the evidentially purposes.

The balance of this page left intentionally blank

MERCHANT NAME: ARC MANAGEMENT GROUP, LLC, et al,
(legal name of the business)

By: *Bill Wilson*

Name: WILLIAM WILSON
Title: cei
FEIN: 030607765

OWNER/GUARANTOR #1:

*Bill Wilson*

Name: WILLIAM WILSON
SSN: 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

OWNER/GUARANTOR #2:

Thresa Wilson (Apr 12, 2023 16:04 EDT)

Name: THRESA WILSON
SSN: 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

## Libertas Funding, LLC Electronic Fund Transfer Authorization

This Libertas Funding, LLC Electronic Fund Transfer Authorization (the "Authorization") supplements the foregoing concurrent Agreement of Sale of Future Receipts (the "Agreement"). Except as noted below, capitalized terms in this Authorization have the meaning set forth in the Agreement.

You irrevocably authorize us (which includes for the purposes of this authorization, our agents, service providers, successors, and assigns) to take delivery of each Daily Delivery Amount by initiating an electronic fund transfer via the Automated Clearing House network or similar network (an "ACH") from the business deposit account specified below, any substitute account you later specify, or any other account containing your Future Receipts (collectively, the "Account") on or after the date the associated Future Receipts were created. You authorize us to initiate a single ACH for the combined amounts of different Daily Delivery Amounts as permitted by the Agreement. You further authorize us initiate ACHs to the Account for any amounts that come due under the Agreement, including ACHs for the Completion Amount in the event you commit a Bad Act. You also authorize us to initiate ACH credits or debits to the Account to correct any errors we may make in processing a payment. In the event that an ACH is returned unpaid, you authorize us to reinitiate the ACH until it is paid and to initiate a separate ACH or to add to a reinitiated ACH the amount of any dishonored payment fee that we charge. You agree that you will not cancel this Authorization or instruct any depository holding Future Receipts we purchased to reject our ACHs. You promise that the Account specified below and any substitute Account you provide us is used for business purposes and not for personal, family or household purposes and that you are an authorized signor on these Accounts.

Business Deposit Account Information:

Account Number: 2000029095971 Routing Number: 061000227
Depository Name: WELLS FARGO BANK, NA Depository City/State: KENNESAW/GA

Type of Account

☐ Business Checking ☐ Business Savings
☐ Other Business Acct. (specify): ____________________

By signing below, you agree to the terms of this Libertas Funding, LLC Electronic Fund Transfer Authorization.

**ACCEPTED AND AGREED:**

**Seller: ARC MANAGEMENT GROUP, LLC, et al.**

By: X *Bill Wilson*

Name: WILLIAM WILSON

Title: Cei

By: X *Bill Wilson*

Owner: WILLIAM WILSON

By: X [signature]

Owner: THRESA WILSON

## ADDENDUM TO CONTRACT

### Addendum to Merchant Agreement 383166

This is an addendum ("Addendum") to that certain merchant agreement (the "Merchant Agreement") entered into by and among Libertas Funding, LLC (the "Purchaser"), WILLIAM WILSON (the "Owner") and ARC MANAGEMENT GROUP, LLC (the "Seller") dated as of April 12, 2023.

WHEREAS, the Purchaser, the Owner and Seller wish to modify the Merchant Agreement as set forth herein.

Now therefore, for good and valuable consideration, the parties agree as follows:

A. The Owner and Seller are hereafter referred to collectively as the Merchant (the "Merchant")
B. I, WILLIAM WILSON, acting on behalf of ARC MANAGEMENT GROUP, LLC hereby authorize Purchaser to execute the payment(s) detailed below in section H "Merchant Agreement Payment Schedule".
C. Merchant understands that all transactions detailed in this addendum will be executed using the proceeds of the receivables purchase detailed in the Merchant Agreement.
D. In the event Merchant chooses to execute the Merchant Agreement, Merchant agrees that the transaction(s) listed below will constitute full remittance of receivables for the merchant agreement(s) Specified in section H (the "Specified Merchant Agreement(s)").
E. As of 04/12/2023, it is agreed that the Merchant has a receivable balance of $1,329,135.86 relating to the Specified Merchant Agreement(s), notwithstanding any returned payments or associated fees.
F. Upon execution of the Merchant Agreement Merchant agrees to waive the rights to any and all legal remedies guaranteed under the Specified Merchant Agreement(s)
G. This Addendum shall be governed by the laws of the state of New York.
H. **Merchant Agreement Payment Schedule:**

| Specified Merchant Agreement(s) | Amount Paid |
|---|---|
| 359802 | $538,095.04 |
| 0 | $791,040.82 |

All other terms of the referenced Merchant Agreement remain unchanged.

By their signatures below the parties agreed to be bound by this addendum.

ACCEPTED AND AGREED:

Purchaser: Libertas Funding, LLC

By: ______________________

Name: Randy Saluck

Title: CEO, Libertas Funding LLC

ACCEPTED AND AGREED:

Seller: ARC MANAGEMENT GROUP, LLC, et al.

By: X Bill Wilson

Name: WILLIAM WILSON

Title: Cei

By: X Bill Wilson

Owner: WILLIAM WILSON

By: X ______________________

Owner: THRESA WILSON

LIBERTAS

**Seller Definition Addendum to the Agreement of Sale of Future Receipts Dated:**

**April 12th, 2023**

Purchaser and Guarantor(s) hereby agree that "Merchant" is defined as follows:

**Name:** ARC MANAGEMENT GROUP, LLC
**Address:** 1825 Barrett Lakes Blvd., Suite 505 KENNESAW, GA 30144
**FEIN:** 030607765

**Name:** WILZARA PROPERTY MANAGEMENT GROUP LLC
**Address:** 12655 OLD SURREY PL ROSWELL, GA 30075
**FEIN:** 0

**Name:** THE J.D. STUART LAW GROUP, LLC
**Address:** 1825 BARRETT LAKES BLVD NW STE 500 KENNESAW, GA 30144
**FEIN:** 0

**Name:** HEALTHTECH RECEIVABLES MGT, INC
**Address:** 3450 BUSCHWOOD PARK DR STE 150 TAMPA, FL 33618
**FEIN:** 0

**ARC MANAGEMENT GROUP, LLC**

Agreed to by: *Bill Wilson* (Signature), their Cei (Title)

Print Owner's Name William Wilson

**WILZARA PROPERTY MANAGEMENT GROUP LLC**

Agreed to by: *Bill Wilson* (Signature), their Cei (Title)

Print Owner's Name William Wilson

**THE J.D. STUART LAW GROUP, LLC**

Agreed to by: *Bill Wilson* (Signature), their Cei (Title)

Print Owner's Name William Wilson

**HEALTHTECH RECEIVABLES MGT, INC**

Agreed to by: *Bill Wilson* (Signature), their Cei (Title)

Print Owner's Name William Wilson

**Purchaser: Libertas Funding, LLC**

Agreed to by: ______________________ (Signature), its ______________________ (Title)

# ADDENDUM TO CONTRACT

## Addendum to Merchant Agreement 383166

**Purchase Price: $2,430,000.00 Purchased Percentage: 20% Purchased Amount: $3,146,850.00**

This is an addendum ("Addendum") to that certain merchant agreement 383166 (the "Merchant Agreement") entered into by and among Libertas Funding, LLC (the "Purchaser"), WILLIAM WILSON (the "Owner") and ARC MANAGEMENT GROUP, LLC (the "Seller" or "Merchant") dated as of April 12, 2023

WHEREAS, the Purchaser and Seller wish to modify the Merchant Agreement as set forth herein.

Now therefore, for good and valuable consideration, the parties agree as follows:

A. Except as provided in this Addendum, all terms and conditions of the Merchant Agreement shall remain in full force and effect. All capitalized terms not defined in this Addendum shall have the meaning set forth in the Merchant Agreement.
B. Merchant acknowledges, accepts, and agrees that as long as the Seller has not delivered all of the Daily Deliveries in connection with the Merchant Agreement, the Merchant understands that taking an additional short-term (12 months or less in expected term) cash advance based on credit card receivables or an ACH-based cash advance or loan based on total sales or deposits with any company (other than the Purchaser or the Purchaser's wholly-owned subsidiaries) would constitute an event of default under the Merchant Agreement, unless the Merchant receives a written authorization from the Purchaser prior to it taking such additional financing.
C. Merchant acknowledges, accepts, and agrees that a breach of this addendum (particularly section B above) will constitute a breach/event of default of the Merchant Agreement and that doing so will result in the immediate acceleration of all Daily Deliveries.
D. This Addendum shall be governed by the laws of the State of New York.
E. This Addendum may only be modified in writing by Purchaser and Merchant.

By their signatures below the parties agreed to be bound by this addendum.

**ACCEPTED AND AGREED:**

**Purchaser: Libertas Funding, LLC**

By: ______________________

Name: Randy Saluck

Title: CEO, Libertas Funding LLC

**ACCEPTED AND AGREED:**

**Seller: ARC MANAGEMENT GROUP, LLC, et al.**

By: X *Bill Wilson*

Name: WILLIAM WILSON

Title: Cei

By: X *Bill Wilson*

Owner: WILLIAM WILSON

By: X [signature]

Owner: THRESA WILSON

# ARC_MANAGEMENT_GROUP_LLC- CONTRACT

Final Audit Report 2023-04-12

| | |
|---|---|
| Created: | 2023-04-12 |
| By: | stips group (stips@libertasfunding.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAVKT7nUNiowZ8QrH7G_ncWZxQSJFOo6AY |

## "ARC_MANAGEMENT_GROUP_LLC- CONTRACT" History

Document created by stips group (stips@libertasfunding.com)
2023-04-12 - 7:40:43 PM GMT- IP address: 160.72.124.38

Document emailed to William Wilson (bwilson@arcmgmt.com) for signature
2023-04-12 - 7:44:53 PM GMT

Email viewed by William Wilson (bwilson@arcmgmt.com)
2023-04-12 - 8:02:39 PM GMT- IP address: 172.226.168.40

Document e-signed by William Wilson (bwilson@arcmgmt.com)
Signature Date: 2023-04-12 - 8:03:25 PM GMT - Time Source: server- IP address: 166.198.157.21

Document emailed to twilson@arcmgmt.com for signature
2023-04-12 - 8:03:26 PM GMT

Email viewed by twilson@arcmgmt.com
2023-04-12 - 8:03:43 PM GMT- IP address: 104.28.57.243

Signer twilson@arcmgmt.com entered name at signing as Thresa Wilson
2023-04-12 - 8:04:43 PM GMT- IP address: 166.198.157.32

Document e-signed by Thresa Wilson (twilson@arcmgmt.com)
Signature Date: 2023-04-12 - 8:04:45 PM GMT - Time Source: server- IP address: 166.198.157.32

Agreement completed.
2023-04-12 - 8:04:45 PM GMT

Names and email addresses are entered into the Acrobat Sign service by Acrobat Sign users and are unverified unless otherwise noted.

LIBERTAS

Libertas Funding, LLC
411 West Putnam Ave Suite 220, Greenwich, CT 06380

## AGREEMENT OF SALE OF FUTURE RECEIPTS

This AGREEMENT OF SALE OF FUTURE RECEIVABLES (this "Agreement") dated as of 05/09/2023, is made by and between Libertas Funding, LLC, a Connecticut Limited Liability Company as purchaser ("Purchaser"), the merchant whose name, address and other pertinent information is set forth below, as seller ("Merchant"), and the individual owner/guarantor of the Merchant whose name, address and other pertinent information are set forth below ("Guarantor"). For good and valuable consideration, the mutual receipt and sufficiency of which is hereby acknowledged, the parties to this Agreement agree as follows:

**Merchant Information (see addendum)**

| | |
|---|---|
| **Merchant Legal Name:** ARC MANAGEMENT GROUP, LLC, et al. | **DBA Name:** Arc Management Group |
| **Entity Type:** Limited Liability Company | **FEIN:** *****7765 |
| **State Of Incorporation:** GA | **Bank Name:** WELLS FARGO BANK, NA |
| **Address:** 1825 Barrett Lakes Blvd., Suite 505, KENNESAW,GA, 30144 | **Phone:** 404-417-1884 |

**OWNER INFORMATION (referred to individually or collectively as the ("Owner"))**

| | | |
|---|---|---|
| **Name of Owner Guarantor 1:** WILLIAM DONALD WILSON | **Cell Phone:** [redacted] | **Social Security #:** *****1178 |
| **Home Address:** [redacted] | **City/State:** [redacted] | **Zip Code:** [redacted] |
| **Ownership %:** 50 | **Email:** [redacted] | |

| | | |
|---|---|---|
| **Name of Owner Guarantor 2:** THRESA LARAE WILSON | **Cell Phone:** [redacted] | **Social Security #:** *****3349 |
| **Home Address:** [redacted] | **City/State:** [redacted] | **Zip Code:** [redacted] |
| **Ownership %:** 50 | **Email:** [redacted] | |

## PRIMARY TERMS

THIS AGREEMENT INCLUDES A JURY TRIAL AND CLASS ACTION WAIVER. PLEASE READ IT CAREFULLY.

In this Agreement, you are selling to us a specified amount of future payments your customers make for your goods and services, as further defined below ("Future Receipts"). We agree to buy from you (and you agree to sell to us) the amount of Future Receipts shown below (the "Amount Sold") in exchange for the "Purchase Price" shown below. In order to deliver to us the Amount Sold, you assign to us the share of your Future Receipts ("Specified Percentage") shown below, every Business Day from the date we deliver the Purchase Price until we have received the entire Amount Sold and all fees or other amounts due under this Agreement (the "Completion Amount").

We are buying Future Receipts from you, not loaning you money. You are not required to pay interest on the Purchase Price and this Agreement has no term or required payment amounts that are not subject to change based on your future revenue. Instead, your obligation is to deliver to us the Specified Percentage of your Future Receipts as they are generated in the ordinary course of your business. This means that your obligation to us aligns with your cash flow. When your Future Receipts decline because business is slow, you will be able to deliver Future Receipts to us more slowly.

By purchasing Future Receipts from you, we assume risks such as not obtaining the Future Receipts we bought as quickly as we anticipated, or not receiving all of them if you go out of business. However, you are not allowed to engage in "bad acts" that unfairly prevent us from receiving what we paid for. For example, unless you cease operations, you are not allowed to change the bank account in which we collect our Daily Delivery Amounts (see below) without our approval, block our ability to collect our Daily Delivery Amounts, sell your Future Receipts to another funding company (stacking) or close your business and start up another similar business right away. Additionally, you are representing that the information that you provided us is accurate in all material respects and that you have not omitted providing us with information that is material to your business. The details on this are below.

## Detailed Terms and Conditions

KEY BUSINESS TERMS AND DEFINITIONS:

| | | |
|---|---|---|
| **Amount Sold** | $1,168,125.00 | The dollar value of Future Receipts that Merchant agrees to sell to Purchaser. |
| **Purchase Price** | $875,000.00 | The total amount that Purchaser agrees to pay for the Amount Sold. |
| **Future Receipts** | $1,946,578.46 | All sums received by or payable to Merchant from its customers as payment for Merchant's goods and/or services in the ordinary course of Merchant's business after Merchant receives the Purchase Price from Purchaser. Future Receipts include, among other things, payments by cash, physical or electronic checks, credit cards, charge cards, debit cards, other payment cards, ACH or other electronic payments, and any other form of funds transfer or payment. When the Payment Card Split Method of delivering Future Receipts is used, Purchaser will collect only Future Receipts processed through the Approved Card Processor (defined below). |
| **Direct Payments to Third Parties/Renewals** | N/A | Amounts paid to Purchaser and/or Other Funders. |
| **Total Amount Sent to Merchant** | $875,000.00 | The Purchase Price minus the Origination Fee (see below) minus Direct Payments to Third Parties/Renewals (see above). |
| **Specified Percentage** | 20% | The percentage of Future Receipts that the Merchant is required to deliver to Purchaser until the entire Completion Amount is delivered to Purchaser in accordance with this Agreement. |
| **Daily Delivery Amount** | $4,635.42 | The dollar amount that Merchant and Purchaser agree to be an approximation of the Specified Percentage of Future Receipts each Business Day as of the date of this Agreement, based upon the information provided by Merchant to Purchaser concerning Merchant's most recent receipts. |
| **Discount Factor** | 1.335 | The adjustment to the Amount Sold that enables us to calculate the Purchase Price. |
| **Origination Fee** | $0.00 | The amount Purchaser will deduct from the Purchase Price and retain to compensate it for due diligence and other costs in evaluating whether to purchase the Amount Sold. |
| **Repurchase Price (applicable discounts)** | None | The discounted price Merchant may pay to end this financing transaction early by repurchasing Future Receipts sold to Purchaser but not yet delivered. The Repurchase Price is equal to the discount factor set forth in the column to the left for each month following the Commencement Date. This shall be multiplied by the Purchase price unless amounts collected prior to the date in which the Repurchase price is paid. |
| **Good Faith Estimate of Term** | 12 Months | This Agreement has no term. However, based on your historical revenue, we have estimated how long it will take you to deliver the Amount Sold to us under this Agreement. |
| **Commencement Date** | | The date when the Purchase Price is paid to Merchant. |
| **Business Day** | | Monday through Friday except bank holidays. |
| **Remittance Method** | ACH | Method of remittance agreed upon by Purchaser and Merchant. |

**Note: The bold type terms in the tables above and below shall constitute defined terms with respect to this Agreement. PLEASE NOTE THAT THE PURCHASER WILL NOT TAKE MORE THAN THE EXPECTED DAILY REMITTANCE WITHOUT THE CONSENT OF THE MERCHANT.**

I. SALE OF FUTURE RECEIPTS; PAYMENT OF PURCHASE PRICE:

1. **Sale of Future Receipts; Not a Loan.** In exchange for the Purchase Price, Merchant hereby sells, assigns, transfers and conveys (hereinafter, the "Sale") to Purchaser all of Merchant's right, title and interest in and to the Specified Percentage of its Future Receipts until the Completion Amount is delivered to Purchaser. This Sale is made without recourse against Merchant and Guarantor except as specifically set forth in this Agreement. By virtue of this Agreement, Merchant transfers to Purchaser full and complete ownership of the Amount Sold and Merchant retains no legal or equitable interest therein. Merchant and Purchaser agree that the Purchase Price is payment for the assignment and sale of the Amount Sold and that this transaction is not intended to be, nor shall it be construed as, a loan from Purchaser to Merchant. Furthermore, Purchaser's ability to collect the Amount Sold is contingent on the continued operation of Merchant's business, and the timing of deliveries of the Specified Percentage of Future Receipts will depend on how quickly Merchant's business generates Future Receipts.**Merchant and Guarantor expressly agree not to take the position that this transaction is a loan, and they expressly waive any and all claims and defenses based on that position in any action or proceeding arising out of this Agreement, including without limitation claims or defenses of usury.**

2. **Purchaser's Acceptance through Payment of Purchase Price.**
   a. Should Purchaser wish to accept this Agreement after the satisfactory completion of Purchaser's due diligence (in its discretion), Purchaser may accept the Agreement without signing it by sending Merchant the Purchase Price minus the Origination Fee, subject to Section 2(b) below.
   b. If Merchant previously sold Future Receipts to Purchaser but has not yet remitted the full Completion Amount pursuant to the prior transaction, Merchant hereby requests to repurchase the undelivered balance of the Amount Sold from that transaction and directs Purchaser to deduct the repurchase price from the Purchase Price and apply it to complete the prior transaction. Similarly, if Merchant previously obtained a loan from Purchaser and has a balance due on such loan, Merchant hereby instructs Purchaser to deduct the balance due on the prior loan from the Purchase Price and apply it to pay off the prior loan. In the event that the agreement for the prior sale of Future Receipts does not permit repurchase of any portion of the amount sold, such agreement is hereby amended to permit repurchase on the same terms as

set forth in this Agreement.

II. DELIVERY OF AMOUNT SOLD:

3. Method of Delivery of Amount Sold. Purchaser offers three methods by which Merchant may deliver the Specified Percentage of its Future Receipts to Purchaser: each Business Day ACH debits by Purchaser from Merchant's bank account, daily remittances from Merchant's payment card processor, and a lockbox arrangement. Each of these methods is described below. The method to be used initially is specified on the first page of this Agreement. The method of delivery may be changed by written agreement between Purchaser and Merchant.

a. Direct Debit Method.
Under the Direct Debit Method, Merchant agrees to deposit all Future Receipts into one (and only one) bank account which shall be preapproved by Purchaser (the "Approved Bank Account"). Merchant shall execute an ACH Authorization allowing Purchaser to debit directly from the Approved Bank Account each Business Day the Daily Delivery Amount via ACH debit, as specified below.

b. Payment Card Split Method.
Under the Payment Card Split Method, Merchant shall exclusively use a single Approved Card Processor (defined below) to process all payments made by credit, debit, and other payment cards for Merchant's goods and services. Merchant shall instruct such Approved Card Processor to remit each Business Day to Purchaser the Specified Percentage of the Future Receipts for that Business Day, and to remit the balance (less any fees charged by the Approved Card Processor) to Merchant.

c. Lockbox Method.
Under the Lockbox Method, Merchant agrees to deposit all Future Receipts into a special bank account established jointly by Purchaser and Merchant in accordance with a lockbox arrangement among Merchant, Purchaser and a banking institution chosen by Purchaser (the "Lockbox Account"), and Purchaser shall debit each Business Day the Daily Delivery Amount from the Lockbox Account.

4. Direct Debit Method and Lockbox Method Provisions. The following terms apply if either the Direct Debit Method or the Lockbox Method is used, unless otherwise specified herein.

a. Daily Delivery Amount. Purchaser and Merchant agree that, for efficiency purposes, Merchant may deliver the Specified Percentage of Future Receipts each Business Day by remitting the Daily Delivery Amount, which Purchaser has calculated to be roughly equivalent to the Specified Percentage of Merchant's historical revenue each Business Day. Purchaser, Merchant, and Guarantor acknowledge that Merchant's actual Future Receipts may vary each Business Day or from Merchant's historical revenue, but they agree that the Daily Delivery Amount is a fair and reasonable estimate of the Specified Percentage of Future Receipts. The Daily Delivery Amount may be adjusted as set forth in Section 11. Merchant also has the right to reconcile any difference between the Daily Delivery Amounts received in a given four-week period and the Specified Percentage of Future Receipts actually generated during that four-week period, as set forth in Sections 10 and 11.

At any time during the term of this Agreement, Purchaser may change the method by which it will accept the Daily Delivery by providing Merchant with written instructions of a new method of delivery of Daily Delivery to Purchaser.

5. Timing of Daily Deliveries. Merchant hereby authorizes Purchaser to debit the Daily Delivery Amount from the Approved Bank Account or the Lockbox Account, as applicable, via ACH or electronic checks once each Business Day. If a debit is scheduled to occur on a bank holiday, the debit shall be made on the following Business Day. Debits of the Daily Delivery Amount shall commence on a date selected by Purchaser which shall be no later than 15 days following the Commencement Date. Daily deliveries shall continue until Purchaser has received the Completion Amount, unless Merchant files for bankruptcy and/or goes out of business in the ordinary course, without first committing a Bad Act (as defined below). In the event that the final daily delivery results in Purchaser receiving more than Amount Sold (not including fees), Purchaser shall refund any amount in excess of the Amount Sold (not including fees) within 5 business days of the final daily delivery.

6. Approved Bank Account. If the Direct Debit Method is used, and for the purpose of allowing Purchaser to debit any fees due under this Agreement if the Payment Card Split Method is used, Merchant designates the bank account below as the Approved Bank Account, subject to approval by Purchaser. Merchant agrees to designate a different bank account acceptable to Purchaser if Purchaser does not approve the account designated below. In the event the Approved Bank Account becomes unavailable or Purchaser requests that a different bank account be used for any reason (such as difficulties debiting the Daily Delivery Amount from such bank account), Merchant shall arrange for another Approved Bank Account immediately, and in no event later than five calendar days after the prior account becomes unavailable or Purchaser requests the designation of a new Approved Bank Account. If any daily delivery (or multiple daily deliveries) required under the Direct Debit Method does not occur due to a change in the Approved Bank Account, Purchaser may debit the missed daily deliveries together with the next daily delivery.
**Account Number: 2000029095971 Routing Number: 061000227**

7. Lockbox Account. If the Lockbox Method is used, Merchant hereby authorizes Purchaser to initiate a lockbox arrangement and to instruct Merchant's Approved Card Processor and Merchant's invoiced customers/clients/vendees to deposit all sums due to Merchant from each of those parties directly to the Lockbox Account. If required, Merchant shall enter into a lockbox agreement with Purchaser and the banking institution chosen by Purchaser, and complete any additional paperwork, for the purpose of establishing the Lockbox Account.

8. Third Party Appointment and Authorization. By signing below, Merchant acknowledges that Purchaser may, at any time, at Purchaser's sole discretion, and without prior notice, appoint a third party, which may be an affiliate of Purchaser, including, without limitation, Kinetic Direct Funding, LLC (such third party being the "Servicing Agent") to perform any or all of the actions authorized by the ACH Authorization and the Agreement. Merchant further agrees and acknowledges that Servicing Agent shall have all of the same rights, responsibilities, and authorizations granted to Purchaser by the ACH Authorization and the Agreement. For purposes of clarity, any Servicing Agent may perform any and all activities to service the Agreement, including the collection of Future Receipts (as set forth above) and fees, as if it was the Purchaser.

9. Fees Associated with Daily Deliveries. It shall be Merchant's exclusive responsibility to pay to its banking institution and/or Purchaser's banking institution directly (or to compensate Purchaser if it is charged) all fees, charges and expenses incurred by either Merchant or Purchaser due to rejected electronic checks or ACH debit attempts, overdrafts or rejections by Merchant's banking institution of the transactions contemplated by this Agreement.

10. Merchant's Right to Reconciliation of Daily Deliveries.

a. Merchant shall have the right, in its sole and absolute discretion but subject to the provisions of Section 11 below, to request retroactive reconciliation of any difference between the Daily Delivery Amounts received by Purchaser through the four daily deliveries immediately preceding the day when such request for reconciliation is received by Purchaser (each such four-week period, a "Reconciliation Month") and the Specified Percentage of Future Receipts actually generated during that Reconciliation Month.

b. Purchaser will perform each timely requested reconciliation (each, a "Reconciliation") within five (5) Business Days following its receipt of the Merchant's request for reconciliation by either crediting or debiting the difference back to or from the Approved Bank Account or the Lockbox Account, as applicable, so that the total amount debited by Purchaser from the Approved Bank Account or the Lockbox Account (as applicable) during the Reconciliation Month at issue is equal to the Specified Percentage of the Future Receipts that Merchant actually collected during the Reconciliation Month at issue.

III. Request for Reconciliation Procedure.

11. Merchant's Right for Reconciliation of Daily Deliveries.

a. It shall be Merchant's sole responsibility and right hereunder to initiate Reconciliation of Merchant's actual Future Receipts during any Reconciliation Month by sending a request for reconciliation to Purchaser.

b. Any such request for Reconciliation of Merchant's Daily receipts for a specific Reconciliation Month shall be in writing, shall include a copy of Merchant's bank statement(s) and credit card processing statement(s) for the Reconciliation Month at issue, and must be received by Purchaser via email at customer.service@libertasfunding.com within five (5) Business Days after the last day of the Reconciliation Month at issue (time being of the essence). Any request for Reconciliation received after this deadline will not be honored.

c. Merchant shall have the right to request Reconciliation as many times during the term of this Agreement as it deems proper, and Purchaser shall comply with such request, provided that:

   i. Each such request is made in accordance with the terms of this Section 11.

   ii. If a request for Reconciliation is timely made after Purchaser has received the Completion Amount, and the Reconciliation results in part of the Completion Amount being refunded to Merchant, then Purchaser shall continue to receive daily deliveries until it receives the Completion Amount.

   iii. If Purchaser becomes aware that it has received funds that it is not entitled to, then Purchaser shall return those funds to the Merchant without request by the Merchant for reconciliation as set forth above.

d. Unless Purchaser has received the Completion Amount, Purchaser is entitled to continue receiving daily deliveries whether or not Merchant has made a request for Reconciliation. Merchant agrees not to take any action to interfere with daily deliveries based on the pendency of a request for Reconciliation.

12. Adjustment of Daily Delivery Amount.

a. If a Reconciliation is performed that results in a refund to the Merchant of at least 20% of the aggregate Daily Delivery Amounts received by Purchaser during the applicable Reconciliation Month, Merchant shall have the option to request, subject to the requirements of Section 13 below, modification ("Adjustment") of the Daily Delivery Amount on a going-forward basis. Purchaser in its sole and absolute discretion may allow a temporary Adjustment upon Merchant's proof of circumstances warranting such Adjustment, such as a natural disaster requiring temporary closure of Merchant's business. After an Adjustment is granted, the adjusted Daily Delivery Amount shall replace and supersede the amount of the Daily Delivery Amount set forth in the preamble of this Agreement and future daily deliveries shall be made in the adjusted amount. All Adjustments made in accordance with this section or other sections of this Agreement, shall be effective for one-month, after which time, the Merchant must provide Purchaser with its bank statements each month to allow Purchaser to re-evaluate the Merchant's information to determine whether a continued Adjustment is warranted.

b. The Adjustment of the Daily Delivery Amount shall be performed by Purchaser within five (5) Business Days following its receipt of the Merchant's request for Adjustment.

13. Request for Adjustment Procedure.

a. It shall be Merchant's sole responsibility and right to initiate the Adjustment by sending a request for Adjustment to Purchaser.

b. A request for Adjustment (an "Adjustment Request") shall be in writing, shall include copies of: (i) Merchant's three (3) consecutive bank statements for the Approved Bank Account or Lockbox Account, as applicable, immediately preceding the date of Purchaser's receipt of the Adjustment Request; (ii) Merchant's three (3) consecutive payment card processing statements immediately preceding the date of Purchaser's receipt of the Adjustment Request; and/or (iii) Merchant's bank statements and payment card processing statements previously provided by Merchant to Purchaser when applying to sell Future Receipts to Purchaser, or when applying for the most recent Adjustment that was made, if applicable. The Adjustment Request shall be sent by email to Purchaser at customer.service@libertasfunding.com within five (5) Business Days after the date that is the later of the last day for which activity is shown on the latest bank statement enclosed with the Adjustment Request and the last day for which activity is shown on the latest card processing statement enclosed with the Adjustment Request (time being of the essence). Any Adjustment Request received after this deadline will not be honored.

c. Merchant may request Adjustment of the Daily Delivery Amount as many times as it deems proper, and Purchaser shall comply with such Adjustment Requests, provided that:

   i. Each Adjustment Request is made in accordance with the requirements set forth in this Section 12;

   ii. No Adjustment Request may be made after Purchaser has received the Completion Amount; and

   iii. Unless Purchaser has received the Completion Amount, Purchaser is entitled to continue receiving daily deliveries whether or not Merchant has made an Adjustment Request. Merchant agrees not to take any action to interfere with daily deliveries based on the pendency of an Adjustment Request.

IV. Payment Card Split Method Provisions. The following terms (see Sections 14-16) apply if the Payment Cared Split Method is used, unless otherwise specified herein.

14. Approved Card Processor. Merchant agrees to enter into a payment card processing agreement with a payment card processor approved by Purchaser (the "Approved Card Processor") in order to obtain card processing services for credit cards, charge cards, debit cards, prepaid cards, or other payment cards used to purchase Merchant's goods and/or services. If Merchant has entered into a payment card processing agreement before

the date of this Agreement, Merchant may request that Purchaser review such agreement and any other information it deems pertinent for approval of the existing payment card processor in the sole and absolute discretion of Purchaser. Merchant agrees to process all of its payment card transactions through the Approved Card Processor, and not to switch to a different payment card processor or use an additional payment card processor without Purchaser's express written consent. If Purchaser permits Merchant to use a different payment card processor, the new processor shall become the Approved Card Processor. In the event the Approved Card Processor becomes unavailable or Purchaser requests that a different payment card processor be used for any reason (such as the Approved Card Processor failing to timely deliver the Specified Percentage of Future Receipts to Purchaser on a consistent basis), Merchant shall arrange for another Approved Card Processor immediately, and in no event later than five calendar days after the Approved Card Processor becomes unavailable or Purchaser requests the designation of a new Approved Card Processor.

15. **Processing Arrangement.** Merchant hereby authorizes and directs the Approved Card Processor, and any other processor, acquirer, service provider, or financial institution taking custody of, holding, possessing, or issuing payment instructions with respect to Future Receipts (together, the "Receipts Custodians") to deliver the Specified Percentage of Future Receipts on each Business Day (the "Daily Delivery Amount") to Purchaser rather than Merchant until Purchaser has received the Completion Amount, or, in the event that Purchaser declares the entire Completion Amount to be deliverable based on a breach of this Agreement, to deliver this amount. On days when banks are not open, the Specified Percentage will be delivered to Purchaser on the next banking day. For example, the Specified Percentage for Friday, Saturday, and Sunday will be delivered on the following Monday (or Tuesday if Monday is a bank holiday). Merchant acknowledges that the Approved Card Processor will be acting on behalf of Purchaser to collect the Specified Percentage of Future Receipts. Merchant agrees that the Future Receipts sold under this Agreement are Purchaser's property. Purchaser shall have no obligation to refund or return the Amount Sold or any portion thereof to Merchant in the event that the Approved Card Processor or any other Receipts Custodian initiates a refund, credit, reversal, or chargeback of a transaction subject to this Agreement, as such adjustments typically are netted against future card volume. Merchant agrees that when a Receipts Custodian takes custody of, holds, possesses, or issues payment instructions with respect to Future Receipts, it does so in trust for Purchaser. If there has not been a default, a Receipts Custodian will not deliver any particular day's Daily Amount to us if that Daily Amount has already been delivered to us by another Receipts Custodian. **Merchant agrees that it does not have the right to revoke or otherwise seek to override the authorization and direction set forth in this section and that this authorization may only be revoked by Purchaser.** You agree that a Receipts Custodian may rely on any instructions issued by us with respect to the delivery of the Future Receipts, including an instruction to deliver all Future Receipts to us in the event we declare the Completion Amount to be deliverable based on a breach of this Agreement. You waive and release any and all claims you may have against any Receipts Custodian that are in any way related to the Receipts Custodian delivering Future Receipts to us as described in this section. You authorize each Receipts Custodian to provide us with any and all information we request about the Receivables that Receipts Custodian possesses or has access to, including without limitation information about daily volumes, number of transactions, distributions, chargebacks, offsets, withdrawals, and totals. **YOU, YOUR SUCCESSORS AND PERMITTED ASSIGNEES AND AFFILIATES, AGREE TO FOREVER DEFEND, PROTECT, INDEMNIFY AND HOLD HARMLESS PURCHASER, EACH RECEIPTS CUSTODIAN, AND THEIR AND OUR SUCCESSORS, ASSIGNS, OFFICERS, DIRECTORS, MANAGERS, MEMBERS, AFFILIATES, AND REPRESENTATIVES AGAINST ALL DAMAGES, EXPENSES, CLAIMS, SUITS, DEMANDS, COSTS, ATTORNEYS' FEES OR LOSSES ARISING OUT OF OR ALLEGED TO HAVE ARISEN OUT OF OR IN CONNECTION WITH DELIVERING FUTURE RECEIPTS TO US AS DESCRIBED IN THIS SECTION. IN NO EVENT WILL WE OR THE RECEIPTS CUSTODIANS BE LIABLE TO YOU OR TO ANY THIRD PARTY FOR ANY LOSS OF USE, REVENUE OR PROFIT OR LOSS OF DATA OR FOR ANY DIRECT, CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL OR PUNITIVE DAMAGES, WHETHER ARISING OUT OF BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, REGARDLESS OF WHETHER SUCH DAMAGE WAS FORESEEABLE AND WHETHER OR NOT SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.**The Parties agree that any amounts due a Receipts Custodian under your agreement with such Receipts Custodian or otherwise take priority over amounts to be delivered to us under this Agreement. The Parties agree that each Receipts Custodian is a third-party beneficiary of this Agreement and may rely on this Agreement even though it is not a party to this Agreement. You grant to us an irrevocable power of attorney, coupled with an interest, and appoint us and our designees as your attorney-in-fact, to take any and all actions necessary or appropriate to direct any new or additional processor to make payment to us as contemplated by this Section.

a. **Processing Trial.** After this Agreement has been executed by Purchaser and Merchant, Purchaser has the option in its sole and absolute discretion to conduct a processing trial (the "Processing Trial") to determine whether the Specified Percentage will be correctly processed and/or reported by the Approved Card Processor to Purchaser. If Purchaser elects to conduct a Processing Trial, Merchant acknowledges and agrees that Purchaser will decide in its sole and absolute discretion whether to purchase the Amount Sold after completion of the Processing Trial. If Purchaser elects not to do so, any amounts received by Purchaser during the Processing Trial shall be refunded to the Merchant.

V. 16. **MERCHANT'S OBLIGATIONS, COVENANTS, REPRESENTATIONS AND WARRANTIES** Merchant agrees, covenants, represents, and warrants as follows at the time it executes this Agreement and on a continuing basis until such time as Purchaser has received the Completion Amount or Merchant has filed for bankruptcy or gone out of business in the ordinary course:

a. **Business Purpose; Use of Purchase Price.** **MERCHANT REPRESENTS AND WARRANTS THAT IT IS ENTERING INTO THIS AGREEMENT SOLELY FOR BUSINESS PURPOSES AND NOT FOR PERSONAL, FAMILY OR HOUSEHOLD PURPOSES.** Merchant agrees to use the Purchase Price exclusively for the benefit and advancement of Merchant's business operations and for no other purpose.

b. **Financial Condition and Financial Information.** Merchant represents and warrants that its bank and financial statements, copies of which have been furnished to Purchaser, and future statements which may be furnished hereafter pursuant to this Agreement or upon Purchaser's request, fairly represent the financial condition of Merchant or other information set forth therein as of the dates such statements are issued, and prior to execution of the Agreement there have been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant has a continuing, affirmative obligation to advise Purchaser of any material adverse change in its financial condition, operation, or ownership. Purchaser may request statements at any time during the term of this Agreement and Merchant shall provide them to Purchaser within Five (5) Business Days. Merchant's failure to do so is a material breach of this Agreement.

c. **Read Only Access to the Approved Bank Account and Approved Card Account.** Merchant hereby agrees that, until Purchaser has received the Completion Amount, Purchaser shall have the right to perform ongoing read-only electronic monitoring of transactions occurring in the Approved Bank Account and Merchant's account with the Approved Card Processor (the "Approved Card Account"). Merchant agrees to provide Purchaser all required online access codes for the Approved Bank Account and the Approved Card Account. If Purchaser's electronic (online) access to Merchant's Approved Bank Account or the Approved Card Account is disabled for any reason, Merchant shall immediately and diligently undertake all steps required of it to restore Purchaser's access to both accounts. Merchant's failure to comply with the provisions of this Section 16 shall constitute Merchant's material breach of its obligations under this Agreement.

d. Governmental Approvals. Merchant represents and warrants that it is in compliance and, until Purchaser receives the Completion Amount, shall be in compliance with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged.

e. Good Standing. Merchant represents and warrants that it is a corporation/limited liability company/limited partnership/other type of business entity that is in good standing and duly incorporated or otherwise organized and validly existing under the laws of its jurisdiction of incorporation or organization and has full power and authority necessary to carry its business as it is now being conducted.

f. Authorization. Merchant represents and warrants that it has all requisite power to execute, deliver and perform this Agreement and consummate the transactions contemplated hereunder; entering into this Agreement will not result in breach or violation of, or default under, any agreement or instrument by which Merchant is bound or any statute, rule, regulation, order, or other law to which Merchant is subject, nor require the obtaining of any consent, approval, permit or license from any governmental authority having jurisdiction over Merchant. All organizational and other proceedings required to be taken by Merchant to authorize the execution, delivery and performance of this Agreement have been taken. The person signing this Agreement on behalf of Merchant represents and warrants that he or she has full power and authority to bind Merchant to perform its obligations under this Agreement.

g. Accounting Records and Tax Returns. Merchant shall treat receipt of the Purchase Price and delivery of the Specified Percentage of Future Receipts in a manner consistent with its nature as a true sale of Future Receipts in its accounting records and tax returns and further agrees that Purchaser is entitled to audit Merchant's accounting records upon reasonable Notice in order to verify compliance. Merchant hereby waives any rights of privacy, confidentiality, or taxpayer privilege in any litigation or arbitration arising out of this Agreement in which Merchant asserts that this transaction is anything other than a sale of future receipts.

h. Taxes; Workers Compensation Insurance. Merchant will promptly pay, when due, all taxes, including, without limitation, income, employment, sales and use taxes, imposed upon Merchant's business by law, and will maintain workers compensation insurance required by applicable governmental authorities.

i. Business Insurance. Merchant will maintain general liability and business-interruption insurance in the amounts and against risks as are satisfactory to Purchaser and shall provide Purchaser proof of such insurance upon request.

j. No Change of Business. You will not materially change the goods or services you sell, materially change the nature of your business, change the business entity through which you carry on your business, change any of the locations where you operate your business, or change the name under which you do business without first notifying us and obtaining our prior written consent.

k. No Closing of Business. Merchant represents and warrants that it has no current plans to close its business either temporarily (for renovations, repairs or any other purpose), or permanently. Merchant agrees that, until Purchaser receives the Completion Amount, Merchant will not voluntarily close its business on a permanent or temporary basis for renovations, repairs, or any other purposes. Notwithstanding the foregoing, Merchant shall have the right to close its business temporarily if such closing is necessitated by a requirement to conduct renovations or repairs imposed upon Merchant's business by legal authorities having jurisdiction over Merchant's business (such as from a health department or fire department) or if such closing is necessitated by circumstances outside Merchant's reasonable control. Prior to any such temporary closure of its business, Merchant shall provide Purchaser ten (10) Business Days' advance notice, or as much notice as reasonably possible under the circumstances.

l. No Pending Bankruptcy. As of the date of Merchant's execution of this Agreement, Merchant is not insolvent, has not filed, and does not contemplate filing, any petition for bankruptcy protection under Title 11 of the United States Code, and there has been no involuntary bankruptcy petition brought or threatened against Merchant. Merchant represents that it has not consulted with a bankruptcy attorney on the issue of filing bankruptcy within the six-month period immediately preceding the date of this Agreement. A breach of any of these representations shall be a material breach of this Agreement. If you go out of business or become the subject of a voluntary or involuntary bankruptcy filing within forty-five (45) days of our purchasing the Amount Sold, you agree that there will be a rebuttable presumption of a material breach.

m. Estoppel Certificate. Each time that we request, you will, upon at least one (1) day's prior notice from us, execute, acknowledge and deliver to us and/or to any other person, person firm or corporation specified by us, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which all or any portion of the Amount Sold has been delivered.

n. Unencumbered Future Receipts. Merchant has and will continue to have good, complete and marketable title to all Future Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests other than by virtue or entering into this Agreement. Merchant shall not sell Future Receipts or obtain any additional financing before Purchaser has received the Completion Amount without Purchaser's express written consent. Merchant shall not take any action inconsistent with or in derogation of Purchaser's ownership of the Amount Sold.

o. No Default Under Contracts with Third Parties. Merchant's execution of and/or performance of its obligations under this Agreement will not cause or create an event of default by Merchant under any contract which Merchant is or may become a party to, or otherwise violate any of Merchant's obligations to third parties.

p. Right of Access. In order to ensure Merchant's compliance with the terms of this Agreement, Merchant hereby grants Purchaser the right to enter, without notice, the premises of Merchant's business for the purpose of inspecting and checking Seller's transaction processing terminals to ensure the terminals are properly programmed to submit and or batch Merchant's Future Receipts to its Approved Card Processor and to ensure that Merchant has not violated any other provision of this Agreement. Furthermore, Merchant hereby grants Purchaser and its employees and consultants' access to Merchant's employees and records and all other items of property located at the Merchant's place of business during the term of this Agreement. Merchant hereby agrees to provide Purchaser, upon request, all and any information concerning Merchant's business operations, banking relationships, names and contact information of Merchant's suppliers, vendors and landlord(s), to allow Purchaser to interview any of those parties regarding any matters relevant to this Agreement.

q. Phone Recordings and Contact. Merchant agrees that any call between Merchant and Purchaser and its owners, managers, employees and agents may be recorded and/or monitored.

r. Knowledge and Experience of Decision Makers. The persons authorized to make management and financial decisions on behalf of Merchant with respect to this Agreement have such knowledge, experience and skill in financial and business matters in general and with respect to transactions of a nature similar to the one contemplated by this Agreement so as to be capable of evaluating the merits and risks of, and making an informed business decision with regard to, Merchant entering into this Agreement.

s. Merchant's Due Diligence. The person authorized to sign this Agreement on behalf of Merchant: (i) has received all information that such person deemed necessary to make an informed decision with respect to a transaction contemplated by this Agreement; and (ii) has had unrestricted opportunity to make such investigation as such person desired pertaining to the transaction contemplated by this Agreement and verify any such information furnished to him or her by Purchaser.

t. Arm's-Length Transaction. The person signing this Agreement of behalf of Merchant: (a) has read and fully understands content of this

Agreement; (b) has consulted to the extent he/she wished with Merchant's own counsel in connection with the entering into this Agreement; (c) he or she has made sufficient investigation and inquiry to determine whether this Agreement is fair and reasonable to Merchant, and whether this Agreement adequately reflects his or her understanding of its terms.

u. **Integration; No Reliance on Oral Representations.** This Agreement contains the entire agreement between Merchant and Purchaser with respect to the subject matter of this Agreement and supersedes each course of conduct previously pursued or acquiesced in, and each oral agreement and representation previously made, by the parties with respect thereto (if any), whether or not relied or acted upon. No course of performance or other conduct subsequently pursued or acquiesced in, and no oral agreement or representation subsequently made, whether or not relied or acted upon, and no usage of trade, whether or not relied or acted upon, shall amend this Agreement or impair or otherwise affect the parties' obligations pursuant to this Agreement or any rights and remedies of the parties to this Agreement.

VI. PLEDGE OF SECURITY:

17. **Acknowledgment of Security Interest and Security Agreement.** The Future Receipts sold by Merchant to Purchaser pursuant to this Agreement are "accounts" or "payment intangibles" as those terms are defined in the Uniform Commercial Code in effect in the state in which Merchant is located (the "UCC"). Such Sale shall constitute and shall be construed and treated for all purposes as a true and complete sale, conveying good title to the Future Receipts free and clear of any liens and encumbrances, from Merchant to Purchaser. To the extent the Future Receipts are "accounts" or "payment intangibles" then (i) the sale of the Future Receipts creates a security interest as defined in the UCC; (ii) this Agreement constitutes a "security agreement" under the UCC; and (iii) Purchaser has all the rights of a secured party under the UCC with respect to such Future Receipts. Merchant further agrees that, with or without an Event of Default, Purchaser may notify account debtors, or other persons obligated on the Future Receipts, on holding the Future Receipts of Merchant's sale of the Future Receipts and may instruct them to make payment or otherwise render performance to or for the benefit of Purchaser.

18. **Financing Statements.** Merchant authorizes Purchaser to file one or more UCC-1 forms consistent with the UCC to give notice that the Amount Sold is the sole property of Purchaser. The UCC filing may state that such sale is intended to be a sale and not an assignment for security and may state that Merchant is prohibited from obtaining any financing that impairs the value of the Amount Sold or Purchaser's ability to collect same. Merchant authorizes Purchaser to debit the Approved Bank Account or Lockbox Account, as applicable, for all costs incurred by Purchaser associated with the filing, amendment or termination of any UCC filings.

19. **Security.** You understand that we have the right to take delivery of the Future Receipts we purchased as they are generated in the ordinary course of your business. The Security Interest granted in this section is being given solely for the purpose of ensuring that you do not take any action to deprive us of that right. This Security Interest does not mean that we have made a loan to you, does not create a debt, and does not make you a debtor or us a creditor. As security for the prompt and complete performance of any and all obligations, covenants, and agreements of Merchant under this Agreement, now or hereafter arising from, out of, or relating to this Agreement, whether direct, indirect, contingent or otherwise (hereinafter referred to collectively as the "Merchant Obligations"), Merchant hereby pledges, assigns and hypothecates to Purchaser and grants to Purchaser a continuing, perfected and first priority lien upon and security interest in, to and under all of Merchant's right, title and interest in and to the following (collectively, the "Collateral"), whether now existing or hereafter from time to time acquired:

a. all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined by Article 9 of the UCC, now or hereafter owned or acquired by Merchant; and
b. all Merchant's proceeds, as that term is defined by Article 9 of the UCC.

20. **Termination of Pledge.** Upon the performance by Merchant in full of the Merchant Obligations, the security interest in the Collateral pursuant to this Pledge shall automatically terminate without any further act of either party being required, and all rights to the Collateral shall revert to Merchant. Upon any such termination, Purchaser will execute, acknowledge (where applicable) and deliver such satisfactions, releases and termination statements, as Merchant shall reasonably request.

21. **Representations with Respect to Collateral.** Merchant hereby represents and warrants to Purchaser that: the execution, delivery and performance by Merchant of this Pledge, and the remedies in respect of the Collateral under this Pledge (i) have been duly authorized; (ii) do not require the approval of any governmental authority or other third party or require any action of, or filing with, any governmental authority or other third party to authorize same (other than the filing of the UCC-1s); (iii) do not and shall not (A) violate or result in the breach of any provision of law or regulation, any order or decree of any court or other governmental authority, or (B) violate, result in the breach of or constitute a default under or conflict with any indenture, mortgage, deed of trust, agreement or any other instrument to which Merchant is a party or by which any of Merchant's assets (including, without limitation, the Collateral) are bound.

22. **Further Assurances.** Upon the request of Purchaser, Merchant at its sole cost and expense, shall execute and deliver all such further UCC-1s, continuation statements, assurances and assignments of the Collateral, and consents with respect to the pledge of the Collateral and the execution of this Pledge, and shall execute and deliver such further instruments, agreements and other documents and do such further acts and things, as Purchaser may request in order to more fully effectuate the purposes of this Pledge and the assignment of the Collateral and obtain the full benefits of this Pledge and the rights and powers herein created.

23. **Attorney-in-fact.** Merchant hereby authorizes Purchaser at any time to take any action and to execute any instrument, including without limitation to file one or more financing statements and/or continuation statements, to evidence and perfect the security interest created hereby and irrevocably appoints Purchaser as its true and lawful attorney-in-fact, which power of attorney shall be coupled with an interest, with full authority in the place and stead of Merchant and in the name of Merchant or otherwise, from time to time, in Purchaser's sole and absolute discretion, including without limitation (a) for the purpose of executing such statements in the name of and on behalf of Merchant, and thereafter filing any such financing and/or continuation statements and (b) to receive, endorse and collect all instruments made payable to Merchant.

VII. EVENTS OF DEFAULT AND REMEDIES:

24. **Events of Default by Merchant.** The occurrence of any of the following events shall constitute an "Event of Default" by Merchant:

a. **Events of Default.**
b. **Bad Acts.** If you commit any of the following acts ("Bad Acts") without our prior written consent before we receive the Completion Amount,

you will be in default:

i. you sell, transfer or otherwise encumber or attempt to sell, transfer or otherwise encumber Future Receipts, whether or not such Future Receipts are part of the Amount Sold, sometimes referred to as "stacking" our Purchase Price with other funding companies;
ii. you encumber or allow any encumbrance to attach to our interest in the Amount Sold;
iii. you sell all or substantially all of your assets used in the operation of your business to a third party;
iv. you materially change the operation of your business (e.g., changes in industry, concept, size, etc.);
v. you stop accepting a particular method of payment while you remain open for business;
vi. you change your legal name or jurisdiction of formation, or carry-on business through a different business entity;
vii. you change, close, or terminate the Approved Bank Account or Approved Card Processor, or interfere with the lockbox arrangement, without our express written consent;
viii. you do not obtain a replacement Approved Bank Account or Approved Card Processor acceptable to us within fifteen (15) days after your bank or processor terminates its relationship with you;
ix. you process any card transaction through a payment card processor other than the Approved Card Processor;
x. you provide us with false or misleading information about your business or revenue (in your application or otherwise) that is material to our decision to purchase Future Receipts from you;
xi. you deposit or cause to be deposited by others Future Receipts into any account other than the Approved Bank Account or Lockbox Account, if applicable;
xii. you take or fail to take an action that hinders our taking delivery of our Specified Percentage of Future Receipts from the Approved Bank Account, Lockbox Account, or any Receivables Custodian, as applicable;
xiii. you disconnect or interfere with the operation of Purchaser's bank monitoring software; or
xiv. you commit any act or omission specified in this Agreement to be a material breach. However, we will not consider any of these acts to be Bad Acts if they occur because you go out of business in the ordinary course. These Bad Acts are prohibited solely to protect our ability to collect the Amount Sold and receive the benefit of our bargain. They do not create any obligation for Merchant to deliver Future Receipts to Purchaser if they are simply not generated by Merchant's business.

c. Other Breaches. If you commit an act that is not a Bad Act but that otherwise violates a term or covenant in this Agreement (an "Other Breach"), you will be in default.

25. **Remedies.** If you commit a Bad Act, you will be liable to us in an amount in cash equal to (a) the undelivered portion of the Amount Sold, plus (b) any other fees and other amounts due to us under this Agreement, plus (c) any additional amounts you would owe us for committing an Other Breach. If you commit an Other Breach, you will be liable to us for all damages resulting from the Other Breach, including, but not limited to, our reasonable attorneys' fees, expenses and costs incurred in any proceeding pursued against you to recover the amounts due us under this Agreement. You agree to pay us the amounts due or we may (d) withdraw such amounts from the Approved Bank Account or Lockbox Account, as applicable, or any other account into which you deposit Future Receipts, via ACH or electronic checks; (e) direct the Approved Card Processor, any other Receipts Custodian, and/or any other payment card processor you use in violation of this Agreement to deliver all of your Future Receipts to us until we have received the amount due; (f) enforce our rights as a secured creditor under the UCC including, without limitation, notifying any of your account debtor(s) of our security interest; (g) enforce Guarantor's personal guaranty of performance provisions of this Agreement against the Guarantor(s) without first seeking recourse from Merchant; (h) commence a suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Merch ant's and Guarantor's obligations hereunder or any other legal or equitable right or remedy including without limitation Purchaser's rights of a secured party under the UCC. All rights available to us are cumulative and not exclusive of any other remedies available to us in law or equity.

26. **Power of Attorney.** Each Merchant and Guarantor irrevocably appoints Purchaser and its representatives as their respective agents and attorneys-in-fact with full authority to take any action or execute any instrument or document to do the following: (A) to settle all obligations due to Purchaser from any payment card processor and/or account debtor(s) of Merchant; (B) upon occurrence of a Bad Act, to perform any and all such obligations of Merchant under this Agreement, including without limitation (i) to collect monies due or to become due under or in respect of any of the Collateral; (ii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) above; (iii) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to Purchaser; and (iv) to file any claims or take any action or institute any proceeding against Merchant and/or Guarantor which Purchaser may deem necessary for the collection of any portion of the undelivered Amount Sold from the Collateral, or otherwise to enforce its rights under this Agreement.

27. **Service of Process.** Merchant and Guarantor(s) consent to service of process and legal notices made by Certified or Priority Mail delivered by the United States Postal Service and addressed to the respective party's address set forth on the first page of this Agreement or any other address(es) provided in writing to Purchaser by Merchant or Guarantor(s), and unless applicable law or rules provide otherwise, any such service or legal notice will be deemed complete upon dispatch. Merchant and Guarantor(s) agree that it will be precluded from asserting that it did not receive service of process or any other legal notice mailed to the address located in the Merchant Information and Owner Information sections set forth on the first page of this Agreement if it does not furnish a certified mail return receipt signed by Purchaser demonstrating that Purchaser was provided with a notice of a change of address.

VIII. ADDITIONAL TERMS:

28. **Fees.** In addition to all other sums due to Purchaser under this Agreement, Merchant shall pay to Purchaser:

a. An Origination Fee of $0.00 upon entering into this Agreement as reimbursement of Purchaser's costs associated with entering into this Agreement (the cost of due diligence on the Merchant's business, financial and legal due diligence, etc.)
b. A Non-Sufficient Funds ("NSF") fee of $35 in each and every instance when delivery of the Daily Delivery Amount to Purchaser has failed due to insufficient funds in the Merchant's Approved Bank Account or Lockbox Account, as applicable; provided, however, that no NSF fee shall be due when the delivery failed because Merchant's business did not generate sufficient Future Receipts to cover the Daily Delivery Amount and Merchant promptly requested Reconciliation and/or Adjustment.
c. $100 in each and every instance when Merchant blocks Purchaser's access (or otherwise prevents Purchaser from accessing) Merchant's bank accounts.
d. $2,500 in each and every instance when, upon occurrence of an Event of Default, Purchaser shall have agreed to waive Merchant's default.

29. **Financial Condition.** Merchant and its Guarantor(s) authorize Purchaser and its agents to investigate their financial responsibility and history

and will provide to Purchaser any bank or financial statements, tax returns, etc., as deems necessary prior to or at any time after execution of this Agreement. A photocopy or electronic image of this authorization will be deemed as acceptable for release of financial information. Purchaser is authorized to update such information and financial profiles from time to time as it deems appropriate.

30. Transactional History. Merchant shall execute written authorization(s) to their bank(s) to provide Purchaser with Merchant's banking and/or credit-card processing history.

31. No Liability. In no event shall Purchaser be liable for any claims asserted by Merchant or its Guarantor under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by Merchant and Guarantor(s).

32. Right to Cancel.

i. Notwithstanding anything to the contrary set forth in this Agreement, Purchaser shall have the right to cancel this agreement any time prior to its delivery of the Purchase Price to Merchant and, upon such cancellation, this Agreement shall become null, and void and the parties shall have no obligation to, or rights against, each other, except that all sums delivered by Merchant to Purchaser on account of entering into this Agreement shall be promptly returned to Merchant.
ii. Notwithstanding anything to the contrary set forth in this Agreement, in the event Merchant has not been in default under this Agreement, Merchant shall have the right to cancel this Agreement any time until the midnight of the second (2nd) Business Day following the date of its receipt of the Purchase Price by notifying Purchaser of such cancellation by notice sent in accordance with this Agreement. Upon timely delivering such cancellation notice to Purchaser, and further provided that Merchant has otherwise complied with the provisions of this Agreement, Merchant shall refund the entire amount of the Purchase Price back to Purchaser within five (5) Business Days following the date of Merchant's receipt of the Purchase Price. Upon such refund of the Purchase Price back to Purchaser, this Agreement shall become null and void and the parties shall have no remaining obligations to or rights against each other except that Purchaser shall have the right keep, as fair and adequate compensation for its costs of entering into this Agreement with Merchant, the Origination Fee and all Daily Delivery Amounts received by Purchaser prior to the date when this Agreement is terminated.

IX. GUARANTY OF PERFORMANCE OF MERCHANT'S OBLIGATIONS:

33. Guarantor's Representations. Guarantor represents and warrants to Purchaser that:

a. Guarantor is an owner, officer, or manager of Merchant and will directly benefit from Purchaser and Merchant entering into the Agreement.
b. Guarantor understands and acknowledges that Purchaser is not willing to enter into the Agreement unless Guarantor irrevocably, absolutely and unconditionally guarantees prompt and complete performance of any and all liabilities, obligations, covenants or agreements of Merchant under this Agreement, now or hereafter arising from, out of or relating to this Agreement, whether direct, indirect, contingent or otherwise (hereinafter referred to collectively as the "Merchant Obligations").

34. Guaranty of Merchant's Obligations. Guarantor hereby irrevocably, absolutely and unconditionally guarantees to Purchaser prompt, full, faithful, and complete performance and observance of all Merchant Obligations; and Guarantor unconditionally covenants to Purchaser that if Merchant shall at any time breach any of the Merchant Obligations, Guarantor shall perform (or cause to be performed) the Merchant Obligations and pay all damages and other amounts stipulated in this Agreement with respect to the non-performance of the Merchant Obligations, or any of them.

35. Guarantor's Other Agreements. Guarantor will not dispose, convey, sell or otherwise transfer, or cause Merchant to dispose, convey, sell or otherwise transfer, any material business assets of Merchant without the prior written consent of Purchaser, which consent may be withheld for any reason, until Purchaser has received the Completion Amount. Guarantor shall pay to Purchaser upon demand all expenses (including, without limitation, reasonable attorneys' fees and disbursements) incurred as the result of, or incidental to, or relating to, the enforcement or protection of Purchaser's rights against Merchant and Guarantor under the Agreement. This Guaranty is binding upon Guarantor and Guarantor's heirs, legal representatives, successors and assigns and shall inure to the benefit of and may be enforced by the successors an assign of Purchaser. The obligation of Guarantor shall be unconditional and absolute, regardless of the unenforceability of any provision of any agreement between Merchant and Purchaser, or the existence of any defense, setoff or counterclaim, which Merchant may assert. Purchaser is hereby authorized, without notice or demand and without affecting the liability of Guarantor hereunder, to at any time renew or extend Merchant's obligations under the Agreement or otherwise modify, amend or change the terms of the Agreement.

36. Two Or More Guarantors. If there is more than one Guarantor, "Guarantor" in this Agreement shall mean all Guarantors and the obligations of the Guarantors hereunder shall be joint and several.

37. Waiver; Remedies. No failure on the part of Purchaser to exercise, and no delay in exercising, any right under this Guaranty shall operate as a waiver, nor shall any single or partial exercise of any right under this Guaranty preclude any other or further exercise of any other right. The remedies provided in this Guaranty are cumulative and not exclusive of any remedies provided by law or equity. In the event that Merchant fails to perform any obligation under the Agreement, Purchaser may enforce its rights under this Guaranty without first seeking to obtain performance for such default from Merchant or any other guarantor.

38. Acknowledgment of Purchase. Guarantor acknowledges and agrees that the Purchase Price paid by Purchaser to Merchant in exchange for the Amount Sold is adequate consideration for the purchase of the Amount Sold and is not a loan or financial accommodation from Purchaser to Merchant. Guarantor specifically acknowledges Purchaser is not a lender, bank, or credit card processor, and that Purchaser has not offered any loans to Merchant. Guarantor waives any claims or defenses of usury in any action arising out of this Agreement.

39. Severability. If for any reason any court of competent jurisdiction finds any provisions of this Agreement applicable to the Guarantor to be void or voidable, the parties agree that the court may reform such provision(s) to render the provision(s) enforceable ensuring that the restrictions and prohibitions contained in those provisions shall be effective to the fullest extent allowed under applicable law.

40. Opportunity for Attorney Review. Guarantor represents that he/she has carefully read this Agreement and has, or had an opportunity to, consult with his or her attorney. Guarantor understands the contents of this Agreement, signs it as his or her free act and deed and agrees to be bound by the provisions hereof.

X. MISCELLANEOUS:

41. Modifications; Agreements. No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by all parties.

42. Assignment. Purchaser may assign, transfer or sell its rights or delegate its duties hereunder, either in whole or in part without prior notice to the Merchant or the Guarantor. Neither Merchant nor Guarantor shall have the right to assign their respective rights or obligations under this Agreement without first obtaining Purchaser's written consent.

43. Notices. All notices, requests, consent, demands and other communications required or permitted to be given under this Agreement, other than service of process and legal notices (see section 27 above), shall be delivered by Certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in the Merchant Information and Owner Information sections on in the first page of this Agreement unless the Merchant and/or Guarantor(s) has received a Certified mail return receipt signed by Purchaser demonstrating that the Purchaser was provided with Merchant's and/or Guarantors'(s') notice of a change of address. Notices governed by this section shall become effective as of the date of the receipt.

44. Waiver Remedies. No failure on the part of any party to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

45. Binding Effect. This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.

46. Governing Law, Venue and Jurisdiction. This Agreement shall be governed by and construed exclusively in accordance with the laws of the State of New York, without regard to any applicable principles of conflicts of law. Any lawsuit, action or proceeding arising out of or in connection with this Agreement shall be instituted exclusively in any court sitting in New York State (the "Acceptable Forums"). Each party signing this Agreement agrees that the Acceptable Forums are convenient, and irrevocably submits to the jurisdiction of the Acceptable Forums and waives any and all objections to inconvenience of the jurisdiction or venue. Should a proceeding be initiated in any other forum, the parties waive any right to oppose any motion or application made by either party to transfer such proceeding to an Acceptable Forum.

47. Survival of Representation, etc. All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been complied with and satisfied in full and this Agreement shall have terminated.

48. Severability. In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

49. Waiver of Class Action; Waiver of Jury Trial. By entering into this agreement, the parties agree that they may bring claims against the other only in their individual capacity, and THE PARTIES ARE EACH EXPRESSLY WAIVING ANY AND ALL RIGHT TO PARTICIPATE AS A REPRESENTATIVE OR MEMBER IN ANY CLASS ACTION, PUTATIVE OR PURPORTED CLASS ACTION, REPRESENTATIVE ACTION, PRIVATE ATTORNEY GENERAL ACTION, OR SIMILAR ACTION RELATING TO ANY CLAIMS (AS HEREINAFTER DEFINED), WHETHER BROUGHT UNDER STATE OR FEDERAL LAW.The parties are each expressly waiving any and all right to join or consolidate claims in any proceeding with those of any other person (except any obligors and guarantors of the same agreement). Further, BY ENTERING INTO THIS AGREEMENT, THE PARTIES ARE EACH EXPRESSLY WAIVING THEIR RESPECTIVE RIGHTS TO A JURY TRIAL FOR ALL CLAIMS. The term "Claim" means any claim, dispute, or controversy (whether based on contract, tort, statute, or otherwise, and whether seeking monetary or any form of non-monetary relief) arising out of or relating to this Agreement or the relationship between or among the parties (collectively, "Claims"). The term Claims is to be given its broadest possible meaning, and includes pre-existing, present, and future Claims, and Claims regarding the enforceability or scope of this waiver. For purposes of this waiver only, the term "party" means that party and all of its respective parents, subsidiaries, affiliates, predecessors, successors, assigns, agents, vendors, employees, officers, and directors. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

50. Captions. The captions in this Agreement are inserted for convenience of reference only and in no way define, describe or limit the scope or intent of this contract or any of the provisions hereof.

51. Counterparts and Facsimile Signatures. This Agreement can be signed in one or more counterparts, each of which shall constitute an original and all of which when take together shall constitute one and the same agreement. Signatures delivered via facsimile and/or via Portable Digital Format (PDF) shall be deemed acceptable for all purposes, including without limitation the evidentially purposes.

The balance of this page left intentionally blank

MERCHANT NAME: ARC MANAGEMENT GROUP, LLC, et al.
(legal name of the business)

By: *Bill Wilson*

Name: WILLIAM DONALD WILSON
Title: CEO
FEIN: 030607765

OWNER/GUARANTOR #1:

*Bill Wilson*

Name: WILLIAM DONALD WILSON
SSN: 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

OWNER/GUARANTOR #2:

*Thresa Wilson*
Thresa Wilson (May 10, 2023 14:51 EDT)

Name: THRESA LARAE WILSON
SSN: 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

## Libertas Funding, LLC Electronic Fund Transfer Authorization

This Libertas Funding, LLC Electronic Fund Transfer Authorization (the "Authorization") supplements the foregoing concurrent Agreement of Sale of Future Receipts (the "Agreement"). Except as noted below, capitalized terms in this Authorization have the meaning set forth in the Agreement.

You irrevocably authorize us (which includes for the purposes of this authorization, our agents, service providers, successors, and assigns) to take delivery of each Daily Delivery Amount by initiating an electronic fund transfer via the Automated Clearing House network or similar network (an "ACH") from the business deposit account specified below, any substitute account you later specify, or any other account containing your Future Receipts (collectively, the "Account") on or after the date the associated Future Receipts were created. You authorize us to initiate a single ACH for the combined amounts of different Daily Delivery Amounts as permitted by the Agreement. You further authorize us initiate ACHs to the Account for any amounts that come due under the Agreement, including ACHs for the Completion Amount in the event you commit a Bad Act. You also authorize us to initiate ACH credits or debits to the Account to correct any errors we may make in processing a payment. In the event that an ACH is returned unpaid, you authorize us to reinitiate the ACH until it is paid and to initiate a separate ACH or to add to a reinitiated ACH the amount of any dishonored payment fee that we charge. You agree that you will not cancel this Authorization or instruct any depository holding Future Receipts we purchased to reject our ACHs. You promise that the Account specified below and any substitute Account you provide us is used for business purposes and not for personal, family or household purposes and that you are an authorized signor on these Accounts.

Business Deposit Account Information:

Account Number: 2000029095971 Routing Number: 061000227
Depository Name: WELLS FARGO BANK, NA Depository City/State: KENNESAW/GA

Type of Account

☑ Business Checking ☐ Business Savings
☐ Other Business Acct. (specify): ____________________

By signing below, you agree to the terms of this Libertas Funding, LLC Electronic Fund Transfer Authorization.

ACCEPTED AND AGREED:

Seller: ARC MANAGEMENT GROUP, LLC, et al.

By: X Bill Wilson

Name: WILLIAM DONALD WILSON

Title: CEO

By: X Bill Wilson

Owner: WILLIAM DONALD WILSON

By: X Thresa Wilson

Owner: THRESA LARAE WILSON

# ADDENDUM TO CONTRACT

## Addendum to Merchant Agreement 390966

This is an addendum ("Addendum") to that certain merchant agreement (the "Merchant Agreement") entered into by and among Libertas Funding, LLC (the "Purchaser"), WILLIAM DONALD WILSON (the "Owner") and ARC MANAGEMENT GROUP, LLC (the "Seller") dated as of May 9, 2023.

WHEREAS, the Purchaser, the Owner, and Seller wish to modify the Merchant Agreement as set forth herein. The Owner and Seller are hereafter referred to collectively as the Merchant (the "Merchant").

Now therefore, for good and valuable consideration, the parties agree as follows:

A. Merchant hereby authorizes Purchaser to execute the transactions detailed below in section G (Variable Receivable Remittance Schedule).
B. Merchant understands that all transactions detailed in this addendum will be executed for remittance of the receivables purchase detailed in the Merchant Agreement.
C. In the event Merchant chooses to execute the Merchant Agreement, Purchaser agrees that completion of the transaction(s) listed below will constitute full remittance of receivables for the referenced merchant agreement(s).
D. Upon execution of the Merchant Agreement, Purchaser agrees to be bound by the remittance schedule detailed in section F below.
E. This Addendum shall be governed by the state of New York.
F. **Variable Receivable Remittance Schedule:**

| Month | Remittance # | Daily (for calculation purposes) Remit Amount | Total Period (Monthly) Remit |
|---|---|---|---|
| 1 | 1-21 | $1,390.63 | $29,203.15 |
| 2 | 22-42 | $1,854.17 | $38,937.53 |
| 3 | 43-63 | $5,238.02 | $109,998.52 |
| 4 | 64-84 | $5,238.02 | $109,998.52 |
| 5 | 85-105 | $5,238.02 | $109,998.52 |
| 6 | 106-126 | $5,238.02 | $109,998.52 |
| 7 | 127-147 | $5,238.02 | $109,998.52 |
| 8 | 148-168 | $5,238.02 | $109,998.52 |
| 9 | 169-189 | $5,238.02 | $109,998.52 |
| 10 | 190-210 | $5,238.02 | $109,998.52 |
| 11 | 211-231 | $5,238.02 | $109,998.52 |
| 12 | 232-252 | $5,238.02 | $109,998.52 |

Except as provided in this Addendum, all other terms of the referenced Merchant Agreement, including without limitation the provisions allowing Merchant to seek Reconciliations and Adjustments of delivery amounts, remain unchanged.

By their signatures below the parties agreed to be bound by this addendum.

**ACCEPTED AND AGREED:**

**Purchaser: Libertas Funding, LLC**

By: ______________________

Name: Randy Saluck

Title: CEO, Libertas Funding LLC

**ACCEPTED AND AGREED:**

**Seller: ARC MANAGEMENT GROUP, LLC, et al.**

By: X Bill Wilson

Name: WILLIAM DONALD WILSON

Title: CEO

By: X Bill Wilson

Owner: WILLIAM DONALD WILSON

By: X Thresa Wilson

Owner: THRESA LARAE WILSON

LIBERTAS

Seller Definition Addendum to the Agreement of Sale of Future Receipts Dated:

May 9th, 2023

Purchaser and Guarantor(s) hereby agree that "Merchant" is defined as follows:

**Name:** ARC MANAGEMENT GROUP, LLC
**Address:** 1825 Barrett Lakes Blvd., Suite 505 KENNESAW, GA 30144
**FEIN:** 030607765

**Name:** WILZARA PROPERTY MANAGEMENT GROUP LLC
**Address:** 12655 OLD SURREY PL ROSWELL, GA 30075
**FEIN:** 0

**Name:** THE J.D. STUART LAW GROUP, LLC
**Address:** 1825 BARRETT LAKES BLVD NW STE 500 KENNESAW, GA 30144
**FEIN:** 0

**Name:** HEALTHTECH RECEIVABLES MGT, INC
**Address:** 3450 BUSCHWOOD PARK DR STE 150 TAMPA, FL 33618
**FEIN:** 0

**Name:** ABI HOLDING LLC
**Address:** 1825 BARRET LAKES BLVD NW STE 505 KENNESAW, GA 30144
**FEIN:**

**Name:** ARC MANAGEMENT GROUP OF GEORGIA, LLC
**Address:** 1825 BARRETT LAKES BLVD; SUITE 505 KENNESAW , GA 30144
**FEIN:**

**Name:** ARC MANAGEMENT GROUP, LLC D/B/A PATIENT ACCOUNT SERVICES
**Address:** 1825 BARRETT LAKES BLVD; STE 505 KENNESAW, GA 30144
**FEIN:**

**ARC MANAGEMENT GROUP, LLC**

Agreed to by: Bill Wilson (Signature), their CEO (Title)

Print Owner's Name William Wilson

**WILZARA PROPERTY MANAGEMENT GROUP LLC**

Agreed to by: Bill Wilson (Signature), their CEO (Title)

Print Owner's Name William Wilson

**THE J.D. STUART LAW GROUP, LLC**

Agreed to by: Bill Wilson (Signature), their CEO (Title)

Print Owner's Name William Wilson

**HEALTHTECH RECEIVABLES MGT, INC**

Agreed to by: Bill Wilson (Signature), their CEO (Title)

Print Owner's Name William Wilson

**ABI HOLDING LLC**

Agreed to by: Bill Wilson (Signature), their CEO (Title)

Print Owner's Name William Wilson

**ARC MANAGEMENT GROUP OF GEORGIA, LLC**

Agreed to by: Bill Wilson (Signature), their CEO (Title)

Print Owner's Name William Wilson

**ARC MANAGEMENT GROUP, LLC D/B/A PATIENT ACCOUNT SERVICES**

Agreed to by: Bill Wilson (Signature), their CEO (Title)

Print Owner's Name William Wilson

**Purchaser: Libertas Funding, LLC**

Agreed to by: ______________________ (Signature), its ______________________ (Title)

# ADDENDUM TO CONTRACT

## Addendum to Merchant Agreement 390966

**Purchase Price: $875,000.00 Purchased Percentage: 20% Purchased Amount: $1,168,125.00**

This is an addendum ("Addendum") to that certain merchant agreement 390966 (the "Merchant Agreement") entered into by and among Libertas Funding, LLC (the "Purchaser"), WILLIAM DONALD WILSON (the "Owner") and ARC MANAGEMENT GROUP, LLC (the "Seller" or "Merchant") dated as of May 9, 2023

WHEREAS, the Purchaser and Seller wish to modify the Merchant Agreement as set forth herein.

Now therefore, for good and valuable consideration, the parties agree as follows:

A. Except as provided in this Addendum, all terms and conditions of the Merchant Agreement shall remain in full force and effect. All capitalized terms not defined in this Addendum shall have the meaning set forth in the Merchant Agreement.
B. Merchant acknowledges, accepts, and agrees that as long as the Seller has not delivered all of the Daily Deliveries in connection with the Merchant Agreement, the Merchant understands that taking an additional short-term (12 months or less in expected term) cash advance based on credit card receivables or an ACH-based cash advance or loan based on total sales or deposits with any company (other than the Purchaser or the Purchaser's wholly-owned subsidiaries) would constitute an event of default under the Merchant Agreement, unless the Merchant receives a written authorization from the Purchaser prior to it taking such additional financing.
C. Merchant acknowledges, accepts, and agrees that a breach of this addendum (particularly section B above) will constitute a breach/event of default of the Merchant Agreement and that doing so will result in the immediate acceleration of all Daily Deliveries.
D. This Addendum shall be governed by the laws of the State of New York.
E. This Addendum may only be modified in writing by Purchaser and Merchant.

By their signatures below the parties agreed to be bound by this addendum.

**ACCEPTED AND AGREED:**

**Purchaser: Libertas Funding, LLC**

By: ______________________

Name: Randy Saluck

Title: CEO, Libertas Funding LLC

**ACCEPTED AND AGREED:**

**Seller: ARC MANAGEMENT GROUP, LLC, et al.**

By: X Bill Wilson

Name: WILLIAM DONALD WILSON

Title: CEO

By: X Bill Wilson

Owner: WILLIAM DONALD WILSON

By: X Thresa Wilson
Thresa Wilson (May 10, 2023 14:51 EDT)

Owner: THRESA LARAE WILSON

# ARC_MANAGEMENT_GROUP_LLC-UPDATED CONTRACT

Final Audit Report 2023-05-10

| | |
|---|---|
| Created: | 2023-05-09 |
| By: | stips group (stips@libertasfunding.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA5pxwaXW0hEbbGgoVKQWPAK9Hn7SozB51 |

## "ARC_MANAGEMENT_GROUP_LLC-UPDATED CONTRACT" History

Document created by stips group (stips@libertasfunding.com)
2023-05-09 - 3:27:33 PM GMT- IP address: 45.62.183.178

Document emailed to William Wilson (bwilson@arcmgmt.com) for signature
2023-05-09 - 3:31:25 PM GMT

Email viewed by William Wilson (bwilson@arcmgmt.com)
2023-05-09 - 4:00:27 PM GMT- IP address: 96.93.179.110

Document e-signed by William Wilson (bwilson@arcmgmt.com)
Signature Date: 2023-05-10 - 6:50:28 PM GMT - Time Source: server- IP address: 70.46.59.202

Document emailed to twilson@arcmgmt.com for signature
2023-05-10 - 6:50:29 PM GMT

Email viewed by twilson@arcmgmt.com
2023-05-10 - 6:50:56 PM GMT- IP address: 70.46.59.202

Signer twilson@arcmgmt.com entered name at signing as Thresa Wilson
2023-05-10 - 6:51:23 PM GMT- IP address: 70.46.59.202

Document e-signed by Thresa Wilson (twilson@arcmgmt.com)
Signature Date: 2023-05-10 - 6:51:25 PM GMT - Time Source: server- IP address: 70.46.59.202

Agreement completed.
2023-05-10 - 6:51:25 PM GMT

Adobe Acrobat Sign

DocuSign Envelope ID: E01732D2-AB5C-4A63-AF89-DFD86C258070

LIBERTAS

# AGREEMENT FOR THE PURCHASE AND SALE OF FUTURE RECEIPTS ("AGREEMENT")
# AGREEMENT NO.: 3132

**Requirements:**

- Sign and initial after every "X" on this contract
- Fill in the correct account information on the addendum page

**Merchant Information:** ***Please Fill In***

| | |
|---|---|
| Business Name: | ARC MANAGEMENT GROUP, LLC |
| Email: | bwilson@arcmgmt.com |
| Business Phone: | 888-444-7069 |
| Cell Phone: | 4044064563 |
| Business Website: | |

DocuSign Envelope ID: E01732D2-AB5C-4A63-AF89-DFD86C258070

LIBERTAS

# AGREEMENT FOR THE PURCHASE AND SALE OF FUTURE RECEIPTS

**Seller's Legal Name:** ARC MANAGEMENT GROUP, LLC

**Type of Business Entity:** **Time in business:** 16.3 Years **Fed. Tax ID #:** 30-0607765

**Business Address:** 1825 Barrett Lakes Blvd., Suite 505 **City:** Kennesaw **State:** GA **Zip:** 30144

**Mailing Address:** 1825 Barrett Lakes Blvd., Suite 505 **City:** Kennesaw **State:** GA **Zip:** 30144

**Primary Contact Name & Title:** WILLIAM DONALD WILSON, Owner

**Purchase Price:** $1,200,000.00 **Purchased Amount:** $1,572,000.00 **Average Monthly Sales:**

**Specified Percentage:** 10.00% **Origination Fee:** $24,000.00 (To be deducted from the Purchase Price)

**Initial Daily Amount:** $4,990.48 (Avg. Monthly Sales x Specified Percentage / Avg. Business Days in a Calendar Month)

**Account for the Deposit of All Future Receipts:** Arc Management Group LLC

**Bank:** WELLS FARGO BANK **Account No.:** 2000029095971

Effective, 03/08/2023, Seller, identified above, hereby sells, assigns and transfers to LENDSPARK CORPORATION, located at 2554 GATEWAY ROAD, CARLSBAD, CA 92009 ("Buyer"), without recourse, the Specified Percentage of the proceeds of each future sale made by Seller (collectively "Future Receipts") until Buyer has received the Purchased Amount. "Future Receipts" includes all payments made by cash, check, ACH or other electronic transfer, credit card, debit card, bank card, charge card (each such card shall be referred to herein as a "Payment Card") or other form of monetary payment in the ordinary course of Seller's business. As payment for the Purchased Amount, Buyer will deliver to Seller the Purchase Price, shown above, minus any Origination Fee shown above. Seller acknowledges that it has no right to repurchase the Purchased Amount from Buyer.

Both parties agree that the obligation of Buyer under this Agreement will not be effective unless and until Buyer has completed its review of the Seller and has accepted this Agreement by delivering the Purchase Price, minus any Origination Fee. Prior to accepting this Agreement, Buyer may conduct a processing trial to confirm its access to the Account and the ability to withdraw the Initial Daily Amount. If the processing trial is not completed to the satisfaction of Buyer, Buyer will refund to Seller all funds that were obtained by Buyer during the processing trail.

**Agreement of Seller:** By signing below Seller agrees to the terms and conditions in this Agreement, including those terms and conditions on the following pages, and further agrees that this transaction is for business purposes and not for personal, family, or household purposes.

**Seller:**

Agreed to by: *Bill Wilson* (Signature), its CEO (Title)

Print Name: WILLIAM DONALD WILSON

Agreed to by: *Thresa Wilson* Thresa Wilson (Mar 9, 2023 09:28 EST) (Signature), its VP Marketing & Development (Title)

Print Name: THRESA LARAE WILSON

**Buyer: LENDSPARK CORPORATION**

Agreed to by: DocuSigned by: [signature] B346349C23B54AC... (Signature), its President (Title)

Print Name: Salman Vakil

Initial *WW* WW Initial *TW* TW CA DBO License No.: 60DBO-41240

DocuSign Envelope ID: E01732D2-AB5C-4A63-AF89-DFD86C258070

**Agreement of Each Owner:** Each Owner signing below agrees to the terms of the Credit Report Authorization below.

| | | | |
|---|---|---|---|
| WILLIAM DONALD WILSON | (Print Name) | Bill Wilson | (Signature) |
| THRESA LARAE WILSON | (Print Name) | Thresa Wilson<br>Thresa Wilson (Mar 9, 2023 09:28 EST) | (Signature) |

1. **Delivery of Purchased Amount:** Seller must deposit all Future Receipts into the single business banking account specified above, which may not be used for any personal, family or household purposes (the "Account") and must instruct Seller's credit card processor, which must be approved by Buyer (the "Processor") to deposit all Payment Card receipts of Seller into the Account. Seller agrees not to change the Account or add an additional Account without the express written consent of Buyer. Seller authorizes Buyer to debit the Daily Amount from the Account each business day by either ACH or electric check. Seller will provide Buyer with all required access codes and agrees not to change them without prior written consent from Buyer. Seller will provide an appropriate ACH authorization to Buyer. Seller understands that it is responsible for either ensuring that the Daily Amount is available in the Account each business day or advising Buyer prior to each daily withdrawal of a shortage of funds. Otherwise, Seller will be responsible for any fees incurred by Buyer resulting from a rejected electronic check or ACH debit attempt, as set forth on Appendix A. Buyer is not responsible for any overdrafts or rejected transactions that may result from Buyer's debiting any amount authorized under the terms of this Agreement. Seller understands that the forgoing ACH authorization is a fundamental condition to induce Buyer to accept this Agreement. Consequently, each authorization is intended to be irrevocable.
2. **Seller May Request Changes to the Daily Amount:** The initial Daily Amount is intended to represent the Specified Percentage of Seller's daily Future Receipts. For as long as no Event of Default has occurred, Seller may request that Buyer adjust the Daily Amount to more closely reflect the Seller's actual Future Receipts times the Specified Percentage. Seller agrees to provide Buyer any information requested by Buyer to assist in this reconciliation. No more often than once a month, Buyer shall adjust the Daily Amount on a going-forward basis to more closely reflect the Seller's actual Future Receipts times the Specified Percentage. Buyer will give Seller notice five (5) business days prior to any such adjustment. After each adjustment made pursuant to this Section, the new dollar amount shall be deemed the Daily Amount until any subsequent adjustment.
3. **Daily Amount Upon Default:** Upon the occurrence of an Event of Default, the Specified Percentage shall equal one hundred percent (100%) of all Future Receipts.
4. **Sale of Future Receipts (THIS IS NOT A LOAN):** Seller is selling a portion of a future revenue stream to Buyer at a discount, not borrowing money from Buyer. There is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by Buyer. If Future Receipts are remitted more slowly than Buyer may have anticipated or projected because Seller's business has slowed down, or if the full Purchased Amount is never remitted because Seller's business went bankrupt or otherwise ceased operations in the ordinary course of business, and Seller has not breached this Agreement, Seller would not owe anything to Buyer and would not be in breach of or default under this Agreement. Buyer is buying the Purchased Amount of Future Receipts knowing the risks that Seller's business may slow down or fail, and Buyer assumes these risks based on Seller's representations, warranties and covenants in this Agreement that are designed to give Buyer a reasonable and fair opportunity to receive the benefit of its bargain. By this Agreement, Seller transfers to Buyer full and complete ownership of the Purchased Amount of Future Receipts and Seller retains no legal or equitable interest therein. Seller agrees that it will treat Purchase Price and Purchased Amount in a manner consistent with a sale in its account records and tax returns. Seller agrees that Buyer is entitled to audit Seller's accounting records upon reasonable Notice in order to verify compliance. Seller waives any rights of privacy, confidentiality or taxpayer privilege in any such litigation or arbitration in which Seller asserts that this transaction is anything other than a sale of future receipts.
5. **Fees and Charges:** Other than the Origination Fee, if any, set forth above, Buyer is NOT CHARGING ANY ORIGINATION OR BROKER FEES to Seller. If Seller is charged another such fee, it is not being charged by Buyer. A list of all fees and charges applicable under this Agreement is contained in Appendix A.
6. **Credit Report and Other Authorizations:** Seller and each of the Owners signing above authorize Buyer, its agents and representatives and any credit reporting agency engaged by Buyer, to (i) investigate any references given or any other statements or data obtained from or about Seller or any of its Owners for the purpose of this Agreement, (ii) obtained consumer and business credit reports on the Seller an any of its Owners, and (iii) to contact personal and business references provided by the Seller in the Application, at any time now or for so long as Seller and/or Owners continue to have any obligation owed to Buyer as a consequence of this Agreement or for Buyer's ability to determine Seller's eligibility to enter into any future agreement with Buyer.
7. **Authorization to Contact Current and Prior Banks:** Seller hereby authorizes Buyer to contact any current or prior bank of the Seller in order to obtain whatever information it may require regarding Seller's transactions with any such bank. Such information may include, but is not limited to, information necessary to verify the amount of Future Receipts previously processed on behalf of Seller and any fees that may have been charged by the bank. In addition, Seller authorizes Buyer to contact any current or prior bank of the Seller for collections and in order to confirm that Seller is exclusively using the Account identified above, or any other account approved by Buyer, for the deposit of all business receipts.

DocuSign Envelope ID: E01732D2-AB5C-4A63-AF89-DFD86C258070

8. **Financial Information:** Seller authorizes Buyer and its agents to investigate its financial responsibility and history, and will provide to Buyer any authorizations, bank or financial statements, tax returns, etc., as Buyer deems necessary in its sole discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed acceptable as an authorization for release of financial and credit information. Buyer is authorized to update such information and financial and credit profiles from time to time as it deems appropriate. Seller waives, to the maximum extent permitted by law, any claim for damages against Buyer or any of its affiliates relating to any investigation undertaken by or on behalf of Buyer as permitted by this Agreement or disclosure of information as permitted by this Agreement.
9. **Transactional History:** Seller authorizes all of its banks and brokers and Payment Card processors to provide Buyer with Seller's banking, brokerage and/or processing history to determine qualification or continuation in this program, or for collections upon an Event of Default.
10. **Publicity:** Seller hereby authorizes Buyer to use its name in listings of clients and in advertising and marketing materials.
11. **Application of Amounts Received by Buyer:** Buyer reserves the right to apply amounts received by it under this Agreement to any fees or other charges due to Buyer from Seller prior to applying such amounts to reduce the amount of any outstanding Purchased Amount.
12. **Representations, Warranties and Covenants of Seller:**
12.1. Good Faith, Best Efforts and Due Diligence. Seller will conduct its business in good faith and will use its best efforts to continue its business at least at its current level, to ensure that Buyer obtains the Purchased Amount.
12.2. Stacking Prohibited. Seller shall not enter into any Seller cash advance or any loan agreement that relates to or involves its Future Receipts with any party other than Buyer for the duration of this Agreement. Buyer may share information regarding this Agreement with any third party in order to determine whether Seller is in compliance with this provision.
12.3. Financial Condition and Financial Information. Any bank statements and financial statements of Seller that have been furnished to Buyer, and future statements that will be furnished to Buyer, fairly represent the financial condition of Seller at such dates, and Seller will notify Buyer immediately if there are material adverse changes, financial or otherwise, in the condition or operation of Seller or any change in the ownership of Seller. Buyer may request statements at any time during the performance of this Agreement and the Seller shall provide them to Buyer within five (5) business days. Furthermore, Seller represents that all documents, forms and recorded interviews provided to or with Buyer are true, accurate and complete in all respects, and accurately reflect Seller's financial condition and results of operations. Seller further agrees to authorize the release of any past or future tax returns to Seller.
12.4. Governmental Approvals. Seller is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.
12.5. Authority to Enter into this Agreement. Seller and the person(s) signing this Agreement on behalf of Seller, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.
12.6. Change of Name or Location or Sale or Closing of Business. Seller agrees not to change its name, its chief executive office, its principal residence or the jurisdiction in which it is organized and/or registered or its business structure without giving Buyer at least 30 days prior written notice. Seller will not sell, dispose, transfer or otherwise convey all or substantially all of its business or assets without (i) the express prior written consent of Buyer, and (ii) the written agreement of any purchaser or transferee assuming all of Seller's obligations under this Agreement pursuant to documentation satisfactory to Buyer. Except as disclosed to Buyer in writing, Seller has no current plans to close its business either temporarily, whether for renovations, repairs or any other purpose, or permanently. Seller agrees that until Buyer has received all of the Purchased Amount, Seller will not voluntarily close its business on a temporarily basis for renovations, repairs, or any other purposes. This provision, however, does not prohibit Seller from closing its business temporarily if such closing is required to conduct renovations or repairs that are required by local ordinance or other legal order, such as from a health or fire inspector, or if otherwise forced to do so by circumstances outside of the control of Seller. Prior to any such closure, Seller will provide Buyer ten (10) business days notice to the extent practicable.
12.7. No Pending or Contemplated Bankruptcy. As of the date Seller executes this Agreement, Seller is not insolvent and does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Seller. Seller represents that it has not consulted with a bankruptcy attorney within six (6) months prior to the date of this Agreement. Seller further warrants that it does not anticipate filing a bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.
12.8. Seller to Pay Taxes Promptly. Seller will promptly pay all necessary taxes, including, but not limited to, employment and sales and use taxes.
12.9. No Violation of Prior Agreements. Seller's execution and performance of this Agreement will not conflict with any other agreement, obligation, promise, court order, administrative order or decree, law or regulation to which Seller is subject, including any agreement the prohibits the sale or pledge of Seller's future receipts.
12.10. No Diversion of Receipts. Seller will not permit any event to occur that could cause a diversion of any of Seller's Future Receipts from the Account to any other entity.
12.11. Seller's Knowledge and Representation. Seller represents warrants and agrees that it is a sophisticated business entity familiar with the kind of transaction covered by this Agreement; it was represented by counsel or had full opportunity to consult with counsel.

DocuSign Envelope ID: E01732D2-AB5C-4A63-AF89-DFD86C258070

13. **Rights of Buyer:**
13.1. Acknowledgment of Security Interest and Security Agreement. The Future Receipts sold by Seller to Buyer pursuant to this Agreement are "accounts" or "payment intangibles" as those terms are defined in the Uniform Commercial Code as in effect in the state in which the Seller is located (the "UCC") and such sale shall constitute and shall be construed and treated for all purposes as a true and complete sale, conveying good title to the Future Receipts free and clear of any liens and encumbrances, from Seller to Buyer. To the extent the Future Receipts are "accounts" or "payment intangibles" then (i) the sale of the Future Receipts creates a security interest as defined in the UCC, (ii) this Agreement constitutes a "security agreement" under the UCC, and (iii) Buyer has all the rights of a secured party under the UCC with respect to such Future Receipts. Seller further agrees that, with or without an Event of Default, Buyer may notify account debtors, or other persons obligated on the Future Receipts, of Seller's sale of the Future Receipts and may instruct them to make payment or otherwise render performance to or for the benefit of Buyer.
13.2. Financing Statements. Seller authorizes Buyer to file one or more UCC-1 forms consistent with the UCC to give notice that the Purchased Amount of Future Receipts is the sole property of Buyer. The UCC filing may state that such sale is intended to be a sale and not an assignment for security and may state that the Seller is prohibited from obtaining any financing that impairs the value of the Future Receipts or Buyer's right to collect same. Seller authorizes Buyer to debit the Account for all costs incurred by Buyer associated with the filing, amendment, continuation or termination of any UCC filings."
13.3. Right of Access. In order to ensure that Seller is complying with the terms of this Agreement, Buyer shall have the right to (i) enter, without notice, the premises of Seller's business for the purpose of inspecting and checking Seller's transaction processing terminals to ensure the terminals are properly programmed to submit and/or batch Seller's daily receipts to the Processor and to ensure that Seller has not violated any other provision of this Agreement, and (ii) Seller shall provide access to its employees and records and all other items as requested by Buyer, and (iii) have Seller provide information about its business operations, banking relationships, vendors, landlord and other information to allow Buyer to interview any relevant parties. Furthermore, Seller agrees to provide Buyer, at all times, "Live Contemporaneous Access" to all of its bank accounts in order for Buyer to evaluate Seller's compliance with this Agreement, and for collections in the Event of Default ("Seller's Accounts"). "Live Contemporaneous Access" shall be defined as: Seller, at all times and including, but not limited to, providing Buyer with accurate login information necessary to access all of Seller's Accounts, such as usernames and passwords, answers to challenge questions, and security tokens.
13.4. Phone Recordings and Contact. Seller agrees that any call between Buyer and Seller, and their agents and employees may be recorded or monitored. Further, Seller agrees that (i) it has an established business relationship with Buyer, its employees and agents and that Seller may be contacted from time-to-time regarding this or other business transactions; (ii) that such communications and contacts are not unsolicited or inconvenient; and (iii) that any such contact may be made at any phone number, emails address, or facsimile number given to Buyer by the Seller, its agents or employees, including cellular telephones.

14. **Events of Default:** The occurrence of any of the following events shall constitute an "Event of Default:" (a) Seller interferes with Buyer's right to collect the Daily Amount; (b) Seller violates any term or covenant in this Agreement; (c) Seller uses multiple depository accounts without the prior written consent of Buyer; (d) Seller changes its depositing account or its payment card processor without the prior written consent of Buyer; (e) Seller defaults under any of the terms, covenants and conditions of any other agreement with Buyer; or (f) Seller's failure to cure, within one business day, any disruptions and/or any inability Buyer may have in maintaining Live Contemporaneous Access to Seller's Accounts pursuant to Section 13.3 of this Agreement.

15. **Remedies:** If any Event of Default occurs, Buyer may proceed to protect and enforce its rights including, but not limited to, the following:
15.1. The Specified Percentage shall equal one hundred percent (100%). The full uncollected Purchased Amount plus all fees and charges (including legal fees) due under this Agreement will become due and payable in full immediately.
15.2. Buyer may enforce the provisions of the Personal Guaranty of Performance against each Owner.
15.3. Buyer may proceed to protect and enforce its rights and remedies by arbitration or lawsuit. In any such arbitration or lawsuit, under which Buyer shall recover Judgment against Seller, Seller shall be liable for all of Buyer's costs of the lawsuit, including, but not limited to, all reasonable attorneys' fees and court costs. However, the rights of Buyer under this provision shall be limited as provided in the arbitration provision set forth below.
15.4. Buyer may debit Seller's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Seller's bank account or otherwise for all sums due to Buyer.
15.5. Seller shall pay to Buyer all reasonable costs associated with the Event of Default and the enforcement of Buyer's remedies, including, but not limited to, court costs and attorneys' fees.
15.6. Buyer may exercise and enforce its rights as a secured party under the UCC.
15.7. All rights, powers and remedies of Buyer in connection with this Agreement may be exercised at any time by Buyer after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

16. **Modifications; Agreements:** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by Buyer.

17. **Assignment:** Buyer may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder,

DocuSign Envelope ID: E01732D2-AB5C-4A63-AF89-DFD86C258070

either in whole or in part, with or without prior written notice to Seller.

18. **Notices:**

18.1. Notices from Buyer to Seller. Buyer may send any notices, disclosures, terms and conditions, other documents, and any future changes to Seller by regular mail or by e-mail, at Buyer's option and Seller consents to such electronic delivery. Notices sent by e-mail are effective when sent. Notices sent by regular mail become effective upon mailing to Seller's address set forth in this Agreement.

18.2. Notices from Seller to Buyer. Seller may send any notices to Buyer by e-mail only upon the prior written consent of Buyer, which consent may be withheld or revoked at any time in Buyer's sole discretion. Otherwise, any notices or other communications from Seller to Buyer must be delivered by certified mail, return receipt requested, to Buyer's address set forth in this Agreement. Notices sent to Buyer shall become effective only upon receipt by Buyer.

19. **Binding Effect; Governing Law, Venue and Jurisdiction:** This Agreement shall be binding upon and inure to the benefit of Seller, Buyer and their respective successors and assigns, except that Seller shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of Buyer which consent may be withheld in Buyer's sole discretion. This Agreement shall be governed by and construed in accordance with the laws of the state of California, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach of this Agreement, shall, if Buyer so elects, be instituted in any court sitting in California (the "Acceptable Forums"). Seller agrees that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Seller waives any right to oppose any motion or application made by Buyer to transfer such proceeding to an Acceptable Forum.

20. **Survival of Representation, etc.:** All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full.

21. **Interpretation:** All parties hereto have reviewed this Agreement with an attorney of their own choosing and have relied only on their own attorney's guidance and advice. No construction determinations shall be made against either party hereto as drafter.

22. **Entire Agreement and Severability:** This Agreement embodies the entire agreement between Seller and Buyer and supersedes all prior agreements and understandings relating to the subject matter hereof. In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

23. **Facsimile Acceptance:** Facsimile signatures hereon, or other electronic means reflecting the party's signature hereto, shall be deemed acceptable for all purposes.

24. **Confidentiality:** The terms and conditions of this Agreement are proprietary and confidential unless required by law. Seller shall not disclose this information to anyone other than its attorney, accountant or similar service provider and then only to the extent such person uses the information solely for purpose of advising Seller and first agrees in writing to be bound by the terms of this Section. A breach entitles Buyer to damages and legal fees as well as temporary restraining order and preliminary injunction without bond.

25. **Monitoring, Recording, and Solicitations:**

25.1. Authorization to Contact Seller by Phone. Seller authorizes Buyer, its affiliates, agents and independent contractors to contact Seller at any telephone number Seller provides to Buyer or from which Seller places a call to Buyer, or any telephone number where Buyer believes it may reach Seller, using any means of communication, including, but not limited to, calls or text messages to mobile, cellular, wireless or similar devices or calls or text messages using an automated telephone dialing system and/or artificial voices or prerecorded messages, even if Seller incurs charges for receiving such communications.

25.2. Authorization to Contact Seller by Other Means. Seller also agree that Buyer, its affiliates, agents and independent contractors, may use any other medium not prohibited by law including, but not limited to, mail, e-mail and facsimile, to contact Seller. Seller expressly consents to conduct business by electronic means.

26. **JURY WAIVER. THE PARTIES WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR ITS ENFORCEMENT, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.**

27. **CLASS ACTION WAIVER. THE PARTIES WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES AGREE THAT: (I) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING**

ANY OTHER PROVISION IN THIS AGREEMENT); AND (II) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

28. ARBITRATION. IF BUYER, SELLER OR ANY GUARANTOR REQUESTS, THE OTHER PARTIES AGREE TO ARBITRATE ALL DISPUTES AND CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT. IF BUYER, SELLER OR ANY GUARANTOR SEEKS TO HAVE A DISPUTE SETTLED BY ARBITRATION, THAT PARTY MUST FIRST SEND TO ALL OTHER PARTIES, BY CERTIFIED MAIL, A WRITTEN NOTICE OF INTENT TO ARBITRATE. IF BUYER, SELLER OR ANY GUARANTOR DO NOT REACH AN AGREEMENT TO RESOLVE THE CLAIM WITHIN THIRTY (30) DAYS AFTER THE NOTICE IS RECEIVED, BUYER, SELLER OR ANY GUARANTOR MAY COMMENCE AN ARBITRATION PROCEEDING WITH THE AMERICAN ARBITRATION ASSOCIATION ("AAA") OR NATIONAL ARBITRATION FORUM ("NAF"). BUYER WILL PROMPTLY REIMBURSE SELLER OR THE GUARANTOR ANY ARBITRATION FILING FEE, HOWEVER, IN THE EVENT THAT BOTH SELLER AND THE GUARANTOR MUST PAY FILING FEES, BUYER WILL ONLY REIMBURSE SELLER'S ARBITRATION FILING FEE AND, EXCEPT AS PROVIDED IN THE NEXT SENTENCE, BUYER WILL PAY ALL ADMINISTRATION AND ARBITRATOR FEES. IF THE ARBITRATOR FINDS THAT EITHER THE SUBSTANCE OF THE CLAIM RAISED BY SELLER OR THE GUARANTOR OR THE RELIEF SOUGHT BY SELLER OR THE GUARANTOR IS IMPROPER OR NOT WARRANTED, AS MEASURED BY THE STANDARDS SET FORTH IN FEDERAL RULE OF PROCEDURE 11(B), THEN BUYER WILL PAY THESE FEES ONLY IF REQUIRED BY THE AAA OR NAF RULES. SELLER AND THE GUARANTOR AGREE THAT, BY ENTERING INTO THIS AGREEMENT, THEY ARE WAIVING THE RIGHT TO TRIAL BY JURY. BUYER, SELLER OR ANY GUARANTOR MAY BRING CLAIMS AGAINST ANY OTHER PARTY ONLY IN THEIR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. FURTHER, BUYER, SELLER AND ANY GUARANTOR AGREE THAT THE ARBITRATOR MAY NOT CONSOLIDATE PROCEEDINGS FOR MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING, AND THAT IF THIS SPECIFIC PROVISION IS FOUND UNENFORCEABLE, THEN THE ENTIRETY OF THIS ARBITRATION CLAUSE SHALL BE NULL AND VOID.

29. RIGHT TO OPT OUT OF ARBITRATION. SELLER AND GUARANTOR(S) MAY OPT OUT OF THIS CLAUSE. TO OPT OUT OF THIS ARBITRATION CLAUSE, SELLER AND EACH GUARANTOR MUST SEND BUYER A NOTICE THAT THE SELLER AND EACH GUARANTOR DOES NOT WANT THIS CLAUSE TO APPLY TO THIS AGREEMENT. FOR ANY OPT OUT TO BE EFFECTIVE, SELLER AND EACH GUARANTOR MUST SEND AN OPT OUT NOTICE TO THE FOLLOWING ADDRESS BY REGISTERED MAIL, WITHIN FOURTEEN (14) DAYS AFTER THE DATE OF THIS AGREEMENT: BUYER – ARBITRATION OPT OUT, LENDSPARK CORPORATION, 2554 GATEWAY ROAD, CARLSBAD, CA 92009, ATTENTION: LEGAL DEPARTMENT.

30. SERVICE OF PROCESS. SELLER HEREBY CONSENTS TO SERVICE OF PROCESS UPON IT BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, SERVICE HEREUNDER SHALL BE COMPLETE UPON SELLER'S ACTUAL RECEIPT OF PROCESS OR UPON BUYER'S RECEIPT OF THE RETURN THEREOF BY THE UNITED STATES POSTAL SERVICE AS REFUSED OR UNDELIVERABLE. SELLER MUST PROMPTLY NOTIFY BUYER, IN WRITING, OF EACH AND EVERY CHANGE OF ADDRESS TO WHICH SERVICE OF PROCESS CAN BE MADE. SERVICE BY BUYER TO THE LAST KNOWN ADDRESS SHALL BE SUFFICIENT. SELLER WILL HAVE (30) CALENDAR DAYS AFTER SERVICE HEREUNDER IS COMPLETE IN WHICH TO RESPOND. FURTHERMORE, SELLER EXPRESSLY CONSENTS THAT ANY AND ALL NOTICE(S), DEMAND(S), REQUEST(S) OR OTHER COMMUNICATION(S) UNDER AND PURSUANT TO THIS AGREEMENT FOR THE PURCHASE AND SALE OF FUTURE RECEIVABLES SHALL BE DELIVERED IN ACCORDANCE WITH THE PROVISIONS OF THIS AGREEMENT FOR THE PURCHASE AND SALE OF FUTURE RECEIVABLES.

DocuSign Envelope ID: E01732D2-AB5C-4A63-AF89-DFD86C258070

# APPENDIX A
# LIST OF FEES AND CHARGES

In addition to the Purchased Amount of Future Receipts, the Agreement provides that the following fees shall be applied:

1. Underwriting Fee - $24,000.00
2. Non-Sufficient Funds (NSF) Fee - $35.00 each (up to FOUR (4) TIMES ONLY before a default is declared)
3. Stopped Fee - $135.00
4. ACH Processing Fee - $12.50
5. UCC Filing Fee - $150.00
6. Default Fee - $2,500.00
7. Financing Fee -

DocuSign Envelope ID: E01732D2-AB5C-4A63-AF89-DFD86C258070

LIBERTAS

# PERSONAL GUARANTY OF PERFORMANCE

This Personal Guaranty of Performance (this "Guaranty") is executed as of 03/08/2023 by WILLIAM DONALD WILSON ("Guarantor"), for the benefit of LENDSPARK CORPORATION ("Buyer").

Capitalized terms used herein, but not defined, shall have the meanings assigned to them in the Purchase Agreement (as hereinafter defined).

## RECITALS

**A.** Pursuant to that Agreement for the Purchase and Sale of Future Receipts (the "Agreement"), dated of even date herewith, between Buyer and ARC MANAGEMENT GROUP, LLC ("Seller"), Buyer has purchased Future Receipts of Seller.

**B.** Buyer is not willing to enter into the Agreement unless Guarantor irrevocably, absolutely and unconditionally guarantees prompt and complete performance to Buyer of all of the obligations of Seller; and

**C.** Guarantor will directly benefit from Buyer and Seller entering into the Agreement.

## AGREEMENT

As an inducement to Buyer to purchase the Future Receipts identified in the Agreement, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Guarantor does hereby agree as follows:

1. **Defined Terms:** All capitalized terms used and not otherwise defined herein shall have the meanings assigned to such terms in the Agreement.
2. **Guaranty of Obligations:** Guarantor hereby irrevocably, absolutely and unconditionally guarantees to Buyer prompt and complete performance of all of Seller's obligations under the Agreement.
3. **Guarantor's Other Agreements:** Guarantor will not dispose, convey, sell or otherwise transfer, or cause Seller to dispose, convey, sell or otherwise transfer, any material business assets of Seller without the prior written consent of Buyer, which may be withheld for any reason, until receipt of the entire Purchased Amount. Guarantor hereby agrees to pay all costs and attorney's fees incurred by Buyer in connection with any actions commenced by Buyer to enforce its rights or incurred in any action to defend its performance under the Agreement and this Guaranty. This Guaranty is binding upon Guarantor, and Guarantor's heirs, legal representatives, successors and assigns. If there is more than one Guarantor, the obligations of the Guarantors hereunder shall be joint and several. The obligation of Guarantor shall be unconditional and absolute, regardless of the unenforceability of any provision of any agreement between Seller and Buyer, or the existence of any defense, setoff or counterclaim which Seller may assert. Buyer is hereby authorized, without notice or demand and without affecting the liability of Guarantor hereunder, to at any time renew or extend Seller's obligations under the Agreement or otherwise modify, amend or change the terms of the Agreement. Guarantor is hereby notified that a negative credit report reflecting on his/her credit record may be submitted to a credit reporting agency if the terms of this Guaranty are not honored by the Guarantor.
4. **Waiver; Remedies:** No failure on the part of Buyer to exercise, and no delay in exercising, any right under this Guaranty shall operate as a waiver, nor shall any single or partial exercise of any right under this Guaranty preclude any other or further exercise of any other right. The remedies provided in this Guaranty are cumulative and not exclusive of any remedies provided by law or equity. In the event that Seller fails to perform any obligation under the Agreement, Buyer may enforce its rights under this Guaranty without first seeking to obtain performance for such default from Seller or any other guarantor.
5. **Acknowledgment of Purchase:** Guarantor acknowledges and agrees that the Purchase Price paid by Buyer to Seller in exchange for the Purchased Amount is a purchase of the Purchased Amount and is not intended to be treated as a loan or financial accommodation from Buyer to Seller. Guarantor specifically acknowledges Buyer is not a lender, bank or credit card processor, and that Buyer has not offered any loans to Seller, and Guarantor waives any claims or defenses of usury in any action arising out of this Guaranty. Guarantor acknowledges the Purchase Price paid to Seller is good and valuable consideration for the sale of the Purchased Amount of Future Receipts.
6. **Governing Law and Jurisdiction:** This Guaranty shall be governed by, and constructed in accordance with, the internal laws of the State of California without regard to principles of conflicts of law. Except as provided in Section 9 of this Guaranty, Guarantor submits to the exclusive jurisdiction and venue of the state or federal courts having jurisdiction over any city/county in the State of California of any claims or actions arising, directly or indirectly, out of or related to this Guaranty. The parties stipulate that the venues referenced in this Guaranty are convenient. The parties further agree that the mailing by certified or registered mail, return receipt requested, of any process required by any such court will constitute valid and lawful service of process against them, without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions.

DocuSign Envelope ID: E01732D2-AB5C-4A63-AF89-DFD86C258070

7. JURY WAIVER: THE PARTIES WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS GUARANTY IS A PART OR ITS ENFORCEMENT, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.
8. CLASS ACTION WAIVER: THE PARTIES WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES AGREE THAT: (I) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS GUARANTY); AND (II) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.
9. ARBITRATION: IF BUYER, SELLER OR ANY GUARANTOR REQUESTS, THE OTHER PARTIES AGREE TO ARBITRATE ALL DISPUTES AND CLAIMS ARISING OUT OF OR RELATING TO THIS GUARANTY. IF BUYER, SELLER OR ANY GUARANTOR SEEKS TO HAVE A DISPUTE SETTLED BY ARBITRATION, THAT PARTY MUST FIRST SEND TO THE OTHER PARTY, BY CERTIFIED MAIL, A WRITTEN NOTICE OF INTENT TO ARBITRATE. IF BUYER, SELLER OR ANY GUARANTOR DO NOT REACH AN AGREEMENT TO RESOLVE THE CLAIM WITHIN THIRTY (30) DAYS AFTER THE NOTICE IS RECEIVED, BUYER, SELLER OR ANY GUARANTOR MAY COMMENCE AN ARBITRATION PROCEEDING WITH THE AMERICAN ARBITRATION ASSOCIATION ("AAA") OR NATIONAL ARBITRATION FORUM ("NAF"). BUYER WILL PROMPTLY REIMBURSE SELLER OR THE GUARANTOR ANY ARBITRATION FILING FEE, HOWEVER, IN THE EVENT THAT BOTH SELLER AND THE GUARANTOR MUST PAY FILING FEES, BUYER WILL ONLY REIMBURSE SELLER'S ARBITRATION FILING FEE AND, EXCEPT AS PROVIDED IN THE NEXT SENTENCE, BUYER WILL PAY ALL ADMINISTRATION AND ARBITRATOR FEES. IF THE ARBITRATOR FINDS THAT EITHER THE SUBSTANCE OF THE CLAIM RAISED BY SELLER OR THE GUARANTOR OR THE RELIEF SOUGHT BY SELLER OR THE GUARANTOR IS IMPROPER OR NOT WARRANTED, AS MEASURED BY THE STANDARDS SET FORTH IN FEDERAL RULE OF PROCEDURE 11(B), THEN BUYER WILL PAY THESE FEES ONLY IF REQUIRED BY THE AAA OR NAF RULES. SELLER AND THE GUARANTOR AGREE THAT, BY ENTERING INTO THIS GUARANTY, THEY ARE WAIVING THE RIGHT TO TRIAL BY JURY. BUYER, SELLER OR ANY GUARANTOR MAY BRING CLAIMS AGAINST ANY OTHER PARTY ONLY IN THEIR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. FURTHER, BUYER, SELLER AND ANY GUARANTOR AGREE THAT THE ARBITRATOR MAY NOT CONSOLIDATE PROCEEDINGS FOR MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING, AND THAT IF THIS SPECIFIC PROVISION IS FOUND UNENFORCEABLE, THEN THE ENTIRETY OF THIS ARBITRATION CLAUSE SHALL BE NULL AND VOID.
10. RIGHT TO OPT OUT OF ARBITRATION: SELLER AND GUARANTOR(S) MAY OPT OUT OF THIS CLAUSE. TO OPT OUT OF THIS ARBITRATION CLAUSE, SELLER AND EACH GUARANTOR MUST SEND BUYER A NOTICE THAT THE SELLER AND EACH GUARANTOR DOES NOT WANT THIS CLAUSE TO APPLY TO THIS GUARANTY. FOR ANY OPT OUT TO BE EFFECTIVE, SELLER AND EACH GUARANTOR MUST SEND AN OPT OUT NOTICE TO THE FOLLOWING ADDRESS BY REGISTERED MAIL, WITHIN FOURTEEN (14) DAYS AFTER THE DATE OF THIS GUARANTY: BUYER – ARBITRATION OPT OUT, LENDSPARK CORPORATION, 2554 GATEWAY ROAD, CARLSBAD, CA 92009, ATTENTION: LEGAL DEPARTMENT.
11. SERVICE OF PROCESS. GUARANTOR HEREBY CONSENTS TO SERVICE OF PROCESS UPON IT BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, SERVICE HEREUNDER SHALL BE COMPLETE UPON GUARANTOR'S ACTUAL RECEIPT OF PROCESS OR UPON BUYER'S RECEIPT OF THE RETURN THEREOF BY THE UNITED STATES POSTAL SERVICE AS REFUSED OR UNDELIVERABLE. GUARANTOR MUST PROMPTLY NOTIFY BUYER, IN WRITING, OF EACH AND EVERY CHANGE OF ADDRESS TO WHICH SERVICE OF PROCESS CAN BE MADE. SERVICE BY BUYER TO THE LAST KNOWN ADDRESS SHALL BE SUFFICIENT. GUARANTOR WILL HAVE THIRTY (30) CALENDAR DAYS AFTER SERVICE HEREUNDER IS COMPLETE IN WHICH TO RESPOND. FURTHERMORE, GUARANTOR EXPRESSLY CONSENTS THAT ANY AND ALL NOTICE(S), DEMAND(S),

DocuSign Envelope ID: E01732D2-AB5C-4A63-AF89-DFD86C258070

**REQUEST(S) OR OTHER COMMUNICATION(S) UNDER AND PURSUANT TO THIS PERSONAL GUARANTY OF PERFORMANCE SHALL BE DELIVERED IN ACCORDANCE WITH THE PROVISIONS OF THIS PERSONAL GUARANTY OF PERFORMANCE.**

12. **Severability:** If for any reason any court of competent jurisdiction finds any provisions of this Guaranty to be void or voidable, the parties agree that the court may reform such provision(s) to render the provision(s) enforceable ensuring that the restrictions and prohibitions contained in this Guaranty shall be effective to the fullest extent allowed under applicable law.
13. **Opportunity for Attorney Review:** The Guarantor represents that it has carefully read this Guaranty and has, or had a reasonable opportunity to, consult with its attorney. Guarantor understands the contents of this Guaranty, and signs this Guaranty as its free act and deed.
14. **Counterparts and Facsimile Signatures:** This Guaranty may be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together shall constitute one and the same agreement. Facsimile or scanned documents shall have the same legal force and effect as an original and shall be treated as an original document for evidentiary purposes.

**For Individual Guarantors:**

Guarantor: WILLIAM DONALD WILSON (Print Name)

Signature: Bill Wilson

**For Individual Guarantors:**

Guarantor: THRESA LARAE WILSON (Print Name)

Signature: Thresa Wilson
Thresa Wilson (Mar 9, 2023 09:28 EST)

**For Corporate Guarantors (or other entities):**

Guarantor: ______________________

Signature: ______________________

Print Name of Signor: ______________________

Its: ______________________ (Official Position)

DocuSign Envelope ID: E01732D2-AB5C-4A63-AF89-DFD86C258070

LIBERTAS

# AUTHORIZATION AGREEMENT FOR AUTOMATED CLEARING HOUSE TRANSACTIONS

ARC MANAGEMENT GROUP, LLC ("Seller") hereby authorizes LENDSPARK CORPORATION ("Buyer") to present automated clearing house (ACH) debits to the following checking account in the amount of fees and other obligations due to Buyer from Seller under the terms of that Agreement for the Purchase and Sale of Future Receipts (the "Agreement") entered into between Seller and Buyer, as it may be amended, supplemented or replaced from time to time. In addition, if an Event of Default (as defined in the Agreement) occurs, Seller authorizes Buyer to debit any and all accounts controlled by Seller or controlled by any entity with the same Federal Tax Identification Number as Seller up to the total amount, including but not limited to, all fees and charges, due to Buyer from Seller under the terms of the Agreement.

**Transfer Funds To/From:** **Name of Bank:** WELLS FARGO BANK

**ABA Transit/Routing #:** 061000227

**Checking Account #** 2000029095971

This authorization is to remain in full force and effect until all obligations due to Buyer under the Agreement have been fulfilled.

**ATTACH VOIDED CHECK HERE**

**Seller:**

Federal Tax ID #: 30-0607765

Signature: Bill Wilson

Print Name: WILLIAM DONALD WILSON

Title: CEO

Date: Mar 9, 2023

Signature: Thresa Wilson
Thresa Wilson (Mar 9, 2023 09:28 EST)

Print Name: THRESA LARAE WILSON

Title: VP Marketing & Development

Date: Mar 9, 2023

DocuSign Envelope ID: E01732D2-AB5C-4A63-AF89-DFD86C258070

Dear Seller,

Please fill out the form below with the access information for your bank account, please write legibly and indicate lower/upper case sensitivity.

| | |
|---|---|
| Legal Name / DBA: | |
| Bank portal website: | |
| Username: | |
| Password: | |
| Security Question/Answer 1: | |
| Security Question/Answer 2: | |
| Security Question/Answer 3: | |
| Security Question/Answer 4: | |
| Security Question/Answer 5: | |
| Security Question/Answer 6: | |
| Any other information necessary to access your account: | |
| | |

DocuSign Envelope ID: E01732D2-AB5C-4A63-AF89-DFD86C258070

LIBERTAS

# STACKING PROHIBITED ADDENDUM

This Stacking Prohibited Addendum is made as of 03/08/2023 (the "Addendum") to the Agreement for the Purchase and Sale of Future Receipts between LENDSPARK CORPORATION (the "Buyer") and ARC MANAGEMENT GROUP, LLC (the "Seller") dated 03/08/2023 (the "Agreement").

Whereas, the Buyer desires to draw attention to Section 12.2 of the Agreement ("Stacking Prohibited"), which strictly prohibits Seller from entering into any type of financing agreement that relates to or involves its Future Receipts with any other party other than Buyer for the duration of the Agreement.

Seller agrees to the Stacking Prohibited provision of the Agreement, and fully understands that breach of the Stacking Prohibited provision shall constitute an Event of Default.

By signing this Addendum, Seller agrees and fully understands that in the event Seller breaches the Stacking Prohibited provision, Buyer fully reserves its rights to immediately commence collections activities pursuant to Section 15 of the Agreement.

IN WITNESS WHEREOF, each of the undersigned has executed, or has caused to be executed, this Addendum as of the date first written above.

**Seller:**

Agreed to by: *Bill Wilson* (Signature), its CEO (Title)
Print Name: WILLIAM DONALD WILSON

Agreed to by: *Thresa Wilson* Thresa Wilson (Mar 9, 2023 09:28 EST) (Signature), its VP Marketing & Development (Title)
Print Name: THRESA LARAE WILSON

**Buyer: LENDSPARK CORPORATION**

Agreed to by: DocuSigned by: [signature] B346349C23B54AC... (Signature), its President (Title)
Print Name: Salman Vakil

DocuSign Envelope ID: E01732D2-AB5C-4A63-AF89-DFD86C258070

LIBERTAS

List of Top 5 Clients – Please list the top 5 clients that you are currently providing services for / have provided services for in the past thirty (30) days.

| | |
|---|---|
| Busines Name: | |
| Contact Name: | |
| Phone Number: | |
| Does this client owe you money? | Amount |
| Business Name: | |
| Contact Name: | |
| Phone Number: | |
| Does this client owe you money? | Amount |
| Business Name: | |
| Contact Name: | |
| Phone Number: | |
| Does this client owe you money? | Amount |
| Business Name: | |
| Contact Name: | |
| Phone Number: | |
| Does this client owe you money? | Amount |
| Business Name: | |
| Contact Name: | |
| Phone Number: | |
| Does this client owe you money? | Amount |

Initial WW WW    Initial TW TW    CA DBO License No.: 60DBO-41240

DocuSign Envelope ID: E01732D2-AB5C-4A63-AF89-DFD86C258070

# INFORMATION DISCLOSURE FORM

**(All information must be provided in order to release funds)**

**CONTRACTUAL FUNDING INFORMATION**

| Advance Amount: | Specified Percentage: | Daily Remittance: |
|---|---|---|
| $1,200,000.00 | 10.00% | $4,990.48 |

**BUSINESS INFORMATION**

| | | | | |
|---|---|---|---|---|
| Legal Business Name: ARC MANAGEMENT GROUP, LLC | | Business DBA: ARC MANAGEMENT GROUP, LLC | | |
| Address: 1825 Barrett Lakes Blvd., Suite 505 | | City: Kennesaw | State: GA | Zip: 30144 |
| Business Phone: 888-444-7069 | Business Email: bwilson@arcmgmt.com | Use of Funds: | Tax ID: 30-0607765 | Time in Business: 16.3 Years |

List all additional locations associated to business.

Does the company currently have any open/unsatisfied advances? List which companies/balances.

Does the company have any active or pending litigation/judgements/liens/tax obligations?

**BANK ACCOUNT INFORMATION (list all accounts below)**

| Bank Name: | Account Number: | Routing Number: |
|---|---|---|
| WELLS FARGO BANK | 2000029095971 | 061000227 |
| | | |
| | | |

**OFFICERS INFORMATION**

| | | | |
|---|---|---|---|
| Owner 1 – Full Name: WILLIAM DONALD WILSON | DOB: | Social Security #: 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 | Cell Phone #: 4044064563 |
| Address: | City: Roswell | State: GA | Zip: 30075 |
| Personal Email Address: bwilson@arcmgmt.com | Ownership %: 50 | Signature: | Date: 03/08/2023 |
| Owner 2 – Full Name: THRESA LARAE WILSON | DOB: | Social Security #: 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 | Cell Phone #: 6785801683 |
| Address: | City: Roswell | State: GA | Zip: 30075 |
| Personal Email Address: twilson@arcmgmt.com | Ownership %: 50 | Signature: | Date: 03/08/2023 |

Initial WW WW    Initial TW TW    CA DBO License No.: 60DBO-41240

DocuSign Envelope ID: E01732D2-AB5C-4A63-AF89-DFD86C258070

| CREDIT DISCLOSURE | | |
|---|---|---|
| The above information is warranted to be true and correct. We hereby authorize LENDSPARK CORPORATION its assigns, agents, bank, or financial institution to verify and collect information on us, included but not limited to bank references, trade credit references, and/or commercial credit reports. In compliance with the FAIR CREDIT REPORTING ACT, this is to inform you that you are authorizing this organization and/or its suppliers to obtain a consumer and/or business profile credit report. | | |
| Owner 1 Signature: Bill Wilson | Print Name: WILLIAM DONALD WILSON | Date: Mar 9, 2023 |
| Owner 2 Signature: Thresa Wilson<br>Thresa Wilson (Mar 9, 2023 09:28 EST) | Print Name: THRESA LARAE WILSON | Date: Mar 9, 2023 |

DocuSign Envelope ID: E01732D2-AB5C-4A63-AF89-DFD86C258070

LIBERTAS

**Seller Definition Addendum to the Agreement for the Purchase of Sale of Future Receipts dated: 03/08/2023.**

Buyer and Seller hereby agree that "Seller" is defined as follows:

Name: ARC MANAGEMENT GROUP, LLC
Address: 1825 Barrett Lakes Blvd., Suite 505 KENNESAW, GA 30144
FEIN: 030607765

Name: WILZARA PROPERTY MANAGEMENT GROUP LLC
Address: 12655 OLD SURREY PL ROSWELL, GA 30075
FEIN:

Name: THE J.D. STUART LAW GROUP, LLC
Address: 1825 BARRETT LAKES BLVD NW STE 500 KENNESAW, GA 30144
FEIN:

Name: HEALTHTECH RECEIVABLES MGT, INC
Address: 3450 BUSCHWOOD PARK DR STE 150 TAMPA, FL 33618
FEIN:

Name: ABI HOLDING LLC
Address: 1825 BARRET LAKES BLVD NW STE 505 KENNESAW , GA 30144
FEIN:

Name: ARC MANAGEMENT GROUP OF GEORGIA, LLC
Address: 1825 BARRETT LAKES BLVD; SUITE 505 KENNESAW , GA 30144
FEIN:

Name: ARC MANAGEMENT GROUP, LLC
Address: 11575 E. LAKETOWNE DRIVE ALBERTVILLE, MN 55301
FEIN:

Name: ARC MANAGEMENT GROUP, LLC
Address: 8825 N 23RD AVE; SUITE 100 PHOENIX , AZ 85021
FEIN:

Name: ARC MANAGEMENT GROUP, LLC
Address: ONE COMMERCE PLAZA ALBANY , NY 12210
FEIN:

Name: ARC MANAGEMENT GROUP, LLC D/B/A PATIENT ACCOUNT SERVICES
Address: 1825 BARRETT LAKES BLVD; STE 505 KENNESAW , GA 30144
FEIN:

**ARC MANAGEMENT GROUP, LLC**

Agreed to by: Bill Wilson (Signature), their CEO (Title)

Print Owner's Name William Wilson

**WILZARA PROPERTY MANAGEMENT GROUP LLC**

Agreed to by: Bill Wilson (Signature), their CEO (Title)

Print Owner's Name William Wilson

DocuSign Envelope ID: E01732D2-AB5C-4A63-AF89-DFD86C258070

LIBERTAS

**THE J.D. STUART LAW GROUP, LLC**

Agreed to by: *Bill Wilson* (Signature), their CEO (Title)

Print Owner's Name William Wilson

**HEALTHTECH RECEIVABLES MGT, INC**

Agreed to by: *Bill Wilson* (Signature), their CEO (Title)

Print Owner's Name William Wilson

**ABI HOLDING LLC**

Agreed to by: *Bill Wilson* (Signature), their CEO (Title)

Print Owner's Name William Wilson

**ARC MANAGEMENT GROUP OF GEORGIA, LLC**

Agreed to by: *Bill Wilson* (Signature), their CEO (Title)

Print Owner's Name William Wilson

**ARC MANAGEMENT GROUP, LLC**

Agreed to by: *Bill Wilson* (Signature), their CEO (Title)

Print Owner's Name William Wilson

**ARC MANAGEMENT GROUP, LLC**

Agreed to by: *Bill Wilson* (Signature), their CEO (Title)

Print Owner's Name William Wilson

**ARC MANAGEMENT GROUP, LLC**

Agreed to by: *Bill Wilson* (Signature), their CEO (Title)

Print Owner's Name William Wilson

**ARC MANAGEMENT GROUP, LLC D/B/A PATIENT ACCOUNT SERVICES**

Agreed to by: *Bill Wilson* (Signature), their CEO (Title)

Print Owner's Name William Wilson

Buyer: LendSpark Corporation

Agreed to by: DocuSigned by: [signature] B346349C23B54AC... (Signature), its President (Title)

# Contract - ARC MANAGEMENT GROUP LLC - 03.08.2023

Final Audit Report 2023-03-09

| | |
|---|---|
| Created: | 2023-03-09 |
| By: | stips group (stips@libertasfunding.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAXJX2PLVYbQHV5wfjnOXk8tCMfFN61M4_ |

## "Contract - ARC MANAGEMENT GROUP LLC - 03.08.2023" History

Document created by stips group (stips@libertasfunding.com)
2023-03-09 - 2:03:46 PM GMT- IP address: 160.72.124.38

Document emailed to William Wilson (bwilson@arcmgmt.com) for signature
2023-03-09 - 2:13:00 PM GMT

Document emailed to twilson@arcmgmt.com for signature
2023-03-09 - 2:13:00 PM GMT

Email viewed by William Wilson (bwilson@arcmgmt.com)
2023-03-09 - 2:13:50 PM GMT- IP address: 73.184.134.228

Document e-signed by William Wilson (bwilson@arcmgmt.com)
Signature Date: 2023-03-09 - 2:15:32 PM GMT - Time Source: server- IP address: 73.184.134.228

Email viewed by twilson@arcmgmt.com
2023-03-09 - 2:26:59 PM GMT- IP address: 73.184.134.228

Signer twilson@arcmgmt.com entered name at signing as Thresa Wilson
2023-03-09 - 2:28:42 PM GMT- IP address: 73.184.134.228

Document e-signed by Thresa Wilson (twilson@arcmgmt.com)
Signature Date: 2023-03-09 - 2:28:44 PM GMT - Time Source: server- IP address: 73.184.134.228

Agreement completed.
2023-03-09 - 2:28:44 PM GMT

DocuSign

## Certificate Of Completion

Envelope Id: E01732D2AB5C4A63AF89DFD86C258070
Status: Completed
Subject: Complete with DocuSign: Contract - ARC MANAGEMENT GROUP LLC - 03.08.2023 - signed.pdf
Source Envelope:

| | | |
|---|---|---|
| Document Pages: 20 | Signatures: 3 | Envelope Originator: |
| Certificate Pages: 1 | Initials: 0 | Funding Department |
| AutoNav: Enabled | | 5857 Owens Ave, Suite 300 |
| EnvelopeId Stamping: Enabled | | Carlsbad, CA 92008 |
| Time Zone: (UTC-08:00) Pacific Time (US & Canada) | | funding@lendspark.com |
| | | IP Address: 23.243.139.86 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original<br>3/9/2023 8:34:58 AM | Holder: Funding Department<br>funding@lendspark.com | Location: DocuSign |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Salman Vakil<br>salman@lendspark.com<br>President<br>Security Level: Email, Account Authentication (None) | <br>Signature Adoption: Drawn on Device<br>Using IP Address: 104.28.130.46<br>Signed using mobile | Sent: 3/9/2023 8:37:19 AM<br>Resent: 3/9/2023 2:09:50 PM<br>Viewed: 3/9/2023 2:19:04 PM<br>Signed: 3/9/2023 2:19:22 PM |



**Electronic Record and Signature Disclosure:**
Not Offered via DocuSign

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 3/9/2023 8:37:19 AM |
| Certified Delivered | Security Checked | 3/9/2023 2:19:04 PM |
| Signing Complete | Security Checked | 3/9/2023 2:19:22 PM |
| Completed | Security Checked | 3/9/2023 2:19:22 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

**EXHIBIT "G" FOLLOWS**

EXHIBIT G



[redacted]

FILED & RECORDED
Wednesday, December 14, 2022 8:28:55 AM
File Number: 007-2022-072630
Janie J. Jones
Barrow County Clerk of Superior Court

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Name: Wolters Kluwer Lien Solutions Phone: 800-331-3282 Fax: 818-662-4141

B. E-MAIL CONTACT AT FILER (optional)
uccfilingreturn@wolterskluwer.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

Lien Solutions
P.O. Box 29071
Glendale, CA 91209-9071

90346083
GAGA

File with: Barrow, GA

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

1a. ORGANIZATION'S NAME: ARC MANAGEMENT GROUP, LLC

OR

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1825 Barrett Lakes Blvd. Suite #505 | Kennesaw | GA | 30144 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

2a. ORGANIZATION'S NAME: The J.D. Stuart Law Group, LLC

OR

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1825 Barrett Lakes Blvd. STE #505 | Kennesaw | GA | 30144 | USA |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

3a. ORGANIZATION'S NAME: C T CORPORATION SYSTEM, AS REPRESENTATIVE

OR

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 330 N Brand Blvd, Suite 700; Attn: SPRS | Glendale | CA | 91203 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
Assets and property of the Seller of Receivables, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, including, but not limited to, all inventory, chattel paper, accounts, equipment, receivables, fixtures, credit card receivables, documents, instruments, investment property, letter-of-credit rights and deposit accounts; whether any of the foregoing is owned now or hereafter acquired; All accessions, additions, replacements and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; and all products and proceeds relating to any of the foregoing.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☒ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA
90346083

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

Prepared by Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282



L

GSCCCA eFile1: EF_009263411_001619037_007 Received:Friday, February 17, 2023 4:55:47 PM Page 1 of 3

[redacted]

FILED & RECORDED
Monday, February 20, 2023 10:35:49 AM
File Number: 007-2023-007715
Janie J. Jones
Barrow County Clerk of Superior Court

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Name: Wolters Kluwer Lien Solutions Phone: 800-331-3282 Fax: 818-662-4141

B. E-MAIL CONTACT AT FILER (optional)
uccfilingreturn@wolterskluwer.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

Lien Solutions
P.O. Box 29071
Glendale, CA 91209-9071

91452510
GAGA

File with: Barrow, GA

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

1a. ORGANIZATION'S NAME: ARC MANAGEMENT GROUP, LLC

OR

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1825 Barrett Lakes Blvd. Suite #505 | Kennesaw | GA | 30144 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

2a. ORGANIZATION'S NAME: The J.D. Stuart Law Group, LLC

OR

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1825 Barrett Lakes Blvd. STE #505 | Kennesaw | GA | 30144 | USA |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

3a. ORGANIZATION'S NAME: C T CORPORATION SYSTEM, AS REPRESENTATIVE

OR

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 330 N Brand Blvd, Suite 700; Attn: SPRS | Glendale | CA | 91203 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
Assets and property of the Seller of Receivables, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, including, but not limited to, all inventory, chattel paper, accounts, equipment, receivables, fixtures, credit card receivables, documents, instruments, investment property, letter-of-credit rights and deposit accounts; whether any of the foregoing is owned now or hereafter acquired; All accessions, additions, replacements and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; and all products and proceeds relating to any of the foregoing.

5. Check only if applicable and check only one box. Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☒ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
91452510



Prepared by Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282

GSCCCA eFile1: EF_009311797_001625913_007 Received:Tuesday, February 28, 2023 7:04:20 PM Page 1 of 5

[redacted]

FILED & RECORDED
Wednesday, March 1, 2023 9:33:59 AM
File Number: 007-2023-009437
Janie J. Jones
Barrow County Clerk of Superior Court

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Name: Wolters Kluwer Lien Solutions Phone: 800-331-3282 Fax: 818-662-4141

B. E-MAIL CONTACT AT FILER (optional)
uccfilingreturn@wolterskluwer.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

Lien Solutions 91616381
P.O. Box 29071
Glendale, CA 91209-9071 GAGA

File with: Barrow, GA

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

1a. ORGANIZATION'S NAME
ARC MANAGEMENT GROUP, LLC

OR

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1825 Barrett Lakes Blvd., Suite 505 | KENNESAW | GA | 30144 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

2a. ORGANIZATION'S NAME
WILZARA PROPERTY MANAGEMENT GROUP LLC

OR

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 12655 OLD SURREY PL | ROSWELL | GA | 30075 | USA |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

3a. ORGANIZATION'S NAME
C T Corporation System, as representative

OR

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 330 N Brand Blvd, Suite 700; Attn: SPRS | Glendale | CA | 91203 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
Assets and property of the Seller of Receivables, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, including, but not limited to, all inventory, chattel paper, accounts, equipment, receivables, fixtures, credit card receivables, documents, instruments, investment property, letter-of-credit rights and deposit accounts; whether any of the foregoing is owned now or hereafter acquired; All accessions, additions, replacements and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; and all products and proceeds relating to any of the foregoing.

5. Check only if applicable and check only one box. Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☒ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA
91616381

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

Prepared by Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282

GSCCCA eFile1: EF_009492742_001652318_007 Received:Monday, April 3, 2023 6:50:36 PM Page 1 of 3

[redacted]

FILED & RECORDED
Wednesday, April 5, 2023 12:03:40 PM
File Number: 007-2023-016566
Janie J. Jones
Barrow County Clerk of Superior Court

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Name: Wolters Kluwer Lien Solutions Phone: 800-331-3282 Fax: 818-662-4141

B. E-MAIL CONTACT AT FILER (optional)
uccfilingreturn@wolterskluwer.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

Lien Solutions 92209267
P.O. Box 29071 GAGA
Glendale, CA 91209-9071

File with: Barrow, GA

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

1a. ORGANIZATION'S NAME: ARC MANAGEMENT GROUP, LLC

OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1825 Barrett Lakes Blvd., Suite 505 | KENNESAW | GA | 30144 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

2a. ORGANIZATION'S NAME: WILZARA PROPERTY MANAGEMENT GROUP LLC

OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 12655 OLD SURREY PL | ROSWELL | GA | 30075 | USA |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

3a. ORGANIZATION'S NAME: C T Corporation System, as representative

OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 330 N Brand Blvd, Suite 700; Attn: SPRS | Glendale | CA | 91203 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
All assets and property of the Seller, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, including, but not limited to, all inventory, chattel paper, accounts, equipment, receivables, fixtures, credit card receivables, documents, instruments, investment property, letter-of-credit rights and deposit accounts; whether any of the foregoing is owned now or hereafter acquired; All accessions, additions, replacements and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; and all products and proceeds relating to any of the foregoing.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box.
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box.
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable). ☐ Lessee/Lessor ☐ Consignee/Consignor ☒ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
92209267

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

Prepared by Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282

GSCCCA eFile1: EF_009540019_001659196_007 Received:Wednesday, April 12, 2023 7:26:34 PM Page 1 of 3

[redacted]

FILED & RECORDED
Thursday, April 13, 2023 10:16:35 AM
File Number: 007-2023-018209
Janie J. Jones
Barrow County Clerk of Superior Court

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Name: Wolters Kluwer Lien Solutions Phone: 800-331-3282 Fax: 818-662-4141

B. E-MAIL CONTACT AT FILER (optional)
uccfilingreturn@wolterskluwer.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

Lien Solutions 92374681
P.O. Box 29071
Glendale, CA 91209-9071 GAGA

File with: Barrow, GA

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

1a. ORGANIZATION'S NAME: ARC MANAGEMENT GROUP, LLC

OR

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX | | |
|---|---|---|---|---|---|
| | | | | | |
| **1c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** | |
| 1825 Barrett Lakes Blvd., Suite 505 | KENNESAW | GA | 30144 | USA | |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

2a. ORGANIZATION'S NAME: WILZARA PROPERTY MANAGEMENT GROUP LLC

OR

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX | |
|---|---|---|---|---|
| | | | | |
| **2c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| 12655 OLD SURREY PL | ROSWELL | GA | 30075 | USA |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

3a. ORGANIZATION'S NAME: C T Corporation System, as representative

OR

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX | |
|---|---|---|---|---|
| | | | | |
| **3c. MAILING ADDRESS** | **CITY** | **STATE** | **POSTAL CODE** | **COUNTRY** |
| 330 N Brand Blvd, Suite 700; Attn: SPRS | Glendale | CA | 91203 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
All assets and property of the Seller, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, including, but not limited to, all inventory, chattel paper, accounts, equipment, receivables, fixtures, credit card receivables, documents, instruments, investment property, letter-of-credit rights and deposit accounts; whether any of the foregoing is owned now or hereafter acquired; All accessions, additions, replacements and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; and all products and proceeds relating to any of the foregoing.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box.
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box.
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☒ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
92374681

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

Prepared by Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282

GSCCCA eFile1: EF_009683172_001682145_007 Received:Thursday, May 11, 2023 2:28:58 PM Page 1 of 3

[redacted]

FILED & RECORDED
Thursday, May 11, 2023 2:51:10 PM
File Number: 007-2023-024134
Janie J. Jones
Barrow County Clerk of Superior Court

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
Name: Wolters Kluwer Lien Solutions Phone: 800-331-3282 Fax: 818-662-4141

B. E-MAIL CONTACT AT FILER (optional)
uccfilingreturn@wolterskluwer.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

Lien Solutions
P.O. Box 29071
Glendale, CA 91209-9071

92901098
GAGA

File with: Barrow, GA

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

1a. ORGANIZATION'S NAME: ARC MANAGEMENT GROUP, LLC

OR

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1825 Barrett Lakes Blvd., Suite 505 | KENNESAW | GA | 30144 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

2a. ORGANIZATION'S NAME: WILZARA PROPERTY MANAGEMENT GROUP LLC

OR

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 12655 OLD SURREY PL | ROSWELL | GA | 30075 | USA |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

3a. ORGANIZATION'S NAME: C T Corporation System, as representative

OR

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 330 N Brand Blvd, Suite 700; Attn: SPRS | Glendale | CA | 91203 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
All assets and property of the Seller, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, including, but not limited to, all inventory, chattel paper, accounts, equipment, receivables, fixtures, credit card receivables, documents, instruments, investment property, letter-of-credit rights and deposit accounts; whether any of the foregoing is owned now or hereafter acquired; All accessions, additions, replacements and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; and all products and proceeds relating to any of the foregoing.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box.
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box.
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☒ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
92901098

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

Prepared by Lien Solutions, P.O. Box 29071, Glendale, CA 91209-9071 Tel (800) 331-3282

**EXHIBIT "H" FOLLOWS**

GSCCCA eFile1: EF_010154353_001757262_038 Received:Thursday, August 17, 2023 4:43:00 PM Page 1 of 1

[redacted]

FILED & RECORDED
Friday, August 18, 2023 8:40:15 AM
File Number: 038-2023-018323
Niki Sewell
Coweta County Clerk of Superior Court

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT SUBMITTER (optional)
CSC 1-800-858-5294

B. E-MAIL CONTACT AT SUBMITTER (optional)
SPRFiling@cscglobal.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

2628 98141
CSC
801 Adlai Stevenson Drive
Springfield, IL 62703
Filed In: Georgia
(Central Index - Coweta County)

SEE BELOW FOR SECURED PARTY CONTACT INFORMATION

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

1a. ORGANIZATION'S NAME: ARC MANAGEMENT GROUP OF GEORGIA, LLC

OR

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1825 BARRETT LAKES BLVD STE 505 | KENNESAW | GA | 30144 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

2a. ORGANIZATION'S NAME:

OR

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

3a. ORGANIZATION'S NAME: GREEN NOTE CAPITAL PARTNERS INC

OR

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1019 AVENUE P, SUITE 401 | BROOKLYN | NY | 11223 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

All personal property of every kind and nature, including, without limitation, all accounts, contract rights, rights to the payment of money, insurance claims and proceeds, chattel paper, electric chattel paper, documents, instruments, securities and other investment property, deposit accounts, supporting obligations of every nature, and general intangibles, including without limitation, customer lists, and all books and records related thereto, and all recorded data of any kind and any nature, regardless of the medium of recording; together with, to the extent not listed above as the original collateral, all substitutions and replacements for and products of any of the foregoing property, and together with proceeds of any and all of the foregoing property.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA: 2628 98141

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 07/01/23)



GN

GSCCCA eFile1: EF_010154269_001757236_038 Received:Thursday, August 17, 2023 4:42:55 PM Page 1 of 1

[redacted]

FILED & RECORDED
Friday, August 18, 2023 8:38:48 AM
File Number: 038-2023-018319
Niki Sewell
Coweta County Clerk of Superior Court

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT SUBMITTER (optional)
CSC 1-800-858-5294

B. E-MAIL CONTACT AT SUBMITTER (optional)
SPRFiling@cscglobal.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

2628 96412
CSC
801 Adlai Stevenson Drive
Springfield, IL 62703

Filed In: Georgia
(Central Index - Coweta County)

SEE BELOW FOR SECURED PARTY CONTACT INFORMATION

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

1a. ORGANIZATION'S NAME: ARC MANAGEMENT GROUP, LLC

OR

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1825 Barrett Lakes Boulevard | KENNESAW | GA | 30144 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

2a. ORGANIZATION'S NAME

OR

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

3a. ORGANIZATION'S NAME: GREEN NOTE CAPITAL PARTNERS INC

OR

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1019 AVENUE P, SUITE 401 | BROOKLYN | NY | 11223 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

All personal property of every kind and nature, including, without limitation, all accounts, contract rights, rights to the payment of money, insurance claims and proceeds, chattel paper, electric chattel paper, documents, instruments, securities and other investment property, deposit accounts, supporting obligations of every nature, and general intangibles, including without limitation, customer lists, and all books and records related thereto, and all recorded data of any kind and any nature, regardless of the medium of recording; together with, to the extent not listed above as the original collateral, all substitutions and replacements for and products of any of the foregoing property, and together with proceeds of any and all of the foregoing property.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA: 2628 96412

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 07/01/23)



GN

**EXHIBIT "I" FOLLOWS**

GSCCCA eFile1: EF_010005444_001732053_038 Received:Wednesday, July 19, 2023 10:13:23 AM Page 1 of 4

[redacted]

FILED & RECORDED
Wednesday, July 19, 2023 10:51:13 AM
File Number: 038-2023-015932
Niki Sewell
Coweta County Clerk of Superior Court

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT SUBMITTER (optional)
CSC 1-800-858-5294

B. E-MAIL CONTACT AT SUBMITTER (optional)
SPRFiling@cscglobal.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

2606 72768
CSC
801 Adlai Stevenson Drive
Springfield, IL 62703

Filed In: Georgia (Central Index - Coweta County)

SEE BELOW FOR SECURED PARTY CONTACT INFORMATION

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

1a. ORGANIZATION'S NAME: ARC Management Group LLC

OR

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1825 Barrett Lakes Boulevard Suite 505 | Kennesaw | GA | 30144 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

2a. ORGANIZATION'S NAME: ABI HOLDING, LLC

OR

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1825 Barrett Lakes Blvd, Suite 505 | Kennesaw | GA | 30144 | USA |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

3a. ORGANIZATION'S NAME: TBF

OR

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 460 Faraday ave | Jackson | NJ | 08527 | USA |

4. COLLATERAL: This financing statement covers the following collateral:

All assets of the Debtor now owned or hereafter acquired and wherever located, including, but not limited to, any and all equipment, fixtures, inventory, accounts, credit card receivables, chattel paper, documents, instruments, investment property, general intangibles, letter-of-credit rights and deposit accounts, together with all products and proceeds thereof. "

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box: ☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box: ☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
2606 72768

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 07/01/23)



TBF

**EXHIBIT "J" FOLLOWS**

ARC MANAGEMENT GROUP, LLC - UCC FILINGS BY CREDITOR

| CREDITOR NAME | DATE/TIME FILED | UCC NUMBER |
|---|---|---|
| **FLOCK FINANCIAL LLC** | 7/17/23 10:42:08 AM | 038-2023-015660 |
| | 7/17/23 10:55:03 AM | 038-2023-015670 |
| | 7/17/23.10:56:15 AM | 038-2023-015673 |
| | 7/25/2023 11:08:00 AM | 033-2023-002648 |
| | 7/25/23 11:08:00 AM | 033-2023-002649 |
| | 7/25/23 11:08:00 AM | 033-2023-002651 |
| | 7/25/23 11:08:00 AM | 033-2023-002652 |
| | 7/25/23 11:08:00 AM | 033-2023-002653 |
| | 7/25/23 11:08:00 AM | 033-2023-002654 |
| | 9/1/2023 9:53:15 AM | 033-2023-003096 |
| | | |
| **GREEN NOTE CAPITAL** | 8/18/23 8:38:48 AM | 038-2023-018319 |
| | 8/18/23 8:40:15 AM | 038-2023-018323 |
| | | |
| **LIBERTAS FUNDING** | 12/14/22 8:28:55 AM | 007-2022-072630 |
| | 2/20/23 10:35:49 AM | 007-2023-007715 |
| | 3/1/23 9:33:59 AM | 007-2023-009437 |
| | 4/5/23 12:03:40 PM | 007-2023-016566 |
| | 4/13/23 10:16:35 AM | 007-2023-018209 |
| | 5/11/23 2:51:10 PM | 007-2023-024134 |
| | | |
| | | |
| **SAMSON MCA** | 12/5/22 2:04:00 PM | 007-2022-070860 |
| | | |
| **TRUE BUSINESS FUNDING** | 7/19/23 10:51:00 AM | 038-2023-015932 |
| | | |
| **WEBBANK** | 8/8/22 12:04:52 PM | 007-2022-047686 |
| | 12/14/22 8:47:02 AM | 007-2022-072654 |

| CREDITOR NAME | DATE/TIME FILED | UCC NUMBER |
|---|---|---|
| | 2/13/23 11:18:08 AM | 007-2023-006398 |
| | | |
| CHEETAH CAPITAL | NO UCC LOCATED | |
| KYF | NO UCC LOCATED | |
| FUNDING CLUB | NO UCC LOCATED | |